UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

KATHERINE WANDEL, Individually and on
Behalf of All Others Similarly Situated,

                    Plaintiff,

      vs.

JING GAO, DEREK BOYANG SHEN, YAN
CUI, WENBIAO LI, ERHAI LIU, XIAN CHEN,
WILLIAM WANG, GANG JI, EDWIN FUNG,
JIANPING YE, JASON ZHENG ZHANG,
CITIGROUP GLOBAL MARKETS INC.,
CREDIT SUISSE SECURITIES (USA) LLC, J.P.
MORGAN SECURITIES LLC, TIGER
BROKERS (NZ) LIMITED, US TIGER
SECURITIES, INC., COGENCY GLOBAL INC.,
RICHARD ARTHUR and PHOENIX TREE
HOLDINGS LIMITED,

                    Defendants.

———————————————————————— x

: Civil Action No. 1:20-cv-03259-PAC
:
:
:
:
: CLASS ACTION
:
:
: AMENDED CLASS ACTION
: COMPLAINT FOR VIOLATIONS
: OF THE SECURITIES ACT OF 1933
:
:
:
:
:
:
:
:
:
:
:
: JURY TRIAL DEMANDED

I.      NATURE OF THE ACTION ................................................................................1

II.     JURISDICTION AND VENUE .........................................................................4

III.    PARTIES ............................................................................................................5

IV.     SUBSTANTIVE ALLEGATIONS ...................................................................11

        A.      Background of the Company's Business ................................................11

                1.      The Company's Product Offerings ............................................12

                2.      The Company's Financial Condition and Sources of Funding .................14

                3.      The Company's Information Technology and Capabilities ......................15

                4.      The Company's Market and Growth Opportunities .................................17

        B.      The Company's IPO ...............................................................................18

        C.      The Emergence of the Coronavirus and Its Proliferation in China Before
                the Effective Date of the Offering Materials and Completion of the IPO ............21

        D.      The Company's Post-IPO Disclosure of the Coronavirus and Its Impact on
                the Company's Operations, Business, and Financial Results, As Well As
                the Emergence of Renter And Landlord Complaints .............................................30

                1.      The 2019 Fourth Quarter and Year-End Financial Results, Issued
                        March 25, 2020 ...........................................................................30

                2.      The 2019 Form 20-F, Filed April 29, 2020 ...............................32

                3.      The 2020 First Quarter Financial Results, Issued June 10, 2020 ..............37

                4.      The Emergence of Renter and Landlord Complaints ................................38

                5.      The Substantial Decline in the Trading Price of the ADS ........................41

        E.      The Offering Materials' Actionable Omissions and Misrepresentations of
                Material Fact ...........................................................................................42

                1.      The Onset of the Coronavirus and Its Implications for Phoenix ..............42

                2.      The Steps Phoenix Might Take to Mitigate the Adverse Impact of
                        the Coronavirus ...........................................................................45

                3.      The Existence and Nature of Tenant Complaints Before the IPO ............47

                4.      The Manner in Which Phoenix Changed Its Sales and Marketing
                        Practices Before the IPO ...........................................................48

5.      The Degree to Which Phoenix's Business Had Already Softened by the Time of the IPO ...............................................................49

6.      Trends, Uncertainties, and Risks Threatened to Materially Affect Phoenix's Business and Render Historical Financial Results Not Indicative of Future Results .......................................................50

F.      Rules and Regulations Governing Preparation of the Offering Materials Imposed a Duty to Update Before the January 22, 2020 Close of the IPO ..........55

V.      CLASS ACTION ALLEGATIONS .......................................................................57

VI.     CLAIMS ...............................................................................................................58

A.      FIRST COUNT: For Violations of Section 11 of the 1933 Act (Against All Defendants) .........................................................................................58

B.      SECOND COUNT: For Violation of Section 12(a)(2) of the 1933 Act (Against All Defendants) ........................................................................59

C.      THIRD COUNT: For Violation of Section 15 of the 1933 Act (Against Phoenix, Cogency Global, the Individual Defendants, and Tiger Brokers) ..........61

VII.    PRAYER FOR RELIEF .......................................................................................63

VIII.   JURY TRIAL DEMAND .....................................................................................63

Court-appointed Lead Plaintiff Gerald L. Kirkpatrick and named plaintiff Katherine Wandel ("Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to their own acts and upon information and belief as to all other matters based on the investigation by their counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of Phoenix Tree Holdings Limited ("Phoenix" or "Company"), press releases, analyst and media reports, and other public reports and information about the Company.  Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein, which will be developed after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a securities class action on behalf of all purchasers of American Depositary Shares ("ADS") of Phoenix pursuant and/or traceable to prospectuses and registration statements, as amended (together, "Offering Materials"), issued in connection with the Company's January 22, 2020 initial public offering ("IPO"), seeking to pursue remedies under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("1933 Act") against Phoenix, certain of its officers and directors ("Individual Defendants"), the IPO underwriters ("Underwriter Defendants"), and others (detailed below, but referred to collectively with the other defendants as "Defendants").

2.    Phoenix is a Cayman Islands holding company that leases and manages apartments in China, which it rents to tenants under the Danke Apartment and Dream Apartment brands.  This case seeks to hold Defendants accountable in strict liability and negligence for preparing the defective Offering Materials in connection with the IPO.  As detailed herein, the Offering Materials omitted or otherwise misrepresented the nature and level of renter complaints the Company had received before and as of the IPO, downward trending occupancy rates and softening demand in China's residential rental market, and the Company's exposure to significant adverse developments resulting from the onset of the coronavirus in China – particularly in Wuhan – at the time of the IPO.

3.      At the time of the IPO, Phoenix generated revenue primarily from rents and service fees.  As of September 30, 2019, it operated in 13 cities in China, including Wuhan, where a portion of its 5,000-plus employees worked.  Operations were funded by upfront payments from financial institutions in connection with rent financing and advances from residents.  Unbeknownst to ADS purchasers, however, Phoenix was uniquely exposed to fallout from the onset of the coronavirus and the worsening pandemic, especially in Wuhan.  In fact, by the time of the IPO, Phoenix's occupancy rates had already substantially declined, which rendered Phoenix especially vulnerable to softening demand in China and, ultimately, the economic impact of the coronavirus.  Phoenix also faced an onslaught of serious complaints from renters as of the IPO, both due to the coronavirus and even before its onset, which implicated the Company's reputation and threatened to – and ultimately did – adversely affect its business.

4.      The Offering Materials did not disclose the full extent to which Phoenix's business had weakened by the time of the IPO, selectively disclosing information on some financial metrics for the nearly-complete 2019 fourth quarter but not others.  Nor did the Offering Materials disclose that the Company's operations were already under siege by mid-January 2020 by the coronavirus, which had originated in Wuhan and was rapidly spreading to other regions in China.  It was thus reasonably foreseeable to Defendants even before the IPO that Phoenix would have to take drastic measures to mitigate the loss in business resulting from the highly infectious coronavirus.

5.      On January 16, 2020, the SEC declared the Offering Materials effective.  On January 22, 2020, the date on which the IPO closed, news emerged that the Chinese government would place Wuhan on lockdown, prohibiting travel to and from the region and restricting travel for Wuhan's 11 million residents; China's government imposed the lockdown the next day.  After the IPO, reports emerged that Phoenix was experiencing severe, ongoing problems due to the coronavirus, which was causing financial and other harm to residents, landlords, and the Company itself.

6.      On March 25, 2020, when Phoenix announced its unaudited financial results for the fourth quarter and fiscal year ended December 31, 2019, it told investors it expected the coronavirus to adversely affect its financial results for the nearly completed first quarter of 2020.  Uncertainties associated with the coronavirus were so pervasive, in fact, that the Company could not reasonably estimate the financial impact it would have on the business.  Information regarding ongoing renter complaints also reached the market after the IPO, adversely affecting the Company, as did the fact that Phoenix's inventory of pre-opened apartments had decreased during the 2019 fourth quarter and that Phoenix had returned a substantial amount of upfront payments – used to finance operations – as a result of early lease terminations.  When Phoenix reported its 2020 first quarter financial results on June 11, 2020, it disclosed that certain operating expenses had ballooned, in part, due to losses from the early termination of rental agreements with property owners "primarily due to the adverse impact of the COVID-19 pandemic . . . ."

7.      As a result of conduct Phoenix engaged in before the IPO and actions it took to shore up its business after the IPO, regulatory authorities in China are investigating the Company and have placed one of its primary operational entities on the "social credit" blacklist, which severely restricts operations and spending.  Additionally, reliable accounts reveal that Phoenix is teetering on the brink of bankruptcy as a result of its massive continued losses, confirming that the Company's previously undisclosed business practices and plans to ameliorate the impacts of the coronavirus outbreak have decimated its operations.

8.      Accordingly, the Offering Materials omitted and misrepresented material information, which misled Plaintiffs and other members of the proposed Class (defined below) about the status of the Company's operations, its future prospects, and the risks associated with purchasing the ADS.  The Offering Materials were thus materially misleading as of the effective date, January 16, 2020.  Additionally, Defendants had an obligation to update the Offering Materials before the close of the

- 3 -

IPO on January 22, 2020, given the materiality of information that had emerged before then, but after the effective date – non-disclosure of which rendered the Offering Materials misleading.  As a result, Plaintiffs and other Class members bought ADS without knowledge of material facts about the Company and were damaged thereby.  This action seeks to recover damages for these purchasers.

## II.    JURISDICTION AND VENUE

9.    The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the 1933 Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].

10.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the 1933 Act [15 U.S.C. §77v] and 28 U.S.C. §1331.

11.    Venue is proper in this District pursuant to Section 22 of the 1933 Act and 28 U.S.C. §1391(b) and (c).  Among other things:

a.    Defendants conducted the IPO in this District, drafted the Offering Materials in part in this District, disseminated the misleading statements at issue in this District, and solicited ADS purchasers here.  The Company, presumably at the direction or with the consent of its directors, also engaged the services of U.S.-based professionals for the IPO.  These professionals included the law firm of Simpson Thacher & Bartlett LLP ("Simpson"), which advised the Company on matters involving the U.S. federal securities laws and New York law.

b.    The Underwriter Defendants have substantial operations and/or conduct substantial business in this District (directly or via agents), and defendants Citigroup Global Markets Inc. ("Citigroup"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), J.P. Morgan Securities LLC ("J.P. Morgan"), and US Tiger Securities, Inc. ("Tiger Securities") are headquartered in this District and represented Phoenix and all or some of the other Defendants in carrying out the IPO in this District.  Some or all of the Underwriter Defendants engaged the law firm of Latham & Watkins

LLP ("Latham"), which advised them on matters involving the U.S. federal securities laws and New York law.

       c.     The Underwriter Defendants delivered ADS against payment in this District; the corporate trust office of the depositary – Citibank, N.A., 388 Greenwich Street, New York, New York 10013 – at which the ADS were to be, and are, administered, is located in this District; and the ADS publicly trade on the New York Stock Exchange ("NYSE"), located in this District.

       d.     In addition, pursuant to the IPO underwriting agreement, Phoenix "legally, validly, effectively and irrevocably submitted, to the personal jurisdiction of each United States federal court and New York state court located in the Borough of Manhattan, in The City of New York, New York, U.S.A. . . . [and] validly and irrevocably waived any objection to the laying of venue of any suit, action or proceeding brought in any such court . . . ."

     12.     Accordingly, the situs of this action lies within this District, Defendants' tortious acts occurred in this District and caused injury to purchasers of ADS deposited in this District, and each of Defendants and Class members would foreseeably expect any case or controversy stemming from the IPO to be adjudicated in this District.

## III.    PARTIES

     13.     As set forth in his Certification, Lead Plaintiff Gerald L. Kirkpatrick purchased ADS on January 17, 2020 pursuant and/or traceable to the Offering Materials and has been damaged thereby. *See* ECF No. 21-2. Additionally, as set forth in her Certification, named plaintiff Katherine Wandel purchased ADS on January 17, 2020 at the IPO price of $13.50 per share pursuant and/or traceable to the Offering Materials, and has been damaged thereby. *See* ECF No. 1 at 19-20.

     14.     Defendant Phoenix is a Cayman Islands company that leases and operates properties in China and rents apartments to individuals and corporations, primarily for co-living arrangements in which the tenants, who may not have previously known each other, live together. It conducted the

IPO in New York and its ADS trade on the NYSE under the ticker symbol "DNK." Each ADS represents ten Class A ordinary shares of Phoenix. The Company's Class B ordinary shares, which were issued in connection with the IPO to defendant Jing Gao ("Gao"), carry 20 votes per share, as compared to one vote for each Class A ordinary share.

15.    Defendant Gao, Phoenix's co-founder, was its Chief Executive Officer ("CEO") and a member of its Board of Directors ("Board") as of the IPO. He signed the Offering Materials for the IPO. As of the IPO, Gao held a 57% equity interest in Zi Wutong (Beijing) Asset Management Co., Ltd. ("Zi Wutong"), a limited liability company organized under Chinese law through which the Company initially conducted operations; Zi Wutong is now under the Phoenix umbrella of operating entities. On June 18, 2020, Phoenix issued a press release announcing that the Board had appointed defendant Yan Cui ("Cui") as interim CEO and assigned all of Gao's responsibilities to Cui. According to the press release, this change was necessary because "Gao is currently involved in an investigation by local government authorities into certain matters relating to his business venture prior to the founding of [Phoenix], and thus is not able to attend to the Company's business or perform any of his directorial and managerial roles at the Company." That investigation appears to be ongoing.

16.    Defendant Derek Boyang Shen ("Shen") was Phoenix's Chairman of the Board as of the IPO. He signed the Offering Materials for the IPO. Shen was an angel investor in the Company and had significant influence and control over its operations, as media reports confirmed before and after the IPO.

17.    Defendant Cui, Phoenix's co-founder, was its President and a member of its Board as of the IPO. He signed the Offering Materials for the IPO and, as of the IPO, held a 43% equity interest in Zi Wutong. He assumed the additional role of interim CEO in June 2020 when news emerged that local governmental authorities in China were investigating Gao.

18.     Defendant Wenbiao Li ("Li") was a member of the Board as of the IPO.  He signed the Offering Materials for the IPO.  Li served as a director of BEST Inc. ("BEST"), a company listed on the NYSE that is based in Hangzhou.  In its April 17, 2020 Form 20-F for the fiscal year ended December 31, 2019, BEST acknowledged that the coronavirus outbreak "started in late 2019" and confirmed that "[b]eginning in January 2020, the . . . outbreak has negatively impacted the Group's operations in China and resulted in lower productivity from late January to early March due to travel restrictions and quarantines."

19.     Defendant Erhai Liu ("Liu") was a member of the Board as of the IPO.  He signed the Offering Materials for the IPO.  On May 7, 2020, Liu resigned from the Board and was replaced by Lillian Jing Liu, Phoenix's Chief People Officer since 2019.

20.     Defendant Xian Chen was a member of the Board who signed the Offering Materials.  He was a partner and the chief investment officer of CMC Capital Group, a private equity firm with offices in Beijing, Shanghai, and Hong Kong that focuses on the media, technology, and consumer sectors in Asia.

21.     Defendant William Wang ("Wang") was a member of the Board who signed the Offering Materials.  He is a founding partner of Primavera Capital Group, which has offices located in Beijing and Hong Kong and which invested in Phoenix and invests in other companies.  As the Offering Materials indicate, Wang served as a director of Yum China Holdings, Inc. ("Yum China"), a company listed on the NYSE that is based in Beijing.  Yum China is the largest master franchisee of Yum! Brands, Inc. ("Yum! Brands"), which itself is listed on the NYSE.  Both of these entities acknowledged that the coronavirus was adversely affecting their business beginning in early 2020.

           a.      For example, in a February 5, 2020 press release announcing financial results for the fourth quarter and fiscal year ended December 31, 2019, Yum China reported that "[s]ince the start of the year [*i.e.*, 2020], the novel coronavirus outbreak in China has significantly impacted

[its] operations" and "is likely to have a materially adverse impact on [its] operating and financial results for the first quarter of 2020 and full year 2020."

        b.     Likewise, in its Annual Report on Form 10-K for the period ended December 31, 2019, filed with the SEC on February 20, 2020, Yum! Brands reported that "[i]n late 2019, a novel strain of coronavirus was first detected in Wuhan, China," and explained that the virus began having a significant impact on Yum China – and, by extension, its own business – in early 2020:

Impact of Coronavirus Outbreak

Since the beginning of 2020, the novel coronavirus outbreak in mainland China has significantly impacted the operations of our largest master franchisee, Yum China, who pays us a continuing fee of 3% on system sales of our Concepts in mainland China. These continuing fees represented approximately 20% of the KFC Division and 16% of the PH Division operating profits in the year ended December 31, 2019. Through the date of the filing of this Form 10-K, Yum China has experienced widespread store closures and significant sales declines as a result of the coronavirus. Additionally, other nearby franchisees, such as those in Hong Kong and Taiwan, have experienced significant sales declines as well. While our Concepts outside of China have not experienced the same levels of same-store sales declines or store closures to date that Yum China has experienced, there can be no assurance that the impacts of the coronavirus will not have a material, adverse impact on our and our franchisees' results on a more widespread basis. The coronavirus situation is ongoing and its dynamic nature makes it difficult to forecast any impacts on the Company's 2020 results with any certainty. However, as of the date of this filing we expect our results for the quarter ending March 31, 2020 to be significantly impacted with potential continuing, adverse impacts beyond March 31, 2020.

        22.     Defendant Gang Ji ("Ji") was a member of the Board as of the IPO who signed the Offering Materials for the IPO.  According to a June 16, 2020 press release – issued only two days before the Company announced Gao's investigation and resignation, and attached to a June 18, 2020 Form 6-K – Ji resigned from the Board as of June 14, 2020 purportedly "due to personal reasons."

        23.     Defendant Edwin Fung ("Fung") was a member of the Board as of the IPO.  The Offering Materials indicate that he accepted appointment as a director effective upon the SEC's declaration of effectiveness of the Offering Materials.  As the Offering Materials indicate, Fung was also a director of Beijing Vantone Real Estate Co., Ltd., which is a real estate investment firm with

properties in Beijing and elsewhere.  He also served as a director of Wanda Sports Group Company Limited ("Wanda Sports"), a company listed on the NASDAQ that is based in Beijing.  In its March 6, 2020 Form 6-K, Wanda Sports confirmed that the coronavirus "was first identified in December 2019 in Wuhan, China, and has since spread globally."

24.     Defendant Jianping Ye was a member of the Board as of the IPO.  The Offering Materials indicate that he accepted appointment as a director effective upon the SEC's declaration of effectiveness of the Offering Materials.

25.     Defendant Jason Zheng Zhang was Phoenix's Chief Financial Officer as of, and after, the IPO.  He signed the Offering Materials for the IPO.  On June 16, 2020, he joined the Board.

26.     Defendant Cogency Global Inc. ("Cogency Global") is based in New York and was Phoenix's Authorized U.S. Representative for the IPO.  Defendant Richard Arthur ("Arthur"), Assistant Secretary of Cogency Global, signed the Offering Materials as an employee of Cogency Global.  Cogency Global is liable for the securities law violations by defendant Arthur in its capacity as his employer, based on principles of agency and *respondeat superior*, and also as a control person under the 1933 Act.

27.     The individual defendants identified above are referred to herein as the "Individual Defendants."  As directors, executive officers, controlling shareholders and/or representatives and agents of the Company, the Individual Defendants participated in the solicitation and sale of ADS to investors in the IPO for their own benefit and the benefit of Phoenix.  Additionally, certain of these individuals traveled to New York to ring the opening bell at the NYSE when Phoenix went public. On January 17, 2020, a group of executives and associates appeared at the NYSE in Manhattan to celebrate the public listing of Phoenix's ADS, which confirms that they knew of and complied with any travel restrictions implemented to mitigate the spread of the coronavirus before the close of the IPO and possibly even the effective date of the Offering Materials.  The NYSE itself tweeted video

of the Phoenix team, including defendant Gao (and possibly defendant Shen and other Individual

Defendants), that was physically present in New York for this occasion.

28.     The Underwriter Defendants are Citigroup, Credit Suisse, J.P. Morgan, Tiger Brokers

(NZ) Limited ("Tiger Brokers") and Tiger Securities.  They underwrote the IPO, solicited purchasers

of the ADS, and/or sold the ADS, in exchange for which they received millions of dollars in fees and

commissions.  As shown below in a chart from the Final Prospectus on Form 424B4, dated January

17, 2020 ("Final Prospectus"), which is incorporated and forms part of the Offering Materials, the

Underwriter Defendants received and offered the following number of ADS for sale:

| Name | Number of ADSs |
|---|---|
| Citigroup Global Markets Inc. | 2,880,000 |
| Credit Suisse Securities (USA) LLC | 2,880,000 |
| J.P. Morgan Securities LLC | 2,880,000 |
| Tiger Brokers (NZ) Limited | 960,000 |
| **Total:** | **9,600,000** |

29.     Additionally, the following chart from the Final Prospectus sets forth underwriting

discounts and commissions and the proceeds before expenses to Phoenix and selling stockholders:

| | Per ADS | Total No Exercise | Total Full Exercise |
|---|---|---|---|
| Public offering price | $ 13.500 | $ 129,600,000 | $ 149,040,000 |
| Underwriting discounts and commissions to be paid by us: | $ 0.945 | $ 9,072,000 | $ 10,432,800 |
| Proceeds, before expenses, to us | $ 12.555 | $ 120,528,000 | $ 138,607,200 |

30.     The Underwriter Defendants also received an option, exercisable within 30 days of

the date of the Final Prospectus, to purchase on a pro rata basis up to 1,440,000 additional ADS at

the IPO price, less underwriting discounts and commissions.  As disclosed in the Final Prospectus,

the Underwriter Defendants partially exercised this option, purchasing for sale an additional 304,933

ADS.

31.     In connection with the IPO, the Underwriter Defendants participated in drafting and

disseminating the Offering Materials, soliciting investors for the IPO, and marketing and pricing the

IPO.  The Underwriter Defendants are liable for the defective Offering Materials, and their failure to

conduct adequate due diligence in connection with the IPO and preparing the Offering Materials was a substantial factor leading to the harm complained of herein.

## IV.     SUBSTANTIVE ALLEGATIONS[1]

### A.     Background of the Company's Business

32.     Headquartered in Beijing, the Company began operating in January 2015 through Zi Wutong.  In June 2015, Phoenix was established and incorporated in the Cayman Islands and, through a series of transactions and a reorganization, became a holding company for the Company's operations and related entities, including Zi Wutong.  As of December 31, 2019, Phoenix had 40 subsidiaries and two variable interest entities by which it conducted its operations.  Most of the Company's subsidiaries appeared to manage rental apartment units in different locations in China, such as Aishangzu (Shanghai) Property Management Co., Ltd., using the convention for naming China companies (where the name in parenthesis is the registered location and the description denotes the conduct in which the company engages).

33.     At the time of the IPO, Phoenix was one of the largest co-living platforms in China. Co-living platforms lease apartments from landlords on a longer-term basis (sometimes for several years), improve or renovate the apartments to increase their attractiveness to renters, and then rent individual rooms of the apartments to occupants who may or may not be related to each other.  In this way, a single apartment is treated as a collective of individual rental units, each of which may command different rent and is occupied by a different resident.  To a resident, the co-living platform effectively replaces the landlord (who continues to own the property), by managing the apartments, handling rental paperwork, collecting rent, and addressing any complaints.

---

[1]     Unless noted, all quotes are from the Offering Materials when declared effective, on January 16, 2020.

34.     Through its subsidiaries and related entities, Phoenix offers rental apartment units under two brands: "Danke Apartment," the primary focus of the business since its inception in 2015, which provides co-living arrangements for individual renters; and "Dream Apartment," introduced "in November 2018 to target the large but underserved blue-collar apartment segment" by providing housing for corporate employees.  Nevertheless, given that Phoenix closely identifies with (and is closely identified with) the Danke Apartment brand, it is commonly known as "Danke" ("eggshell," in Chinese) and the ticker symbol of its ADS is "DNK," which is shorthand for Danke.

### 1.     The Company's Product Offerings

35.     Under the Danke Apartment brand, Phoenix "lease[s] apartments from individual property owners on a long-term basis, design[s], renovate[s] and furnish[es] such apartments in a standardized and stylish manner, and rent[s] them out to individual residents, either as private rooms within an apartment or an entire apartment."  The Company leases these apartments from the owners typically for four to six years, finances renovations itself, and rents the apartment units to residents under one-year leases.

36.     Residents occupy each room of an apartment (which Phoenix calls "private rooms") but share common areas such as the living room (when not converted into a private room), kitchen, and bathroom.  As the Offering Materials indicate, "[p]rivate rooms constitute a substantial majority of [the Company's] apartment units."  "As of September 30, 2019, [the Company had] established operations in 13 cities in China, including Beijing, Shenzhen, Shanghai, Hangzhou, Tianjin, Wuhan, Nanjing, Guangzhou, Chengdu, Suzhou, Wuxi, Xi'an and Chongqing," and operated a total of 406,746 apartment units – a number that had increased to 438,309 by December 31, 2019.

37.     The following chart from the Offering Materials depicts the Company's growth in locations and apartment units from inception until September 30, 2019, shortly before the IPO:



(1)    Increase over the three years and nine months from December 31, 2015 to September 30, 2019.

(2)    CAGR over the three years from December 31, 2015 to December 31, 2018.

38.    Under the Dream Apartment brand, Phoenix "lease[s] entire buildings or floors in a building, transform[s] them into dormitory-style apartments, and rent[s] them to corporate clients for employee accommodation."  Because this rental offering caters to corporate employees living in a communal setting, the Company generally furnishes each room with multiple beds to accommodate multiple residents at a time.  "[Its] corporate clients range from local business owners, such as restaurants and body shops, to large corporations and organizations, such as hotel chains, hospitals and delivery companies."

39.    This product offering focuses on "blue-collar workers who have been chronically underserved in expensive cities such as Beijing and Shanghai."  "As of September 30, 2019, [Phoenix] operated six Dream Apartment facilities in Beijing with a total of 7,302 beds and [the Company] had four additional facilities in Beijing and Shanghai that were still under renovation with total planned capacity of 3,808 beds."  By December 31, 2019, the Company operated nine Dream Apartment facilities in Beijing with a total of 8,558 beds and had four additional facilities in Beijing, Shanghai and Shenzhen that were still under renovation with total planned capacity of 3,752 beds.

- 13 -

### 2.   The Company's Financial Condition and Sources of Funding

40.   Phoenix primarily generates revenues from rents and service fees. When a unit is rented, the Company begins collecting rent and service fees. The Company "refer[s] to the amount of time required to recover the initial capital investment for the apartment units sourced in a given period as [the] payback period." It calculates the payback period by dividing the average cost for renovation and furnishing a unit by the average rental spread. "From the first quarter of 2017 to the third quarter of 2019, the payback period for the apartment units sourced in each quarter typically ranged between 12 to 20 months."

41.   According to the Offering Materials, Phoenix's "revenues increased by 307.3% from RMB656.8 million in 2017 to RMB2,675.0 million (US$374.3 million) in 2018, and by 198.8% from RMB1,673.0 million in the nine months ended September 30, 2018 to RMB4,999.7 million (US$699.5 million) in the nine months ended September 30, 2019." The Offering Materials tied this increase in revenue "primarily" to "an increase in opened apartment units through organic growth, which contributed to 176.0% of the revenue growth during the period," stating that "the remaining 22.8% . . . of growth in [the] revenues in the nine months ended September 30, 2019 was due to an increase in opened apartment units through acquisition of Aishangzu in March 2019."

42.   In turn, the Offering Materials indicated that as of September 30 and November 30, 2019, the number of "opened apartment units" – those ready-to-move in or rented – was 391,911 and 432,690, respectively, as compared to 341,213 as of June 30, 2019 and 270,337 as of March 31, 2019. The Offering Materials also disclosed that as of September 30, 2019, Phoenix had 14,835 pre-opening apartment units – a substantial increase from 5,160 units as of June 30, 2019.

43.   Likewise, the Offering Materials stated that Phoenix's occupancy rate – "the number of rented-out apartment units as a percentage of the number of opened apartment units" – was strong as of September 30, 2019, at 86.9%. Although the Offering Materials indicated that the occupancy

rate was 77.9% as of November 30, 2019, they attributed the reduction since September 30, 2019 "primarily" to "seasonality and the fact that [Phoenix] adjusted [its] sales and marketing strategies in the fourth quarter of 2019 . . . ."

44.     Because Phoenix does not own any of the apartments it rents to customers and makes substantial improvements and other renovations to the rental units, the Company requires significant funding to finance its operations.  As of the IPO, "significant sources of [its] capital include[d] upfront payment from financial institutions in connection with rent financing and advance[s] from [its] residents."  As the Offering Materials further indicate, "[a]s of December 31, 2017, 2018 and September 30, 2019, [Phoenix] had upfront payment[s] from financial institutions of RMB937.6 million, RMB2,127.0 million (US$297.6 million) and RMB3,105.7 million (US$434.5 million), respectively, and advance from [its] residents of RMB105.7 million, RMB279.5 million (US$39.1 million) and RMB794.3 million (US$111.1 million), respectively."

### 3.     The Company's Information Technology and Capabilities

45.     In the Offering Materials, the Company extolled the virtues of its "big data platform," which purportedly "serves as the foundation of [its] technology system" and "continuously processes and structurizes a massive amount of data to support, train and improve Danke Brain" – the "artificial intelligence decision engine" behind many of the Company's rental decisions – "through proprietary deep learning algorithms."  According to the Offering Materials, Danke Brain provides distinct advantages over competitors in the residential rental industry because it: (i) "instantaneously takes hundreds of parameters into account and makes tens of thousands of decisions each day effortlessly"; (ii) "avoids human errors and is less prone to bias"; (iii) "applies what it learned in existing cities and neighborhoods to new cities and neighborhoods"; (iv) "adapts as a city evolves"; and (v) "improves from each transaction and each interaction through deep learning[.]"

46.     Underscoring Phoenix's active and immense monitoring and information-gathering capabilities and activities, the Offering Materials represented that the Company "possess[es] a vast amount of internally-generated data from [its] day-to-day operations, as well as additional rental market-related data and demographic data from public and third-party sources."  Moreover, the Company's information technology infrastructure purportedly "digitizes each step in [its] business operation, enables [its] employees to implement decisions made by Danke Brain and connects all of [its] employees, property owners, residents and third-party service providers," and "provides feedback from [its] daily operations . . . ."

47.     Additionally, with its Digital City System, the Company actively monitors cities and neighborhoods for expansion planning, using real-time, location-based data to drive decisions.  The Company also uses this system to power business-development decisions, such as identifying new rental apartment units and negotiating leases.  For example, the system "monitors on a real-time basis [the Company's] business performance and the competitive landscape in each neighborhood, so that [the] local team can adjust strategies," and "enables local managers to monitor how [the Company] perform[s] in each neighborhood as compared to [its] competitors" so they can "allocate the salesforce accordingly."

48.     The Company also purportedly has "strong capabilities to manage the dynamic supply chain through technology," and "use[s] proprietary technologies to achieve precise budgeting, accurate time estimate, and seamless workflow coordination across [its] supply chain."  According to the Offering Materials, these capabilities enable the Company to "effectively manage an extensive network of renovation contractors to simultaneously renovate 50,000 apartment units scattered in thousands of neighborhoods across 13 cities and maintain consistent quality."  These technologies "connect and benefit property owners, residents and third-party service providers," which provides the Company with "significant monetization opportunities."

- 16 -

### 4.       The Company's Market and Growth Opportunities

49.     The Offering Materials favorably described the residential co-living rental market, emphasizing strong demand on behalf of current and prospective residents and "enormous growth potential for co-living platforms in China." For example, the Offering Materials indicated that "[c]o-living platforms are rapidly gaining popularity in China," representing that "[p]roperties operated by co-living platforms offering standardized renovation, furnishing and services only accounted for approximately 2% of all residential rental properties in China as of December 31, 2018." By contrast, "[i]n the United States and Japan, the percentage of renovated or serviced rental apartments operated by institutions was around 57% and 80%, respectively," presumably for the same period.

50.     Accordingly, the Offering materials indicated that the Company intended to "[f]urther expand [its] scale." As Phoenix represented: "We have realized only 0.15% of our total addressable market based on our revenues in 2018. We believe there is enormous opportunity for our further penetration into the market." Indeed, as the Offering Materials further represented, Phoenix "see[s] China's overall residential rental market as [its] total addressable market and residential rental market in tier 1 and tier 2 cities as [its] serviceable addressable market."

51.     The Offering Materials identified "tier 1 and tier 2 cities" collectively as: "Beijing, Shanghai, Guangzhou, Shenzhen, Changchun, Changsha, Changzhou, Chengdu, Chongqing, Dalian, Dongguan, Foshan, Fuzhou, Guiyang, Ha'erbin, Hangzhou, Hefei, Jinan, Kunming, Nanjing, Nanchang, Nanning, Ningbo, Qingdao, Quanzhou, Shenyang, Shijiazhuang, Suzhou, Taiyuan, Tianjin, Wenzhou, Wuhan, Wuxi, Xi'an, Xiamen, Zhengzhou and Zhuhai." According to the Offering Materials, those cities "generally offer more vibrant economies, better career prospects and higher income levels, and have generally experienced net population inflows," and thus "accounted for RMB1.2 trillion in total rental income in 2018, representing approximately 67% of China's total

residential rental market" – a market the Offering Materials said was "expected to grow to RMB2.0 trillion in 2023" according to iResearch Global Inc., an industry research firm that Phoenix hired.

B.    **The Company's IPO**

52.    Phoenix's path to becoming a public company formally began on August 28, 2019, when the Company filed with the SEC a draft registration statement on Form F-1, with a prospectus, on a confidential basis.  At that time, those materials included consolidated financial statements as of and for the years ended December 31, 2017 and 2018 and unaudited consolidated financial statements as of June 30, 2019 and for each of the six-month periods ended June 30, 2018 and 2019.

53.    The ADS were expected to list on the NYSE or NASDAQ after the completion of the IPO.  The law firm of Simpson represented Phoenix in connection with this process, with personnel staffed out of its office at ICBC Tower, 35th Floor, 3 Garden Road, Hong Kong.  Also involved were personnel from Latham staffed out of its office at One Exchange Square, 8 Connaught Place, Central, Hong Kong, and from KPMG Huazhen LLP, which has offices in 25 locations in China, including Hong Kong and Wuhan, and staffed the engagement with professionals resident in at least its office at Oriental Plaza, 1 East Chang An Avenue, Beijing.

54.    On October 4, 2019, the Company filed with the SEC Amendment No. 1 to the draft August 28, 2019 materials, also on a confidential basis.  Generally, Phoenix addressed comments set forth in a September 24, 2019 letter from SEC staff and otherwise revised portions of the August 28, 2019 materials.

55.    On October 28, 2019, Phoenix filed with the SEC a draft registration statement on Form F-1, which, together with the prospectus and amendments described herein, constitute the Offering Materials.

56.    On January 8, 2020, Phoenix filed with the SEC Amendment No. 1 to the October 28, 2019 materials, revising portions of the October 28, 2019 materials and included a section entitled

"Recent Developments" setting forth "selected unaudited financial data for October 2019 and certain operating data for October or November 2019." The January 8, 2020 materials acknowledged the importance of providing updated information, while noting that Phoenix's 2019 fiscal year, which ended December 31, 2019, had "recently concluded":

> We have set forth below our selected unaudited financial data for October 2019 and certain operating data for October or November 2019. We have provided the preliminary results described below for the purpose of providing the investors with the most current information that we are able to provide under the time constraints. The below summary of financial data is not a comprehensive statement of our financial results for October 2019 or October 2018. Because our 2019 fiscal year has only recently concluded, we are still in the process of completing our annual financial statements. Therefore, it is possible that normal annual adjustments will be made.

57. Additionally, the January 8, 2020 materials included an estimated price range for the IPO of between $14.50 and $16.50 per ADS for an offering of 10.6 million ADS, or 12.19 million ADS upon the Underwriter Defendants' exercise in full of the overallotment option. The estimated price range equaled an aggregate offering of between $153.7 million and $174.9 million, depending on the exercise of the overallotment option. In a letter accompanying the January 8, 2020 materials, Phoenix, through its counsel at Simpson, advised SEC staff that "[t]he Company will commence its marketing activities in connection with the IPO shortly after the date hereof," while requesting the SEC to declare the Offering Materials effective "on or about January 16, 2020 . . . ."

58. On January 10, 2020, Phoenix filed with the SEC Amendment No. 2 to the October 28, 2019 materials, amending the exhibit index and attaching various exhibits not previously filed publicly with the SEC. The January 10, 2020 materials also discussed Phoenix's indemnification of directors and officers and reported the Company's sales of unregistered securities over the previous three years.

59. On January 15, 2020, Phoenix filed with the SEC Amendment No. 3 to the October 28, 2019 materials, revising portions of the previously filed materials. The section entitled "Recent

Developments," however, remained identical to the version that was included in the January 8, 2020 materials. Notably, the Offering Materials told prospective investors not to consider any information outside of its four corners when deciding whether to purchase ADS in connection with the IPO:

> No dealer, salesperson or other person is authorized to give any information or to represent as to anything not contained in this prospectus or in any free writing prospectus we may authorize to be delivered or made available to you. You must not rely on any unauthorized information or representations.

60.    Underscoring this point, the Offering Materials elsewhere represented: "You should carefully read the entire prospectus, including 'Risk Factors' and the financial statements, before making an investment decision."

61.    In a January 15, 2020 letter joining Phoenix's request of the same date to accelerate the effectiveness of the Offering Materials to January 16, 2020, Citigroup, Credit Suisse and J.P. Morgan, as representatives of the underwriters, advised the SEC that between January 8 and 15, 2020, "approximately 1970 copies of the preliminary prospectus of the Company dated January 8, 2020 were distributed to prospective underwriters, dealers, institutional investors and others."

62.    Also, on January 15, 2019, Phoenix filed with the SEC a free writing prospectus that provided information on indications of interest received from existing shareholders and a "strategic investor" in purchasing ADS in connection with the IPO. The free writing prospectus indicated that it amended the Offering Materials; referred prospective investors to Citigroup, Credit Suisse, and J.P. Morgan for a copy of the Offering Materials; and provided that Amendment No. 1 on January 8, 2020 was the "most recent preliminary prospectus," despite that Amendment No. 3 superseded that document in the entirety. Additionally, the free writing prospectus told investors to rely only on the Offering Materials when deciding whether to invest in the Company (italics in original):

> *Before you invest, you should read the prospectus in that registration statement and other documents our company has filed with the SEC for more complete information about our company and this offering. Investors should rely upon the prospectus and any relevant free writing prospectus for complete details.*

63.     On January 16, 2020, the SEC declared the Offering Materials effective.  The next day, January 17, 2020, the Company priced the IPO and filed its Final Prospectus (dated January 16, 2020), which incorporated and formed part of the Offering Materials.  The Final Prospectus revealed that Phoenix intended to offer for sale 9.6 million ADS at the significantly reduced offering price of $13.50 per ADS – below the low end of the range previously estimated – representing an aggregate IPO price of $129.6 million.  The Final Prospectus also indicated that the Underwriter Defendants had the right to exercise an over-allotment option to purchase 1.44 million ADS, which would bring the aggregate IPO price to about $149 million.

64.     Together, the Offering Materials were used to sell 9.6 million ADS, representing 96 million Class A ordinary shares of Phoenix, at $13.50 per share.  The Underwriter Defendants also only partially exercised their overallotment option, purchasing an additional 304,933 ADS for sale. According to the Final Prospectus, "[Phoenix] issued and sold an aggregate of 9,904,933 ADSs . . . representing 99,049,330 Class A ordinary shares, raising approximately US$128.4 million in net proceeds after deducting underwriting commissions and the offering expenses."  The IPO closed on January 22, 2020.

## C.     The Emergence of the Coronavirus and Its Proliferation in China Before the Effective Date of the Offering Materials and Completion of the IPO

65.     Those outside of China, including prospective investors in Phoenix's IPO based in the U.S. and elsewhere, had little access to reliable information regarding the onset of the coronavirus. By contrast, those residing or doing business in China – especially in Wuhan, where the coronavirus is widely believed to have originated – received enough information to understand that an outbreak was occurring before the IPO and that the situation could worsen significantly if the issue was not controlled and remediated immediately.

66.     This information was particularly important to Phoenix, whose IPO was scheduled to close in late-January 2020 as the pandemic was worsening and whose operations are at least partially based in Wuhan.  As the Offering Materials indicate, Wuhan was the sixth location in which Phoenix offered apartment units, beginning in or about late 2017 or early 2018.

67.     Information regarding the coronavirus had emerged in China by the end of December 2019, when Chinese officials identified the onset of a pneumonia-like illness of unknown origin in Wuhan City, Hubei Province of China, traced to a seafood market there.[2]  Almost immediately, this outbreak was compared to the 2002/2003 outbreak of severe acute respiratory syndrome (or SARS) in China, which reportedly infected over 5,000 people there and had widespread effects globally.

68.     Underscoring the potency of this threat shortly after its identification, the Wuhan Health and Medical Commission issued an "Emergency Notice" to medical institutions on December 30, 2019 concerning the illness.  On December 31, 2019, China's National Health Commission ("NHC") sent an expert team to Wuhan to investigate and the Wuhan Municipal Health Commission released a briefing about the outbreak, confirmed that 27 cases were under investigation, and told citizens not to gather or congregate in enclosed areas.

69.     Also, on December 31, 2019, governmental authorities in Taiwan – 80 miles off the coast of mainland China – implemented monitoring protocols for travelers from Wuhan.  Instituting

---

[2]     According to a report, concern regarding the onset and proliferation of the coronavirus was already building among the Chinese population before December 2019.  A study of social media posts and searches on WeChat, China's largest social media platform with over 1 billion monthly active users, showed that the use of symptom-related terminology significantly increased from November 17, 2019 to December 30, 2019.  A study of searches by users in Hubei province on Baidu, China's leading search engine, also showed that the use of similar keywords increased on December 30, 2019.  The report presented these findings, which suggest that residents in China – particularly in Wuhan and surrounding cities in Hubei province – were aware as of late December 2019 that an outbreak was on the verge of occurring, if not already underway.

"onboard quarantine," personnel were directed to board arriving planes to evaluate passengers from Wuhan for fever or and pneumonia-like symptoms before releasing them.

70.     On January 1, 2020, Chinese officials closed the Huanan Seafood Wholesale Market in Wuhan for sanitation and disinfection.  Within days, more than 50 cases of illness existed in Wuhan, as Chinese authorities instituted a public education campaign there on disease prevention and environmental hygiene.

71.     Nevertheless, even before additional cases had proliferated, the Government of the Hong Kong Special Administrative Region ("Hong Kong") expressed serious concerns regarding the potential transmission of the illness – despite that Wuhan is located hundreds of miles away (indeed, almost 600 miles) from Hong Kong.

72.     On January 2, 2020, the Hong Kong government reported that its Secretary for Food and Health and Controller of the Centre for Health Protection of the Department of Health ("CHP") had convened and participated in an inter-departmental meeting on Wuhan-related cases for the purpose of strengthening prevention and control measures.  Involved in the meeting were officials from Hong Kong's Department of Health, Hospital Authority, Education Bureau, Transport and Housing Bureau, Security Bureau, Constitutional and Mainland Affairs Bureau, and many other governmental institutions.

73.     In accord with that meeting, effective January 3, 2020, the Hong Kong government implemented heightened surveillance procedures to monitor and address the situation, engaging in daily reporting of Wuhan-related cases in public hospitals, instituting boundary checkpoints for those traveling by air or train, implementing thermal imaging systems to monitor body temperature and identify travelers with fever, and recommending cleaning and sanitation protocols for businesses and other institutions in Hong Kong.   In fact, Hong Kong directed hospital staff to place patients with

suspected cases of infection to airborne isolation rooms for treatment and laboratory investigation, with instructions to immediately inform the CHP, Department of Health and Hospital Authority.

74.     On January 3, 2020, the Hong Kong government reported 44 known cases, indicating that common respiratory illnesses were ruled out as a cause and revealing that CHP had increased surveillance on possible cases of infection since December 31, 2019.

75.     On January 4, 2020, the Hong Kong government announced that it had implemented the Preparedness and Response Plan for Novel Infectious Disease of Public Health Significance ("Plan") in response to the threat posed by this illness and activated the "serious" response level. According to the Plan, the "serious" response level – the second highest (of three levels total) – "corresponds to a situation where the risk of health impact caused by the novel infection on local population in Hong Kong is moderate."  This response level "depicts a situation when there is limited spread of the disease in local population, e.g. sporadic or small cluster(s) of infection," but "may also apply to situation[s] when a significant number of human cases of the novel infection with serious health outcomes are reported in places/areas where the trade and travel relationship with Hong Kong is significant."  According to Hong Kong's CHP, a novel infectious disease "has the potential to lead to international spread and public health emergency."

76.     As of January 4, 2020, the CHP noted that "[t]he current cluster of viral pneumonia cases in Wuhan can be regarded as a Novel Infectious Disease of Public Health Significance," and was engaging in public efforts to alert travelers to and from Wuhan of the health situation and the need for increased personal hygiene under the circumstances then existing.

77.     By January 5, 2020, governmental authorities in Taiwan augmented their own efforts to identify potentially infected travelers, expanding the scope of their monitoring protocol to cover travelers to Wuhan within two weeks who exhibited fever or symptoms of an upper respiratory tract infection at the point of entry.  Taiwanese officials implemented procedures to screen those travelers

suspected of illness for 26 viruses, including SARS and Middle East respiratory syndrome (MERS). Travelers who exhibited symptoms were subject to quarantine and referred for treatment, as needed.

78.     On January 6, 2020, the Hong Kong government held a Steering Committee meeting of governmental officials in accordance with the Plan, at which participants discussed prevention and control measures.

79.     Also, on that date, Taiwan's Centers for Disease Control ("CDC") emphasized its own effort "[i]n response to the severe pneumonia outbreak in Wuhan, China," announcing plans "to reinforce the implementation [of] quarantine practices at airports and ports" and directing healthcare facilities to "heighten vigilance for suspected cases," evaluate patients' travel and circumstances, and implement "nosocomial infection control measures."  The Taiwan CDC also advised "travelers planning to visit Wuhan or other neighboring areas in China" to practice suitable personal hygiene, "avoid visiting crowded public places," and "notify the airline crew and the quarantine officer at the quarantine station in the airport/port" or seek medical attention "[i]f fever or influenza-like illness symptoms develop upon arriving in" or "after returning to Taiwan . . . ."

80.     On January 7, 2020, the Hong Kong government announced that it would amend regulations to include "Severe Respiratory Disease associated with a Novel Infectious Agent" as a statutorily notifiable infectious disease.  Hong Kong implemented this measure to require doctors and other medical practitioners to notify CHP if they encountered or treated any person with fever or respiratory illness who had visited Wuhan within 14 days before the onset of any symptoms.  This regulatory amendment was necessary to vest Hong Kong with legal authority to manage suspected and confirmed cases of the illness if patients refused isolation or quarantine, as appropriate, thus enabling Hong Kong to ensure that any cases of suspected or confirmed illness did not spread further inside or outside of Hong Kong.

81.     Also, on January 7, 2020, the U.S. Embassy in Beijing issued an advisory to travelers to or from Wuhan, warning of a pneumonia outbreak of unknown cause and instructing them to take health precautions and seek medical attention if symptomatic or sick.  The U.S. Embassy referred inquiries to its Beijing address and telephone number and the U.S. Consulate in Wuhan.

82.     On January 8, 2020, foreign media reported that researchers had ruled out SARS, MERS, the flu and bird flu, confirming they had not ruled out the discovery of a new coronavirus as the cause of illness.  Governmental authorities across Asia began implementing precautionary measures designed to detect if not curb spread of the illness, such as temperature checks and required notification systems when residents or travelers showed symptoms.

83.     On January 9, 2020, for example, the Taiwan CDC reported that it had continued to implement the "onboard quarantine of all direct flights arriving from Wuhan" – a practice started on December 31, 2019.  By January 9, 2020, Taiwan had inspected 14 flights and 1,317 passengers and cabin crew members.  Taiwan also reminded travelers to practice suitable personal hygiene, notify "the quarantine officer at the quarantine station in the airport/port" of any flu-like symptoms, and "seek immediate medical attention" upon developing "symptoms . . . within 14 days after returning to Taiwan from Wuhan . . . ."

84.     By January 10, 2020, governmental authorities in China stationed personnel at airports and train stations across the region to evaluate travelers who had visited Wuhan, including by administering fever checks.

85.     On January 12, 2020, the Wuhan Municipal Health Commission identified the cause of the illness as the coronavirus, a finding that Chinese state media reported.  Government mandates required local businesses to temporarily close, including Kingold Jewelry, Inc., a company based in Wuhan that temporarily closed and halted its jewelry production operations since January 12, 2020.  Likewise, Levi Strauss & Co. later reported that the coronavirus led to store closures in mid-January

2020, including its 7,000 square foot location in Wuhan, which was only opened in the fall of 2019 and was then its largest store in China.

86.     By then, local hospital respiratory wards were already reaching maximum capacity. Notably, according to a study of hospital traffic by a team of researchers from the Harvard Medical School, hospitals in Wuhan began experiencing a significant increase in visitors – based on satellite imagery of hospital parking lots – no later than August 2019, and symptom-related search engine queries spiked.  Additionally, in mid-January 2020, enhanced surveillance and entry screening at various transport hubs resulted in the detection of suspected cases in Hong Kong, Macau, Singapore, South Korea, and Taiwan.

87.     On January 13 and 16, 2020, Thailand and Japan respectively confirmed coronavirus cases traceable to travelers from Wuhan.  Meanwhile, by January 14, 2020, China had installed 35 infrared thermometers in airports, railway stations, long-distance bus stations, and ferry terminals, and Wuhan began to strictly control travel.  And on January 15, 2020, the U.S. Embassy in Beijing issued another advisory to those traveling to or from Wuhan, this time warning about the coronavirus outbreak in Wuhan and instructing travelers to take health precautions and seek medical attention if symptomatic or sick; it reissued that advisory on January 17 and 18, 2020.

88.     Also, on January 17, 2020, the U.S., at the direction of the Centers for Disease Control and Prevention and the Department of Homeland Security's Customs and Border Protection, implemented coronavirus entry screening at three airports that received the most travelers in the U.S. from Wuhan: San Francisco (SFO), New York (JFK), and Los Angeles (LAX) airports.

89.     From January 18 to 20, 2020, 136 additional coronavirus cases emerged, bringing the total number of cases in Wuhan to 198.  By then, public reports in China confirmed that the virus had spread outside of Wuhan, with cases in Beijing, Shenzhen, Taiwan, Japan, South Korea, and

Thailand.  Indeed, as of January 20, 2020, there were over 280 reported coronavirus cases, with 278 in China – 258 of which were from Wuhan alone.

90.     Given the severity of the outbreak, the Chinese government increased precautionary measures within Wuhan and the surrounding areas and issued public statements in China to advise the public on those efforts.  For example, on January 20, 2020:

a.     An expert panel commissioned by China's NHC convened a press conference (in Chinese) where it advised the public to avoid Wuhan; emphasized the importance of continued monitoring, including temperature checks, particularly for those leaving Wuhan; and recommended mandatory quarantine for anyone with a fever or other symptoms, as well as others who came into contact with them.

b.     Wuhan Mayor Zhou Xianwang advised outsiders not to come to Wuhan and Wuhan citizens not to leave.

c.     The Xinhua News Agency reported that Chinese President Xi Jinping had issued instructions on the coronavirus outbreak in Wuhan and other locations in Hubei Province, informing citizens to implement measures to stop the spread of the virus.

d.     Consistent with President Xi Jinping's directive, Wuhan immediately began implementing more stringent entry and exit protocols.  For example, riders were ousted from a train in Wuhan on January 20, 2020.

91.     Also, on January 20, 2020, the Taiwan CDC "announced the activation of the Central Epidemic Command Center (CECC) . . . to integrate resources across government agencies and further protect the health of the Taiwanese public from the outbreak."  Taiwan instructed all agencies to support "all disease prevention and control efforts," including "quarantine measures" at airports, and a panel of experts commissioned by Taiwan's government recommended "expand[ing] the target population for the reporting criteria of cases of severe special infectious pneumonia and includ[ing]

all pneumonia cases with history of travel to China rather than history of travel [only] to Wuhan, China in order to broaden the scope of surveillance and promptly identify suspected cases." By then, Taiwan's CDC reported that Taiwanese officials had inspected a total of 26 flights from Wuhan, covering 2,845 passengers and crew members, for any sign of infection. Taiwan's CDC continued to advise travelers to take precautions to prevent the spread of infection.

92.     As of January 21, 2020, some villages in China prohibited Wuhan residents from entering their territories. In fact, travel restrictions were so severe by then that Wuhan's railway authority offered refunds to passengers who purchased tickets for trains departing from or traveling to Wuhan. The Civil Aviation Administration of China likewise issued a notice requiring refunds to passengers who purchased tickets for flights to or from Wuhan. Additionally, Wuhan announced that it had canceled its 2020 Spring Festival.

93.     On January 22, 2020, the date on which Phoenix's IPO closed, news emerged that the Chinese government would place Wuhan – and its 11 million residents – on lockdown the next day, officially prohibiting travel to and from the region.

94.     On January 23, 2020, when the Wuhan lockdown began, Chinese authorities imposed similar restrictions on the nearby cities of Huanggang (7.5 million people) and Ezhou (1 million people), as well as five other cities in the Hubei province (of which Wuhan is the capital) – covering, in total, almost 25 million people.

95.     On January 24, 2020, China implemented a wide-ranging travel ban covering 13 cities and 41 million people. These actions resulted in the cancellation of Chinese Lunar New Year celebrations across the region and closure of Beijing's Forbidden City and Shanghai's Disneyland.

96.     By January 30, 2020, China had expanded the travel ban to include 16 cities with a total population of 45 million. As of January 31, 2020, Wuhan reported 3,215 laboratory-confirmed cases and 192 fatalities, and other cities in mainland China reported a total of almost 8,600 cases.

**D.    The Company's Post-IPO Disclosure of the Coronavirus and Its Impact on the Company's Operations, Business, and Financial Results, As Well As the Emergence of Renter And Landlord Complaints**

**1.    The 2019 Fourth Quarter and Year-End Financial Results, Issued March 25, 2020**

97.    On March 25, 2020, Phoenix issued a press release announcing its unaudited financial results for the fourth quarter and fiscal year ended December 31, 2019.  Despite arguably favorable commentary on these results, CEO Gao was forced to acknowledge that "[w]ith the coronavirus outbreak, we have experienced a challenging start to 2020."

98.    The Company signaled that the rental market had softened during the fourth quarter, noting that the number of opened apartment units was 431,228 as of December 31, 2019 (an increase from 391,911 as of September 30, 2019 and a decrease from 432,690 as of November 30, 2019, both of which the Offering Materials disclosed), but that pre-opening units had declined to levels not seen since June 20, 2019, when the Company operated in 10 (as opposed to 13) cities.

99.    As of December 31, 2019, the number of pre-opening units was only 7,081 – slightly greater than 5,160 as of June 30, 2019 – compared to 14,835 as of September 30, 2019.  And pre-opening expenses decreased 57.8% year-over-year, from RMB89.1 million to RMB37.6 million (US$5.4 million), "primarily due to a lower number of pre-opening apartment units during the quarter compared to the prior year period, as the Company strategically sourced a larger number of apartment units in the fourth quarter of 2018."[3]

100.    Notably, the Company described pre-opening and opened apartment units as "key operating metrics."

---

[3]    Phoenix used the following exchange rate to translate Renminbi to U.S. dollars: RMB6.9618 to US$1.00.

101.     The Company's other key financial metrics also declined, reflecting the weakening of the rental market.  EBITDA – defined as "net loss before depreciation and amortization, interest expenses, interest income, and income tax benefit (expense)" – was negative RMB489.8 million (US$70.4 million) in the fourth quarter, compared to negative RMB363.2 million in the prior year period.  Adjusted EBITDA – defined as "EBITDA before share-based compensation and incentives for apartment sourcing" – was negative RMB461.0 million (US$66.2 million) in the fourth quarter of 2019, compared to negative RMB349.2 million in the prior year period.

102.     Net loss also worsened, with the Company reporting RMB921.0 million (US$132.3 million) for the fourth quarter of 2019, compared to RMB556.8 million in the fourth quarter of 2018.  Likewise, adjusted net loss – defined as "net loss before share-based compensation and incentives for apartment sourcing" – was RMB892.1 million (US$128.1 million) in the quarter, compared to RMB542.8 million in the prior year period.

103.     In a section entitled "Recent Developments," the Company also provided information on the onset and current and future impact of the coronavirus, providing, in full, as follows:

**Novel Coronavirus Outbreak**

Since the outbreak of the coronavirus, the Company has proactively initiated measures to protect its residents and support the government's efforts to combat the epidemic. For example, the Company provided safety notifications and preventative guidelines to residents through multiple channels, immediately launched online travel detail registration, and assisted residents with applying for neighborhood entry permits. In addition, leveraging its online platform, the Company publicized various online facilitation services including launching an online, zero-contact apartment viewing and selection function. Furthermore, the Company offered partial rental waivers to certain affected residents and held discussions with property owners to offer rental waivers during this difficult time. The Company has encouraged employees to work from home as necessary, and implemented temperature checks and frequent disinfection of workplaces. To support the relief effort in Wuhan, the Company provided 800 apartment units in the Wuhan area for medical workers, free of charge, to provide them with places to rest.

The Company expects adverse impacts on its business and financial performance from the novel coronavirus outbreak for the first quarter of 2020. The Company

- 31 -

expects a decrease in the occupancy rate as residents delay their return to work, which will result in an adverse impact on the Company's revenues. Since the outbreak of the novel coronavirus, the Company also adjusted the number of apartment units it operated to counteract some of the adverse impacts on its occupancy rate. As a result, the number of apartment units the Company will operate as of March 31, 2020, is expected to decrease as compared to that as of the end of 2019. In addition, the Company has been taking proactive actions to control its costs and expenses, including significantly slowing down the rate of sourcing and renovating additional apartment units. Furthermore, the Company's management team has volunteered for a pay cut during this difficult time. The Company currently expects the impacts of the outbreak to be short-term given some early signs of recovery in China, and remains confident in the long-term outlook of its industry and growth prospects.

The extent to which the novel coronavirus outbreak impacts the Company's operating results for the remainder of the fiscal year is highly uncertain and difficult to predict and will depend on future developments, including the duration, severity, and reach of the outbreak, and actions taken to contain the situation. The Company continues to monitor the rapidly evolving situation in order to evaluate the impact on its business and financial performance and to protect the health and safety of its residents and employees.

104.    Finally, in a section called "Business Outlook," Phoenix provided a financial forecast for the first quarter of 2020 but acknowledged that uncertainties associated with the coronavirus prevented it from reasonably estimating the financial impact the virus would have on the business. Specifically, the Company disclosed that the forecast reflects its "current and preliminary views, which is subject to change and substantial uncertainties, particularly in view of the potential impact of the novel coronavirus outbreak, the effects of which are difficult to analyze and predict."

### 2.    The 2019 Form 20-F, Filed April 29, 2020

105.    In its Annual Report on Form 20-F, filed with the SEC on April 29, 2020 for the year ended December 31, 2019, Phoenix reiterated its year-end and full-year 2019 financial results and extensively described the coronavirus outbreak and its impact on the business, while updating its risk factors to address the virus.  The Form 20-F also reported additional information which confirmed weakness in the market during the 2019 fourth quarter.

106.     Reflecting market weakness at the end of 2019, for example, the Form 20-F disclosed that in 2019 the Company had returned almost the entirety of upfront payments it had received from financial institutions – and that amount was far above what the Company had returned in years prior. As of December 31, 2017, 2018 and 2019, Phoenix received upfront payments from institutions of RMB937.6 million, RMB2,127.0 million and RMB2,753.2 million (US$395.5 million), and also had received advances from residents of RMB105.7 million, RMB279.5 million and RMB976.3 million (US$140.2 million), respectively.[4]  In 2017, 2018 and 2019, however, the total upfront payments that Phoenix returned to financial institutions in the event of early termination of the leases or defaults by residents on loan repayments was RMB436.6 million, RMB1,757.1 million and RMB2,810.9 million (US$403.8 million), respectively.

107.     Additionally, Phoenix included the following risk factor in the Form 20-F concerning the onset of, and continuing fallout from, the coronavirus:

> **The COVID-19 pandemic in China and worldwide has adversely effected, and may continue to adversely affect, our business, results of operations and financial condition, as well as the trading price of our ADSs.**
>
> The on-going pandemic of a novel strain of coronavirus disease (COVID-19) has adversely affected our business, results of operations and financial conditions. We started to foresee that the COVID-19 outbreak may have some negative impacts on our business and operations, particularly in Wuhan, after the Chinese government implemented various travel restrictions and quarantine measures, starting from an unexpected and unprecedented lockdown of the City of Wuhan on January 23, 2020. We have apartment units in Wuhan and our local operations in the city were subsequently adversely affected. COVID-19 has since spread throughout China and our business and operations in other cities have also been adversely affected. The occupancy rate of our apartment units decreased in the first quarter of 2020 as many residents delayed their return to work, which had an adverse impact on our revenues. We estimate that our revenues decreased by a single digit percentage for the first quarter of 2020 compared to the fourth quarter of 2019.

---

[4]     Phoenix used the following exchange rate to translate Renminbi to U.S. dollars: RMB6.9618 to US$1.00.

We have taken measures to counteract some of the adverse impact on our results of operations from the decrease in occupancy rate, including but not limited to significantly reducing the rate of sourcing and renovation of additional apartment units and negotiating with property owners for early termination of certain leases. As a result, the number of apartment units we operated decreased at the end of the first quarter of 2020 as compared to the end of 2019, which may affect our future revenues. The early termination of certain leases with property owners resulted in a loss of approximately RMB82.0 million (US$11.8 million) for the related leasehold improvements and deposits to the property owners for the first quarter of 2020. In addition, we offered partial rental waivers to certain affected residents during such difficult times, which adversely affected our revenues. We also held discussions with property owners to offer rental waivers, which did not always yield satisfactory solutions. As the COVID-19 pandemic intensified, we experienced higher level of complaints from both the property owners and residents, which has caused negative publicity and adversely affected our reputation.

We have implemented preventative and control measures to protect the health of our residents and employees. For example, we provide safety notifications and preventative guidelines to residents through multiple channels, facilitate online travel detail registration, and assist residents with applying for neighborhood entry permits. We also offer online facilitation services, including launching an online, zero-contact apartment viewing and selection function. We encourage our employees to work from home as necessary and conduct temperature checks and frequent disinfection of workplaces. All these measures have increased our operating costs and adversely affected our work efficiency.

There can be no assurance that our employees or residents have not been, or will not be, infected with COVID-19. Our business operations could be disrupted if any of our employees, in particular our executive officers and other key employees, is infected or suspected of being infected with COVID-19, since it could require such employee as well as many of our other employees to be quarantined and/or our offices to be shut down for disinfection. We may be short on workforce if a large number of our employees are diagnosed with COVID-19 or are required to be quarantined or self-isolated. Our business could be adversely impacted if our residents are diagnosed with COVID-19 as the apartment buildings may be temporarily locked down. Our business could also be adversely affected and our services may be suspended if any of our business partners, such as renovation contractors and third-party service providers, is affected by the COVID-19 outbreak.

The COVID-19 pandemic has already materially and adversely affected the Chinese economy. According to the National Bureau of Statistics of China, China's gross domestic product (GDP) declined by 6.8% in the first quarter of 2020 mainly due to impacts from the COVID-19 pandemic, which was the first contraction in decades and compared to a GDP growth of 6.1% in China in 2019. In addition, the COVID-19 pandemic may lead to a rise in unemployment rate and cause our existing or potential residents to be more price sensitive. As a result, they may choose cheaper rental options or we may have to reduce our rent to prevent resident attrition, which

could result in a decrease in our revenues and adversely affect our results of operation.

While there are some early signs of recovery in China, the COVID-19 outbreak has spread to many other countries in the world and the World Health Organization declared COVID-19 a pandemic in March 2020. The global spread of the COVID-19 pandemic is complex and rapidly-evolving, with governments, public institutions and other organizations imposing or recommending, and businesses and individuals implementing, restrictions on various activities or other actions to combat its spread. This has created global economic disruption and uncertainty, including significant turmoil in the U.S. stock market. Our business, results of operations and financial condition could be adversely affected to the extent that COVID-19 harms the Chinese and global economy in general, and the trading price of our ADSs has been and may continue to be adversely affected.

The extent to which the COVID-19 pandemic will continue to adversely affect our business, results of operations and financial condition, including the duration and magnitude of such effects, will depend on numerous evolving factors that cannot be accurately predicted or assessed, including the duration and scope of the pandemic, the negative impact it has on the Chinese and global economy, the duration and magnitude of its impact on unemployment and consumer confidence, the ability of ourselves and our residents to successfully navigate the impacts of the pandemic, as well as actions governments, businesses and individuals take in response to the pandemic.

The COVID-19 pandemic, and the volatile Chinese and global economic conditions stemming from the pandemic, as well as reactions to future pandemics or resurgences of COVID-19, could also precipitate or aggravate the other risk factors that we identify in this annual report, which in turn could materially adversely affect our business, results of operations, financial conditions, and the trading price of our ADSs. Further, the COVID-19 pandemic may also affect our operating and financial results in a manner that is not presently known to us or that we currently do not consider to present significant risks to our operations.

108.    The Company also updated the risk factor it had included in the Offering Materials, which now referred to COVID-19 specifically.  Likewise, the Company included a four-paragraph description of uncertainties arising from the coronavirus, as follows:

***Uncertainty of the Novel Coronavirus Outbreak***

The novel coronavirus (COVID-19) outbreak has impacted and may continue to impact our business, results of operations and financial condition. Our results for the first quarter of 2020 were adversely affected due to the extension of lunar new year holiday and imposition of travel restrictions and self-isolation policies by local and national government of China. The occupancy rate of our apartment units decreased

- 35 -

in the first quarter of 2020 as many residents delayed their return to work after the lunar new year holiday. As a result, we estimate that our revenues decreased by a single digit percentage for the first quarter of 2020 compared to the fourth quarter of 2019.

We have taken measures to counteract some of the adverse impact on our results of operations from the decrease in occupancy rate, including but not limited to significantly reducing the rate of sourcing and renovation of additional apartment units and negotiating with property owners for early termination of certain leases. As a result, the number of apartment units we operated decreased at the end of the first quarter of 2020 as compared to the end of 2019, which may affect our future revenues. The early termination of certain leases with property owners resulted in a loss of approximately RMB82.0 million (US$11.8 million) for the related leasehold improvements and deposits to the property owners for the first quarter of 2020. In addition, we offered partial rental waivers to certain affected residents, which adversely affected our revenues.

We have also implemented preventative and control measures to protect the health of our residents and employees. For example, we provide safety notifications and preventative guidelines to residents through multiple channels, facilitate online travel detail registration, and assist residents with applying for neighborhood entry permits. We also offer online facilitation services, including launching an online, zero-contact apartment viewing and selection function. We encourage our employees to work from home as necessary and conduct temperature checks and frequent disinfection of workplaces. All these measures have increased our operating costs and adversely affected our work efficiency.

109.     Additionally, in the "Subsequent Events" section of the financial statements included

in the Form 20-F, the Company represented as follows:

There was an outbreak of the novel coronavirus disease that has been designated as COVID-19, which has spread throughout China and other countries. Chinese government implemented various measurements including travel restrictions, extended holidays, quarantining individuals and requirements that most business be conducted remotely, starting from the lockdown of the City of Wuhan on January 23, 2020. These measurements have interrupted the operation of Group's businesses. This, in turn, has caused a decrease in the Group's occupancy rate, slower pace of sourcing and renovating new apartment units and early termination of lease agreements with landlords, which have had an adverse effect on the Group's results of operations. The Group's total revenues declined by a single digital percentage for the first quarter of 2020 compared to the fourth quarter of 2019 due to the decline in the occupancy rate. The early termination of lease agreements with landlords resulted in a loss of approximately RMB 82.0 million for the related leasehold improvements and deposits to the landlords for the first quarter of 2020. As the COVID-19 outbreak has further spread outside the PRC and it is uncertain as to whether the COVID-19 outbreak will continue to be contained in the PRC, the Group is unable to reasonably

- 36 -

estimate the magnitude of COVID-19's impact on its operations and the related financial impact for 2020 at this time.

110.    Accordingly, the extensive disclosures in the Form 20-F not only acknowledged the severe implications for Phoenix's business the coronavirus had posed, but they warned of additional adverse implications that could result from the coronavirus in the future.  These problems were not limited just to a reduction in apartment units or the return of upfront payments due to early lease terminations, but also involved increased complaints from property owners and residents.

### 3.    The 2020 First Quarter Financial Results, Issued June 10, 2020

111.    On June 10, 2020, Phoenix issued a press release reporting unaudited financial results for the first quarter ended March 31, 2020.  It disclosed that certain operating expenses had increased 105% year-over-year, from RMB121.9 million to RMB250.6 million (US$35.4 million), partially attributable to "a loss on [the] early termination of rental agreements due to the early termination of certain leases with property owners, which was primarily due to the adverse impact of the COVID-19 pandemic and resulted in a loss for the related leasehold improvements and deposits to the property owners for the first quarter of 2020 . . . ."[5]

112.    At the same time, "the Company significantly slowed down the rate of sourcing new apartments" during the quarter – thereby reducing the number of apartments it opened – "in response to the COVID-19 outbreak . . . ."  Now, the Company reported that pre-opening apartment units as of March 31, 2020 was 3,571 – a substantial reduction from 7,081 as of December 31, 2019 and 14,835 as of September 30, 2019.  Additionally, the Company recorded an impairment of long-lived assets due to the underperformance of various apartment units "primarily caused by the impact of [the] COVID-19 pandemic."

---

[5]    Phoenix used the following exchange rate to translate Renminbi to U.S. dollars: RMB7.0808 to US$1.00.

113.     Additionally, Phoenix's other key financial metrics continued trending downward in the quarter.  EBITDA was negative RMB833.8 million (US$117.8 million) for the quarter, compared to negative RMB566.7 million in the prior year period.  Adjusted EBITDA was negative RMB578.3 million (US$81.7 million), compared to negative RMB549.6 million in the prior year period.  Net loss was RMB1,234.4 million (US$174.3 million), compared to RMB816.2 million in the prior year period.  And Adjusted net loss was RMB978.9 million (US$138.2 million), compared to RMB799.1 million in the prior year period.  The occupancy rate also continued to decrease, reaching 75.6% as of March 31, 2020 – a decline from 76.7% as of December 31, 2019.

114.     Finally, in a section called "Business Outlook," Phoenix provided a financial forecast for the second quarter of 2020, acknowledging that uncertainties associated with the coronavirus continued to prevent it from reasonably estimating the financial impact the virus would have on the business.  Specifically, the Company disclosed that the forecast reflects its "current and preliminary views, which is subject to change and substantial uncertainties, particularly in view of the potential impact of the COVID-19 outbreak, the effects of which are difficult to analyze and predict."

**4.      The Emergence of Renter and Landlord Complaints**

115.     Phoenix collects rent from tenants in the form of monthly, quarterly, semi-annual, and annual payments, but remits payments to landlords on a monthly or quarterly basis.  It then uses the advance rental payments for corporate purposes, such as funding operations and expansion, before paying landlords on a quarterly (or less frequent) basis, when possible.  This practice provides the Company with an influx of cash that it must replenish on an ongoing basis to ensure it has sufficient reserves to pay landlords when payment is due.  If Phoenix is unable to cause existing residents to make large upfront payments or obtain new tenants, however, its web of funding would collapse or, at a minimum, become severely constrained.

116.     As a result, the Company engaged in the questionable practice of requiring tenants in many cities to pay rent on a monthly or half-yearly basis (by electing not to provide tenants with any ability to pay less frequently), to ensure it would receive an adequate stream of advance payments. This conduct also gave rise to an even more nefarious practice: coaxing tenants to take out long-term loans without adequate prior disclosure or consent, which resulted in the remittance to Phoenix of large upfront rental payments (in the form of the loan proceeds) while the tenant remained obligated to repay the loan in installments over the life of the (already paid) lease.  But that practice also put Phoenix's business in peril because if the tenant defaulted on payments to the lender, the Company was in some cases responsible for the missed payments.

117.     In China before the IPO, Phoenix was the subject of complaints about these practices, from both tenants and landlords.  Complaints regarding these practices intensified after the IPO, however, as Phoenix was beset by the combined effects of substantial weakening in its business and the coronavirus.  In the face of these issues, Phoenix has in certain instances ceased paying landlords altogether, placing its relationships with landlords in jeopardy and resulting in the landlords' mass eviction of tenants who had prepaid rent to the Company and thus honored their lease obligations. According to some reports, Phoenix instituted a formal policy in early February 2020 that forced landlords to forgo rent payments from the Company for 30 days, infuriating landlords.  Additionally, on February 3, 2020, the Company announced it would return one month's rent to tenants in Wuhan and offer temporary rent reductions to tenants in other cities.  Nevertheless, tenants have continued to complain of Phoenix's deceptive business practices, including steering them to take out loans without adequate disclosure and requiring large upfront payments without options to pay rent on a more frequent basis.  These ongoing practices rendered Phoenix more susceptible to losses in the ordinary course of its business as it struggled to deal with the reverberating fallout from the pre-IPO outbreak of the coronavirus, including issues afflicting the rental market in China.

- 39 -

118.     In the wake of the IPO, tenants and landlords voiced concerns over Phoenix's policies and practices, with dozens of tenants, landlords, and others staging protests at its offices, including its Beijing headquarters and offices in Shenzhen, and Hangzhou.  According to published reports, landlords demanded payment because renters continued to occupy their properties even as Phoenix has in some cases relieved tenants of the obligation to pay and otherwise discontinued remitting rental payments to landlords.  Tenants have demanded Phoenix to force landlords to honor leases for which they have prepaid rent or to provide a reprieve from rent because of complications resulting from the coronavirus, including a lack of work, the threat of infection, and the inability to occupy apartments due to travel or other restrictions or conditions.  Phoenix employees have also gone unpaid, sparking internal protests.  This unrest is the foreseeable result of practices Phoenix engaged in before the IPO, as well as its potential emergency response plans, neither of which Defendants warned investors about in the Offering Materials.  Phoenix has even explicitly acknowledged some of this conduct, issuing a public apology – a *mea culpa* of sorts – to tenants who felt deceived, and before the IPO, defendant Shen publicly expressed the need for transparency on the part of the Company in brokering rental arrangements.

119.     These practices prompted increased regulation and monitoring of the industry, as well as governmental investigations, after the IPO.  In February 2020, for example, Shenzhen's finance and insurance regulatory watchdogs announced a joint investigation into Phoenix's rental loan practices, concentrating on allegations that the Company exploited tenants and landlords by raising rents on tenants and delaying lease payments to landlords, all without consent.  In November 2020, the Wuhan Municipal Housing Security and Housing Administration issued an "Emergency Notice on Further Strengthening the Supervision and Management of the Housing Leasing Industry," designed to standardize information to tenants, strengthen supervision of rental business practices, and establish an online complaint system.  Additionally, the Shenzhen Municipal Bureau of Housing

and Construction issued a directive entitled "Emergency Notice on the Stabilisation of Eggshell [*i.e.*, Phoenix] Apartment Tenants," which called for cooperation in handling the concerns of tenants of the Company's apartment units.  Even before then, China's Ministry of Housing and Urban-Rural Development expressed concern over prolific industrywide practices, such as undercharging rent to attract tenants and collecting large advance rental payments – conduct the Company engaged in.

120.     In early December 2020, reports emerged that Phoenix was facing bankruptcy due to its substantial losses and inability to continue operating its business as it had before the IPO, and that regulatory investigations and actions in China had intensified.  A court in Shanghai placed Zi Wutong, through which Phoenix conducts much of its business in China, on a "social blacklist." This sanction, imposed under policies adopted by China's Supreme People's Court, its highest court, severely restricts the activities and spending of individuals and entities whose conduct has threatened consumers and otherwise concerns regulators.  The Supreme People's Court issued a statement confirming that Phoenix was the subject of intense public scrutiny and that authorities in China were investigating it.

121.     Although its debt reportedly exceeds $500 million, Phoenix has not reported financial results or provided financial updates since the first quarter of 2020, when it announced results on June 10, 2020.  Its last SEC filing was a *pro forma*, non-substantive Form S-8 relating to registering securities for its incentive plans, filed on July 7, 2020, which contained no financial information.  It did, however, issue a press release on November 6, 2020 regarding a promotional standup comedy show it hosted.

### 5.     The Substantial Decline in the Trading Price of the ADS

122.     The revelation of this information caused an immediate and significant decline in the trading price of the ADS.  On April 24, 2020, the date of filing of the initial complaint in this action, the trading price of the ADS closed at $6.97 per share – $6.53 per share below the $13.50 IPO price,

a decline of 48.4%.  Since then, further news has emerged concerning the impact of the coronavirus and other issues alleged herein on the Company, resulting in a continued decline in the trading price of the ADS.  On November 10, 2020, for example, the trading price of the ADS closed at $1.52 per share – a $5.45 per share reduction from the closing price on April 24, 2020, and $11.98 per share below the IPO price.  Additionally, information has emerged that the Company is suffering from a liquidity crunch, has not paid employees for months, has a business in disarray, and is on the verge of bankruptcy – all less than a year after its January 2020 IPO, and all of which emanated from the allegations set forth herein.

### E.    The Offering Materials' Actionable Omissions and Misrepresentations of Material Fact

123.    The Offering Materials misrepresented and omitted material information regarding several issues: (i) the onset of the coronavirus before the IPO and its implications for the Company's business; (ii) the steps the Company might take after the IPO to mitigate the adverse impact of the coronavirus; (iii) the existence and nature of renter complaints before and after the IPO, including complaints regarding nonconsensual or confusing renter financing at the inception of leases; (iv) the manner in which the Company changed its sales and marketing efforts before the IPO, as well as the actual and expected impact of that change on the Company's operations; (v) the degree to which the Company's business had already softened by the time of the IPO; and (vi) the trends, uncertainties, and risks that threatened to materially affect the business and whose disclosure was required under Items 303 and 105 of SEC Regulation S-K.

### 1.    The Onset of the Coronavirus and Its Implications for Phoenix

124.    China has faced significant outbreaks of sickness in the past, including the 2002/2003 SARS outbreak.  Accordingly, Defendants understood the importance of alerting IPO investors to the Company's susceptibility and vulnerability to large-scale health emergencies of the type that had

previously afflicted China and disrupted business operations there.  The need for transparent and

open communication from the Company was especially acute here given the Chinese government's

notorious reticence to communicate in a transparent way with foreign governments and the outside

world.

125.    Nevertheless, the Offering Materials obliquely warned in a catchall "risk factor" that

Phoenix's "business could also be adversely affected by the effects of Ebola virus disease, H1N1 flu,

H7N9 flu, avian flu, Severe Acute Respiratory Syndrome, or SARS, or other epidemics," noting that

"operations could be disrupted" if employees are suspected of having any such disease or condition

and financial results could be adversely affected if the Chinese economy is harmed by an epidemic.

The Offering Materials generically provided, in relevant part, as follows:

> Our business could also be adversely affected by the effects of Ebola virus disease,
> H1N1 flu, H7N9 flu, avian flu, Severe Acute Respiratory Syndrome, or SARS, or
> other epidemics.  Our business operations could be disrupted if any of our employees
> is suspected of having Ebola virus disease, H1N1 flu, H7N9 flu, avian flu, SARS or
> another contagious disease or condition, since it could require our employees to be
> quarantined and/or our offices to be disinfected.  In addition, our results of operations
> could be adversely affected to the extent that any of these epidemics harms the
> Chinese economy in general.

126.    As of the effective date of the Offering Materials on January 16, 2020, however,

China was already facing an outbreak of worsening proportions that had originated in Wuhan, a city

in which Phoenix had significant operations.  Indeed, by then, some local governments in China had

warned of the onset and potential spread of the coronavirus and had implemented travel monitoring

and issued local advisories, hospital respiratory wards in Wuhan were already reaching maximum

capacity, Thailand and Japan respectively confirmed coronavirus cases traceable to travelers from

Wuhan, China had installed infrared thermometers and other monitoring devices at areas of travel

departures and arrivals, and Wuhan began strictly controlling travel.  Additionally, some businesses

in Wuhan had already halted operations or closed their manufacturing facilities out of an abundance

of caution or at the direction of governmental authorities.  And communication exchanges on social media platforms in China reflected mounting concern from residents in Wuhan and the surrounding regions of the onset and proliferation of symptoms of the coronavirus, even before it was identified.

127.    This situation had only intensified by the close of the IPO on January 22, 2020, when news broke that the Chinese government would place Wuhan on lockdown the next day.  Between January 16 and 22, 2020, for example, the U.S. implemented coronavirus entry screening at three airports that received the most travelers in the U.S. from Wuhan, public reports in China confirmed that the coronavirus had spread outside of Wuhan to other regions in China and beyond, an expert panel in China advised the public to avoid Wuhan, Wuhan Mayor Zhou Xianwang told the public to avoid Wuhan, authorities adopted more stringent entry and exit protocols in Wuhan and prevented members of the public from using mass transit, and some villages prohibited Wuhan residents from entering their territories.

128.    It was materially misleading for the Offering Materials to warn that viruses and other maladies could adversely impact Phoenix's business without disclosing the onset of the coronavirus, about which Chinese authorities and regulators had expressed concern and which then threatened to harm the business.  By January 16, 2020, and certainly by January 22, 2020, Phoenix had enough information to know that China – and Wuhan, in particular – was already under siege by the coronavirus, and that it was reasonably likely to have a material adverse effect on the Company's operations and revenues.  Even by the effective date of the Offering Materials, the coronavirus was ravaging China – especially Wuhan, which was widely regarded as the epicenter of the virus and a significant operational hub for the Company's business.

129.    By warning of a merely hypothetical risk that "Ebola virus disease, H1N1 flu, H7N9 flu, avian flu, Severe Acute Respiratory Syndrome, or SARS, or other epidemics" could occur, the Offering Materials failed to apprise investors that the Company was already subject to the potentially

devastating effects of the coronavirus: at first, of the prospect of a serious outbreak; and later, of a worsening pandemic. Because information about a hypothetical possibility is not nearly as valuable as information about a current condition, investors were unable to adequately assess the value of the ADS in connection with the IPO and thus purchased their shares without material information.

130.    The Offering Materials' representations about these viruses and their attendant risks were also materially misleading given the focus on Company employees, but not residents, property owners, available and pre-opening apartment units, occupancy rates, funding, and other key aspects of the business subject to harm. Indeed, if residents (or prospective residents) fell ill (or worried that they might), the Company's business could suffer in fundamentally different ways than if employees became sick. Yet the Offering Materials did not discuss the myriad particular ways in which the Company's business, operations, and financial condition could suffer if an outbreak of sickness beset China and its residents, in Wuhan or elsewhere.

### 2.    The Steps Phoenix Might Take to Mitigate the Adverse Impact of the Coronavirus

131.    In describing the steps Phoenix might take in the event of a hypothetical incidence of sickness, the Offering Materials said the Company "could require [its] employees to be quarantined and/or [its] offices to be disinfected." But the Offering Materials failed to disclose any of the other steps the Company could realistically take, or planned to actually take, to mitigate the harm from an outbreak, even as the coronavirus was wreaking havoc in Wuhan and threatened the other regions in which the Company operated. Moreover, by limiting the risk of additional harm to the Company's operations from the coronavirus to only the risk of harm that the Chinese economy faced in general, the Offering Materials misled investors regarding the specific risks the Company and its business model faced from the coronavirus.

132.     Later, investors learned that Phoenix had offered rent abatements to select residents, increased rent for other residents, and withheld rent from some landlords in certain instances, all as a means of controlling fallout from problems associated with the coronavirus.  That the Company might refuse to pay landlords and allow residents not to pay rent were not actions that the Offering Materials described or that an IPO investor could reasonably foresee, nor would investors expect that the Company would raise rent for some residents in the midst of an outbreak then afflicting Wuhan and surrounding regions.  Rather, that conduct materially differed from the few actions the Offering Materials did disclose Phoenix could take in the context of a hypothetical situation: quarantine of employees and disinfection of corporate offices.

133.     Underscoring the importance of these issues to Phoenix's business are the Company's post-IPO disclosure of resident and landlord complaints regarding its handling of the coronavirus. As the Company acknowledged in a new "risk factor" in its April 2020 Form 20-F: "As the COVID-19 pandemic intensified, we experienced higher level of complaints from both the property owners and residents, which has caused negative publicity and adversely affected our reputation."  Phoenix's conduct following the IPO also caused regulators in China to intensify their efforts to investigate the Company's business practices and increase their oversight of the Company.

134.     Additionally, the Company later disclosed that it had significantly reduced the rate at which it renovated and sourced new apartment units, a move intended to staunch losses associated with the coronavirus.  Again, the Offering Materials did not alert investors to the possibility that the Company might suspend its efforts to renovate or source new apartments under any circumstances, much less those facing the Company as of the IPO.

135.     Rather, the Offering Materials merely emphasized the Company's reliance on various business partners, including "third-party service providers which provide cleaning and maintenance services, renovation partners which renovate [the] apartments, licensed financial institutions which

provide rent financing to [the] residents, and commercial banks and third-party payment companies which process rental payments for [the Company]."  Moreover, as the Offering Materials indicated: "If [Phoenix] cannot successfully pursue, establish or maintain relationships with [its] business partners, [its] business operations may be adversely affected."  These pre-IPO representations could not possibly apprise investors of the prospect that the Company would bring its apartment sourcing and renovation activities virtually to a halt after the IPO.

### 3.    The Existence and Nature of Tenant Complaints Before the IPO

136.    The Offering Materials favorably portrayed Phoenix's business, emphasizing its focus on residents and customer service while cautioning, in the most general way, that complaints made by residents and market rumors could adversely affect the Company's business and operations.  For example, the Offering Materials broadly stated: "Regulatory inquiries or investigations, lawsuits and other claims in the ordinary course of our business, perceptions of conflicts of interest, complaints made by our residents and market rumors, among other things, could substantially damage our reputation, even if they are baseless or fully addressed."

137.    Even before the IPO, however, Phoenix was subjected to numerous renter complaints about its business practices.  Some of these complaints stemmed from the Company's practice of funding operations with advance rent payments from residents, a form of financing described in the Offering Materials.  Unbeknownst to IPO investors, residents complained about Phoenix's practice of coaxing or deceiving them into applying for long-term loans without knowledge or authorization. The Company would receive the loan proceeds as a lump sum advance payment of rent, while the resident repaid the loan in monthly installments (akin to rent), plus interest.

138.    This practice obligated tenants to a loan without their prior express consent or all information necessary to understand the legal ramifications, while enabling the Company to receive and use all of the loan proceeds to cover operating expenses and costs and expand the business.  This

practice also complicated the termination of leases between Phoenix and its residents because a resident who ended a lease early was entitled to a refund of advance "rent" paid to the Company at the inception of the lease, but was still obligated to pay back the loan in many cases, and the process associated with receiving a refund was reportedly long and difficult.

### 4. The Manner in Which Phoenix Changed Its Sales and Marketing Practices Before the IPO

139.    The Offering Materials "primarily" attributed a material decline in occupancy before the IPO – from 86.9% to 77.9% between September 30 and November 30, 2019 – to "seasonality and the fact that [the Company] adjusted [its] sales and marketing strategies in the fourth quarter of 2019 . . . ."  But the Offering Materials failed to disclose the manner in which the Company changed its sales and marketing practices shortly before the IPO, nor did they disclose how any such changes adversely impacted occupancy.  Instead, the Offering Materials assured investors that the Company "believe[d]" its changes "will improve our sales and marketing efficiency in the long run."

140.    As the Offering Materials indicate, sales and marketing expenses "mainly" consist of advertising expenses, payroll costs for sales teams, incentives for apartment renting (including sales commissions and lead generation fees paid to third parties), and other related expenses.  As such, the Company could have altered its sales and marketing strategies in any number of ways, each of which could have had an impact on the nature and amount of its sales and marketing expenses and the way in which occupancy might decline.  Without disclosure of what that change entailed, investors could not appreciate whether the fourth quarter modification to sales and marketing strategies – evidently, a material change that occurred shortly before the IPO – might factor prominently into their decision to purchase the Company's ADS.

### 5. The Degree to Which Phoenix's Business Had Already Softened by the Time of the IPO

141.   The Offering Materials selectively disclosed certain information regarding Phoenix's financial results and operational condition in the months leading up to the IPO but did not disclose other information required to render a portrayal of those matters non-misleading.  Most of the factual information pertaining to the Company was current as of June 30, 2019, but in certain instances the information covered periods up to and including November 30, 2019 – just seven weeks before the January 16, 2020 effective date of the Offering Materials and eight weeks before the January 22, 2020 close of the IPO.

142.   Under a heading entitled "Recent Developments," the Offering Materials presented most of this updated information, stating that the Company set forth "selected unaudited financial data for October 2019 and certain operating data for October or November 2019" "for the purpose of providing . . . the most current information that [it is] able to provide under the time constraints," while acknowledging that "[its] 2019 fiscal year has only recently concluded . . . ."  That section indicated that the Company's occupancy rate had declined to 77.9% by November 30, 2019, which the Offering Materials blamed on seasonality and a change in sales and marketing strategies.  In fact, the Offering Materials indicated that the November 30, 2019 occupancy rate was nearly identical to the rate as of December 31, 2018 – 76.9% – implying that the decrease in occupancy before the IPO was normal, predictable, and cyclical in the business.

143.   The Offering Materials failed to present an accurate picture of the number of early lease terminations the Company faced during the just-completed fourth quarter of 2019 and beyond, which called for the Company to refund advance rental payments and lease the units to other tenants, if possible.  Instead, the Offering Materials represented that 67.9% of residents who had valid leases for the nine months ended September 30, 2019 had rent financing arrangements with the Company –

as compared to 91.3% in 2017 and 75.8% in 2018.  The Offering Materials also disclosed that the total amount of upfront payments Phoenix had returned to financial institutions for early termination of leases or resident defaults on loan repayments was RMB1,759.4 million (US$246.1 million) for the nine-month period ended September 30, 2019, as compared to RMB436.6 million in 2017 and RMB1,757.1 million (US$245.8 million) in 2018.

144.    After the IPO, however, in the April 29, 2020 Form 20-F, Phoenix reported that it had returned total upfront payments of RMB2,810.9 million (US$403.8 million) for 2019, which meant that early lease terminations and defaults had skyrocketed during the fourth quarter and required the return of RMB1,051.5 million (US$151 million) over that three-month period alone.  This quarterly amount, which constituted 37.4% of the entire amount Phoenix returned in 2019, was not disclosed in the Offering Materials.  Yet that quarterly amount represented a 79.3% increase from the average amount the Company had returned in each of the previous three quarters: an average of RMB586.47 million for each of the first, second, and third quarters of 2019, versus RMB1,051.5 million for the fourth quarter of 2019 (an increase of RMB465.03 million, or 79.3%).

145.    Accordingly, Phoenix's business had significantly weakened before the IPO, but the Offering Materials' selective disclosure rendered a misleading portrayal of the Company's condition, implying that the decline in occupancy in late-2019 was an expected and normal development while failing to disclose that the Company was then returning enormous amounts of upfront rent payments.

### 6.    Trends, Uncertainties, and Risks Threatened to Materially Affect Phoenix's Business and Render Historical Financial Results Not Indicative of Future Results

146.    As detailed herein, Phoenix filed a registration statement on Form F-1 (as amended), for the IPO.  Part I of Form F-1, entitled "Information Required in Prospectus," governs the nature and content of information an issuer must disclose in connection with an offering, such as the IPO.

Item 4 of Part I, entitled "Information with Respect to the Registrant and the Offering," requires, in subpart (a) thereof, disclosure of the "[i]nformation required by Part I of Form 20-F.

147.    In turn, Item 5 of Part I of Form 20-F, entitled "Operating and Financial Review and Prospects," requires an issuer to disclose "*management's assessment of factors and trends which are anticipated to have a material effect on the company's financial condition and results of operations in future periods*." (Emphasis in original).  Specifically, Item 5(D), entitled "Trend information," provides (emphasis is added):

> The company should identify the most significant recent trends in production, sales and inventory, the state of the order book and costs and selling prices since the latest financial year. *The company also should discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.*

148.    The scope of the information whose disclosure is required under this paragraph on trends, uncertainties and events is coextensive with that required under Item 303(a)(3)(ii) of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), which requires an issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

149.    Thus, for example, in May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on *currently known trends, events, and uncertainties that are reasonably expected to have material effects*, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.

> \*        \*        \*

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

150.    The 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1)    Is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.

(2)    If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

151.    Additionally, the SEC published interpretive guidance, effective December 29, 2003, "regarding the disclosure commonly known as Management's Discussion and Analysis of Financial Condition and Results of Operations, or MD&A, which is required by Item 303 of Regulation S-K, Items 303(b) and (c) of Regulation S-B, Item 5 of Form 20-F and Paragraph 11 of General Instruction B of Form 40-F."  The SEC advised that "companies must identify and disclose known trends, events, demands, commitments and uncertainties that are reasonably likely to have a material effect on financial condition or operating performance," citing the 1989 Interpretive Release and quoting, in footnote 6, the following text of the 1989 Interpretive Release:

MD&A mandates disclosure of specified forward-looking information, and specifies its own standards for disclosure – i.e., reasonably likely to have a material effect. The specific standard governs the circumstances in which Item 303 requires disclosure.

152.    Furthermore, in adopting amendments in 2003 to require disclosure of off-balance sheet arrangements for domestic and foreign issuers, the SEC recognized that "for Form 20-F annual reports, the existing MD&A-equivalent requirements for foreign private issuers currently mirror the substantive MD&A requirements for U.S. companies."  Because Form F-1 incorporated the MD&A

requirements from Form 20-F, and they are the same for domestic issuers, disclosure of uncertainties under Item 303(a) of Regulation S-K was required in the Offering Materials.

153.     Accordingly, the rules and regulations governing the preparation of the Offering Materials required the disclosure of information regarding known events, trends and uncertainties, including, as of the Offering Materials' effective date:

a.      That Phoenix had received customer complaints and negative press regarding questionable business conduct before the IPO, including its widespread and notorious practice of deceptively inducing renters to procure loans whose proceeds financed the Company's business and operations;

b.      That competition and demand in the residential rental market in China had suffered by the time of the IPO, as Phoenix experienced increasing, material early lease terminations during the fourth quarter of 2019 and the coronavirus ravaged the locations where Phoenix primarily operated, including Wuhan, the epicenter of the pandemic;

c.      That Phoenix was contending with extraordinarily adverse developments at the time of the IPO due to the coronavirus, including an increase in renter complaints and negative press and the prospect that renters could not continue to pay rent and service fees under conditions then existing as of the IPO, as well as the uncertainties associated with the steps that the Company might take, or planned to take, to mitigate these problems;

d.      That Phoenix had returned a significant amount of total upfront rent payments during the fourth quarter of 2019, which weakened the Company's capital position before the IPO and rendered it vulnerable to the ongoing, adverse effects of the coronavirus, as well as the prospect that the Company would have to return additional upfront payments as conditions worsened;

      e.     That Phoenix needed to grow in order to become profitable but as a result of its weakened capital position, decreasing occupancy, and increasing obligations to return rent and rental loans, the Company was unable to continue growing;

      f.     That Phoenix's technological capabilities were unable to enable the Company to overcome the complications and erosion of business resulting from the spread of the coronavirus throughout China at the time of the IPO; and

      g.     That, as a result of the foregoing, Phoenix was positioned no differently – or was positioned worse – than its competitors in managing the fallout from customer complaints or adverse implications stemming from the coronavirus in China.

154.    These developments, which were underway as of the IPO and progressively worsened thereafter, presented uncertainties and risks that were reasonably likely to have a material adverse effect on Phoenix's business, operations, and financial condition, requiring appropriate disclosure in the Offering Materials.

155.    Additionally, the Offering Materials failed to disclose certain of Phoenix's most material risks as of the IPO, in violation of Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105.[6] Item 105 requires an issuer to "provide under the caption 'Risk Factors' a discussion of the most significant factors that make an investment in the [securities] speculative or risky."  Specifically, Item 105 requires a company to "[e]xplain how the risk affects the registrant or the securities being offered" and "[s]et forth each risk factor under a subcaption that adequately describes the risk."  Item 3 of Part I of Form F-1 also requires a foreign private issuer, such as the Company, to "[f]urnish the information required" by Item 105.

---

[6]    Amendments to Regulation S-K, effective May 2, 2019, redesignated Item 503 of Regulation S-K, 17 C.F.R. §229.503(c), as Item 105, but Item 105 is substantively identical to its predecessor.

156.     The Offering Materials did not sufficiently disclose the risks associated with a decline in the business as a result of weakening demand and the onset of the coronavirus, including early terminations in the fourth quarter of 2019, the slowdown in sourcing and renovating apartment units, the return of upfront rent payments from tenants and financed by banks, and the actions that the Company might take or planned to take to address all of these issues.  In fact, the Offering Materials misleadingly stated that the only adverse effects on the Company's operations beyond quarantined employees and offices that required disinfecting were adverse effects caused by weakening in the Chinese economy "in general."  Without adequate disclosure of the specific risks facing Phoenix as a result of the pandemic, investors could not adequately ascribe a value for the Company's ADS in connection with the IPO.

**F.     Rules and Regulations Governing Preparation of the Offering Materials Imposed a Duty to Update Before the January 22, 2020 Close of the IPO**

157.     In addition to requiring disclosure of information necessary to render statements in the Offering Materials accurate and non-misleading and to describe known trends, uncertainties, and risks, the rules and regulations governing the preparation of the Offering Materials imposed a duty on Defendants to update and supplement disclosure therein between the Offering Materials' January 16, 2020 effective date and the January 22, 2020 close of the IPO.

158.     Generally, SEC Rule 424, codified as 17 C.F.R. §230.424, requires an issuer to file a prospectus with updated or supplemental disclosure of information to that in a prior prospectus or registration statement, where the new information concerns a basic term of a public offering that was previously omitted (such as the offering price), or describes a substantive change from or addition to the previously disclosed information.

159.     Specifically, SEC Rule 424(b)(3) [17 C.F.R. §230.424(b)(3)], requires a prospectus to disclose information that substantively differs from that set forth in an earlier-filed prospectus or registration statement no later than five business days after the effective date, as follows:

> A form of prospectus that reflects facts or events other than those covered in paragraphs (b) (1), (2) and (6) of this section that constitute a substantive change from or addition to the information set forth in the last form of prospectus filed with the Commission under this section or as part of a registration statement under the Securities Act shall be filed with the Commission no later than the fifth business day after the date it is first used after effectiveness in connection with a public offering or sales, or transmitted by a means reasonably calculated to result in filing with the Commission by that date.

160.     As detailed above, further material information emerged and developments occurred between January 16 and 22, 2020 which "constitute[d] a substantive change from or addition to" the information and developments set forth in the [Offering Materials]," effective on January 16, 2020. Such information and developments concerning the further spread of the coronavirus, additional travel restrictions in and around Wuhan and outside of China, public statements in China warning citizens not to enter Wuhan, and plans to place Wuhan on "lockdown" as of January 23, 2020.

161.     Despite this information and these developments, Defendants never caused Phoenix to issue a supplemental prospectus pursuant to Rule 424(b)(3) (or other applicable rule or regulation) within five business days of January 16, 2020 (or before the close of the IPO on January 22, 2020).[7] Accordingly, Defendants did not appropriately discharge their duty to update the Offering Materials, which continued to deprive investors of information necessary to understand Phoenix's business, operations, and prospects, as well as the true risks and uncertainties associated with purchasing the ADS in connection with the IPO.

---

[7]     Five business days of January 16, 2020 is January 24, 2020 (January 18 and 19 were weekend days, and January 20 was Martin Luther King Jr.'s Birthday, a federal legal public holiday listed in 5 U.S.C. §6103(a)).

## V.    CLASS ACTION ALLEGATIONS

162.    Plaintiffs bring this action as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons or entities who purchased Phoenix ADS pursuant and/or traceable to the Offering Materials (the "Class").  Excluded from the Class are Defendants and their families; the officers, directors and affiliates of Defendants and members of their immediate families; the legal representatives, heirs, successors or assigns of any of the foregoing; and any entity in which any Defendant has or had a controlling interest.

163.    The members of the Class are so numerous that joinder is impracticable.  Phoenix ADS are actively traded on the NYSE and millions of shares were sold in the IPO.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through discovery, Plaintiffs believe there are hundreds, if not thousands, of members in the Class.  Record owners and other Class members may be identified from records procured from or maintained by the Company or its transfer agent and may be notified of the pendency of this action using a form of notice similar to that customarily used in securities class actions.

164.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the common questions of law and fact are:

a.    whether Defendants violated the 1933 Act, as alleged herein;

b.    whether the Offering Materials misrepresented and/or omitted material information in violation of the 1933 Act; and

c.    whether and to what extent Class members have sustained damages, as well as the proper measure of damages.

165.    Plaintiffs' claims are typical of the claims of the Class, as all Class members were similarly affected by Defendants' conduct.

166.     Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in securities class actions.

167.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the wrongs alleged. There will be no difficulty in managing this action as a class action.

## VI.     CLAIMS

### A.     FIRST COUNT: For Violations of Section 11 of the 1933 Act (Against All Defendants)

168.     Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

169.     This Count is brought under Section 11 of the 1933 Act [15 U.S.C. §77k] on behalf of the Class, against all Defendants.  This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 11, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

170.     The registration statement, which was incorporated in and formed part of the Offering Materials for the IPO, contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein non-misleading, and omitted to state material facts required to be stated therein.

171.     Phoenix is the registrant for the IPO.  Defendants named herein were responsible for the contents and dissemination of the Offering Materials, and the Individual Defendants each signed and/or authorized the signing of the Offering Materials or were designated as director-nominees. Further, Cogency Global employed defendant Arthur, and, therefore, is responsible for his Section

11 violations under principles of agency and *respondeat superior*. The Underwriter Defendants marketed and underwrote the IPO and sold ADS to investors.

172.     As the issuer of the shares, Phoenix is strictly liable to Plaintiffs and the Class for the Offering Materials' material misstatements and omissions. Signatories of the Offering Materials, and possibly other Defendants, may also be strictly liable to Plaintiffs and the Class for such material misstatements and omissions.

173.     None of Defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Offering Materials were complete, accurate or non-misleading.

174.     By reason of the conduct alleged herein, each defendant violated, and/or controlled a person who violated, Section 11 of the 1933 Act.

175.     Plaintiffs and the Class members purchased the ADS pursuant and/or traceable to the registration statement and have sustained damages as a result. The value of the ADS has declined substantially subsequent and due to Defendants' violations.

176.     At the time of their purchases of the ADS, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.

177.     Less than one year elapsed from the time that Plaintiffs discovered, or reasonably could have discovered, the facts upon which these claims are based to the time this action was filed. Less than three years has elapsed between the time the securities were offered to the public and the time this action was filed.

**B.     SECOND COUNT: For Violation of Section 12(a)(2) of the 1933 Act
        (Against All Defendants)**

178.     Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

179.     This Count is brought under Section 12(a)(2) of the 1933 Act [15 U.S.C. §77l(a)(2)] on behalf of the Class, against all Defendants.  This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 12(a)(2), and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

180.     By means of the defective prospectus, which was incorporated in and formed part of the Offering Materials for the IPO, Defendants promoted and sold, for the benefit of themselves and their associates, ADS to Plaintiffs and other members of the Class.  In the absence of their efforts to publicize the IPO and solicit ADS purchasers, the IPO could not have occurred.  Moreover, Cogency Global, which employed and directed defendant Arthur, is responsible for his Section 12(a)(2) violations under principles of agency and *respondeat superior.*

181.     Additionally, Phoenix qualifies as a statutory seller under SEC Rule 159A, which provides that an issuer is a statutory seller for the purpose of Section 12(a)(2) regardless of the form of underwriting.  Specifically, SEC Rule 159A(a), codified as 17 C.F.R. §230.159A(a)(1)- (4), provides, in part, the following "[d]efinition of seller for the purposes of section 12(a)(2) of the [1933] Act":

> For purposes of section 12(a)(2) of the Act only, in a primary offering of securities of the issuer, regardless of the underwriting method used to sell the issuer's securities, seller shall include the issuer of the securities sold to a person as part of the initial distribution of such securities, and the issuer shall be considered to offer or sell the securities to such person, if the securities are offered or sold to such person by means of any [prospectus] . . . or other communication that is an offer in the offering by the issuer to such person.

182.     Furthermore, for the purposes of SEC Rule 159A(a), "information is provided or a communication is made by or on behalf of an issuer if an issuer or an agent or representative of the issuer authorizes or approves the information or communication before its provision or use." Note 1, 17 C.F.R. §230.159A(a); *see also* 70 Fed. Reg. 44722 at 44769 (Aug. 3, 2005).

183.     The Offering Materials contained untrue statements of material fact and failed to disclose material facts, as detailed above.  Defendants owed Plaintiffs and the other Class members a duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials to ensure they were truthful and accurate.  In the exercise of reasonable care, Defendants should have known of the misstatements and omissions contained in the Offering Materials.

184.     Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Offering Materials when purchasing the ADS.

185.     By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the 1933 Act.  As a direct and proximate result of these violations, Plaintiffs and other members of the Class who purchased the ADS pursuant to the Offering Materials sustained substantial damages in connection with their purchases.  Accordingly, Plaintiffs and the other members of the Class who hold ADS issued pursuant to the Offering Materials have the right to rescind and recover the consideration paid for their shares, and hereby tender their ADS to Defendants.  Class members who have sold their ADS seek damages to the extent permitted by law.

**C.     THIRD COUNT: For Violation of Section 15 of the 1933 Act (Against Phoenix, Cogency Global, the Individual Defendants, and Tiger Brokers)**

186.     Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

187.     This Count is brought under Section 15 of the 1933 Act [15 U.S.C. §77o] against Phoenix, Cogency Global, the Individual Defendants, and Tiger Brokers.  This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 15, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

188.     As detailed herein, each of Defendants committed primary violations of the 1933 Act, or are directly responsible and primarily liable for any such violations, by committing conduct in contravention of Sections 11 and 12(a)(2) or having responsibility for such conduct.

189.     The Company controlled all of the Individual Defendants and Cogency Global, which it employed as its U.S. representative in connection with the IPO and otherwise.  Cogency Global, through defendant Arthur, executed the Offering Materials on behalf of Phoenix at its direction, and committed primary violations of the 1933 Act as a result.  Alternatively, because Arthur possessed and exercised the authority to sign the Offering Materials and bind the Company accordingly, he had control over the Company in connection with the IPO.

190.     The Individual Defendants, other than Arthur, each were control persons of Phoenix by virtue of their positions as directors and/or senior officers of the Company.  They each had direct and/or indirect business and/or personal relationships with other directors, officers and/or major shareholders of the Company.  Alternatively, the Company controlled the Individual Defendants, given the influence and control the Company possessed and exerted over the Individual Defendants.

191.     And Tiger Brokers controlled Tiger Securities, the broker-dealer through which Tiger Brokers offered ADS for sale in the U.S. for purposes of the IPO.  Without Tiger Brokers' direction, control, and involvement in the IPO, Tiger Securities would not have offered the ADS for sale. Accordingly, Tiger Brokers controlled Tiger Securities for the purpose of this claim and is therefore responsible for Tiger Securities' violation of Sections 11 and 12(a)(2) under principles of agency and *respondeat superior.*

192.     By reason of the conduct alleged herein, these defendants violated Section 15 of the 1933 Act, and Plaintiffs and the Class have suffered harm as a result.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, respectfully pray for judgment against Defendants as follows:

A.    Determining that this action is properly brought as a class action and certifying the Class accordingly, designating Plaintiffs as Class representatives, and appointing Robbins Geller Rudman & Dowd LLP and Johnson Fistel, LLP as Class Counsel;

B.    Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with prejudgment interest thereon;

C.    Awarding rescission or a rescissory measure of damages, to the extent available under the 1933 Act, together with prejudgment interest thereon;

D.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

E.    Granting such other, further and/or different relief as the Court deems just and proper.

## VIII.  JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  January 15, 2021                    ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                            SAMUEL H. RUDMAN
                                            JOSEPH RUSSELLO
                                            MARGARET SANBORN-LOWING


                                            _____
                                                 */s/ Samuel H. Rudman*
                                            SAMUEL H. RUDMAN

- 63 -

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
jrussello@rgrdlaw.com
mlowing@rgrdlaw.com

JOHNSON FISTEL, LLP
RALPH M. STONE
1700 Broadway, 41st Floor
New York, NY  10019
Telephone:  212/292-5690
212/292-5680 (fax)
ralphs@johnsonfistel.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
Murray House
40 Powder Springs Street
Marietta, GA 30064
Telephone:  470/632-6000
770/200-3101
michaelf@johnsonfistel.com

*Lead Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Samuel H. Rudman, certify that on January 15, 2021, I authorized a true and correct copy

of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF

system, which will send notification of such filing to all counsel registered to receive such notice.

*/s/ Samuel H. Rudman*

SAMUEL H. RUDMAN
