**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

KATHERINE WANDEL, Individually and on Behalf of All Others Similarly Situated,

             Plaintiff,

   vs.

JING GAO, DEREK BOYANG SHEN, YAN CUI, WENBIAO LI, ERHAI LIU, XIAN CHEN, WILLIAM WANG, GANG JI, EDWIN FUNG, JIANPING YE, JASON ZHENG ZHANG, CITIGROUP GLOBAL MARKETS INC., CREDIT SUISSE SECURITIES (USA) LLC, J.P. MORGAN SECURITIES LLC, TIGER BROKERS (NZ) LIMITED, US TIGER SECURITIES, INC., COGENCY GLOBAL INC., RICHARD ARTHUR and PHOENIX TREE HOLDINGS LIMITED,

             Defendants.

Civil Action No. 1:20-cv-03259-PAC

---

**MEMORANDUM OF LAW IN SUPPORT OF THE UNDERWRITERS'**
**MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..........................................................................................1

STATEMENT OF FACTS ................................................................................................4

    I.    PHOENIX TREE'S BUSINESS ...............................................................4

    II.    THE UNFOLDING OF THE COVID-19 PANDEMIC AND PHOENIX TREE'S IPO..........................................................................................5

        A.    The Coronavirus Emerges in Wuhan..............................................5

        B.    The Offering Materials and the IPO ...............................................6

        C.    Post-IPO Events Related to the Spread of COVID-19 ....................8

    III.    PHOENIX TREE'S POST-IPO DISCLOSURES .................................10

    IV.    THE COMPLAINT ................................................................................11

ARGUMENT....................................................................................................................11

    I.    PLAINTIFFS FAIL TO ALLEGE AN ACTIONABLE MISSTATEMENT OR OMISSION..................................................................................11

        A.    Plaintiffs' Claims Based on Alleged Omissions Regarding the Potential Impact of COVID-19 and Phoenix Tree's Response Should Be Dismissed. .................................................................13

        B.    Plaintiffs' Claims Based on Alleged Omissions Regarding Changes to Phoenix Tree's Sales and Marketing Strategies Should Be Dismissed. ..................................................................................18

        C.    Plaintiffs' Claims Based on Alleged Omissions Regarding Customer Complaints Must Be Dismissed......................................................19

        D.    Plaintiffs' Claims Based on Alleged Omissions of Financial Data Showing Pre-IPO "Softening" of Phoenix Tree's Business Must Be Dismissed....................................................................................21

        E.    Plaintiffs' Claims Based on Alleged Omissions of Information Required by Items 303 and 105 Must Be Dismissed.....................23

    II.    A DISPOSITIVE NEGATIVE CAUSATION DEFENSE IS EVIDENT ON THE FACE OF THE COMPLAINT. .......................................................24

III.    PLAINTIFFS' CONTROL PERSON CLAIMS MUST ALSO BE
         DISMISSED. ...........................................................................................25

CONCLUSION.................................................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*In re All. Pharm. Corp. Sec. Litig.*,
   279 F. Supp. 2d 171 (S.D.N.Y. 2003)......................................................................................17

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007).....................................................................................................12

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013).................................................................................2, 17

*Berg v. Velocity Fin., Inc.*,
   2021 WL 268250 (C.D. Cal. Jan. 25, 2021) ...........................................................................15

*In re BHP Billiton Ltd. Sec. Litig.*,
   276 F. Supp. 3d 65 (S.D.N.Y. 2017).......................................................................................23

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*,
   2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ......................................................................13, 23

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
   665 F. Supp. 2d 404 (S.D.N.Y. 2009)......................................................................................24

*Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*,
   114 F. Supp. 2d 316 (D.N.J. 2000) .........................................................................................13

*Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*,
   2010 WL 4642554 (S.D.N.Y. Nov. 17, 2010).........................................................................13

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   618 F. Supp. 2d 311 (S.D.N.Y. 2009)......................................................................................17

*In re HEXO Corp. Sec. Litig.*,
   2021 WL 878589 (S.D.N.Y. Mar. 8, 2021) .......................................................................14, 15

*In re IAC/InterActiveCorp Sec. Litig.*,
   695 F. Supp. 2d 109 (S.D.N.Y. 2010)......................................................................................20

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016).......................................................................................................23

*In re Initial Pub. Offering Sec. Litig.*,
   358 F. Supp. 2d 189 (S.D.N.Y. 2004)......................................................................................22

*Jaroslawicz v. M&T Bank Corp.*,
    962 F.3d 701 (3d Cir. 2020)........................................................................................24

*Johnson v. Sequans Commc'ns S.A.*,
    2013 WL 214297 (S.D.N.Y. Jan 17, 2013) (Crotty, J.)...............................12, 13, 19

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*,
    650 F.3d 167 (2d Cir. 2011).........................................................................................25

*Lin v. Interactive Brokers Grp., Inc.*,
    574 F. Supp. 2d 408 (S.D.N.Y. 2008)..........................................................................13

*In re Livent, Inc. Noteholders Sec. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001)..........................................................................19

*Medina v. Tremor Video, Inc.*,
    640 F. App'x 45 (2d Cir. 2016) .............................................................................15, 24

*Miller v. Lazard, Ltd.*,
    473 F. Supp. 2d 571 (S.D.N.Y. 2007)..........................................................................19

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)...................................................................................12, 25

*In re Netflix, Inc. Sec. Litig.*,
    2005 WL 1562858 (N.D. Cal. June 28, 2005) .............................................................20

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).........................................................................................12

*Nurlybayev v. ZTO Express (Cayman) Inc.*,
    2019 WL 3219451 (S.D.N.Y. July 17, 2019) ..............................................................11

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015)..................................................................................................19

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008).................................................................. *passim*

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..........................................................................................12

*Rubinstein v. Credit Suisse Grp. AG*,
    457 F. Supp. 3d 289 (S.D.N.Y. 2020).....................................................................23, 24

*Stadnick v. Vivint Solar, Inc.*,
    861 F.3d 31 (2d Cir. 2017)............................................................................................23

v

*In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*,
    774 F. Supp. 2d 584 (S.D.N.Y. 2011)........................................................................24

*In re Stemline Therapeutics, Inc. Sec. Litig.*,
    313 F. Supp. 3d 543 (S.D.N.Y. 2018) (Crotty, J.) ............................................16, 19

*Thesling v. Bioenvision, Inc.*,
    374 F. App'x 141 (2d Cir. 2010) ..................................................................................18

*In re TVIX Sec. Litig.*,
    25 F. Supp. 3d 444 (S.D.N.Y. 2014)...............................................................3, 4, 18

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
    2020 WL 7029134 (S.D.N.Y. Nov. 30, 2020).........................................................19

## Statutes and Regulations

15 U.S.C. § 77k................................................................................................. *passim*

15 U.S.C. § 77l.................................................................................11, 13, 24, 25

15 U.S.C. § 77o................................................................................................ 25

17 C.F.R. § 229.303(a)(3)(ii) .............................................................................23

## Rules

Fed. R. Civ. P. 12(b)(6)...............................................................................1, 24, 25

Defendants Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, J.P. Morgan Securities LLC, Tiger Brokers (NZ) Limited, and US Tiger Securities, Inc. (collectively, the "Underwriters") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiffs' Amended Class Action Complaint (ECF No. 32, the "Complaint" or "AC") pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]

## PRELIMINARY STATEMENT

This action relates solely and exclusively to the January 17, 2020 initial public offering ("IPO") of Phoenix Tree Holdings Limited ("Phoenix Tree"). As the Court is aware, new counsel for Phoenix Tree has not yet appeared, and Plaintiffs have not yet served its individual current and/or former officers and directors. Somewhat unusually, it thus falls to the Underwriters to explain why the Complaint fails to state a claim under the Securities Act of 1933 (the "Securities Act"). Whatever Phoenix Tree's *current* issues may be with appearing and defending this action, the only question before the Court at this time is whether Plaintiffs plausibly allege that the Offering Materials[2] for Phoenix Tree's IPO were materially misleading *when they were issued in January 2020*. For the reasons explained below, the Complaint fails entirely to meet that requirement, and the Court should therefore grant this motion and dismiss Plaintiffs' claims against the Underwriters.

Plaintiffs' core claim is that the Offering Materials misled investors by not including a specific risk disclosure addressing the potential future impact of the novel coronavirus on Phoenix Tree's residential apartment business. To withstand dismissal, this claim must be based on plausible, well-pleaded allegations that Phoenix Tree knew *as of the time of the IPO* that the novel

---

[1] Documents cited as "Ex. ___" are attached to the concurrently-filed Declaration of Adam J. Goldstein in Support of the Underwriters' Motions to Dismiss.

[2] The Prospectus, Ex. 1, along with the amended Registration Statement filed January 15, 2020 and all documents referred to therein, are collectively referred to herein as the "Offering Materials."

coronavirus would have a material adverse impact on its business. Plaintiffs' own allegations, however, show that cases of novel coronavirus appeared at the time to be confined to Wuhan—which was only one of the 13 Chinese cities in which Phoenix Tree operated apartments. (Ex. 1 at 128.) Moreover, nothing in the Complaint supports a reasonable inference that Phoenix Tree knew or could have predicted on January 16, 2020—the effective date of the Offering Materials—that the 41 reported cases of novel coronavirus infection among Wuhan's 11 million residents would worsen and become a once-in-a-century pandemic. Indeed, even after the IPO closed, none other than Dr. Anthony Fauci wrote that the trajectory of COVID-19 was still "impossible to predict."[3] And it was not until March 2020 that the U.S. Securities and Exchange Commission (the "SEC") promulgated guidance to reporting companies like Phoenix Tree regarding their COVID-19 disclosures.[4] Upon the issuance of that guidance, which was months after the IPO, Phoenix Tree promptly updated its disclosures to specifically address COVID-19. Tellingly, Plaintiffs *completely ignore* the timing of the SEC's guidance and Phoenix Tree's prompt response to it. In addition, consistent with prevailing practices prior to the SEC's March 2020 guidance, the Offering Materials included disclosures related to virus risks, specifically citing the SARS and MERS coronaviruses as examples of what could impair Phoenix Tree's business, which any reasonable investor would have understood could extend to the COVID-19 coronavirus should the situation worsen. *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013), ("[Where there is disclosure that is broad enough to cover a specific risk, the disclosure is not misleading simply because it fails to discuss the specific risk. This is particularly so when there is ample disclosure of the broader risk.") (internal citations omitted).

---

[3] (Ex. 4.)
[4] (Ex. 5.)

2

Plaintiffs' other misrepresentation allegations, which do not focus on COVID-19, are likewise deficient. *First,* Plaintiffs' demand for specific details of Phoenix Tree's *already-disclosed* changes to its sales and marketing strategies in the fourth quarter fails because Phoenix Tree, as a matter of law, had no duty to disclose that information notwithstanding Plaintiffs' insistence that they "might" have wanted to know it. *See, e.g.*, *In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 450 (S.D.N.Y. 2014). *Second*, Plaintiffs' claim that the Offering Materials omitted to disclose the existence of customer complaints should be dismissed because Phoenix Tree never gave the misleading impression that it did not have customer complaints; it instead disclosed survey results showing a respectable, but far-from-flawless, 70% customer satisfaction rating. Indeed, Plaintiffs' only allegations on the topic concern an increase in customer complaints—and some renter protests—that followed the IPO in the wake of the COVID-19 pandemic. But Plaintiffs fail to identify any statement in the Offering Materials that was false or misleading as a result of the alleged nondisclosure. *Finally*, Phoenix Tree's alleged failure to disclose purported "softening" during its fourth quarter is not actionable. The IPO took place before fourth quarter results were finalized. The Offering Materials thus included only preliminary information about the quarter, none of which Plaintiffs allege was false. Instead, Plaintiffs claim Phoenix Tree should have also disclosed preliminary statistics for rent pre-payments it needed to return. Phoenix Tree had no duty to disclose this information, however, and the Offering Materials in any event were not misleading because the increase in returned rent payments was entirely in line with the increase in apartments managed by Phoenix Tree.

The Court should dismiss Plaintiffs' claims against the Underwriters with prejudice.[5]

---

[5] Importantly, though not necessary for the Court to consider given Plaintiffs' failure to allege adequately that the Offering Materials were materially misleading, there is no well-pleaded suggestion whatsoever in the Complaint that the Underwriters knew or should have known that any aspect of Phoenix Tree's disclosures were misleading. To the contrary, even if Plaintiffs' could show that the Offering Materials were materially misleading, which they cannot, the

3

## STATEMENT OF FACTS

### I.      Phoenix Tree's Business

Plaintiffs allege that Phoenix Tree operates one of the largest co-living platforms in China. (AC ¶ 33.)  Phoenix Tree rents apartments from property owners on a long-term basis and then splits them into smaller units, makes improvements, and subleases the new units to tenants.  (*Id*. ¶ 33.)  Residents typically occupy one room and share common areas such as the living room, kitchen, and bathroom.  (*Id*. ¶ 36.)  According to the Complaint, Phoenix Tree generates most of its revenues from rents and service fees.  (*Id*. ¶ 40.)  Residents pay rent upfront on an annual, half-yearly, or quarterly basis.  (Ex. 1 at 94.)  For residents wanting to pay on a monthly basis, Phoenix Tree cooperates with financial institutions to offer rent financing options.  (*Id*.)  Under such arrangements, residents enter into a financing agreement for their annual rent, the financial institution pays Phoenix Tree, and the residents repay the loan to the financial institution in monthly installments.  (*Id*.)  This practice not only helps residents by allowing them to pay rent over time but also provides Phoenix Tree with an additional source of capital to support its operations and growth.  (*Id*. at 105-06.)  However, as Phoenix Tree explains in the Offering Materials, in the event of an early termination or a resident's default, Phoenix Tree returns the upfront payment to the relevant financial institution.  (*Id*. at 106.)

As of the IPO, the Complaint alleges that Phoenix Tree managed 406,746 apartments, more than half of which are located in its top three cities—Beijing, Shanghai, and Hangzhou.  (*Id*. at 36.)  Just 12% of Phoenix Tree's apartments were in Wuhan.  (*See* AC ¶ 37.)  Phoenix Tree also

---

Underwriters would be able to establish in this action the affirmative due diligence defense provided for in the Securities Act. 15 U.S.C. § 77k(b)(3) (underwriters will not be liable if they had, "after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading").

has operations in other cities, including Tianjin, Nanjing, Guangzhou, Chengdu, Suzhou, Wuxi, Xi'an and Chongqing, (Ex. 1 at 36; AC ¶ 36), and is headquartered in Beijing, (AC ¶ 37).

## II.     The Unfolding of the COVID-19 Pandemic and Phoenix Tree's IPO

### A.     The Coronavirus Emerges in Wuhan

On December 31, 2019, the Wuhan Municipal Health Commission released the first public message about early signs of "pneumonia cases" related to a local seafood market in Wuhan.  (*See* AC ¶ 67.)  Of the 27 cases discovered, seven were considered "serious," two had improved and were set to be discharged, and the remaining patients were in "stable and controllable condition."[6] On January 2, 2020, major Chinese newspapers started what became a trend of reports stating that the situation was under control.[7]  Reports on January 3, 2020 disclosed that a total of 44 people had been diagnosed with what was then being described as viral pneumonia.  (*See* AC ¶ 74.)[8] Scientists in China did not publicly announce the discovery of the novel coronavirus until January 7, 2020, and, at that time, there was no publicly reported evidence that the new virus could be readily spread by humans.[9] (*Cf.* AC ¶ 81 (alleging that on January 7, 2020, the U.S. Embassy in Beijing warned of a pneumonia outbreak of an unknown cause).)

In addition to the media's delayed reports on medical developments, the Chinese government was also late to share information publicly.[10]  For example, while the Chinese government internally acknowledged a threat of a pandemic on January 14, 2020, President Xi

---

[6] (*See* Ex. 6 (twenty-seven people infected with the viral pneumonia, only seven were in critical condition, and that the "viral pneumonia is 'preventable' and 'controllable[,]'" and that "Wuhan citizens don't need to worry because 'there has been a mature system to control and cure'" the virus).)

[7] (Ex. 7 ("[W]e can be sure about one thing－even if it is an epidemic, it can be controlled.  Unlike in 2002-03, China now has a comprehensive emergency response mechanism in place.").)

[8] (Ex. 8 (quoting Wuhan Health Commission release that stated "[s]o far, there is no clear sign[] of human-to-human transmission, and no medical worker has been infected").)

[9] (Ex. 9.)

[10] (*See* Ex. 10.)

Jinping did not warn the public until January 20, 2020.[11]  Further, while China reported the first

"likely" coronavirus-related death on January 11, 2020,[12] officials continued to state the situation

was under control.[13]  Even the January 15, 2020 advisory issued by the U.S.  Embassy in Beijing

referenced in the Complaint (*see* AC ¶ 87), issued one day before Phoenix Tree's registration

statement went effective, was only a "Watch Level 1 Alert," meaning "be aware and practice usual

precautions."[14]  In fact, until at least January 16, 2020, officials in Wuhan stated publicly that there

had been no new cases recorded for about two weeks.[15]  The city operated as usual, with peak

levels of travel, dining, and lodging due to the Lunar New Year festivities.[16]

### B.    The Offering Materials and the IPO

On January 16, 2020, Phoenix Tree's registration statement became effective.  (AC ¶ 63.)

Phoenix Tree's offering documents contained detailed disclosures about the company's business

as well as the risks associated with the investment in its ADS.  As part of disclosures addressing

the "risks related to catastrophic weather, natural disasters, potential climate change, health

epidemics and other outbreaks, which could significantly disrupt our operations," Phoenix Tree

included a specific warning concerning the potential impact of a future epidemic:

> Our business could also be adversely affected by the effects of Ebola virus disease,
> H1N1 flu, H7N9 flu, avian flu, Severe Acute Respiratory Syndrome, or SARS, or
> other epidemics. Our business operations could be disrupted if any of our
> employees is suspected of having Ebola virus disease, H1N1 flu, H7N9 flu, avian
> flu, SARS or another contagious disease or condition, since it could require our
> employees to be quarantined and/or our offices to be disinfected. In addition, our

---

[11] (Ex. 11 (quoting first public comments by President Xi Jinping regarding developing coronavirus).)

[12] (Ex. 12.)

[13] (Ex. 13.)

[14] (Ex. 14 (reporting first death from the coronavirus, but also stating that, based on reports from the Wuhan Municipal Health Commission, "[t]he [other] patients' condition and epidemic situation is currently controllable").)

[15] (Ex. 15 ("the risk of widespread transmission between humans is low" also stating, "[i]nvestigations have uncovered no clear evidence that the new coronavirus could be transmitted between human beings, and experts are conducting further research into the virus."  The article noted that, per the Wuhan Health Commission, "[m]ost of the 41 confirmed cases occurred in males and middle-aged or elderly people.  Symptoms mostly seen in the early stage of the disease are fever and coughing, and those patients in serious condition are mostly elderly or those with other diseases").)

[16] (*See* Ex. 16.)

6

results of operations could be adversely affected to the extent that any of these epidemics harms the Chinese economy in general.

(Ex. 1 at 44; AC ¶ 125.)  Elsewhere in the Offering Materials Phoenix Tree provided additional warnings about potential downturns in China's economy:

> **Any severe or prolonged slowdown in China's economy, any slowdown or discontinuation of urbanization in our target markets, or any changes in government policies that restrain the development of residential rental market may materially and adversely affect our business, financial condition and results of operations**. Economic downturn in China at large or in the cities we operate in could also result in a reduction of available apartments we could source from as fewer people may purchase properties for investment purpose or some property owners may have to sell their properties for liquidity. In addition, in the event of recession, our potential residents or existing residents may choose cheaper rental options due to budget constraint, or we may have to reduce our rent to prevent resident attrition, which may result in our rent expense exceeding our revenues and would adversely affect our business, financial condition and results of operations.

(Ex. 1 at 36 (emphasis added).)  Phoenix Tree also provided extensive disclosures of the risks to its business associated with tenant financing, lease terminations, and tenant defaults.  (*See id.* at 31, 142.)  For example:

> In the event of lease breach or early termination, we may not be able to find a new resident or corporate client to fill the vacancy in a timely manner, under the same terms or at all, and the security deposit or penalty of the defaulting resident or corporate client may not be sufficient to cover our losses for the period in between the leases. Our business, results of operations and financial condition would be adversely affected if a significant number of our residents or corporate clients seek early termination nor [sic] fail to meet their obligations in connection with the lease.

(*Id.* at 32.)  And Phoenix Tree disclosed that it made changes to its sales and marketing activities that could impact its growth in the fourth quarter of 2019.  For example, Phoenix Tree disclosed to investors that:

> [O]ur strong historical growth rates may not be indicative of our future growth, and we may not be able to generate similar growth rates in future periods**.** For instance, we expect our revenue growth in the fourth quarter of 2019 to be modest compared with our growth in prior quarters. This is primarily because we adjusted our sales and marketing strategies in the fourth quarter of 2019 which we believe will improve our sales and marketing efficiency in the long run.

7

(*Id.* at 25.)  Finally, Phoenix Tree informed investors that the Offering Materials only include

information known as of January 16, 2020:

> The forward-looking statements made in this prospectus relate only to events or
> information as of the date on which the statements are made in this prospectus.
> Except as required by law, we undertake no obligation to update any forward-
> looking statements to reflect events or circumstances after the date on which the
> statements are made or to reflect the occurrence of unanticipated events. You
> should read this prospectus and the documents that we have referred to in this
> prospectus and have filed as exhibits to the registration statement, of which this
> prospectus is a part, completely and with the understanding that our actual future
> results may be materially different from what we expect.

(*Id.* at 72.)

On January 17, 2020, far from being quarantined due to a known pandemic, a group of

Phoenix Tree employees that had freely traveled to Manhattan from China rang the opening bell

of the New York Stock Exchange to celebrate the public listing and start of trading of Phoenix

Tree's ADS.  (AC ¶ 27.)  Plaintiffs both allege they purchased Phoenix Tree ADS on January 17,

2020 "pursuant and/or traceable to the Offering Materials."  (*Id.* ¶ 13.)

### C.    Post-IPO Events Related to the Spread of COVID-19

On January 17, 2020, the day of Phoenix Tree's IPO, the Wuhan Municipal Health

Commission announced the second novel coronavirus-related death.[17]  On January 20, 2020, as

more than 200 cases and three more deaths were confirmed, the World Health Organization's

("WHO") regional director for the Western Pacific admitted for the first time that the virus could

spread through "at least some human to human transmission."[18]  On January 22, 2020, the Chinese

government announced that it would impose a temporary cancellation of all outgoing flights and

trains from Wuhan, beginning on January 23, 2020.[19]  (*See* AC ¶ 93.)  Even still, China's

---

[17] (Ex. 17.)
[18] (Ex. 18.)
[19] (Ex. 19.)

8

government was projecting to its own population and the rest of world that everything was under control. Indeed, on January 22, 2020, now-former President Trump announced that the virus was "totally under control" and that the situation was "going to be just fine" based on his conversations with President Xi.[20]

On January 24, 2020, China implemented a wide-ranging travel ban covering 13 cities and 41 million people. (AC ¶ 95.) As of January 31, 2020, however, Wuhan reported only 3,215 laboratory-confirmed cases and 192 fatalities. (*Id.* ¶ 96.) From January 1, 2020 through February 28, 2020, 32 companies (including Phoenix Tree) commenced initial public offerings in the United States.[21] Nine of those companies were based in China, including one—Yunhong International— with headquarters in Wuhan.[22] The offering materials of *only one* of the 32 companies even mentioned the novel coronavirus. And that single company's disclosure was made on February 6, 2020—nearly three full weeks after Phoenix Tree's Offering Documents were declared effective, during which time the world learned a great deal about the novel coronavirus and certain countries took action to mitigate its spread—and completely mirrors Phoenix Tree's disclosure regarding the potential impact of epidemics except that it includes "coronavirus" in the list of diseases before the catch-all provision of other potential diseases; in all other respects it was the same.[23] But even that single mention of the novel coronavirus was ahead of its time; it was not until March of 2020

---

[20] (Ex. 20.)

[21] *See* Goldstein Decl. at ¶ 3.

[22] Like Phoenix Tree's Offering Materials, the offering documents for Yunhong International's February 12, 2020 IPO included a general risk disclosure concerning the potential impact of pandemic disease on the company's financial condition, but did not specifically mention the novel coronavirus. (Ex. 21 at 59.)

[23] That company—Huize Holding Limited ("HHL")— in its February 6, 2020 prospectus briefly mentioned the novel coronavirus as part of its disclosures concerning the general risks posed by epidemics. (*See* Ex. 22 at 38-39 ("In recent years, there have been outbreaks of epidemics in China and globally, such as the coronavirus originated in Wuhan at the end of 2019, H1N1 flu, avian flu or another epidemic. Our business operations could be disrupted by any of these epidemics. In addition, our results of operations could be adversely affected to the extent that any health epidemic harms the Chinese economy in general.").) Even as of February 6, 2020 HHL did not provide specific disclosure as to how the novel coronavirus could impact its business.

that the SEC sought to provide guidance to registrants as to whether and how they should disclose the potential impacts of COVID-19.

## III.    Phoenix Tree's Post-IPO Disclosures

The SEC did not provide reporting companies guidance about disclosures concerning the potential impact of COVID-19 until March 2020.  (*See* Ex. 5.)   And Phoenix Tree promptly followed the SEC's guidance on this disclosure in its March 25, 2020 press release, which included its unaudited financial results for the fourth quarter and completed 2019 calendar year.  (*See* Ex. 2.)  Phoenix Tree's performance was consistent with its pre-IPO operations, and Phoenix Tree viewed the final totals for 2019 positively.  (*See id.* at 1 ("We are very pleased with our progress during this quarter and throughout the year. We experienced rapid growth in operating scale, with the number of apartment units increasing 85.4% year-over-year as of December 31, 2019.").)  In accordance with SEC guidance, Phoenix Tree informed investors that the "novel coronavirus" was having an impact on its business and described the initial steps it was taking to mitigate the effects of the virus and to protect its employees and residents.

About a month later, on April 24, 2020, named Plaintiff Wandel initiated this action by filing her original complaint in this case with the Court.  (*See* ECF No. 1.)  After the lawsuit was filed, on April 29, 2020, Phoenix Tree filed its Form 20-F with the SEC.  (AC ¶ 105; Ex. 3.)  In the Form 20-F, Phoenix Tree reiterated its year-end and full-year 2019 financial results.  (AC ¶ 105.)  It also provided extensive disclosure about the impact of the coronavirus.  (*Id.*)  For example, Phoenix Tree explained that it first began to see that the COVID-19 outbreak could possibly have some negative impacts on its business and operations, "particularly in Wuhan, after the Chinese government implemented various travel restrictions and quarantine measures, starting from an unexpected and unprecedented lockdown of the City of Wuhan on January 23, 2020."  (*Id.* ¶ 107.)

10

Consistent with its risk disclosures regarding the potential impact of an economic downturn, Phoenix Tree disclosed that, in responding to COVID-19, it terminated certain leases with property owners and in some cases offered partial rental waivers to certain affected residents. (*Id.*) And Phoenix Tree disclosed that after the COVID-19 pandemic intensified, it began to experience "a higher level of complaints from both property owners and residents." (*Id.*)

## IV.    The Complaint

The Complaint asserts six categories of alleged misrepresentations or omissions: (i) the onset of the coronavirus before the IPO and its potential implications for Phoenix Tree's business (AC ¶¶ 124-30); (ii) the steps Phoenix Tree might take after the IPO to mitigate the adverse impact of the coronavirus (*id.* ¶¶ 131-35); (iii) the existence and nature of renter complaints before and after the IPO, including complaints regarding nonconsensual or confusing renter financing at the inception of leases (*id.* ¶¶ 136-38); (iv) the manner in which Phoenix Tree changed its sales and marketing efforts before the IPO, as well as the actual and expected impact of that change on Phoenix Tree's operations (*id.* ¶¶ 139-40); (v) the degree to which Phoenix Tree's business had already softened by the time of the IPO (*id.* ¶¶ 141-45); and (vi) a claimed failure to disclose "known trends" or risks under Items 303 and 105 of Regulation S-K (*id.* ¶¶ 146-56). As noted, new counsel for Phoenix Tree has not yet appeared, and Plaintiffs have not yet served the individual defendants.

## ARGUMENT

## I.    Plaintiffs Fail to Allege an Actionable Misstatement or Omission.

To maintain claims under Sections 11 and 12(a)(2) of the Securities Act, Plaintiffs must allege, among other things, that the Offering Materials "contained an untrue statement of material fact or omitted to state a material fact that was required to be stated therein or was necessary to make the statements therein not misleading." *Nurlybayev v. ZTO Express (Cayman) Inc.*, 2019

WL 3219451, at *4 (S.D.N.Y. July 17, 2019).  Courts evaluate whether a statement of material fact is false or misleading based on what the complaint plausibly alleges the issuer knew or should have known at the time of the challenged offering.  *See Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669-70 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009). Clairvoyance is not required.  *Id.* at 664 ("The securities laws do not require clairvoyance in the preparation of offering documents."); *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Corporate officials need not [be] clairvoyant; they are only responsible for revealing those material facts reasonably available to them.  Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.").

Moreover, in assessing whether a particular statement is false or misleading, courts review the offering materials as a whole to determine whether the "representations, taken together and in context, would have misled a reasonable investor."  *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (citation omitted); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 365-66 (2d Cir. 2010) ("When analyzing offering materials for compliance with the securities laws, we review the documents holistically and in their entirety.").  Courts may also consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff[s] and upon which [they] relied in bringing the suit," as well as other matters of which judicial notice may be taken, such as news articles and stock prices.  *See Johnson v. Sequans Commc'ns S.A.*, 2013 WL 214297, at *8 (S.D.N.Y. Jan 17, 2013) (Crotty, J.) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.

2007)); *Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at \*1 (S.D.N.Y. Jan. 14, 2010) (court may take judicial notice of stock prices).

**A.      Plaintiffs' Claims Based on Alleged Omissions Regarding the Potential Impact of COVID-19 and Phoenix Tree's Response Should Be Dismissed.**

Even though the Offering Materials disclosed the risks of an epidemic on Phoenix Tree's operations and financial results, Plaintiffs assert the Offering Materials were misleading because they lacked "adequate disclosure of the specific risks facing Phoenix Tree as a result of the [COVID-19] pandemic." (AC ¶ 156.) Alternatively, Plaintiffs assert that Defendants can be liable for failing to update the Offering Materials after the effective date and after investors' claimed purchase date. (*Id.* ¶ 161.) Either way, Plaintiffs' claims fail as a matter of basic securities law because both theories of liability are improper attempts to impose Securities Act liability based "on a 'backward-looking assessment' of the registration statement." *Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*, 2010 WL 4642554, at \*11 (S.D.N.Y. Nov. 17, 2010) (citation omitted).

Most significantly, Plaintiffs do not and cannot plausibly allege that the potential impact of COVID-19 on Phoenix Tree's business was known—or even knowable—to Phoenix Tree as of the IPO, which is a requirement to state a claim against the Underwriters. *See Johnson*, 2013 WL 214297, at \*12 ("The relevant inquiry under the Securities Act is . . . whether the Company knew or had reason to know, at the time the offering documents were filed, that the statement was untrue.") (citation omitted); *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008) ("A cognizable claim under Section 11 or 12 of the 1933 Act requires plaintiffs to, 'at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering.'") (quoting *Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*, 114 F. Supp. 2d 316, 323 (D.N.J. 2000)). Given the Complaint's failure to plausibly

13

allege that Phoenix Tree knew or could have known the extent to which COVID-19 would profoundly impact its business in China, it certainly cannot be read to allege plausibly that Phoenix Tree knew or could have known it would ultimately contemplate (and implement) purportedly unprecedented measures to address that pandemic and the resulting financial fallout. *See In re HEXO Corp. Sec. Litig.*, 2021 WL 878589, at *9 (S.D.N.Y. Mar. 8, 2021) (plaintiffs failed to allege "any particular facts indicating that the [company] knew at the time of the IPO that [it] would later exercise their business judgment").

As of January 16, 2020—the date the Offering Materials were declared effective—Chinese health officials had confirmed ***only 41 total cases*** of viral infection.  (*See* Ex. 15.)  Even the *China Daily*, the most widely circulated English-language newspaper in China, was reporting that "the risk of widespread transmission between humans is low."  (*See id.*)  There was simply no way for anyone to know what was to come over the next week, let alone the next few months. Unsurprisingly, Plaintiffs provide no factual support for their conclusory assertion that Phoenix Tree's operations were "already under siege by mid-January 2020 by the coronavirus, which had originated in Wuhan and was rapidly spreading to other regions in China."  (AC ¶¶ 4, 128.)

Instead, Plaintiffs point to two things they claim support an allegation Phoenix Tree knew about the risks posed by COVID-19.  First, they allege Phoenix Tree's executives traveled to ring the NYSE opening bell on January 17, 2020, and therefore must have known about international travel warnings announced in response to the virus, and thus were somehow expected to be able to predict the potential future impact the virus would inflict on Phoenix Tree.  (*Id.* ¶ 27.)  Even if Phoenix Tree's executives knew of the purported travel advisories—which is not particularly

14

likely[24]—the more probable inference to be drawn by their alleged willingness to travel internationally is that they lacked the greater knowledge and insight about the developing contagion that Plaintiffs imply.

Plaintiffs then point to the fact that Phoenix Tree's operations are based in China and include a presence in Wuhan.  (*See id.* ¶¶ 27, 126.)  The mere fact that Phoenix Tree operates in China and manages apartments in Wuhan does not create a plausible inference it was aware by the time of the IPO of the nature of this specific virus or the prolonged impact it would have.  Indeed, an awareness that an emerging virus infected 41 total people and caused a single death in a city of more than 11 million people is a far cry from Phoenix Tree knowing this particular virus would soon grow to become a deadly global pandemic unlike anything the world had experienced in more than 100 years.  *See Berg v. Velocity Fin., Inc.*, 2021 WL 268250, at *10 (C.D. Cal. Jan. 25, 2021) (mortgage company did not need to disclose coronavirus-related uncertainty in the real estate market in the offering materials for its January 17, 2020 IPO because defendants could not have known the extent of the coronavirus pandemic at the time of the IPO").

At most, the Complaint relies on the ultimate impact COVID-19 had on Phoenix Tree's business (and hindsight) to suggest that additional warnings should have been included in the Offering Materials.  (*See, e.g.*, AC ¶ 96.)  However, "[b]ecause 'post hoc description[s]' of events 'do[ ] not speak to what the Company knew or should have known at the time of time of the Offering,' plaintiffs' Section 11 claim must be dismissed as to all defendants." *HEXO*, 2021 WL 878589, at *10; *see also Medina v. Tremor Video, Inc.*, 640 F. App'x 45, 49 (2d Cir. 2016) ("With the benefit of hindsight, it may be possible to say that seeds of what was to come were available

---

[24] Not only do Plaintiffs fail to allege that there were even travel restrictions in place as of January 17, 2020, but it is likely that Phoenix Tree's executives departed China for the United States prior to January 17 if they were to arrive at the NYSE in time to ring the opening bell that morning.

to defendants at the time.  But we cannot attribute to [Phoenix Tree], based on hindsight alone, knowledge that events that may well have appeared unremarkable at the time, were omens of future material problems.").

Moreover, Phoenix Tree did warn investors that it could be impacted to the extent a future epidemic harmed China's economy.  (*See supra* II.B.)[25]  Plaintiffs cannot point to anything that would make this statement actionable simply because it mentioned other viruses (and included a catch-all) without explicitly mentioning the one that causes COVID-19.  *See, e.g.*, *In re Stemline Therapeutics, Inc. Sec. Litig.*, 313 F. Supp. 3d 543, 549 (S.D.N.Y. 2018) (Crotty, J.) (dismissing claims where allegedly materialized risk would not have been unexpected to reasonable investor).

Recognizing there is no plausible basis to establish the Offering Materials were misleading as of January 16, 2020, Plaintiffs attempt to impose liability because Phoenix Tree did not submit an amended prospectus in light of *public* reports regarding COVID-19 between January 17 and January 24, and particularly, the news of the January 23, 2020 lockdown of Wuhan by the Chinese government.  (*See* AC ¶¶ 157-61 & n.7.)  But just as the Securities Act does not require companies to predict the future or disclose risks based on information before it exists, it does not require a company to supplement its offering documents in real time during the days between the effective date of its final registration statement and the closing date of its offering.  Indeed, Sections 11 and 12(a)(2) expressly concern whether statements in a company's offering materials are false or misleading *when they are made* (*i.e.*, declared effective) and do not impose a duty to disclose subsequent developments.  *See, e.g.*, 15 U.S.C. § 77k(a) (providing for liability if "any part of the

---

[25] Plaintiffs' reliance on COVID-related disclosures made by Yum! Brands in its February 5, 2020 press release and in its 2019 Form-10-K that it filed on February 20, 2020 is entirely unavailing. (*See* AC ¶ 21.)  The three weeks between the effective date of Phoenix Tree's registration statement and Yum! Brands' press release were historic in terms of the evolving state of the world's knowledge about the novel coronavirus and the responsive and proactive measures taken by governments all over the world to slow the rate of infections.  For example, the Chinese government did not impose a lockdown in Wuhan until January 23, 2020, (*see id.* ¶ 107), and the WHO did not publicly classify the novel coronavirus as a public health emergency until January 30, 2020, (*see* Ex. 23).

registration statement, ***when such part became effective***, contained" misstatements) (emphasis added); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 320 (S.D.N.Y. 2009) ("The disclosure provided in a prospectus is adjudged by the facts as they existed when the applicable registration statement became effective."); *In re All. Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 183 (S.D.N.Y. 2003) ("Section 11 plainly states that it provides a civil remedy . . . based on false statements or misleading omissions of material fact in any part of a registration statement *when such part became effective*") (citation omitted) (emphasis in original).

Furthermore, even if Phoenix Tree was obligated to supplement its disclosures based on developments between January 16, 2020 and January 24, 2020, any alleged omissions would still be inactionable because the information referenced in the Complaint concerning the developing virus and the potential impact on Phoenix Tree was available to investors and the public at large, and the Offering Materials warned investors about epidemics and the potential impact of an economic downturn. Thus, a specific reference to a then-novel coronavirus would not have substantively altered the "total mix of information available to investors." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) ("Because the substance of the alleged omissions was already in the public domain, the alleged omissions could not have altered 'the total mix of information available' to the public and were also immaterial as a matter of law."). Nor are there any non-conclusory or non-hindsight-driven allegations establishing that the developments over that single week somehow provided more information to Phoenix Tree such that it suddenly became clairvoyant as to how the virus would impact its business over the course of the next several months.

17

**B.      Plaintiffs' Claims Based on Alleged Omissions Regarding Changes to Phoenix Tree's Sales and Marketing Strategies Should Be Dismissed.**

Perhaps Plaintiffs' most puzzling claims are those based on Phoenix Tree's alleged omissions about changes it made to its sales and marketing practices during the fourth quarter of 2019—puzzling because Plaintiffs *concede* that the Offering Materials disclosed the fact that changes were made and that those changes, together with seasonality, may have driven a short-term decline of 9% in Phoenix Tree's occupancy rates between September 30 and November 30 of 2019.  (*See* AC ¶ 139.)  Plaintiffs instead allege that these disclosures were inadequate—*but not misleading*—because they failed to detail the specific changes and the precise manner in which they contributed to the reported short-term dip in occupancy rates.  This fails to state a claim under the Securities Act for two reasons.

First, Plaintiffs fail to allege that Phoenix Tree had any duty to disclose those details.  *See Thesling v. Bioenvision, Inc.*, 374 F. App'x 141, 143 (2d Cir. 2010) ("For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information.").  Plaintiffs do not claim the allegedly omitted details about the specific changes rendered the factual statement that those changes were made (or any other affirmative statements in the Offering Materials) misleading.  Rather, Plaintiffs merely assert that those details "might" have allowed investors to assess whether they agreed with Phoenix Tree's statements about the probable impact of the change in strategy.  (AC ¶ 140.)  But "[i]t is not sufficient to allege that the investor *might* have considered the . . . omission important." *In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 450 (S.D.N.Y. 2014), *aff'd sub nom. Elite Aviation LLC v. Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2014) (emphasis added).  This is particularly so when investors' interest in those omitted details stems

18

from a desire to evaluate whether they agreed with Phoenix Tree's business judgment.[26]  *See In re Weight Watchers Int'l Inc. Sec. Litig.*, 2020 WL 7029134, at *12 (S.D.N.Y. Nov. 30, 2020) (dismissing omissions-based claims as inactionable attacks on company strategy and management performance rather than on adequacy of disclosures).

Second, investors were expressly informed of the scope of disclosure about "what that change entailed" at the time of the IPO.  (AC ¶ 140.)  Yet Plaintiffs (and every other member of the putative class) invested in Phoenix Tree anyway.  Plaintiffs cannot impose Securities Act liability because Phoenix Tree failed to disclose detailed information investors knew was omitted.  *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 441 (S.D.N.Y. 2001).

### C.    Plaintiffs' Claims Based on Alleged Omissions Regarding Customer Complaints Must Be Dismissed.

Plaintiffs' customer complaint claim fails for similar reasons.  At the outset, the securities laws do not impose a generalized duty to disclose information—even material information (which the alleged omissions regarding customer complaints are *not* in any event).  *See Panther Partners, Inc.*, 538 F. Supp. 2d at 668 ("Materiality alone does not demand disclosure, nor does the duty to disclose encompass non-material information.").  Instead, the Securities Act only imposes a duty to disclose information necessary to render other affirmative statements made in offering materials not misleading.  *See Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 578 (S.D.N.Y. 2007); *In re Stemline*, 313 F. Supp. 3d at 549 ("[Defendants'] silence could not have been misleading when there was no duty to disclose.").  Yet Plaintiffs do not point to a single statement in the Offering Materials that created the impression that Phoenix Tree had no customer complaints (or even very

---

[26] To the extent the Plaintiffs also challenge as misleading Phoenix Tree's statement that it believes those changes "will improve our sales and marketing efficiency in the long run," (AC ¶ 139), Plaintiffs fail to allege sufficient facts to establish that the belief or opinion was not genuinely held, as is required to state a Securities Act claim, s*ee Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1325-27 (2015).  Moreover, this type of generalized statement of corporate optimism about the future success of recent initiatives is typically described by courts as non-actionable puffery.  *See Johnson*, 2013 WL 214297, at *15.

few complaints) or that every Phoenix Tree customer was totally satisfied.  To the contrary, the Offering Materials disclosed that Phoenix Tree's customer satisfaction rate—expressed as the percentage of surveyed customers who would recommend a Phoenix Tree-operated apartment— was approximately 70%.  (Ex. 2 at 4.)  There is no allegation this was false.  The Offering Materials also disclosed risks associated with potential customer complaints, tenant defaults, and lease cancellations.  (*Id.* at 142.)  There is no claim these were false.

To be clear, every company with customers has *some* customer complaints.  *See In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005) (dismissing securities fraud claims and explaining "every large company can expect to have some customer complaints, and the existence of such complaints fails to render Netflix's statements about its service false."). The question is whether the nature and/or the quantity of those complaints materially affected Phoenix Tree's business at the time of the IPO.  *See Panther Partners*, 538 F. Supp. 2d at 669. Here, the only specific factual allegations about customer complaints suggest that any such complaints were immaterial until after the IPO, once the COVID-19 pandemic deepened.  (*See, e.g.*, AC ¶¶ 117-19.)[27]  Plaintiffs' failure to allege any facts to establish that any pre-IPO complaints were negatively impacting Phoenix Tree's business pre-IPO—or that they evidenced a material level of customer dissatisfaction that threatened to do the same—requires dismissal.  *See In re IAC/InterActiveCorp Sec. Litig.,* 695 F. Supp. 2d 109, 120 (S.D.N.Y. 2010) (plaintiffs failed to allege widespread dissatisfaction was damaging issuer's business prior to offering).

---

[27] Plaintiffs' claim about customer complaints—particularly prior to the IPO—appears to be derived from the following sentence in Phoenix Tree's April 29, 2020 Form 20-F: "As the COVID-19 pandemic intensified, we experienced higher level of complaints from both the property owners and residents, which has caused negative publicity and adversely affected our reputation." (AC ¶¶ 107, 133.)  Plaintiffs apparently infer from the phrase "higher level of complaints" that a significant volume of customer complaints must have existed before COVID-19.  (S*ee id.* ¶ 111.)  The more plausible inference to be drawn from that disclosure, however, is that prior levels of complaints from residents and owners preceding the intensification of the COVID-19 pandemic were not perceived as a threat and thus were not material.  Moreover, there were no tenant and landlord protests "[i]n the wake of the IPO" as Plaintiffs allege, (*id.* ¶ 118); those protests took place *nine months later* in November 2020.  (*See* Ex. 24.)

**D.      Plaintiffs' Claims Based on Alleged Omissions of Financial Data Showing Pre-IPO "Softening" of Phoenix Tree's Business Must Be Dismissed.**

Plaintiffs assert the Offering Materials were misleading because they omitted information concerning "the degree to which the Company's business had already softened by the time of the IPO." (AC ¶¶ 123, 141.)  This claim apparently is based on the non-disclosure of a single data point regarding Phoenix Tree's financial performance during its most recently completed quarter as of the IPO—results that were expressly not included in the Offering Materials.  Specifically, Plaintiffs claim the total upfront payments Phoenix Tree returned to financial institutions as a result of lease terminations or tenant defaults "skyrocketed" during the fourth quarter of 2019, and Phoenix Tree's failure to disclose this misled investors by concealing that Phoenix Tree's business "had significantly weakened before the IPO." (*Id.* ¶¶ 144-45.)  This claim fails for several reasons.

First, the Complaint makes no attempt to allege Defendants were aware of the purported material increase in the level of lease terminations or tenant defaults at the time of the IPO. Defendants adequately warned they were reporting then-incomplete financial results of the prior quarter. (Ex. 1 at 11 ("The selected unaudited financial data [for October 2019 only] and operating data [for October/November 2019 only] above may not be indicative of our financial results for future interim periods or for the full year ended December 31, 2019").)  And Plaintiffs fail to allege facts to plausibly establish that the fourth quarter financials were sufficiently finalized and accurate such that the information concerning alleged material changes was available to Phoenix Tree for inclusion in the Offering Materials.  Without any such information, the Court cannot conduct its "critical inquiry" into whether and to what extent the alleged issues and their potential impacts were known or knowable at the time of the IPO. *See Panther Partners*, 538 F. Supp. 2d at 669.

Second, Plaintiffs fail to plausibly allege that the historical financial data disclosed in the Offering Materials contained any misstatements.  Indeed, Plaintiffs do not allege the reporting of

21

Phoenix Tree's historical financial results included in the Offering Materials was false in any way. *See In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 210 (S.D.N.Y. 2004) (accurate statements of historical fact are "non-actionable"). Instead, Plaintiffs allege the disclosures of Phoenix Tree's historical financial results were misleading because they did not include the alleged significant increase in the total amount of lease terminations or resident defaults for Q4 2019.

But this claim cannot withstand basic scrutiny because, while the total dollar amount returned by Phoenix Tree to financial institutions in connection with terminated leases and renter defaults increased in Q4 2019 compared to the first three quarters of 2019, the percentage of residents who terminated leases or defaulted remained constant. (*See* Ex. 1 at 95 (disclosing that 44.6% of residents with financing arrangements terminated their leases early in the first nine months of 2019); Ex. 3 at 75 (disclosing that 44.6 % of residents with financing arrangements terminated their leases early for the entire calendar year 2019).) In fact, while Plaintiffs attempt to reverse engineer a claim by asserting that the amount of lease terminations "skyrocketed" in the then-undisclosed fourth quarter of 2019, the percentage of residents who terminated or defaulted on their leases *actually decreased* from 46.8% in 2018 to 44.6% in 2019. (Ex. 3 at 75.) What did change, however, was the number of apartments operated by Phoenix Tree and its subsidiaries over the course of 2019, which climbed from 285,349 units as of March 31, 2019 to 438,309 units by December 31, 2019. (*See* Ex. 2 at 4.) The mere fact that the dollar amount Phoenix Tree returned to financial institutions as a result of lease terminations increased as the number of apartment units being managed and leased by Phoenix Tree also increased is unremarkable and unsurprising. It is, in fact, a function of basic math.

Plaintiffs also knew from the Offering Materials that the total amount of upfront payments Phoenix Tree returned to financial institutions as a result of early lease termination or resident

22

defaults in the first nine of months of 2019 (RMB1,759.4 million (US$246.1 million)) exceeded the yearly totals for both 2017 (RMB436.6 million) and 2018 (RMB1,757.1 million (US$245.8 million). (AC ¶ 143.) Thus, to the extent this single financial metric could be described as material, investors were already aware it historically trended upwards. (Ex. 1 at 27.) *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017) (omission of interim quarter results for period immediately preceding registration statement would not have altered "total mix" of information available because omitted results were consistent with the company's prior performance).

### E. Plaintiffs' Claims Based on Alleged Omissions of Information Required by Items 303 and 105 Must Be Dismissed.

Plaintiffs' invocation of Items 303 and 105 of SEC Regulation S-K to create a duty to disclose that plainly did not exist at the time of the IPO does not rescue their deficient claims. (AC ¶¶ 146-54.) A trend or uncertainty must be disclosed pursuant to Item 303 only if it is both (1) presently known to management, and (2) reasonably likely to have material effects on the registrant's financial condition or results of operation. *See* 17 C.F.R. § 229.303(a)(3)(ii); *see also* SEC Release No. 33-6835 (May 18, 1989). Plaintiffs accordingly must plead, "with some specificity, facts establishing that [Phoenix Tree] had actual knowledge of the purported trend" or uncertainty at the time of the IPO. *Blackmoss Invs. Inc.*, 2010 WL 148617, at *9; *see also Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) ("Item 303 requires the registrant to disclose only those trends, events, or uncertainties that it actually knows of when it files the relevant report with the SEC."); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 88 (S.D.N.Y. 2017) ("Item 303 requires the registrants actual knowledge of the relevant trend of uncertainty."). To state a claim under Item 105, Plaintiffs must adequately allege that Phoenix Tree knew, as of the time of the IPO, about an undisclosed risk factor that could seriously affect its present or future business. *Rubinstein v. Credit Suisse Grp. AG*, 457 F. Supp. 3d 289, 300

(S.D.N.Y. 2020); *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 713 (3d Cir. 2020) ("[A] cause of action for failing to disclose a material risk naturally requires an allegation that a known risk factor existed at the time of the offering.").

For the same reasons discussed above, the Complaint's allegations regarding what Phoenix Tree knew—and, most importantly, when it knew—"lack the specificity and detail needed to rise above the 'speculative' level and into the realm of a 'plausible' pleading." *Panther Partners, Inc.*, 538 F. Supp. 2d at 670; *see also Tremor Video, Inc.*, 640 F. App'x at 48 ("Our precedents require allegations of specific facts from which we could draw the "plausible inference" that defendants had actual knowledge of the trends or uncertainties at the time the registration statement was issued."); *Rubinstein*, 457 F. Supp. 3d at 301 (dismissing complaint asserting claim under Item 105 where the plaintiffs failed to allege that the defendants "knew of any undisclosed risk factors"). Moreover, Plaintiffs' other allegations and the other facts subject to judicial notice demonstrate that the purported undisclosed "trends and uncertainties" either were not in existence or not material at the time the Offering Materials were declared effective.

## II.   A Dispositive Negative Causation Defense is Evident on the Face of the Complaint.

Plaintiffs' Securities Act claims should also be dismissed because their alleged damages from the drop in the price of the ADS were not caused by the alleged misstatements. 15 U.S.C. § 77k(e); 15 U.S.C. § 77*l*(b).  Although "negative causation" is an affirmative defense, dismissal is appropriate where the facts giving rise to the defense are apparent on the face of the Complaint (and matters of which the Court may take judicial notice).  *See, e.g.*, *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 590 (S.D.N.Y. 2011); *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 420 (S.D.N.Y. 2009) (dismissing complaint under Rule 12(b)(6) on negative causation grounds where complaint and public documents showed that

24

issuer's stock price fell sharply before the "purported corrective disclosure" and the corrective disclosure did not "correct" any statements made in the IPO documents).

Here, Plaintiffs conclude the "revelation of [the allegedly misstated and omitted information] caused an immediate and significant decline in the trading price of the ADS," (AC ¶ 122.)  But no such thing occurred following the purportedly corrective disclosures in Phoenix Tree's March 25, 2020 press release.  Rather, the trading price of the ADS began to decline in February 2020 and continued to decline along with the rest of the global stock market through March 20, 2020, when it hit a trading price of $7.50 per share. (*See* Ex. 25.)  The trading price of the ADS then *increased* following the March 25, 2020 press release—climbing approximately 17.7% from $7.65 per share on March 24, 2020 to $9.00 per share on March 27, 2020.  (*Id.*) Accordingly, the Complaint's allegations on their face demonstrate the absence of any causal relationship between the alleged misstatements and Plaintiffs' purported damages, and the Court should dismiss Plaintiffs' claims on this basis as well.

## III.    Plaintiffs' Control Person Claims Must Also Be Dismissed.

Because Plaintiffs fail to adequately allege a "primary violation" of Section 11 or 12, *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185-86 (2d Cir. 2011), their Section 15 claim against Tiger Brokers also fails.  *Morgan Stanley*, 592 F.3d at 358.

## CONCLUSION

For the foregoing reasons, the Underwriters respectfully request that the Court dismiss Plaintiffs' Securities Act claims against the Underwriters with prejudice.

Dated: New York, New York
   May 3, 2021

                              SHEARMAN & STERLING LLP

                              By:    /s/ Daniel Lewis
                                     Adam S. Hakki
                                     Daniel Lewis
                                     Emily Griffen
                                     Adam J. Goldstein
                                     SHEARMAN & STERLING LLP
                                     599 Lexington Avenue
                                     New York, New York 10022-6069
                                     Telephone:  (212) 848-4000
                                     Facsimile:  (212) 848-7179
                                     Email:  adam.hakki@shearman.com
                                             daniel.lewis@shearman.com
                                             egriffin@shearman.com
                                             adam.goldstein@shearman.com

                                     *Attorneys for Underwriters*