Table of Contents

**Off-Balance Sheet Arrangements**

We have not entered into any financial guarantees or other commitments to guarantee the payment obligations of any third parties. We have not entered into any derivative contracts that are indexed to our shares and classified as shareholder's equity, or that are not reflected in our consolidated financial statements. Furthermore, we do not have any retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to such entity. We do not have any variable interest in any unconsolidated entity that provides financing, liquidity, market risk or credit support to us or engages in leasing, hedging or research and development services with us.

**Holding Company Structure**

We are a holding company with no material operations of our own. We conduct our operations through our subsidiaries, consolidated VIEs and our subsidiaries in China. As a result, our ability to pay dividends depends upon dividends paid by our PRC subsidiaries. If our existing PRC subsidiaries or any newly formed ones incur debt on their behalf in the future, the instruments governing their debt may restrict their ability to pay dividends to us. In addition, our wholly foreign-owned subsidiary in China is permitted to pay dividends to us only out of its retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. Under PRC law, each of our subsidiaries, our consolidated VIE and its subsidiaries in China are required to set aside at least 10% of its after-tax profits each year, if any, to fund certain statutory reserve funds until such reserve funds reach 50% of its registered capital. In addition, our wholly foreign-owned subsidiary in China may allocate a portion of its after-tax profits based on PRC accounting standards to enterprise expansion funds and staff bonus and welfare funds at its discretion, and our consolidated VIE and its subsidiaries may allocate a portion of its after-tax profits based on PRC accounting standards to a discretionary surplus fund at their discretion. The statutory reserve funds and the discretionary funds are not distributable as cash dividends. Remittance of dividends by a wholly foreign-owned company out of China is subject to examination by the banks designated by SAFE. Our PRC subsidiaries have not paid dividends and will not be able to pay dividends until they generate accumulated profits and meet the requirements for statutory reserve funds.

**Inflation**

Since inception, inflation in China has not materially affected our results of operations. According to the National Bureau of Statistics of China, the year-over-year percent changes in the consumer price index for December 2017 and 2018 were increases of 1.8% and 1.9%, respectively. Although we have not been materially affected by inflation in the past, we may be affected if China experiences higher rates of inflation in the future.

**Quantitative and Qualitative Disclosures about Market Risk**

*Foreign Exchange Risk*

Substantially all of our revenues and expenses are denominated in Renminbi. The functional currency of our subsidiaries in the PRC, the consolidated VIEs and their subsidiaries is the Renminbi. We use Renminbi as our reporting currency. Monetary assets and liabilities denominated in currencies other than the functional currency are translated into the functional currency at the rates of exchange ruling at the balance sheet date. Transactions in currencies other than the functional currency during the year are converted into functional currency at the applicable rates of exchange prevailing when the transactions occurred. Transaction gains and losses are recognized in the consolidated statements of comprehensive loss.

We do not believe that we currently have any significant direct foreign exchange risk and have not used any derivative financial instruments to hedge exposure to such risk. Although in general our

109

Table of Contents

exposure to foreign exchange risks should be limited, the value of your investment in our ADSs will be affected by the exchange rate between the U.S. dollar and the Renminbi because the value of our business is effectively denominated in Renminbi, while our ADSs will be traded in U.S. dollars.

The conversion of Renminbi into foreign currencies, including U.S. dollars, is based on rates set by the PBOC. The PRC government allowed the Renminbi to appreciate by more than 20% against the U.S. dollar between July 2005 and July 2008. Between July 2008 and June 2010, the exchange rate between the Renminbi and the U.S. dollar had been stable and traded within a narrow band. Since June 2010, the Renminbi has fluctuated against the U.S. dollar, at times significantly and unpredictably. On November 30, 2015, the Executive Board of the International Monetary Fund (IMF) completed the regular five-year review of the basket of currencies that make up the Special Drawing Right, or the SDR, and decided that with effect from October 1, 2016, Renminbi is determined to be a freely usable currency and will be included in the SDR basket as a fifth currency, along with the U.S. dollar, the Euro, the Japanese yen and the British pound. In the fourth quarter of 2016, the Renminbi has depreciated significantly in the backdrop of a surging U.S. dollar and persistent capital outflows of China. This depreciation halted in 2017, and the Renminbi appreciated approximately 7% against the U.S. dollar during this one-year period. Starting from the beginning of 2019, the Renminbi has depreciated significantly against the U.S. dollar again. In early August 2019, the PBOC set the Renminbi's daily reference rate at RMB7.0039 to US$1.00, the first time that the exchange rate of Renminbi to U.S. dollar exceeded 7.0 since 2008. With the development of the foreign exchange market and progress towards interest rate liberalization and Renminbi internationalization, the PRC government may in the future announce further changes to the exchange rate system, and we cannot assure you that the Renminbi will not appreciate or depreciate significantly in value against the U.S. dollar in the future. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the Renminbi and the U.S. dollar in the future.

To the extent that we need to convert U.S. dollars into Renminbi for our operations, appreciation of the Renminbi against the U.S. dollar would have an adverse effect on the Renminbi amount we receive from the conversion. Conversely, if we decide to convert Renminbi into U.S. dollars for the purpose of making payments for dividends on our ordinary shares or ADSs or for other business purposes, appreciation of the U.S. dollar against the Renminbi would have a negative effect on the U.S. dollar amounts available to us.

We estimate that we will receive net proceeds of approximately US$152.4 million from this offering if the underwriters do not exercise their option to purchase additional ADSs, after deducting underwriting discounts and commissions and the estimated offering expenses payable by us. Assuming that we convert the full amount of the net proceeds from this offering into Renminbi, a 10% appreciation of the U.S. dollar against the Renminbi, from the exchange rate of RMB7.1477 for US$1.00 as of September 30, 2019 to a rate of RMB7.8625 to US$1.00, will result in an increase of RMB109.0 million in our net proceeds from this offering. Conversely, a 10% depreciation of the U.S. dollar against the Renminbi, from the exchange rate of RMB7.1477 for US$1.00 as of September 30, 2019 to a rate of RMB6.4329 to US$1.00, will result in a decrease of RMB109.0 million in our net proceeds from this offering.

*Interest rate risk*

We have not been exposed to material risks due to changes in market interest rates, and we have not used any derivative financial instruments to manage our interest risk exposure. However, we cannot provide assurance that we will not be exposed to material risks due to changes in market interest rate in the future.

After the completion of this offering, we may invest the net proceeds we receive from the offering in interest-earning instruments. Investments in both fixed rate and floating rate interest earning instruments carry a degree of interest rate risk. Fixed rate securities may have their fair market value

110

Table of Contents

adversely impacted due to a rise in interest rates, while floating rate securities may produce less income than expected if interest rates fall.

**Critical Accounting Policies, Judgments and Estimates**

We prepare our financial statements in conformity with U.S. GAAP, which requires us to make judgments, estimates and assumptions. We continually evaluate these estimates and assumptions based on the most recently available information, our own historical experience and various other assumptions that we believe to be reasonable under the circumstances. Since the use of estimates is an integral component of the financial reporting process, actual results could differ from our expectations as a result of changes in our estimates.

An accounting policy is considered critical if it requires an accounting estimate to be made based on assumptions about matters that are highly uncertain at the time such estimate is made, and if different accounting estimates that reasonably could have been used, or changes in the accounting estimates that are reasonably likely to occur, could materially impact the consolidated financial statements. We believe that the following accounting policies involve a higher degree of judgment and complexity in their application and require us to make significant accounting estimates. The following descriptions of critical accounting policies, judgments and estimates should be read in conjunction with our consolidated financial statements and other disclosures included in this prospectus.

*Consolidation of Variable Interest Entities*

We operate certain of our business in China through Zi Wutong and Yishui, which are limited liability companies established under the laws of the PRC in January 2015 and November 2016, respectively. Yishui holds the VATS License for internet content provision business, or the ICP License, from the government in order to carry out certain VATS business in China. The equity interests of our consolidated VIEs are legally held by individuals who act as nominee equity holders of the consolidated VIEs on behalf of Xiaofangjian, one of our wholly-owned subsidiary of us. A series of contractual agreements, including power of attorney agreements, exclusive business cooperation agreements, equity interest pledge agreements, exclusive call option agreements and spouse consent letters, were entered among Zi Wutong, Xiaofangjian and nominee equity holders of Zi Wutong and among Yishui, Xiaofangjian and nominee equity holders of Yishui. Through the contractual arrangements, the nominee equity holders of the consolidated VIEs have granted all their legal rights including voting rights and disposition rights of their equity interests in the consolidated VIEs to Xiaofangjian. The nominee equity holders of the consolidated VIEs do not participate significantly in income and loss and do not have the power to direct the activities of the consolidated VIEs that most significantly impact their economic performance. Accordingly, the consolidated VIEs are considered variable interest entities.

In accordance with Accounting Standards Codification ("ASC") 810-10-25-38A, we, through Xiaofangjian, has a controlling financial interest in the consolidated VIEs because Xiaofangjian has (i) the power to direct activities of the consolidated VIEs that most significantly impact the economic performance of con consolidated VIEs; and (ii) the obligation to absorb the expected losses and the right to receive expected residual return of the consolidated VIEs that could potentially be significant to the consolidated VIEs. Thus, we, through the WOFE, is the primary beneficiary of the VIE.

Under the terms of the contractual arrangements, Xiaofangjian has (i) the right to receive economic benefits that could potentially be significant to the consolidated VIEs in the form of service fees under the exclusive business cooperation agreement; (ii) the right to receive all dividends declared by the consolidated VIEs and the right to all undistributed earnings of the consolidated VIEs; (iii) the right to receive the residual benefits of the consolidated VIEs through its exclusive call option to acquire 100% of the equity interests in the consolidated VIEs, to the extent permitted under PRC law.

111

Table of Contents

Accordingly, through Xiaofangjian, the financial statements of the consolidated VIE are consolidated in the consolidated financial statements of us.

Under the terms of the contractual arrangements, the consolidated VIEs' nominee equity holders have no rights to the net assets nor have the obligations to fund the deficit, and such rights and obligations have been vested to us. All of the deficit (net liabilities) and net loss of the VIE are attributed to us.

***Share-based compensation***

We periodically grants share-based awards, including but not limited to, restricted ordinary shares and share options to eligible employees and directors, which are subject to service and performance conditions.

We recognizes compensation cost for an equity classified award with only service conditions that has a graded vesting schedule on a straight-line basis over the requisite service period for the entire award, provided that the cumulative amount of compensation cost recognized at any date at least equals the portion of the grant date fair value of such award that is vested at that date. For equity awards that contain both a service condition and a performance condition, we recognizes compensation cost on a tranche-by-tranche basis. To the extent the required vesting conditions are not met resulting in the forfeiture of the share-based awards, previously recognized compensation expense relating to those awards is reversed.

**Internal Control Over Financial Reporting**

Prior to this offering, we have been a private company with limited accounting personnel and other resources with which to address our internal control and procedures and we were never required to evaluate our internal control within a specified period, and, as a result, we may experience difficulty in meeting these reporting requirements in a timely manner. Our management has not completed an assessment of the effectiveness of our internal control over financial reporting, and our independent registered public accounting firm has not conducted an audit of our internal control over financial reporting. However, in the course of preparing and auditing our consolidated financial statements for the years ended December 31, 2017 and 2018, we and our independent registered public accounting firm identified one material weakness in our internal control over financial reporting as of December 31, 2018. In accordance with reporting requirements set forth by the SEC, a "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis.

The material weakness identified related to insufficient accounting personnel with appropriate U.S. GAAP knowledge for accounting of complex transactions, presentation and disclosure of financial statements in accordance with U.S. GAAP and SEC reporting requirements.

We are in the process of implementing a number of measures to address these material weaknesses identified, including: (i) hiring more qualified personnel equipped with relevant U.S. GAAP and SEC reporting experience and qualifications to strengthen the financial reporting function and to set up a financial and system control framework, (ii) implementing regular and continuous U.S. GAAP accounting and financial reporting training programs for our accounting and financial reporting personnel, (iii) establishing effective oversight and clarifying reporting requirements for non-recurring and complex transactions to ensure consolidated financial statements and related disclosures are accurate, complete and in compliance with U.S. GAAP and SEC reporting requirements and (iv) enhancing an internal audit function as well as engaging an external consulting firm to help us assess our compliance readiness under rule 13a-15 of the Exchange Act and improve overall internal control. We expect that we will incur significant costs in the implementation of such measures. However, we cannot assure you that we will remediate our material weaknesses in a timely manner.

112

Table of Contents

See "Risk Factors—Risks Related to Our Business and Industry—If we fail to remediate our material weaknesses and implement and maintain an effective system of internal controls over financial reporting, we may be unable to accurately report our results of operations, meet our reporting obligations or prevent fraud."

As a company with less than US$1.07 billion in revenue for our last fiscal year, we qualify as an "emerging growth company" pursuant to the JOBS Act. An emerging growth company may take advantage of specified reduced reporting and other requirements that are otherwise applicable generally to public companies. These provisions include exemption from the auditor attestation requirement under Section 404 of the Sarbanes-Oxley Act of 2002, related to the assessment of the effectiveness of the emerging growth company's internal control over financial reporting.

**Recent Accounting Pronouncements**

In February 2016, the FASB issued ASU No. 2016-02 ("ASU 2016-02"), Leases (Topic 842). ASU 2016-02 is intended to increase transparency and comparability among organizations by recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. Additionally, the ASU will require disclosures to help investors and other financial statement users better understand the amount, timing, and uncertainty of cash flows arising from leases, including qualitative and quantitative requirements. The update requires lessees to apply a modified retrospective approach for recognition and disclosure, beginning with the earliest period presented. In July 2018, the FASB issued ASU No. 2018-11, "Leases (Topic 842)"—Targeted Improvements, which allows an additional transition method to adopt the new lease standard at the adoption date, as compared to the beginning of the earliest period presented, and recognize a cumulative-effect adjustment to the beginning balance of retained earnings in the period of adoption. Topic 842 is effective for public companies for annual reporting periods, and interim periods within those years beginning after December 15, 2018. For all other entities, it is effective for fiscal years beginning after December 15, 2019, and interim periods within fiscal years beginning after December 15, 2020. Early adoption is permitted. In November 2019, the FASB issued ASU No. 2019-10 ("ASU 2019-10"), *Financial Instruments—Credit Losses (Topic 326), Derivatives and Hedging (Topic 815), and Leases (Topic 842),* which defers the effective date of Topic 842 for all non-public companies to fiscal years beginning after December 15, 2020, and interim periods within fiscal years beginning after December 15, 2021. Early application continues to be allowed. As the Company is an "emerging growth company" and elects to apply for the new and revised accounting standards at the effective date for a private company, ASU 2019-10 will be applied for the fiscal year ending December 31, 2021. The Company is currently evaluating the effect that this accounting standard will have on the consolidated financial statements and related disclosures.

In January 2017, the FASB issued ASU 2017-04, Simplifying the Test for Goodwill Impairment ("ASU 2017-04"), which simplifies the accounting for goodwill impairment by eliminating Step two from the goodwill impairment test. If the carrying amount of a reporting unit exceeds its fair value, an impairment loss shall be recognized in an amount equal to that excess, versus determining an implied fair value in Step two to measure the impairment loss. The guidance is effective for annual and interim impairment tests performed in periods beginning after December 15, 2019. Early adoption is permitted for all entities for annual and interim goodwill impairment testing dates on or after January 1, 2017. The guidance should be applied on a prospective basis. The Company is still evaluating the effect that this accounting standard will have on the consolidated financial statements and related disclosures.

113

Table of Contents

**INDUSTRY OVERVIEW**

**China's residential rental market**

China's residential rental market is large and fast growing. In 2018, approximately 200 million people lived in rented housing in China accounting for total rental income of RMB1.8 trillion. This market is expected to grow to RMB3.0 trillion by 2023, according to iResearch.

China's tier 1 and tier 2 cities generally offer more vibrant economies, better career prospects and higher income levels, and have generally experienced net population inflows. These cities accounted for RMB1.2 trillion in total rental income in 2018, representing approximately 67% of China's total residential rental market. This market is expected to grow to RMB2.0 trillion in 2023.

**China's Residential Rental Market**
**(RMB in trillion)**



Source: National Bureau of Statistics of China, National Health Committee of China, iResearch

The growth in China's residential rental market is driven by a number of factors:

**_Continued urbanization._**  China has experienced rapid urbanization over the past four decades. China's urban population increased from 182 million in 1979 to 837 million in 2018, representing nearly 60% of the total population. However, China's level of urbanization is still significantly below that of the US and Japan, which currently stands between 80-90%. China's rate of urbanization is expected to further increase to over 70% by 2030, implying an addition of more than 170 million to the urban population.

**_High housing prices, particularly in tier 1 and tier 2 cities._**  Most cities in China, especially tier 1 and tier 2 cities, have seen substantial increases in property prices over the past 20 years. Purchasing a property has thus become increasingly unaffordable: the price for a 100 square meter home ranged from 25 to 36 times of the average annual household income in Beijing, Shanghai and Shenzhen during the first half of 2019, among the highest of the major cities in the world. Due to high price and other factors, people are choosing to purchase homes later in life: the average age of first-time homebuyers

114

Table of Contents

in China's tier 1 cities (i.e., Beijing, Shanghai, Guangzhou and Shenzhen) has increased from 30 in 2013 to 35 in 2018, implying an additional five years of rental needs, according to iResearch.

*Changing mindset towards renting.*    An increasing number of young people in China today prefer to rent rather than buy properties to have more disposable income for travel, leisure and entertainment and to give themselves more flexibility for relocation. In 2018, around 43% of young people accepted the idea of renting indefinitely instead of owning a property, according to iResearch.

*Favorable government policies.*    The PRC government has made developing the residential rental market a priority in order to address housing problems in large cities. A number of supportive policies have been adopted, including granting renters equal access to public schools and other public services, and creating new financing channels for property rental companies.

**Trend in residential rents**

Average residential rents in China have increased at a moderate rate in recent years. Going forward, rents are expected to increase at an accelerated rate for the next five years, especially in tier 1 and tier 2 cities.



**Average Monthly Residential Rents Index in China**
**(Re-based to 2016 China overall)**

*Source: iResearch*

**The current state of China's residential rental market**

While there is strong and growing demand for rental housing, the conventional residential rental market in China is fragmented and inefficient, and one in which individual property owners and renters face numerous pain points. This presents an enormous opportunity for co-living platforms.

*Pain points of property owners*

- *Upgrade costs*—high renovation and furnishing costs

- *Maintenance burden*—obligation for ongoing repairs and maintenance

- *Inefficient rental process*—significant time and efforts required in dealing with agents and potential renters

115

Table of Contents

-   *Vacancy risk*—rental income loss between two contract periods when current contract expires

-   *Credit risk*—limited protection in the event that one renter does not pay rent or causes damage to property

*Pain points of renters*

-   *Affordability*—lack of affordable apartments in tier 1 and tier 2 cities, and difficulty in subletting in order to share rental costs

-   *High search costs*—high transaction costs and tedious transaction process

-   *Poor housing conditions*—no guarantee on housing conditions

-   *Counterparty risks*—untrustworthy property owners and agents during contract negotiations and post renting

-   *Lack of services*—no readily available cleaning or maintenance services

**How co-living platforms address these pain points**

Co-living platforms provide an institutional solution to the fragmented and inefficient rental market. They centrally operate a large number of apartment units, leasing in apartments at scale and converting them into standardized and refurbished units, while offering an efficient transaction process and post-rental services. Through this, co-living platforms address the pain points of both renters and property owners.

Affordability is the biggest issue for young renters today, particularly in tier 1 and tier 2 cities. In the conventional residential rental market, the smallest unit available for rent is often an entire apartment, as individual property owners are generally unable or otherwise unwilling to bear the burden and risk of renting out private rooms. Co-living platforms reduce the smallest unit available for rent to a private room (which we term "apartment unit"), thereby providing an affordable alternative. Below is an illustration of the difference in average cost of renting a studio or one-bedroom apartment compared with renting a private room with shared common space from Danke in the same neighborhood in Beijing in the nine months ended September 30, 2019.

116

Table of Contents

**Average Monthly Rent in Beijing**



_____

(1)       Average monthly rent for a studio or one-bedroom apartment in the six urban districts of Beijing, namely Haidian, Chaoyang, Dongcheng, Xicheng, Fengtai and Shijingshan.

(2)       Average monthly rent for Danke's private room with shared common space, such as living room, kitchen and bathroom, in the six urban districts of Beijing mentioned above.

_Source: iResearch_

**Key trends supporting the opportunity for co-living platforms**

A number of secular trends are driving the rise in popularity of co-living platforms, and their deepening penetration of the residential rental market:

***Sharing economy.***     The current young generation is demonstrating a greater openness to the idea of sharing. Renting private rooms instead of an entire apartment has become an increasingly popular choice among young people in large cities.

***Online consumption.***     The current young generation is accustomed to shopping, ride hailing and food delivery all being a tap away. An increasing number of renters are comfortable renting an apartment online without offline viewings from co-living platforms with a reputation for consistent quality.

***Consumption upgrade.***     The current young generation increasingly desires convenience, reliability and quality of products and services. This overall trend suggests that young people in China will increasingly favor the quality and standardized offerings of co-living platforms over the inconsistent quality of apartments offered by individual property owners.

***Increasing acceptance by property owners.***     As the offerings of co-living platforms in China become better known, property owners increasingly recognize the proposition they offer. This has seen an increasing willingness of property owners to rent to co-living platforms rather than manage the properties themselves and rent to individual renters.

117

Table of Contents

Currently most of the residential rental properties in China are still owned and operated by individual property owners. Properties operated by co-living platforms offering standardized renovation, furnishing and services only accounted for roughly 2% of all residential rental properties in China as of the end of 2018. In the United States and Japan, the percentage of renovated or serviced rental apartments operated by institutions was around 57% and 80%, respectively. We believe this suggests an enormous growth potential for co-living platforms in China.

**The value-added services opportunity for co-living platforms**

As co-living platforms achieve scale, they accumulate a large, captive pool of renters to whom value-added services can be provided. Typical renters spend more than ten hours each day at home, and during their stay, they may demand a wide range of services including cleaning, repair and maintenance, laundry, relocation, food delivery, smart home and online insurance, among others. These services represented a nearly RMB2.4 trillion market in China in 2018, according to iResearch. This represents an enormous incremental opportunity beyond that offered by the residential rental market.

**Our addressable market**

We see China's overall residential rental market as our total addressable market and the residential rental market in tier 1 and tier 2 cities as our serviceable addressable market, representing our immediate near term opportunity. We see the provision of value-added services to renters as an incremental opportunity beyond that of the residential rental market.



*Source: iResearch*

118

Table of Contents

**BUSINESS**

**Our Mission**

Our mission is to help people live better.

**Overview**

We are redefining the residential rental market through technology. We started Danke in 2015 to provide young people with comfortable yet affordable homes. Today, we are one of the largest co-living platforms in China with the fastest growth, according to iResearch. We established operations in 13 cities in China as of September 30, 2019 and have become a major player in each of the 10 cities that we entered into prior to June 30, 2019. We grew the number of apartment units we operated from 2,434 as of December 31, 2015 to 406,746 as of September 30, 2019, a 166-fold increase over less than four years.

China's residential rental market is expected to nearly double in size from 2018 to reach RMB3.0 trillion in 2023. We see an enormous opportunity within this addressable market, one of the last conventional markets to be touched by technology. China's residential rental market is highly fragmented and inefficient, and one in which both individual property owners and renters suffer from numerous pain points. We provide a solution to both property owners and renters through our innovative "new rental" business model, which is defined by the following features:

- ***Centralization.*** We centrally operate the apartments sourced from property owners and rent them out to our residents.

- ***Standardization.*** We standardize the design, renovation and furnishing of our apartment units, and provide high-quality, reliable one-stop services.

- ***Online.*** Our entire business process is empowered by technology to enable seamless online experience for both property owners and residents. We have had no physical storefronts since inception.

 

119

Case 1:20-cv-03259-PAC Document 60-2 Filed 05/03/21 Page 12 of 112



Our "new rental" business model is well-received by our residents. Approximately **74%**[1] of the residents surveyed indicated that we improved their quality of life and enhanced their trust in co-living platforms. We ranked **No.1**[1] in overall resident satisfaction and in the following areas:

| Convenience of Process | Style of Design | Service Quality | APP User Experience |

(1)       According to a survey conducted by iResearch of China's leading co-living platforms, including us and our peers in August 2019.

We operate two branded products, "Danke Apartment ( 蛋壳公寓 )" and "Dream Apartment ( 筑梦公寓 )." Danke Apartment has been the primary focus of our business since our inception in 2015. We source and lease apartments from individual property owners on a long-term basis, design, renovate and furnish such apartments in a standardized and stylish manner, and rent them out to individual residents, either as private rooms within an apartment or an entire apartment. Leveraging our experience in operating Danke Apartment, we introduced Dream Apartment in November 2018 to target the large but underserved blue-collar apartment segment. We lease entire buildings or floors in a building, transform them into dormitory-style apartments, and rent them to corporate clients for employee accommodation. For all of our residents, we provide high-quality one-stop services, including cleaning, repair and maintenance, WiFi as well as 24/7 resident support.

We run Danke like a data science company. As founders are technology veterans, technology is deeply rooted in our DNA. At the core of our technology system is our proprietary artificial intelligence decision engine, or "Danke Brain," which makes real-time and unbiased decisions based on data analytics to guide each step of our business operations and generate valuable business intelligence. Danke Brain has self-learning capability. It is able to apply what it learns in existing cities and neighborhoods to new cities and neighborhoods, and improves from each transaction and interaction. It reduces our reliance on local expertise, enables higher efficiency and facilitates rapid expansion. Danke Brain is supported by our big data platform, which continually processes and structurizes a massive amount of data with over 100 dimensions. Connecting everything together, our IT infrastructure digitizes our business operation and links all of our employees, property owners, residents and third-party service providers.

Leveraging our robust technology capabilities, we are able to handle complicated and large-scale business operations. For instance, pricing decisions represent a core competency for a co-living platform, yet pricing is complex due to the heterogeneous nature of apartments, neighborhoods and cities. Our technology system enables us to make tens of thousands of pricing decisions each day with approximately 95% accuracy rate of the estimated lease-out price, without the need to rely on the local expertise of individual agents. We also have strong capabilities to manage the dynamic supply chain through technology. We can effectively manage an extensive network of renovation contractors to simultaneously renovate 50,000 apartment units scattered in thousands of neighborhoods across 13 cities and maintain consistent quality. While the job is carried out locally, we use proprietary

120

Table of Contents

technologies to achieve precise budgeting, accurate time estimate, and seamless workflow coordination across our supply chain.

Empowered by our data, technology and apartment network, we have created a vibrant and expanding ecosystem to connect and benefit property owners, residents and third-party service providers. Their interaction forms a virtuous cycle, while also providing us with significant monetization opportunities.

Our disruptive business model has enabled us to achieve unparalleled growth, operational excellence and customer satisfaction. We are particularly proud of the following achievements, where in each case we ranked the highest amongst our peers, according to iResearch:

**141x**
Increase in
number of apartment units[1]

**89%**
Occupancy rate[2]

**70%+**
Recommendation rate[3]

**51%**
Renewal rate of our residents[4]

**80%**
Renewal rate of property owners[5]

---

(1)      Growth over the three and a half years from December 31, 2015 to June 30, 2019. We achieved 166-fold increase in the number of apartment units we held over the period between December 31, 2015 and September 30, 2019.

(2)      As of June 30, 2019. Our occupancy rate was 87% as of September 30, 2019 and 77.9% as of November 30, 2019.

(3)      Percentage of residents surveyed that would recommend our platforms to others, according to a survey conducted by iResearch in August 2019.

(4)      For the first half of 2019; excluding residents who entered into leases with Aishangzu prior to our acquisition of Aishangzu. The renewal rate of our residents exceeded 50% in each of 2017 and 2018. We improved our ranking among our peers in terms of such renewal rate from the third in 2017 to the first in 2018 and the first half of 2019, according to iResearch. The renewal rate of our residents for the nine months ended September 30, 2019 was 52%.

(5)      For the period between our inception and June 30, 2019; excluding property owners who entered into leases with Aishangzu prior to our acquisition of Aishangzu. The renewal rate of our property owners for the period between our inception and September 30, 2019 was 79%.

We currently generate revenues primarily from rents and service fees. Our revenues increased by 307.3% from RMB656.8 million in 2017 to RMB2,675.0 million (US$374.3 million) in 2018, and by 198.8% from RMB1,673.0 million in the nine months ended September 30, 2018 to RMB4,999.7 million (US$699.5 million) in the nine months ended September 30, 2019.

We are just taking off. Our business model not only enables us to achieve stong performance, but also places us in a unique position to capture the enormous potential of China's residential rental market.

**Our Strengths**

We believe the following competitive strengths are key drivers of our success and set us apart from our competitors:

***Disruptive business model***

We pioneered an innovative "new rental" business model to disrupt China's highly fragmented and inefficient residential rental market, where finding an apartment is inconvenient and quality of

121

Table of Contents

apartments and services is inconsistent. Our business model features centralization, standardization and online experience. We centralize the operation of apartments sourced from property owners, and provide apartment units with standardized design, renovation and furnishing to our residents, along with high-quality, reliable one-stop services. Our entire business process is empowered by technology to enable seamless online experience for both property owners and residents. We have no physical storefronts since inception.

Our business model propelled our exponential growth and fostered unparalleled operating efficiency. We are the fastest-growing co-living platform in China, according to iResearch, with a CAGR of 359.7% in the number of apartment units we operated from December 31, 2015 to December 31, 2018. With our disruptive business model, we believe we are well-positioned to capture the enormous potential of China's residential rental market.

### Large-scale operation with increasing network effect

As one of the largest co-living platforms in China, we have achieved substantial scale. As of September 30, 2019, we operated 406,746 apartment units of Danke Apartment, and established operations in 13 tier 1 and tier 2 cities in China. We had cumulatively served over 124,000 property owners and over 679,000 residents as of September 30, 2019.

Our scale has enhanced nationwide recognition of our brand and industry influence. We regularly ranked the first among all co-living platforms in China in terms of brand influence, according to all three authoritative industry publications, namely Meadin Academy, CRIC and Ruihe. We have been invited to assist the Ministry of Housing and Urban-Rural Development in China with setting industry standards for residential rental properties operated by institutions.

The combination of all these elements has created an increasing network effect. More property owners bring in more high-quality apartments with long-term exclusive leases in various locations, which in turn attract more residents. As our resident base grows, property owners are more willing to lease their apartments to us and enjoy a hassle-free process and stable long-term returns.

The rapidly increasing scale of our operation enables us to achieve significant economies of scale. Meanwhile, as we process more data over time, our Danke Brain is continuously enhanced, which improves our ability to serve our residents and property owners. The aforementioned factors form a virtuous cycle and further enhance our competitive position which is difficult to replicate.

### Deeply-rooted technology DNA

Technology is deeply rooted in our DNA and is what fundamentally differentiates us from other market players. At the core of our technology system is our proprietary artificial intelligence decision engine, Danke Brain, which makes real-time and unbiased decisions based on data analytics. Danke Brain is supported, trained and improved by our big data platform, which continually processes and structurizes a massive amount of data. In addition, our comprehensive IT infrastructure digitizes our business operations and enables our employees to implement decisions made by Danke Brain. Our technology system is able to power every step of our business process, and enables us to achieve better planning, effective sourcing, efficient building, targeted renting and tailored servicing.

*Better Planning.*    Our AI-powered technology system optimizes the accuracy and efficiency of our geographic planning through analytics of multi-dimensional rental-related data. It enables us to derive holistic insight into the rental market and formulate optimal strategies with different priorities for each neighborhood based on its unique trait. In Chengdu, the last city we entered into in 2018, the number of apartment units we operated reached 20,000 within only 12 months, whereas it took us 31 months to achieve such scale in Beijing, our first city.

122

Table of Contents

*Effective Sourcing.*    Rental pricing is complex due to the heterogeneous nature of the apartments, neighborhoods and cities, yet we are making tens of thousands of pricing decisions each day. Our system generates deal terms for property owners based on evaluation of apartment conditions and analytics of rental-related data in real time, which significantly improves the efficiency of our lease negotiation process. In the nine months ended September 30, 2019, the accuracy rate of the estimated lease-out price was approximately 95%.

*Efficient Building.*    Our system generates renovation plans based on apartment conditions and enables us to track the whole renovation process. This effectively reduced our average renovation and furnishing process to 17-21 days in the six months ended June 30, 2019, which was more efficient than our peers, while maintaining consistent quality. We can effectively manage an extensive network of renovation contractors to simultaneously renovate 50,000 apartment units scattered in thousands of neighborhoods across 13 cities.

*Targeted Renting.*    We make personalized recommendations of apartment units to potential residents through user profiling. In the six months ended June 30, 2019, our residents signed leases with us after seeing on average 1.8 apartments, which was the best among our peers, according to iResearch.

*Tailored Servicing.*    As our system continues to paint more accurate portraits of our residents, we are able to better understand their specific needs, and improve our ability to offer more tailored services.

Leveraging our technology system, we are able to operate with no physical storefronts, reduce reliance on the expertise of local staff, improve our operational efficiency and achieve rapid geographic expansion.

### High quality and standardized product offerings

We offer our residents comfortable and stylish apartment units designed in-house. Our design team has developed a set of highly standardized modules consisting of multiple options for every aspect of renovation, which can be easily selected and assembled to match different apartment conditions and floor plans. This enables efficient and massive replication while still keeping our classic "Danke Style" for each of our apartment units.

We have built a proprietary supply chain management system encompassing procurement, renovation, furnishing and quality control, to ensure superior and consistent quality. We handpick environmental-friendly raw materials from designated suppliers to minimize environmental health hazards. We purchase electronic appliances from reputable manufacturers and collaborate with reliable OEMs to manufacture our self-designed furniture. Our quality control team conducts multiple rounds of inspection to ensure that we offer our residents the apartment units of the best quality possible. Before residents move in, we also conduct a strict air quality test to make sure that the level of formaldehyde is below our self-imposed limit, which is more stringent than regulatory requirements.

We pioneer an intelligent ventilation system, which can effectively improve air quality of newly-renovated apartments. With the support of local government, we are advocating the use of the system as an industry standard.

Our residents recognize the quality of our apartments and the easy move-in experience, which results in higher resident stickiness. Our resident satisfaction rate for our design style, furniture and appliances is higher than our peers, according to a survey conducted by iResearch in August 2019.

123

Table of Contents

*Best-in-class services*

We strive to provide best-in-class services to our residents. To address the lack of high-quality nationwide service providers, we have built the largest in-house cleaning and maintenance services team, according to iResearch, which enables us to provide superior and consistent services to our residents. We also have a 24/7 resident support team to ensure fast response whenever needed. Our rigorous training and quality control program facilitates our service team to provide a consistent high standard of service.

We digitize our servicing process. Our residents can easily submit their requests by tapping a button in our mobile app. Our service system automatically assigns and tracks their requests, and monitors the progress and quality of our services. As our system continues to paint more accurate portraits of our residents, we are able to better understand their needs, and improve our ability to serve them.

Our best-in-class services have led to increasing resident satisfaction and stickiness, making us a trusted partner of our residents. For the six months ended June 30, 2019, the renewal rate of our residents exceeded 51%, the highest among our peers. We improved the renewal rate of our residents to 52% for the nine months ended September 30, 2019. Our overall resident satisfaction rate is higher than our peers, according to a survey conducted by iResearch in August 2019.

*Visionary and results-driven management*

Our founding team members cherish innovation and the philosophy of leveraging technology to make people live better is deeply rooted in their DNA. They have worked closely in building and operating start-ups for more than a decade, which has made them a cohesive team with a strong entrepreneurial spirit.

Our senior management team possesses vision, proven execution capability and complementary expertise. They have worked in renowned multinational corporations, such as Google, LinkedIn, Baidu, Walmart, General Electric and Citi, with broad experience spanning different fields, including technology, operation management, supply chain and finance. Our company has a flat organizational structure, which enables our management to quickly adapt to a changing market environment and take decisive actions in real time. Throughout the organization, we foster a culture of striving for success.

Our shareholders recognize the value of our business model and operational philosophy and have been working with us to provide services to our customers. For instance, we have entered into certain business cooperation framework agreements with the affiliated entities of Antfin (Hong Kong) Holding Limited, one of our major shareholders, to explore collaboration in payments, financial services and user acquisition.

**Our Strategies**

We intend to further grow our business and reinforce our leading market position by pursuing the following strategies:

*Continue to enhance our technological capabilities*

We will continue to invest in our technology system to strengthen our operation and facilitate our rapid growth. In the long run, we aim to completely eliminate offline operations with the aid of technology, except for physical renovation and provision of services which by its nature can only be performed offline. For instance, we plan to leverage computer vision to replace onsite inspections and allow property owners to complete the leasing process online; we also aim to substitute in-person apartment tours with virtual reality facilities for potential residents to settle the transaction without paying a visit. In addition, we seek to further improve algorithms to enhance pricing accuracy and

124

Table of Contents

supply chain management, aiming to achieve higher operational efficiency. Furthermore, we plan to continually develop the artificial intelligence capabilities of our technology system to generate more valuable business intelligence to further refine high-level decision making and overall strategic planning.

*Further expand our scale*

We have realized only 0.15% of our total addressable market based on our revenues in 2018. We believe there is enormous opportunity for our further penetration into the market.

Our growing scale and rapidly expanding apartment network improve our network effect. We plan to further expand our apartment network and increase penetration rate by exploring new neighborhoods that accommodate various needs of our residents. We also seek to further expand our geographic coverage to establish strong presence in all tier 1 and tier 2 cities that are economically vibrant and have a large population with rental needs.

We plan to explore the opportunities to collaborate with local market players by empowering their operations with our technology, supply chain management capabilities, service standards and resident base, thereby further expanding our network.

*Expand and enhance our product and service offerings*

We plan to further improve the design of our apartments to provide our residents with even cozier and more stylish living environments. We intend to diversify our product portfolios to reach a broader resident base, satisfy their various needs and extend resident lifecycle. For instance, we may offer premium apartments to cater for high-end living needs. We also strive to improve our residents' living experience and provide better services by enhancing the service quality of our service team.

*Promote brand awareness and industry influence*

We plan to strengthen our branding and marketing efforts. For instance, we plan to organize more marketing campaigns tailored to our targeted residents, such as promotional activities at university campuses. We aim to further build our brand equity through general brand advertising. We also seek to reinforce our influence and leadership within the industry by assisting the regulatory authorities in formulating better industry standards.

*Strengthen and expand our ecosystem*

Our residents spend more than ten hours each day in our apartments, which provides us, as a demand aggregator, and third-party service providers with ample opportunities to serve their various needs. We plan to strengthen and expand our ecosystem by embedding additional third-party service providers, offering a wider spectrum of services to better serve our residents and explore new monetization opportunities, such as IoT smart home, moving services, financial and insurance services, new retail and other local services. In addition, we thrive to empower third-party service providers with our data and technology so they can provide personalized services to our residents. We plan to establish a membership program to further increase user stickiness. As we strengthen and expand our ecosystem, we endeavor to eventually become a one-stop lifestyle platform of choice.

**Our Ecosystem**

We have created a vibrant ecosystem. Our data, technology and apartment network serve as the basis of our ecosystem, which bring in and connect the key stakeholders in our ecosystem — property owners, residents and third-party service providers. The interaction among these stakeholders forms a virtuous cycle which brings benefits to each one of them, while also allowing us to act as a demand

125

Table of Contents

aggregator and providing us with significant monetization opportunities. Our ecosystem continues to expand and attract more participants as we scale up.



***Our Value Propositions to Property Owners***

- ***Hassle-free process.*** We act as a trustworthy, single point-of-contact. Property owners do not need to interact with multiple agents and potential renters. We save them time and money in upgrading their properties and handling trivial requests from residents. We also conduct the regular maintenance of apartments and reduce damage risks.

- ***Stable returns.*** We sign long-term leases with property owners, which help them minimizes vacancy risks and generate stable long-term income.

***Our Value Propositions to Residents***

- ***Affordability.*** We offer affordable rental options to our residents. We save them the trouble of subletting by offering quality co-living apartment units.

- ***Consistent quality.*** We renovate all of our apartment units with standardized design and quality, which relieves our residents from concerns about poor housing conditions.

- ***Hassle-free process.*** We serve as a trustworthy, single point-of-contact for our residents. They do not need to deal with multiple agents, property owners or other service providers.

- ***Best-in-class services.*** Our in-house services team delivers one-stop services of high quality and to the satisfaction of our residents.

126

Table of Contents

*Our Value Propositions to Third-Party Service Providers*

- ***Large monetization opportunities.*** We have a large number of well-educated young residents in our ecosystem with long-term, high-frequency consumption demand, which provides third-party service providers with numerous monetization opportunities.

- ***Personalization and user stickiness.*** We are able to identify specific needs of our residents with our data analytics and help third-party service providers reach and acquire their target users with personalized services. We also create a feedback loop between residents and third-party service providers, and help build valuable customer relationships with increased stickiness.

**Our Products and Service Offerings**

We offer "Danke Apartment ( 蛋壳公寓 )" to individual residents and "Dream Apartment ( 筑梦公寓 )" to corporate clients.

*Danke Apartment*

Danke Apartment has been our primary business focus since inception. We source and lease apartments from individual property owners on a long-term basis, generally for four to six years. We then design, renovate and furnish such apartments in a standardized and stylish manner, and rent them out to individual residents, mainly for one year.

Residents who stay in Danke Apartment are generally college-educated young people between the ages of 22 to 30 with stable income, who value affordability, consistent quality, efficiency and quality services. In response, we offer fully furnished apartment units that strike the right balance between cost, comfort and location, and provide fast and reliable services a tap away.

We offer private rooms and entire apartments under Danke Apartment. Private rooms constitute a substantial majority of our apartment units. Each private room is secured by a digital door lock. Residents of the private rooms in the same apartment share common spaces such as the living room,

127

Table of Contents

kitchen and bathroom. We also offer entire apartments to accommodate residents who prefer more space and privacy, with digital door locks installed on the front doors.



*Danke Apartment—Private Room*            *Danke Apartment—Entire Apartment*

 

*Danke Apartment—Bedroom*           *Danke Apartment—Living Room*

     As of September 30, 2019, we established operations in 13 cities in China, including Beijing, Shenzhen, Shanghai, Hangzhou, Tianjin, Wuhan, Nanjing, Guangzhou, Chengdu, Suzhou, Wuxi, Xi'an and Chongqing. The number of apartment units we operated increased from 2,434 as of December 31, 2015 to 236,420 as of December 31, 2018, representing a CAGR of 359.7%. This number further increased to 406,746 as of September 30, 2019. The following chart illustrates the rapid growth in the number of apartment units we operated since December 31, 2015.

128

Table of Contents

**Number of apartment units of Danke Apartment (in thousands)**



(1)       Increase over the three years and nine months from December 31, 2015 to September 30, 2019.

(2)       CAGR over the three years from December 31, 2015 to December 31, 2018.

To make our residents' experience hassle-free, we offer one-stop services including bi-weekly cleaning of common spaces, repair and maintenance, WiFi and 24/7 resident hotline to address any problem they may have. Residents can submit and track their service requests via our mobile app.

We pride ourselves in our in-house cleaning team and maintenance team, each consisting of over 1,000 people. We have a rigorous training and quality control program for our services team to ensure a consistent high standard of service. We use an online service system to assign and track resident requests to evaluate our service crew and to ensure fast and effective resolution of problems.

As we scale up our business, we plan to offer additional services through third-party service providers to improve resident experience and increase our monetization opportunities, such as IoT smart home, moving services, financial and insurance services, new retail and other local services.

*Dream Apartment*

Leveraging our experience in operating Danke Apartment, we introduced Dream Apartment in November 2018. We lease from property owners entire buildings or several floors in a building, transform them into well-renovated and fully furnished dormitory-style apartments with multiple beds in each room, and rent the rooms out to various corporate clients for employee accommodation. Our corporate clients range from local business owners, such as restaurants and body shops, to large corporations and organizations, such as hotel chains, hospitals and delivery companies.

With Dream Apartment, we aspire to improve the living standards of blue-collar workers who have been chronically underserved in expensive cities such as Beijing and Shanghai. We provide value-for-money options to our corporate clients for employee accommodation, thereby improving the living environment of their blue-collar workers and increasing employee satisfaction.

129

Table of Contents

We operate Dream Apartment with the same philosophy of providing a hassle-free living experience. We offer comfortable rooms, WiFi, 24/7 onsite management and security, repair and maintenance, daily cleaning, and amenities such as gym, lounges, laundry rooms and mailroom services.

As of September 30, 2019, we operated six Dream Apartment facilities in Beijing with a total of 7,302 beds and we had four additional facilities in Beijing and Shanghai that were still under renovation with total planned capacity of 3,808 beds. The budgeted renovation and furnishing cost for the four additional Dream Apartment facilities that were still under renovation was approximately RMB49.6 million (US$6.9 million) in aggregate, of which we had already incurred RMB776.4 thousand (US$108.6 thousand) as of September 30, 2019. We have completed renovation of one of these facilities. We expect to complete renovation of two other facilities in the first quarter of 2020 and the remaining facility in the second quarter of 2020.



*Dream Apartment—Bedroom*



*Dream Apartment—Hallway*



*Dream Apartment—Pantry*



*Dream Apartment—Lounge*

**Our Technology**

Our technology system consists of Danke Brain, our proprietary artificial intelligence decision engine, our big data platform and IT infrastructure. They work seamlessly together as the backbone of our business.

130

Table of Contents

*Danke Brain—Our Artificial Intelligence Decision Engine*

Operating a co-living platform presents a few unique technological challenges, especially for pricing:

- *Heterogeneity.*  Pricing is complex due to the heterogeneous nature of apartments and rooms. No two units are the same.

- *Irreplicability.*  Each city and each neighborhood is different. One might be able to rely on experienced real estate agents to succeed in a neighborhood or a city, but such success would be hard to replicate in other cities.

- *Frequency.*  Tens of thousands of decisions need to be made each day on whether to source an apartment and at what price—making a traditional human-driven approval process inefficient and unrealistic.

In order to standardize the process and enable more efficient and informed decision-making throughout the business process, we have developed a proprietary artificial intelligence decision engine, "Danke Brain." Compared to the human brain, even the brain of an experienced real estate agent, the Danke Brain has unique advantages:

- *Efficiency.*  It instantaneously takes hundreds of parameters into account and makes tens of thousands of decisions each day effortlessly.

- *Accuracy.*  It avoids human errors and is less prone to bias.

- *Replicability.*  It applies what it learned in existing cities and neighborhoods to new cities and neighborhoods.

- *Adapting.*  It adapts as a city evolves—for example, as new subway lines are built, startups gather momentum in up and coming business districts, and new grocery stores are coming to gentrified neighborhoods.

- *Self-learning.*  It improves from each transaction and each interaction through deep learning—how fast an apartment / room gets rented out and at what price; how many viewings it took; for the viewings that did not convert, what apartments were chosen over this particular one.

131

---

Table of Contents

Danke Brain interacts with each step of our business process as illustrated in the chart below:



### Our Big Data Platform

Our big data platform serves as the foundation of our technology system. It continuously processes and structurizes a massive amount of data to support, train and improve Danke Brain through proprietary deep learning algorithms. We believe we are at the forefront of residential rental market in terms of the richness, depth and comprehensiveness of our data. We have multi-dimensional structured data on more than 100 parameters, all of which are highly relevant to residential rental market. Our data is also closely interrelated with each other and can provide us with deep and holistic insight into the rental market.

We possess a vast amount of internally-generated data from our day-to-day operations, as well as additional rental market-related data and demographic data from public and third-party sources. Such data is cleansed, structured, encrypted and centrally stored in our data warehouses, enabling data analytics and data mining.

### Our IT Infrastructure

We have also built comprehensive IT infrastructure, including various operational systems and workstations. Our IT infrastructure digitizes each step in our business operation, enables our employees to implement decisions made by Danke Brain and connects all of our employees, property owners, residents and third-party service providers. It also provides feedback from our daily operations into the big data platform to make our Danke Brain "smarter."

We build our technology system on Alibaba Cloud to facilitate reliability and scalability.

Our technology system is essential to our rapid growth and high efficiency. It empowers every step of our business process, and enables us to achieve better planning, effective sourcing, efficient building, targeted renting and tailored servicing.

132

https://sec.report/Document/0001047469-20-000244/a2240464zf-1a.htm

Table of Contents

**Our Business Process**

Our business process consists of planning, sourcing, building, renting and servicing.

*Planning*

We plan on a city level and neighborhood level when deciding whether to expand our footprint. Our Digital City System utilizes location-based data, demographic data and trends, historical and market rental prices to determine where we should devote our resources to and when. It modularizes a city into blocks of 500 × 500 meters, evaluates each block based on over 100 rental-related dimensions, and assigns an attractiveness rating to each block. Such ratings together with other strategic considerations determine our expansion into a particular city; once we have entered a city, the system generates an "intra-city expansion route" based on the ratings, which guides the sequence and pace of our expansion into new neighborhoods.

**Digital City System**



The speed of our intra-city expansion has improved significantly as our Danke Brain gets smarter. For instance, in Beijing, our first city, it took us 31 months to achieve 20,000 apartment units. In Chengdu, the last city we entered in 2018, we reached the same number within only 12 months. The following chart shows the organic growth in the number of apartment units we operated during the first twelve months after we entered into a city.

133

Table of Contents

**High Speed of Organic Expansion into New Cities**



### Sourcing

*Lead Generation*

We source apartments from property owners primarily through our business development team, or BD team. Our BD team collects leads primarily from our online platform, our call center, as well as third-party online and offline channels. As we become an established brand in China, property owners increasingly reach out to us directly through our online platform or call center, after which our BD team will follow up by visiting the apartments.

*Intelligent Pricing*

During a visit, our BD team inspects and records the condition of the apartment into our Intelligent Pricing System. The system estimates the rent we ultimately charge our residents primarily based on the neighborhood of the apartment and the renovation cost based on evaluation of the apartment's conditions, and back-calculates how much we can afford to pay the property owner. To facilitate real-time negotiation, the system offers flexibility by instantaneously generating multiple sets of deal terms, including lease term, rental price and escalation over the term of the lease and rent-free period. Our BD team is required to strictly follow the deal terms, which significantly improves the efficiency in lease negotiation. If the property owner chooses to accept an offer, a standardized lease can be signed on the spot using our mobile app.

134

Table of Contents

**Intelligent Pricing System**



Apartment Condition Input      Deal Terms Proposal

As we improve the algorithms and as Danke Brain constantly learns from past transactions, the accuracy of its pricing estimates continuously improves. In the nine months ended September 30, 2019, the accuracy rate of the estimated lease-out price was approximately 95%.

*BD Team Empowerment*

Our Digital City System monitors on a real-time basis our business performance and the competitive landscape in each neighborhood, so that our local team can adjust strategies accordingly. For instance, it enables local managers to monitor how we perform in each neighborhood as compared to our competitors and allocate the salesforce accordingly.

The streamlined, tech-enabled sourcing process and effective management improve our BD team's efficiency. In 2018, our BD team successfully sourced and leased on average 7.1 apartments per person per month, which was the highest among our peers, according to iResearch. The system also relieves us from reliance on a real estate agent's experience about a particular neighborhood or city, which are rarely transferrable across cities.

**Building**

Our strong in-house design and supply chain management capabilities enable us to efficiently convert a diverse portfolio of apartments into consistent "Danke Style" with optimized quality and cost. We can effectively manage an extensive network of renovation contractors to simultaneously renovate 50,000 apartment units scattered in thousands of neighborhoods across 13 cities and maintain consistent quality.

*Design*

We have a professional in-house design team dedicated to produce stylish renovation solutions that cater to our residents. As a majority of our residents are young people between the ages of 22 and 30,

135

Table of Contents

our design team adapts a modern and contemporary theme for renovation and furnishing. As tastes and preference shift over the years, our design team continuously upgrades our solutions while staying true to the "Danke Style."





*Nordic Style*                    *Industrial Style*





*Minimalist Style*              *New Classic Style*

Our design team has developed a set of standardized renovation modules consisting of multiple options for every aspect of the renovation and furnishing process based on different floor plans and apartment conditions. Our field designers can leverage the Intelligent Renovation System to easily select and assemble the optimal renovation modules to match a particular apartment based on its parameters and condition. This modularized approach enables efficient and massive replication while still keeping our classic "Danke Style" for each of our apartment units. It also optimizes our SKUs, which enables just-in-time deliveries and allows us to procure furniture at favorable cost.

As we accumulate more data from daily operations and collect more resident feedbacks, we are able to frequently upgrade our renovation modules to better serve the needs of our residents while also optimizing renovation time and cost.

*Supply Chain Management*

Our strong supply chain capabilities across procurement, renovation, furnishing and quality control pave the way for efficient replication of "Danke Style."

We have established an extensive network of renovation contractors across all cities we operate in. Our scale and status as a repeat client allow us to secure favorable rates and consistent quality performance from our renovation partners. We furnish the apartments with high-quality furniture and electronic appliances. We design modern and stylish furniture and outsource the production to OEMs, and purchase electronic appliances such as refrigerators and air conditioners from reputable manufacturers.

136

Table of Contents

We carefully select our suppliers and furniture OEMs through a centralized selection process based on their reputation and qualifications. Our supply chain system identifies the types of furniture and electronic appliances we need from the designed floor plans and automatically place orders with our suppliers. We monitor their progress through our supply chain system and conduct regular evaluations of their quality. We enter into framework agreements with our suppliers and review the performance of the suppliers on an annual basis to make sure that we only retain suppliers that can meet our stringent standards of quality and efficiency.

We dissect the renovation and furnishing process into multiple steps, with detailed timetable as to when each step needs to be completed. We monitor the entire process online to make sure that the timetable is strictly followed. This allows us to standardize and optimize the renovation and furnishing process.

**Renovation and Furnishing Process Management System**



Our supply chain management capabilities enable us to improve our efficiency in renovation and furnishing and reduce the average time required for such process. In the six months ended June 30, 2019, it generally took 17-21 days for us to renovate and furnish an apartment depending on different apartment conditions, while maintaining consistent quality. This was more efficient than our peers, according to iResearch. We reduced the average time for renovation and furnishing to 18.7 days in the nine months ended September 30, 2019. We have been able to constantly improve our supply chain

137

Case 1:20-cv-03259-PAC Document 60-2 Filed 05/03/21 Page 30 of 112

Table of Contents

efficiency and enjoy better economies of scale as we expand. We effectively reduced the average renovation and furnishing cost to RMB10,404 during the nine months ended September 30, 2019.

**Average Days for Renovation and Furnishing**      **Average Cost for Renovation and Furnishing**[1] **(in RMB)**



(1)      Represents total renovation and furnishing cost for a given period divided by the net addition of apartment units opened in such period; total renovation and furnishing cost incurred in 2017, 2018 and the nine months ended September 30, 2019 was RMB452.8 million, RMB1,860.0 million and RMB1,898.8 million, respectively.

We exert strict quality control during the renovation and furnishing process. See "—Quality and Safety—Procurement" and "—Inspections."

*Renting*

We have no physical storefront. We acquire our residents for Danke Apartment primarily through online channels, including our online platform and third-party rental listing platforms, as well as our call center.

We have a centralized rental system. Potential residents who are interested in renting from us can browse all of our apartment listings on our online platform or talk to our sales team at our call center. While a traditional real estate agent generally has every incentive to only push for available apartments within the agent's own territory, we centralize the renting process and leverage Danke Brain's user profiling capabilities to make personalized recommendations across neighborhoods within the specific city that a potential resident is interested in, either through tailored online listings or our call center.

138

Case 1:20-cv-03259-PAC    Document 60-2    Filed 05/03/21    Page 31 of 112
https://sec.report/Document/0001047469-20-000244/a2240464zf-1a.htm

**Danke APP**



Once potential residents find apartment units they want to view, they can book an in-person apartment tour with us. We will assign a member of our sales team to accompany the viewing and to recommend additional options if needed.

Because we uphold our standard and adopt a consistent style when renovating and furnishing our apartments, potential residents generally know what they are getting even before setting foot in an actual Danke Apartment. They can even place orders online for apartment units that are still under renovation and sign leases in advance. The standardized design coupled with our targeted recommendation reduces the time and effort spent on in-person tours for both the residents and the sales team, while also reducing our reliance on physical viewings. In the first half of 2019, our residents signed leases with us after seeing on average 1.8 apartments, and our sales team successfully rented out on average 21.4 apartment units per person per month. Our occupancy rate was 89.0% as of June 30, 2019. All of these metrics are better than our peers, according to iResearch.

*Servicing*

We offer one-stop services to our residents, and track the status of their requests through an online service system. See "—Our Products and Service Offerings." As our system continues to paint more accurate portraits of our residents, we are able to better understand their specific needs, and improve our ability to offer more tailored services.

139

Table of Contents

**Online Service System**



*Submit Repair Request via Danke APP*      *Track Status*

Our business process for Dream Apartment similarly consists of planning, sourcing, building, renting and servicing, albeit on a different scale and timeline. During the planning process, we leverage our Digital City System to identify the best neighborhoods and locations. However, due to the larger ticket size of our Dream Apartment facilities, sourcing is a project-based approval process, and renovation takes months as opposed to days. We primarily rely on our BD team to acquire corporate clients. We derive synergies from data, technology, supply chain and services between Danke Apartment and Dream Apartment.

**Quality and Safety**

To provide someone a home is a great responsibility. We have established and implemented strict quality control protocols and security measures to protect the health and safety of our residents when staying with us, which is of paramount importance to us.

*Procurement*

We exercise strict control over the procurement of materials used to renovate and furnish our apartments. For example, painted panels, floors, paint and glue are the top causes of formaldehyde pollution in newly renovated apartment units. Currently we procure these materials from suppliers who send the materials directly to our furniture OEMs and renovation contractors to eliminate the risk of sub-standard materials being used in our apartments. The painted panels and floors from our designated suppliers follow the E0 standard, which is the standard with the lowest formaldehyde level. Each piece of our self-designed furniture is specially designed and manufactured to be durable, recyclable, safe and environmental-friendly.

*Inspections*

We conduct multiple rounds of inspections during the renovation and furnishing process to ensure quality of work. After an apartment has been renovated and furnished, our quality control team conducts a final round of inspection before a new resident moves in. We use a comprehensive checklist of approximately 700 items that covers every aspect of the apartment from water heater to curtains. Among others, strict air quality test is performed using advanced inspection equipment. In rare cases

140

Table of Contents

where the air quality fails to meet our standard, we will engage a third-party air quality management company to improve the air quality until it satisfies the test.

### Intelligent Ventilation System

We recently launched an innovative intelligent ventilation system, which can effectively improve air quality of newly-renovated apartments. We recently installed the system in a majority of our newly-renovated apartments in Hangzhou. With the support of the local government, we are advocating the use of the system as an industry standard.

We believe the rental market and the renovation market at large will benefit from the implementation of industry standards for better quality and services. Having voluntarily adopted a self-imposed high standard over the years, we also believe that we will benefit from industry-wide transparency in this regard.

### Safety and Security

Each of our apartments and dormitory-style rooms has a password-protected digital door lock to ensure safety and privacy. In the context of Danke Apartment where residents rent separate private rooms, each room also has its own additional digital door lock. For Dream Apartment, we have 24/7 onsite security to provide safeguard.

We perform background checks on each resident before signing a lease. We also keep a blacklist of former residents with bad behaviors who are not welcomed back.

## Sales and Marketing

### Property Owner Acquisition

We source Danke Apartments primarily through our BD team that collect leads primarily from our online platform, our call center, as well as third-party online and offline channels. As to Dream Apartments, our BD team primarily source from corporate property owners, such as owners of chained budget hotels and small office buildings, as well as real estate developers who prefer to rent out their own properties on a long-term basis.

### Resident Acquisition

We have no physical storefront. We primarily acquire our residents for Danke Apartments through online channels, including our online platform and third-party rental listing platforms, as well as our call center. We also acquire residents for our Danke Apartment through our sales team. As to Dream Apartment, we primarily rely on our BD team to search for and acquire corporate clients.

### Marketing

We cooperate with major online media to direct traffic to our online platform. We also place targeted advertisements on third-party rental listing platforms for lead generation.

We conduct general branding advertising and organize targeted offline marketing campaigns and events to enhance our brand awareness. For instance, as many of our residents are fresh graduates, we host on-campus campaigns to enhance our brand recognition among target residents. We also offer attractive promotions to fresh graduates, such as deposit-free programs. In addition, we organize networking and social events for our residents, while also promoting our brand and increasing a sense of community.

141

Table of Contents

**Lease Arrangements**

*Lease Arrangements with Property Owners*

We generally enter into four- to six-year leases with property owners of Danke Apartment and pay our rent on a monthly or quarterly basis. As to property owners of Dream Apartment, we typically enter into ten-year leases with them and pay our rent on a semi-annual basis. In both instances, we are typically required to make certain amount of deposit with the property owners upfront.

The property owners are required to provide us with documentation to demonstrate their legal ownership of the properties. We are entitled to sublet the apartments without the need to obtain prior written consent from the property owners. We typically have the right to terminate the lease prior to its expiration if property owners make misrepresentations or breach the lease. In the event of early termination by the property owners, they are typically required to pay certain penalties to us and the residents or corporate clients who rent their apartments from us. We are generally not required to restore the properties to their original conditions at the expiration of the leases, with limited exceptions. The property owners are obligated to ensure that we can properly use the apartments and should indemnify us for any losses caused by their failure to do so. The property owners are liable for any damages to the apartments caused by third parties and we are liable for any damages caused by our improper use of the apartments.

*Lease Arrangements with Our Residents*

Our residents for Danke Apartments generally sign leases on one-year term and are required to make certain amount of deposit with us upfront. A resident is also solely liable for any damages, personal injuries or property losses he or she causes during the lease term. A resident cannot sublet the apartment unit without our prior written consent. If a resident seeks to terminate the lease prior to its expiration, he or she is generally required to pay us certain penalties. We have the right to terminate the lease and charge our resident penalties if the resident is delinquent on rent payment for seven days or longer, interfere with other residents' use of the apartment or conduct any illegal activities, among others.

We provide flexible payment options to our residents for Danke Apartment. They may choose to prepay rent on an annual, semi-annual or quarterly basis. We also cooperate with licensed financial institutions that offer rent financing to them. Once a resident opts for rent financing, we will connect the resident with a financing institution we cooperate with. The financial institution will perform a credit assessment on the resident, and if approved, will communicate financing terms and enter into financing agreements with the resident. To ensure proper use of the funds, the financial institutions will make upfront payment to us, and the residents will pay back the loan to the financial institutions in monthly installments. We pay the corresponding interest to the relevant financial institutions. In the event of the early termination of a resident's lease or a resident's default on repayment of monthly installments, we are required to return the upfront payment for the remaining lease term to the relevant financial institution. In the event of resident delinquency, we have the right to terminate the lease and reclaim the apartment unit. For more information regarding rent financing, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Components of Results of Operations—Interest Expenses."

*Lease Arrangements with Corporate Clients*

Our corporate clients for Dream Apartment typically sign leases on one- or two-year term and make certain amount of deposit with us upfront. They typically pay rent on a quarterly or semi-annual basis. They are not allowed to sublet the property without our prior written consent. The termination clause of the leases for Dream Apartment is generally similar to that of Danke Apartment.

142

https://sec.report/Document/0001047469-20-000244/a2240464zf-1a.htm

Table of Contents

**Data Privacy and Security**

We are committed to protecting data privacy. We collect and store personal information and other data during our daily operations with prior consent in accordance with applicable laws and regulations. Whenever a property owner or resident registers on or logs into our online platform, they can review our data usage and privacy policy, which sets forth how we collect, process and use their data and the measures we implement to protect the privacy of their data. We undertake to keep their data private and secured and use every means to make sure that we do not disclose or leak such information to any third party without their express consent unless required by law. We have established and implemented strict internal policies on data collection, processing, usage, storage and transmission. We encrypt all the data we collect and strictly limit and monitor employee access to such data. We also use Alibaba Cloud security system to improve data security and facilitate the prevention of unauthorized use, leak or loss of the data. In addition, we use third-party cybersecurity company to conduct regular penetration test to identify weaknesses in our system and evaluate its security. Whenever an issue is discovered, we take prompt actions to upgrade our system and mitigate any potential problems that may undermine the security of our system. We believe our policies and practice with respect to data privacy and security are in compliance with applicable laws and with prevalent industry practice.

**Intellectual Property**

We regard our trademarks, copyrights, patents, domain names, know-how, proprietary technologies and other intellectual property as critical to our success. We currently rely on trademarks, copyrights, trade secret law and confidentiality, invention assignment and non-compete agreements with our employees and others to protect our proprietary rights. As of September 30, 2019, we have registered 171 trademarks, 30 copyrights and 39 domain names in and outside of China.

**Competition**

The residential rental market is highly competitive and rapidly changing. Our ability to compete successfully depends on many factors, including our brand recognition and reputation, our ability to source additional apartments and other properties, our ability to retain existing residents and attract new ones, and the robustness of our technology system, particularly our Danke Brain, in supporting our business operations.

Our competitors include (i) other co-living platforms, (ii) traditional real estate agents, (iii) real estate developers that rent out their own properties and (iv) hotel and serviced apartments operators. We believe our strong technological capabilities in the residential rental arena set us apart from our competitors. Our extensive apartment network and rapid growth speed have further reinforced our competitiveness.

**Seasonality**

We experience seasonality in our business. We generally rent out a higher number of apartment units during the graduation season when college students start to look for off-campus rental apartments. We typically experience a lower level of rental around lunar year-end when a large number of migrants return to their hometowns to celebrate the Chinese New Year. It generally picks up after the Chinese New Year when these migrants return to work.

143

Table of Contents

**Employees**

As of December 31, 2017 and 2018 and September 30, 2019, we had a total of 1,610, 6,676 and 5,205 employees, respectively. The following table sets forth the breakdown of our employees as of September 30, 2019 by function:

| Function | Number of Employees | % of Total |
|---|---|---|
| Sales and marketing | 3,272 | 62.9 |
| Customer service | 722 | 13.9 |
| Technology and product development | 686 | 13.2 |
| General administration | 337 | 6.5 |
| Supply chain | 188 | 3.6 |
| **Total** | **5,205** | **100.0** |

Our employees were based in Beijing, Shenzhen, Shanghai, Hangzhou, Tianjin, Wuhan, Nanjing, Guangzhou, Chengdu, Suzhou, Wuxi, Xi'an and Chongqing, respectively, as of September 30, 2019.

We believe we offer our employees competitive compensation packages and a dynamic and cohesive work environment. As a result, we have generally been able to attract and retain qualified personnel and maintain a stable core management team. We plan to hire additional experienced and talented employees for our technology team.

Under PRC laws, we participate in various employee social security plans that are organized by municipal and provincial governments for our PRC-based full-time employees, including pension, unemployment insurance, childbirth insurance, work-related injury insurance, medical insurance and housing provident fund. We are required under PRC laws to make contributions from time to time to employee benefit plans for our PRC-based full-time employees at specified percentages of their salaries, bonuses and certain allowances of such employees, up to maximum amounts specified by local governments in China. We enter into employment contracts with our full-time employees which contain standard confidentiality and non-compete provisions.

We believe that we maintain a good working relationship with our employees, and we have not experienced any major labor disputes.

**Properties and Facilities**

Our corporate headquarters are located in Beijing, China, where we lease approximately 6,333 square meters of office space. We also maintain other leased offices in Shenzhen, Shanghai, Hangzhou, Tianjin, Wuhan, Nanjing, Guangzhou, Chengdu, Suzhou, Xi'an and Chongqing totaling approximately 4,150 square meters. We owned office buildings in Hangzhou totaling approximately 876 square meters. In addition, we lease warehouses in each of Beijing, Shenzhen, Shanghai, Hangzhou, Tianjin, Nanjing, Guangzhou, Chengdu, Wuhan and Suzhou totaling approximately 35,156 square meters. We believe that we will be able to obtain adequate facilities, principally by lease, to accommodate our future expansion plans.

**Insurance**

We maintain property insurance covering apartment units we operate. We also maintain personal injury insurance that covers personal injuries of our renters caused by certain types of accidents in a majority of our apartments. We provide social security insurance including pension insurance, unemployment insurance, work-related injury insurance and medical insurance for our employees. We also purchased employer liability insurance and additional commercial health insurance to increase insurance coverage of our employees. We do not maintain property insurance policies covering our

144

Table of Contents

equipment and other property, business interruption insurance or general third-party liability insurance, nor do we maintain product liability insurance or key-man insurance. We consider our insurance coverage to be sufficient for our business operations in China.

**Legal Proceedings**

We are currently not a party to any material legal or administrative proceedings. We may from time to time be subject to various legal or administrative claims and proceedings arising from the ordinary course of business. Litigation or any other legal or administrative proceeding, regardless of the outcome, is likely to result in substantial cost and diversion of our resources, including our management's time and attention.

145

Table of Contents

# REGULATIONS

This section sets forth a summary of the most significant rules and regulations that affect our business activities in China.

**Foreign Investment Law**

The Foreign Investment Law was formally adopted by the 2nd session of the thirteenth National People's Congress on March 15, 2019, which became effective on January 1, 2020 and replaced the trio of existing laws regulating foreign investment in China, namely, the Sino-foreign Equity Joint Venture Enterprise Law, the Sino-foreign Cooperative Joint Venture Enterprise Law and the Wholly Foreign-invested Enterprise Law, together with their implementation rules and ancillary regulations. Meanwhile, the Regulations for the Implementation of the Foreign Investment Law came into effect as of January 1, 2020, which clarified and elaborated the relevant provisions of the Foreign Investment Law. The organization form, organization and activities of foreign-invested enterprises shall be governed, among others, by the Company Law of PRC and the Partnership Enterprise Law of PRC. Foreign-invested enterprises established before the implementation of this Law may retain the original business organization and so on within five years after the implementation of this Law.

According to the Foreign Investment Law, foreign investments are entitled to pre-entry national treatment and are subject to negative list management system. The pre-entry national treatment means that the treatment given to foreign investors and their investments at the stage of investment access is not lower than that of domestic investors and their investments. The negative list management system means that the state implements special administrative measures for access of foreign investment in specific fields. Foreign investors shall not invest in any forbidden fields stipulated in the negative list and shall meet the conditions stipulated in the negative list before investing in any restricted fields. Foreign investors' investment, earnings and other legitimate rights and interests within the territory of China shall be protected in accordance with the law, and all national policies on supporting the development of enterprises shall equally apply to foreign-invested enterprises.

The Guidance Catalog of Industries for Foreign Investment, or the Foreign Investment Catalog, promulgated by the National Development and Reform Commission, or the NDRC, and the Ministry of Commerce, or the MOFCOM on June 28, 1995 and amended from time to time, listed three categories with regard to foreign investment: "encouraged", "restricted" and "prohibited". Industries not listed in the catalog are generally deemed as falling into a fourth category "permitted" unless specifically restricted by other PRC laws. On June 30, 2019, the NDRC and the MOFCOM promulgated the Special Administrative Measures for Access of Foreign Investment, or the 2019 Negative List, which came into effect on July 30, 2019 and replace the previous Foreign Investment Catalogue or negative list. Our business like VATS is under special administrative measures in the Negative List 2019.

**Regulations on Real Estate Leasing Services**

*General Regulations on House Leasing*

Pursuant to the Administration of Urban Real Estate Law of the PRC, which was promulgated by the Standing Committee in July 5, 1994 and most recently amended in January 1, 2020, a written lease contract shall be entered into between the lessor and the lessee for leasing a property, and the contract shall include the terms and conditions such as the term, purpose and price of leasing and liability for maintenance and repair, etc., as well as other rights and obligations of both parties.

Pursuant to the Administrative Measures on Leasing of Commodity Housing which was issued by Ministry of Housing and Urban-Rural Development on December 1, 2010 and came into effect on February 1, 2011, House may not be leased in any of the following circumstances: (i) the house is an

146

Table of Contents

illegal structure;(ii) the house fails to meet mandatory engineering construction standards with respect to safety and disaster preventions; (iii) house usage is changed in violation of applicable regulations; and (iv) other circumstances which are prohibited by laws and regulations. The lessor and the lessee shall register and file with the local property administration authority within thirty days after entering into the lease contract and make further registration for changes of such lease (if any). Non-compliance with such registration and filing requirements shall be subject to fines from RMB1,000 to RMB10,000 provided that they fail to rectify within required time limits. In addition, the housing and urban-rural development department of government of provinces, autonomous regions and centrally-administered municipalities may formulate implementation regulations based on these measures.

Pursuant to the Opinion on Rectifying and Regulating the Order of the Residential Rental Market, or the Opinion, which was jointly promulgated by Ministry of Housing and Urban-Rural Development, National Development and Reform Commission, Ministry of Public Security, State Administration for Market Regulation, China Banking and Insurance Regulatory Commission, Cyberspace Administration on December 13, 2019 and came into effect on the same day, an entity engaging in real estate brokerage business should include "real estate brokerage" in the business scope of its business license, while an entity engaging in house leasing business should include "house leasing" in the business scope of its business license. The Opinion also requires the real estate brokerage companies and the house leasing companies to file the leasing agreements online, use the template of the leasing agreement prepared by the local governmental authorities, prepare the instructions for use of the house and inform the lessee how to use the house. In addition, the Opinion also requires that the amount of payment that a house leasing company receives through rent financing shall not exceed 30% of the rental income of such company, and all the house leasing companies shall rectify such ratio by the end of 2022. Since the Opinion is relatively new, the interpretation and enforcement of the Opinion involve uncertainties.

*Regulations on Real Estate Brokerage Business and Brokers and House Leasing Enterprises*

On January 20, 2011, the Ministry of Housing and Urban-Rural Development, National Development and Reform Commission and Ministry of Human Resources and Social Security jointly promulgated the Real Estate Brokerage Management Methods, which took into effect on April 1, 2011 and was revised on April 1, 2016. Pursuant to the Real Estate Brokerage Management Methods, the real estate brokerage refer to the behaviors that real estate brokerage institutions and personnel engaging in the real estate transactions in order to provide intermediary and agency services to the principals and in return for commissions. To qualify as a real estate brokerage institution, a company and its branch offices shall have sufficient number of real estate personnel and file with the construction authorities in respective cities within 30 days after obtaining the business license. Information such as business license and filling documents, contents and standard of services, fees and methods to regulate trading funds shall be showed prominently in their premises. Non-compliance with the requirements prescribed in the Real Estate Brokerage Management Methods will subject the real estate brokerage institutions to penalties including fines, suspension of business or even criminal liability.

Pursuant to the Interim Regulation on Profession Qualification for Real Estate Agent Professionals and Implementing Measures on Examinations of Real Estate Agent Professionals which was issued by the Ministry of Human Resources and Social Security and the Ministry of Housing and Urban-Rural Development in June 25, 2015 and came into effect on July 1, 2015, to practice as a qualified real estate agent professional, an individual must obtain a qualification certificate for real estate agent professional. On the contrast, an individual broker who fails to obtain the required qualification certificate will not be permitted to engage in the real estate brokerage agent service.

On May 19, 2017, the Ministry of Housing and Urban-Rural Development promulgated the Administrative Measures on House Leasing and Sale (Draft for Comments), or the Measures on

147

https://sec.report/Document/0001047469-20-000244/a2240464zf-1a.htm

Table of Contents

Leasing and Sale, which has not been effective. Pursuant to the Measures on Leasing and Sale, the PRC government supports the development of scaled and professional house leasing enterprises. The house leasing enterprises and real estate brokerage agencies shall go through the record-filing formalities with the real estate administrations within 30 days from the date of establishment. Penalty for non-compliance with the record-filing requirement includes warning, imposition of fine and confiscation of illegal gains. Also the real estate intermediary shall prepare the statement of the house conditions and inspect the house on the spot before release the rental information. Further, the real estate brokerage agencies shall be responsible for the authenticity of the leasing information on their website. Certain cities, including but not limited to Beijing, Shanghai, Nanjing, Shenzhen, Chengdu, Wuhan and Tianjin, have promulgated notices specifying the record-filing requirement of house leasing enterprises and real estate brokerage agencies.

Pursuant to the Circular on Accelerating the Development of the House Leasing Market in Large and Medium-Sized Cities with a Net Inflow Population jointly issued by the Ministry of Housing and Urban-Rural Development, National Development and Reform Commission, Ministry of Public Security, Ministry of Finance, Ministry of Land and Resource, People's Bank of China, State Administration of Taxation and China Securities Regulatory Commission on July 18, 2017, the business scope of house leasing enterprise shall uniformly use the term "house leasing" when applying for the business registration. In addition, local Housing and Urban-Rural Development departments shall establish and improve the record-filing system for house leasing enterprise and real estate brokerage agencies.

***Regulations on Dividing Room for Leasing***

Pursuant to the Administrative Measures on Leasing of Commodity Housing, for residential lease, the original design room shall be the smallest unit, the per capital floor area shall not be less than the minimum standard stipulated by the local People's Government. Violation of the regulation may cause warnings and fines. Kitchen, washroom, balcony and basement store room shall not be let out for residential purpose. It is silent on whether the living room could be divided for rental or not. According to the Real Estate Brokerage Management Methods, the real estate brokerage institutions and their personnel shall not change the internal structure of houses and divide them for rental.

On March 1, 2017, Ministry of Commerce promulgated the Operation and Service Standards of the Rental Apartment (Draft for Comments), or the Operation and Service Standards. According to the Operation and Service Standards, living room can be divided for rental, provided that certain requirements for dividing living room can be satisfied, such as the area after division shall not be less than 10 square meters, the materials used for division shall meet the national requirement and the divided space of living room shall satisfy the sound insulation standard as bedrooms. However, the Operation and Service Standards has not been effective.

Local competent regulatory authorities of certain cities where we are conducting house leasing business, including but not limited to Beijing, Shanghai, Hangzhou, Guangzhou, Wuhan, Tianjin, Chengdu, Nanjing, Suzhou and Shenzhen etc., also promulgated regulations or rules governing the operations of house leasing business. We cannot assure you that our operations of dividing room for leasing business will not be deemed as non-compliance with local regulations and we cannot assure you that we will not be subject to any penalties imposed by local regulatory authorities that may materially and adversely affect our business, financial condition and results of operations.

***Regulation on Centralized Leasing Apartment***

On June 15, 2018, Beijing Municipal Commission of Housing and Urban-Rural Development, Beijing Municipal Public Security Bureau and Beijing Municipal Commission of Urban Planning, Land and Resource jointly issued the Opinion on Developing Leasing Collective Dormitories for Employees

148

Table of Contents

(for Trail Implementation). This Opinion stipulated the requirements of leasing centralized apartment such as: (i) leasing dormitories for employees shall not be sold or by way of lease in disguised form; (ii) the per capital useable area for residential shall not less than 4 square meters and the number of persons living in each dormitory shall not exceed 8; (iii) the operator shall lease the dormitory to an employer and cannot directly lease to individuals or families, etc.

**Regulations on Construction Project**

The Construction Law, which took effect on November 1, 1997 and was amended in April 2011 and April 2019, respectively, is primarily aimed at regulating the construction industry. Pursuant to the Construction Law, the developer shall apply for a construction permit prior to commencement of a construction project, except for small projects below the limit determined by the construction administrative authorities of the State Council. Construction enterprises shall be classified under different qualification grade based on their registered capital, technical professionals, technical equipment and track records of completed construction projects. Construction enterprises may engage in construction activities within the scope of permitted qualification grade. Unauthorized construction that without obtaining construction permit and projects which do not satisfy the criteria for commencement of work may lead to liability of ordered to stop construction project and fines by construction administrative authorities.

On October 15, 1999, Ministry of Housing and Urban-Rural Development issued the Administrative Measures for the Construction Permits of Construction Projects, or the Construction Measures, which took into effect in December 1, 1999 and was amended in July 2001, June 2014 and September 2018, respectively. Under the Construction Measures, construction and decoration of all kinds of buildings and ancillary facilities shall apply for the permission before starting construction project unless the amount investment of the project less than RMB300,000 or the area of the construction project is less than 300 square meters (the administrative department of Housing and Urban-Rural development in provincial level may adjust the limitation capital based on the reality of different regions). Furthermore, the Construction Measures emphasis that no entity or individuals shall divide any construction project into a number of separate projects below the applicable limits in order to avoiding the requirement of construction project permit. The violators may be ordered to stop project, ordered to take remedial actions within a specified period of time and subject to fines.

**Regulations on Value-added Telecommunication Services**

Among all of the applicable laws and regulations, the Telecommunications Regulations of the People's Republic of China, or the Telecom Regulations, promulgated by the PRC State Council on September 25, 2000 and last amended on February 6, 2016, is the primary governing law, and sets out the general framework for the provision of telecommunications services by domestic PRC companies. Under the Telecom Regulations, telecommunications service providers are required to procure operating licenses prior to their commencement of operations. The Telecom Regulations distinguish "basic telecommunications services" from VATS. VATS are defined as telecommunications and information services provided through public networks. The Catalogue of Telecommunications Services, or the Telecom Catalogue, was issued as an attachment to the Telecom Regulations to categorize telecommunications services as either basic or value-added. In February 2003 and December 2015, the Telecom Catalogue was updated respectively, categorizing online data and transaction processing, information services, among others, as VATS.

Foreign direct investment in telecommunications companies in China is governed by the Provisions on the Administration of Foreign-Invested Telecommunications Enterprises, or the FITE Regulations, which was issued by the State Council on December 11, 2001, became effective on January 1, 2002 and was last amended on February 6, 2016. Under the aforesaid regulations, foreign-invested telecommunications enterprises in the PRC, or FITEs, must be established as Sino-foreign equity joint

149

Table of Contents

ventures, and the geographical area it may conduct telecommunications services is provided by the Ministry of Industry and Information Technology, or the MIIT, accordingly. The foreign party to a FITE engaging in VATS may hold up to 50% of the equity of the FITE. In addition, the major foreign investor in value-added telecommunications business in China must satisfy a number of stringent performance and operational experience requirements, including demonstrating a good track record and experience in operating a value-added telecommunications business. Moreover, approvals from the MIIT and the MOFCOM or their authorized local counterparts must be obtained prior to the operation of the FITE and the MIIT and the MOFCOM retain considerable discretion in granting such approvals.

In September 2000, the State Council promulgated the Administrative Measures on internet-based Information Services, or the internet Measures, most recently amended on January 8, 2011. Under the internet Measures, commercial internet content-related services operators shall obtain an ICP License, from the relevant government authorities before engaging in any commercial internet content-related services operations within China.

The Administrative Measures on Licensing of Telecommunications Business, or the Licenses Measures, issued on March 1, 2009 and most recently amended on July 3, 2017, which set forth more specific provisions regarding the types of licenses required to operate VATS, the qualifications and procedures for obtaining such licenses and the administration and supervision of such licenses. Under these regulations, a commercial operator of VATS must first obtain a VATS License, from MIIT or its provincial level counterparts, otherwise such operator might be subject to sanctions including corrective orders and warnings from the competent administration authority, fines and confiscation of illegal gains and, in the case of significant infringements, the related websites may be ordered to close.

Under the Licenses Measures, where telecommunications operators change the name, legal representative or registered capital within the validity period of their operating licenses, they shall file an application for update of the operating license to the original issuing authority within 30 days after completing the administration for industry and commerce. Those fail to comply with the procedure may be ordered to make rectifications, issued a warning or imposed a fine of RMB5,000 to RMB30,000 by the relevant telecommunications administrations.

We engage in business activities that are VATS as defined in the Telecom Regulations and the Catalog. To comply with the relevant laws and regulations, Yishui (Shanghai) Information Technology Co., Ltd., has obtained the ICP License, which will remain effective until April 30, 2024.

**Regulation on Internet Information Security and Privacy Protection**

The PRC government has enacted laws and regulations with respect to internet information security and protection of personal information from any abuse or unauthorized disclosure. Internet information in China is regulated and restricted from a national security standpoint. PRC laws impose criminal penalties for any effort to: (i) gain improper entry into a computer or system of strategic importance; (ii) disseminate politically disruptive information; (iii) leak state secrets; (iv) spread false commercial information; or (v) infringe intellectual property rights. In addition, the Ministry of Public Security has promulgated measures prohibiting use of the internet in ways which result in a leak of state secrets or a spread of socially destabilizing content, among other things. If an internet information service provider violates any of these measures, competent authorities may revoke its operating license and shut down its websites.

Under the Several Provisions on Regulating the Market Order of Internet Information Services, issued by the MIIT in December 2011, an internet information service provider may not collect any personal information on a user or provide any such information to third parties without the user's consent. It must expressly inform the user of the method, content and purpose of the collection and processing of such user's personal information and may only collect information to the extent necessary

150

https://sec.report/Document/0001047469-20-000244/a2240464zf-1a.htm

Table of Contents

to provide its services. An internet information service provider is also required to properly maintain users' personal information, and in case of any leak or likely leak of such information, it must take immediate remedial measures and, in the event of a serious leak, report to the telecommunications regulatory authority immediately.

Pursuant to the Decision on Strengthening the Protection of Online Information, issued by the Standing Committee of the National People's Congress in December 2012, and the Order for the Protection of Telecommunication and Internet User Personal Information, issued by the MIIT in July 2013, any collection and use of a user's personal information must be subject to the consent of the user, be legal, rational and necessary and be limited to specified purposes, methods and scopes. An internet information service provider must also keep such information strictly confidential, and is further prohibited from divulging, tampering or destroying any such information, or selling or providing such information to other parties. An internet information service provider is required to take technical and other measures to prevent the collected personal information from any unauthorized disclosure, damage or loss. Any violation of these laws and regulations may subject the internet information service provider to warnings, fines, confiscation of illegal gains, revocation of licenses, cancelation of filings, closedown of websites or even criminal liabilities.

Pursuant to the Notice of the Supreme People's Court, the Supreme People's Procuratorate and the Ministry of Public Security on Legally Punishing Criminal Activities Infringing upon the Personal Information of Citizens, issued in April 2013, and the Interpretation of the Supreme People's Court and the Supreme People's Procuratorate on Several Issues regarding Legal Application in Criminal Cases Infringing upon the Personal Information of Citizens, which was issued on May 8, 2017 and took effect on June 1, 2017, the following activities may constitute the crime of infringing upon a citizen's personal information: (i) providing a citizen's personal information to specified persons or releasing a citizen's personal information online or through other methods in violation of relevant national provisions; (ii) providing legitimately collected information relating to a citizen to others without such citizen's consent (unless the information is processed, not traceable to a specific person and not recoverable); (iii) collecting a citizen's personal information in violation of applicable rules and regulations when performing a duty or providing services; or (iv) collecting a citizen's personal information by purchasing, accepting or exchanging such information in violation of applicable rules and regulations.

The PRC Network Security Law, which was promulgated in November 2016 and took effect on June 1, 2017, requires a network operator, including internet information services providers among others, to adopt technical measures and other necessary measures in accordance with applicable laws and regulations as well as compulsory national and industrial standards to safeguard the safety and stability of network operations, effectively respond to network security incidents, prevent illegal and criminal activities, and maintain the integrity, confidentiality and availability of network data. The Network Security Law emphasizes that any individuals and organizations that use networks must not endanger network security or use networks to engage in unlawful activities such as those endangering national security, economic order and the social order or infringing the reputation, privacy, intellectual property rights and other lawful rights and interests of others. The Network Security Law has also reaffirmed certain basic principles and requirements on personal information protection previously specified in other existing laws and regulations, including those described above. Any violation of the provisions and requirements under the Network Security Law may subject an internet service provider to warnings, fines, confiscation of illegal gains, revocation of licenses, cancellation of filings, closedown of websites or even criminal liabilities.

151

Table of Contents

**Regulations on Intellectual Property Rights**

*Regulations on Copyright*

     The Copyright Law, which took effect on June 1, 1991 and was amended in October 2001 and February 2010, respectively, provides that Chinese citizens, legal persons, or other organizations shall, whether published or not, own copyright in their copyrightable works, which include, among others, works of literature, art, natural science, social science, engineering technology and computer software. Copyright owners enjoy certain legal rights, including right of publication, right of authorship and right of reproduction. The Copyright Law as revised in 2001 extends copyright protection to internet activities and products disseminated over the internet. In addition, PRC laws and regulations provide for a voluntary registration system administered by the Copyright Protection Center of China, or the CPCC. According to the Copyright Law, an infringer of the copyrights shall be subject to various civil liabilities, which include ceasing infringement activities, apologizing to the copyright owners and compensating the loss of copyright owner. Infringers of copyright may also subject to fines and/or administrative or criminal liabilities in severe situations.

     Pursuant to the Computer Software Copyright Protection Regulations promulgated in June 1991 and amended in January 2013, the software copyright owner may go through the registration formalities with a software registration authority recognized by the State Council's copyright administrative department. The software copyright owner may authorize others to exercise that copyright, and is entitled to receive remuneration.

*Trademark Law*

     Trademarks are protected by the Trademark Law which was adopted in August 1982 and subsequently amended in February 1993, October 2001, August 2013 and April 2019 respectively as well as by the Implementation Regulations of the PRC Trademark Law adopted by the State Council in 2002 and as most recently amended on April 29, 2014. The Trademark Office of the State Administration for Market Regulation of the PRC handles trademark registrations. The Trademark Office grants a ten-year term to registered trademarks and the term may be renewed for another ten-year period upon request by the trademark owner. A trademark registrant may license its registered trademarks to another party by entering into trademark license agreements, which must be filed with the Trademark Office for its record. As with patents, the Trademark Law has adopted a first-to-file principle with respect to trademark registration. If a trademark applied for is identical or similar to another trademark which has already been registered or subject to a preliminary examination and approval for use on the same or similar kinds of products or services, such trademark application may be rejected. Any person applying for the registration of a trademark may not injure existing trademark rights first obtained by others, nor may any person register in advance a trademark that has already been used by another party and has already gained a "sufficient degree of reputation" through such party's use.

*Domain Names*

     The MIIT promulgated the Administrative Measures on internet Domain Names or the Domain Name Measures on August 24, 2017, which took effect on November 1, 2017 and replaced the Administrative Measures on China internet Domain Names promulgated by MII on November 5, 2004. According to the Domain Name Measures, the MIIT is in charge of the administration of PRC internet domain names. The domain name registration follows a first-to-file principle. Applicants for registration of domain names shall provide the true, accurate and complete information of their identities to domain name registration service institutions. The applicants will become the holder of such domain names upon the completion of the registration procedure.

152

Table of Contents

**Regulations on Foreign Exchange and Offshore Investment**

Under the PRC Foreign Exchange Control Regulation promulgated on January 29, 1996 and most recently amended on August 5, 2008 and various regulations issued by the State Administration of Foreign Exchange (the "SAFE") and other relevant PRC government authorities, Renminbi is convertible into other currencies for current account items, such as trade-related receipts and payments and payment of interest and dividends. The conversion of Renminbi into other currencies and remittance of the converted foreign currency outside the PRC for of capital account items, such as direct equity investments, loans and repatriation of investment, requires the prior approval from the SAFE or its local office.

Payments for transactions that take place within the PRC must be made in Renminbi. Unless otherwise approved, PRC companies may not repatriate foreign currency payments received from abroad or retain the same abroad. Foreign-invested enterprises may retain foreign exchange in accounts with designated foreign exchange banks under the current account items subject to a cap set by the SAFE or its local office. Foreign exchange proceeds under the current accounts may be either retained or sold to a financial institution engaged in settlement and sale of foreign exchange pursuant to relevant SAFE rules and regulations. For foreign exchange proceeds under the capital accounts, approval from the SAFE is generally required for the retention or sale of such proceeds to a financial institution engaged in settlement and sale of foreign exchange.

Under the Notice of the State Administration of Foreign Exchange on Issues Concerning the Foreign Exchange Control for Overseas Investment and Financing and Round-tripping Investment by Chinese Residents through Special Purpose Vehicles, or the SAFE Circular 37, issued by the SAFE and effective on July 4, 2014, PRC residents are required to register with the local SAFE branch prior to the establishment or control of an offshore special purpose vehicle, or SPV, which is defined as offshore enterprises directly established or indirectly controlled by PRC residents for offshore equity financing of the enterprise assets or interests they hold in China. An amendment to registration or subsequent filing with the local SAFE branch by such PRC resident is also required if there is any change in basic information of the offshore company or any material change with respect to the capital of the offshore company. At the same time, the SAFE has issued the Operation Guidance for the Issues Concerning Foreign Exchange Administration over Round-trip Investment regarding the procedures for SAFE registration under the SAFE Circular 37, which became effective on July 4, 2014 as an attachment of Circular 37.

Under the relevant rules, failure to comply with the registration procedures set forth in the SAFE Circular 37 may result in restrictions on the foreign exchange activities of the relevant onshore company, including the payment of dividends and other distributions to its offshore parent or affiliates, and may also subject relevant PRC residents to penalties under PRC foreign exchange administration regulations.

Pursuant to the Circular on Further Simplifying and Improving the Foreign Exchange Management Policies on Direct Investment, or the SAFE Circular 13, effective from June 1, 2015, which cancels the administrative approvals of foreign exchange registration of direct domestic investment and direct overseas investment and simplifies the procedure of foreign exchange-related registration, the investors shall register with banks for direct domestic investment and direct overseas investment.

Based on the SAFE Circular 13 and other laws and regulations relating to foreign exchange, when setting up a new foreign-invested enterprise, the foreign invested enterprise shall register with the bank located at its registered place after obtaining the business license, and if there is any change in capital or other changes relating to the basic information of the foreign-invested enterprise, including without limitation any increase in its registered capital or total investment, the foreign invested enterprise shall register such changes with the bank located at its registered place after obtaining the approval from or completing the filing with competent authorities. Pursuant to the relevant foreign exchange laws and

153

Table of Contents

regulations, the above-mentioned foreign exchange registration with the banks will typically take less than four weeks upon the acceptance of the registration application.

**Regulations on Dividend Distribution**

The principal laws and regulations regulating the dividend distribution of dividends by foreign-invested enterprises in the PRC include the Company Law of the PRC, as amended in August 2004, October 2005, December 2013 and October 2018, the Law of Wholly Foreign-owned Enterprises promulgated in April 1986 and amended in October 2000 and September 2016 and its implementation regulations promulgated in December 1990 and subsequently amended in April 2001 and February 2014, the Sino-Foreign Equity Joint Venture Law of the PRC promulgated in July 1979 and subsequently amended in April 1990, March 2001 and September 2016 and its implementation regulations promulgated in September 1983 and subsequently amended in January 1986, December 1987, July 2001, January 2011, February 2014 and March 2019, and the Sino-Foreign Cooperative Joint Venture Law of the PRC promulgated in April 1988 and amended in October 2000, September 2016 and November 2017 and its implementation regulations promulgated in September 1995 and amended in March 2014, March 2017 and November 2017 respectively. The Wholly Foreign-owned Enterprise Law, the Sino-Foreign Equity Joint Venture Law of the PRC and the Sino-Foreign Cooperative Joint Venture Law of the PRC were replaced by the Foreign Investment Law on January 1, 2020. Under the current regulatory regime in the PRC, foreign-invested enterprises in the PRC may pay dividends only out of their retained earnings, if any, determined in accordance with PRC accounting standards and regulations. A PRC company is required to set aside as statutory reserve funds at least 10% of its after-tax profit, until the cumulative amount of such reserve funds reaches 50% of its registered capital unless laws regarding foreign investment provide otherwise. A PRC company shall not distribute any profits until any losses from prior fiscal years have been offset. Profits retained from prior fiscal years may be distributed together with distributable profits from the current fiscal year.

**Regulations on Taxation**

*Enterprise Income Tax*

On March 16, 2007, the SCNPC promulgated the Corporate Income Tax Law of PRC, or the EIT Law, which was amended on February 24, 2017 and December 29, 2018. On December 6, 2007, the State Council enacted the Regulations for the Implementation for the Corporate Income Tax Law of PRC, which came into effect on January 1, 2008 and was amended in April 2019. Under the EIT Law and its implementing regulations, both resident enterprises and non-resident enterprises are subject to tax in the PRC. Resident enterprises are defined as enterprises that are established in China in accordance with PRC laws, or that are established in accordance with the laws of foreign countries but are actually or in effect controlled from within the PRC. Non-resident enterprises are defined as enterprises that are organized under the laws of foreign countries and whose actual management is conducted outside the PRC, but have established institutions or premises in the PRC, or have no such established institutions or premises but have income generated from inside the PRC. Under the EIT Law and relevant implementing regulations, a uniform corporate income tax rate of 25% is applied. However, if non-resident enterprises have not formed permanent establishments or premises in the PRC, or if they have formed permanent establishment or premises in the PRC but there is no actual relationship between the relevant income derived in the PRC and the established institutions or premises set up by them, enterprise income tax is set at the rate of 10% with respect to their income sourced from inside the PRC.

*Value-added Tax*

The Provisional Regulations of the PRC on Value-added Tax were promulgated by the State Council on December 13, 1993 and came into effect on January 1, 1994, were subsequently amended

154

Table of Contents

on November 10, 2008 and came into effect on January 1, 2009 and were most recently amended on February 6, 2016 and November 19, 2017. The Implementation Rules for the Provisional Regulations the PRC on Value-added Tax (Revised in 2011) were promulgated by the Ministry of Finance on December 25, 1993 and subsequently amended on December 15, 2008 and October 28, 2011, or collectively, the VAT Law. On November 19, 2017, the State Council promulgated The Decisions on Abolition of the Provisional Regulations of the PRC on Business Tax and Revision of the Provisional Regulations of the PRC on Value-added Tax, or Order 691. According to the VAT Law and Order 691, all enterprises and individuals engaged in the sale of goods, the provision of processing, repair and replacement services, sales of services, intangible assets, real property and the importation of goods within the territory of the PRC are the taxpayers of VAT. The VAT tax rates generally applicable are simplified as 17%, 11%, 6% and 0%, and the VAT tax rate applicable to the small-scale taxpayers is 3%. The Notice of the Ministry of Finance and the State Administration of Taxation on Adjusting Value-added Tax Rates, or the Notice, was promulgated on April 4, 2018 and came into effect on May 1, 2018. According to the Notice, the VAT tax rates of 17% and 11% are changed to 16% and 10%, respectively. On March 20, 2019, the Ministry of Finance, State Taxation Administration and General Administration of Customs jointly promulgated the Announcement on Policies for Deeping the VAT Reform or Notice 39, which came into effect on April 1, 2019. Notice 39 further changes the VAT tax rates of 16% and 10% to 13% and 9%, respectively.

**Regulations on Employment and Social Welfare**

*Labor Law and Labor Contract Law*

The Labor Law of the PRC, or the Labor Law, which was promulgated by the Standing Committee of the NPC in July 1994, became effective in January 1995, and was most recently amended in December 2018. Pursuant to the Labor Law, an employer shall develop and improve its labor safety and health system, stringently implement national protocols and standards on labor safety and health, conduct labor safety and health education for workers, guard against labor accidents and reduce occupational hazards.

The Labor Contract Law of the PRC, or the Labor Contract Law, which took effect on January 1, 2008 and was amended on December 28, 2012, is primarily aimed at regulating rights and obligations of employer and employee relationships, including the establishment, performance and termination of labor contracts. Pursuant to the Labor Contract Law, labor contracts shall be concluded in writing if labor relationships are to be or have been established between employers and the employees. Employers are prohibited from forcing employees to work above certain time limit and employers shall pay employees for overtime work in accordance to national regulations. In addition, employee wages shall be no lower than local standards on minimum wages and shall be paid to employees timely.

The Labor Contract Law also imposes stringent requirements on the use of employees of temp agencies, who are known in China as "dispatched workers". Dispatched workers are entitled to equal pay with fulltime employees for equal work. Employers are only allowed to use dispatched workers for temporary, auxiliary or substitutive positions, and the number of dispatched workers may not exceed 10% of the total number of employees.

*Social Insurance and Housing Fund*

As required under the Regulation on Work-related Injury Insurance implemented on January 1, 2004 and amended in 2010, the Provisional Measures for Maternity Insurance of Employees of Corporations implemented on January 1, 1995, the Decision of the State Council for the Establishment of a Unified Basic Pension Plan for Enterprises Employees issued on July 16, 1997, the Decisions on the Establishment of the Medical Insurance Program for Urban Workers of the State Council promulgated on December 14, 1998, the Unemployment Insurance Measures promulgated on

155

Table of Contents

January 22, 1999 and the Social Security Law of the PRC implemented on July 1, 2011 and amended on December 29, 2018, employers are required to provide their employees in the PRC with welfare benefits covering pension insurance, unemployment insurance, maternity insurance, labor injury insurance and medical insurance.

In accordance with the Regulations on the Management of Housing Provident Fund which was promulgated by the State Council in April 1999 and amended in March 2002 and March 2019, respectively, employers must register at the designated administrative centers and open bank accounts for depositing employees' housing funds. Employer and employee are also required to pay and deposit housing funds, with an amount no less than 5% of the monthly average salary of the employee in the preceding year in full and on time.

*Employee Stock Incentive Plan*

Pursuant to the Notice of Relevant Issues Concerning the Administration of Foreign Exchange for Domestic Individuals' Participation in Equity Incentive Plan of Overseas Listed Company, or Circular 7, which was issued by the SAFE on February 15, 2012, employees, directors, supervisors, and other senior management who participate in any stock incentive plan of an publicly-listed overseas company and who are PRC citizens or non-PRC citizens residing in China for a continuous period of no less than one year, subject to a few exceptions, are required to register with SAFE through a qualified domestic agent, which may be a PRC subsidiary of such overseas listed company, and complete certain other procedures.

In addition, the State Administration of Taxation, or the SAT, has issued certain circulars concerning employee stock options and restricted shares. Under these circulars, employees working in the PRC who exercise stock options or are granted restricted shares will be subject to PRC individual income tax. The PRC subsidiaries of an overseas listed company are required to file documents related to employee stock options and restricted shares with relevant tax authorities and to withhold individual income taxes of employees who exercise their stock option or purchase restricted shares. If the employees fail to pay or the PRC subsidiaries fail to withhold income tax in accordance with relevant laws and regulations, the PRC subsidiaries may face sanctions imposed by the tax authorities or other PRC governmental authorities.

**M&A Rules and Overseas Listing**

On August 8, 2006, six PRC governmental and regulatory agencies, including the MOFCOM and the China Securities Regulatory Commission, or the CSRC, promulgated the Provisions on Merger and Acquisition of Domestic Enterprises by Foreign Investors, or the M&A Rules, governing the mergers and acquisitions of domestic enterprises by foreign investors that became effective on September 8, 2006 and was revised on June 22, 2009. The M&A Rules, among other things, requires that if an overseas company established or controlled by PRC companies or individuals, or PRC Citizens, intends to acquire equity interests or assets of any other PRC domestic company affiliated with the PRC Citizens, such acquisition must be submitted to the MOFCOM for approval. The M&A Rules also requires that an offshore SPV formed for overseas listing purposes and controlled directly or indirectly by the PRC Citizens shall obtain the approval of the CSRC prior to overseas listing and trading of such SPV's securities on an overseas stock exchange.

156

Table of Contents

# MANAGEMENT

**Directors and Executive Officers**

The following table sets forth certain information relating to our directors and executive officers as of the date of this prospectus.

| Name | Age | Position/Title |
|---|---|---|
| Derek Boyang Shen | 46 | Chairman |
| Jing Gao | 37 | Co-Founder, Director and Chief Executive Officer |
| Yan Cui | 37 | Co-Founder, Director and President |
| Wenbiao Li | 53 | Director |
| Erhai Liu | 51 | Director |
| Xian Chen** | 38 | Director |
| Gang Ji | 45 | Director |
| William Wang** | 45 | Director |
| Edwin Fung* | 55 | Independent Director |
| Jianping Ye* | 58 | Independent Director |
| Michael Guodong Gu | 44 | Chief Operating Officer |
| Jason Zheng Zhang | 45 | Chief Financial Officer |
| Bing Yu | 34 | Chief Technology Officer |
| Lillian Jing Liu | 55 | Chief People Officer |

\*     Has accepted appointment as our independent director, effective upon the SEC's declaration of effectiveness of our registration statement on Form F-1, of which this prospectus is a part.

\*\*     Will resign immediately prior to the SEC's declaration of effectiveness of our registration statement on Form F-1, of which this prospectus is a part.

*Mr. Derek Boyang Shen* is our chairman of board of directors and the angel investor of us. Mr. Shen is a successful serial entrepreneur and investor and has extensive experience in the internet industry. Mr. Shen served as the president of LinkedIn China and a global vice president of LinkedIn from 2014 to 2017. Prior to that, he founded Nuomi and served as its chief executive officer from 2010 to 2013. From 2005 to 2010, Mr. Shen worked at Google in both the U.S. and China, with his last position being the head of business development of Google China. Prior to Google, he held various senior technical leadership roles at Yahoo! and two other internet companies in the U.S. Mr. Shen obtained dual bachelor's degrees in business administration and environmental chemistry from Nankai University in 1996. He obtained his master's degree in computer science from University of California, Los Angeles (UCLA) in 2000.

*Mr. Jing Gao* is our co-founder, director and chief executive officer. Mr. Gao has more than a decade of experience in the internet industry and is a successful serial entrepreneur. Prior to co-founding our company, Mr. Gao served as the chief executive officer of Sun0101.com, an advertising technology company in 2014. From 2013 to 2014, he worked as the head of business intelligence and business analytics system of Nuomi, where he was also responsible for developing new business opportunities. Prior to that, Mr. Gao was the chief of staff to the president of OkBuy, a leading e-commerce company in China, from 2011 to 2013. He worked as a search engine marketing manager at Baidu from 2009 to 2011. From 2005 to 2009, he worked at Baixing.com, an online classifieds platform, with his last position being the head of Beijing branch. Mr. Gao graduated from Beijing Jiaotong University in 2005, where he majored in computer science.

*Mr. Yan Cui* is our co-founder, director and president. Mr. Cui has more than a decade of experience in the internet industry. Prior to co-founding our company, Mr. Cui served as an operation manager at the online business department of New Oriental from 2011 to 2015. He worked at Baixing.com from 2006 to 2009, where he was responsible for online sales and marketing and data

157

Table of Contents

analytics. Mr. Cui obtained a bachelor's degree in computer science from Beijing Union University in 2006.

*Mr. Wenbiao Li* has served as our director since 2015. Mr. Li has served as a managing director of Walden International since 2008 and as a managing partner of Kaiwu Walden Capital, L.P. since 2013. Mr. Li also serves as a director of Union Optech Co., Ltd. a company listed on the Shenzhen Stock Exchange and Best, Inc., a company listed on the NYSE. From 2004 to 2007, Mr. Li served as a director of mobile engineering at Google. From 2000 to 2003, Mr. Li served as a vice president of engineering at Skire, Inc. Mr. Li obtained a bachelor's degree in computer engineering from Huazhong University of Science and Technology, a master's degree in computer science from the University of San Francisco, and an EMBA degree from Golden Gate University.

*Mr. Erhai Liu* has served as our director since 2017. Mr. Liu is a founding and managing partner of Joy Capital. He has also served as a director of Bitauto Holdings Limited, a company listed on the NYSE, since 2005, and of Luckin Coffee, Inc., a company listed on NASDAQ, since 2018. Before founding Joy Capital in 2015, Mr. Liu worked for Legend Capital from 2003 to 2015, where he served as a managing director and led the TMT and innovative consumption team. Mr. Liu obtained a bachelor's degree in communication engineering from Guilin University of Electronic Technology in 1990, a master's degree in communication and information system from Xidian University in 1994, an MBA degree and a master's degree in global finance from Fordham University in 2003, and a master's degree in psychology from Peking University in 2011.

*Mr. Xian Chen* has served as our director since 2018. Mr. Chen is a partner and the chief investment oficer of CMC Capital. Prior to joining CMC Capital in 2013, Mr. Chen worked at Providence Equity Asia from 2009 to 2013. From 2004 to 2009, he worked at Morgan Stanley Private Equity Asia. Mr. Chen obtained a bachelor's degree in electronics engineering from Tsinghua University in 2003.

*Mr. Gang Ji* has served as our director since 2019. Mr. Ji has served as a vice president of Ant Financial since 2016. He is currently a director of AGTech Holdings Ltd., a company listed on the Hong Kong Stock Exchange, and Cellular Biomedicine Group, Inc., a company listed on NASDAQ. Prior to joining Ant Financial, he served as a vice president of Alibaba Group from 2008 to 2016. Prior to that, Mr. Ji served as a vice president of Agile Partners from 2003 to 2007. He worked as an investment associate of New Margin Ventures from 2000 to 2003. He worked at KPMG from 1997 to 2000. Mr. Ji obtained a bachelor's degree in international business management from University of International Business and Economics in 1997.

*Mr. William Wang* has served as our director since 2019. Mr. Wang is one of the founding partners of Primavera Capital Group. Mr. Wang also serves as a director of Yum China Holdings, Inc., a company listed on the NYSE, Geely Automobile Holdings Limited, a company listed on the Hong Kong Stock Exchange, and Sunlands Online Education Group, a company listed on the NYSE. Before co-founding Primavera Capital Group in 2010, he served as a managing director of Goldman Sachs (Asia) L.L.C. from 2006 to 2010, where he led significant successful investments in China. Prior to that, Mr. Wang worked in the investment banking division and the private equity group of China International Capital Corporation Limited (CICC). Mr. Wang obtained dual bachelor's degrees in management engineering and computer science and a master's degree in management science and engineering from Shanghai Jiao Tong University in 1997 and in 2000, respectively.

*Mr. Edwin Fung* will serve as our independent director upon the SEC's declaration of effectiveness of our registration statement on Form F-1, of which this prospectus is a part. Mr. Fung is a professional accountant and fellow members of the Hong Kong Institute of Certified Public Accountant and the Association of Chartered Certified Accountants of United Kingdom. Mr. Fung is also an independent director of Wanda Sports Group Company Limited, a company listed on NASDAQ and a director of Beijing Vantone Real Estate Co., Ltd., a company listed on the Shanghai Stock Exchange.

158

Table of Contents

He has over 30 years of professional experience in financial auditing, corporate finance and internal control compliance. Mr. Fung worked at KPMG from 1986 to 2017, where he was a vice chairman and a member of the management committee of KPMG China prior to his retirement. In 2012, Mr. Fung became the senior partner of KPMG Northern China region and the senior partner of Beijing office. Prior to that, Mr. Fung was the founding chairman of KPMG's Global China Practice and was responsible for establishing local China practice in 40 countries around the world from 2010 to 2011. He became a partner of KPMG in 1999. Mr Fung has a diploma in Accounting from Hong Kong Institution of Vocational Education.

*Mr. Jianping Ye* will serve as our independent director upon the SEC's declaration of effectiveness of our registration statement on Form F-1, of which this prospectus is a part. Mr. Ye is an expert on land and real estate and has over 30 years of experience in business and public management education. Since 2001, Mr. Ye has been a chair professor at the Department of Land and Real Estate Management of Renmin University of China, where he was an associate professor from 1994 to 2001. Mr. Ye is an expert consultant to both the Ministry of Housing and Urban-Rural Development and Ministry of Natural Resources of China. He also serves as an executive director of the Global Chinese Real Estate Congress and an executive director of the China Land Science Society. He is also an Honorary Professor at the Department of Real Estate and Construction of The University of Hong Kong. Mr. Ye obtained a bachelor's degree in aerial survey and remote sensing technology from Wuhan University in 1984, a master's degree in enterprise management and a doctor of philosophy degree in land management from Renmin University of China in 1989 and 2002, respectively.

*Mr. Michael Guodong Gu* is our chief operating officer. Prior to joining our company in 2019, Mr. Gu served at Baidu from 2013 to 2019 with his last position being the vice president of sales. He served as the national sales director of Sino-American Tianjin SmithKline & French Laboratories, a joint-venture invested by GlaxoSmithKline, from 2008 to 2013. Mr. Gu served as the chief operating officer of Nuomi from May to December 2013. Mr. Gu was a regional general manager of Pepsi China from 2005 to 2008. Prior to that, he served as a director of national sales and development of Royal Dutch Shell China from 2001 to 2005. Mr. Gu worked at Procter & Gamble from 1997 to 2001, with his last position being a regional general manager. Mr. Gu obtained a bachelor's degree in information and communication engineering from Xi'an Jiaotong University in 1997.

*Mr. Jason Zheng Zhang* is our chief financial officer. Prior to joining our company in 2019, Mr. Zhang worked at Citigroup Global Markets Asia Limited from 2007 to 2019, with his last position being a managing director and the chief operating officer of China investment banking division. From 2005 to 2007, he served as a manager and senior manager of the investment banking division of BNP Prime Peregrine. He worked at the head office of China Ocean Shipping (Group) Company from 1996 to 2003. Mr. Zhang obtained a bachelor's degree in international finance from Nankai University in 1996. He obtained an MBA degree from the Robert H. Smith School of Business at University of Maryland in 2005.

*Mr. Bing Yu* is our chief technology officer. Prior to re-joining our company in 2019, Mr. Yu served as the chief software architect and director of engineering productivity of Tuhu.cn, an automobile maintenance e-commerce platform, from 2016 to 2019. Prior to that, he was one of our co-founders and served as our chief technology officer from 2015 to 2016. From 2005 to 2015, Mr. Yu worked at Baixing.com, with his last position being the head of engineering. Mr. Yu obtained a bachelor's degree in electronics engineering from Fudan University in 2007.

*Ms. Lillian Jing Liu* is our chief people officer. Prior to joining our company in 2019, Ms. Liu served as the chief human resources officer and a group vice president of SF Express from 2016 to 2019. Prior to that, she served as the senior vice president of human resources of Renren Inc. from 2012 to 2016. From 2004 to 2012, she served as the head of human resources in the North Asia region of Nokia. Prior to that, she served as a business and human resource director of Hewlett-Packard

159

Table of Contents

Enterprise from 1999 to 2004. From 1994 to 1999, Ms. Liu served as the head of human resources in the Greater China region of Nortel Networks. Ms. Liu obtained an MBA from City University of Seattle in 1999.

**Board of Directors**

Our board of directors will consist of ten directors upon the SEC's declaration of effectiveness of our registration statement on Form F-1, of which this prospectus is a part. A director is not required to hold any shares in our company to qualify to serve as a director. A director may vote with respect to any contract or any proposed contract or arrangement in which he is interested, and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of our directors at which any such contract or proposed contract or arrangement is considered, provided (a) such director has declared the nature of his interest at the meeting of the board at which the question of entering into the contract or arrangement is first considered if he knows his interest then exists, or in any other case at the first meeting of the board after he knows he is or has become so interested, either specifically or by way of a general notice and (b) if such contract or arrangement is a transaction with a related party, such transaction has been approved by the audit committee. The directors may exercise all the powers of the company to borrow money, to mortgage or charge its undertaking, property and uncalled capital, and to issue debentures or other securities whenever money is borrowed or as security for any debt, liability or obligation of the company or of any third party. None of our non-executive directors has a service contract with us that provides for benefits upon termination of service.

**Duties of Directors**

Under Cayman Islands law, our directors have a fiduciary duty to act honestly in good faith with a view to our best interests. Our directors also have a duty to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances. In fulfilling their duty of care to us, our directors must ensure compliance with our post-offering amended and restated memorandum and articles of association. A shareholder has the right to seek damages if a duty owed by our directors is breached.

The functions and powers of our board of directors include, among others:

- conducting and managing the business of our company;

- representing our company in contracts and deals;

- appointing attorneys for our company;

- selecting senior management such as managing directors and executive directors;

- providing employee benefits and pension;

- managing our company's finance and bank accounts;

- exercising the borrowing powers of our company and mortgaging the property of our company; and

- exercising any other powers conferred by the shareholders meetings or under our amended and restated memorandum and articles of association.

**Terms of Directors and Executive Officers**

Our directors may be elected by a resolution of our board of directors, or by an ordinary resolution of our shareholders, pursuant to our post-offering amended and restated memorandum and articles of association. For so long as YIHAN HOLDINGS LIMITED and its affiliated entities collectively hold no less than 50% of the voting power of us, Jing Gao shall be entitled to nominate or

160

Table of Contents

propose the removal or replacement of a majority of the directors by delivering a written notice to us, and our directors shall procure to pass the relevant resolutions to give effect to such appointment, removal or replacement. Each of our directors will hold office until his or her successor takes office or until his or her earlier death, resignation or removal or the expiration of his or her term as provided in the written agreement with our company, if any. A director will cease to be a director if, among other things, the director (i) dies, or becomes bankrupt or makes any arrangement or composition with his creditors; (ii) is found to be or becomes of unsound mind; (iii) resigns his office by notice in writing to the company; (iv) without special leave of absence from our board, is absent from three consecutive board meetings and our directors resolve that his office be vacated; or (v) is removed from office pursuant to provisions of our post-offering amended and restated memorandum and articles of association. Our officers are elected by and serve at the discretion of the board of directors.

Pursuant to our shareholders agreement dated October 28, 2019 and our tenth amended and restated memorandum and articles of associations effective as of October 28, 2019, we have granted each of (i) Antfin (Hong Kong) Holding Limited and/or its affiliated entities, (ii) Internet Fund IV Pte. Ltd. and/or its affiliated entities, (iii) CMC Entities (CMC Downtown Holdings Limited and CMC Downtown II Holdings Limited are collectively referred to in this prospectus as the CMC Entities) and/or its affiliated entities, (iv) Joy Capital Entities (Joy Capital I, L.P., Joy Capital II, L.P., Joy Capital Opportunity, L.P., SUCCESS GOLDEN GROUP LIMITED are collectively referred to in this prospectus as the Joy Capital Entities) and/or their affiliated entities, (v) KIT Cube Limited and/or its affiliated entities, (vi) Primavera Entities (Ducati Investment Limited and Juneberry Investment Holdings Limited are collectively referred to in this prospectus as Primavera Entities) and/or their affiliated entities and (vii) Napa Time Holdings Inc. the right to elect, remove and replace one director on our board of directors, or the board representation rights. We have also granted our co-founders Mr. Jing Gao and Mr. Yan Cui the right to collectively elect, remove and replace two directors on the board. The shareholders agreement and the board representation rights are expected to be terminated upon completion of this offering. We also expect to adopt our eleventh amended and restated memorandum and articles of associations to be effective upon the completion of this offering.

**Board Committees**

Our board of directors has established an audit committee, a compensation committee and a nominating and corporate governance committee. We will adopt a charter for each of the committees. Each committee's members and functions are described below.

*Audit Committee*

Our audit committee will initially consist of Edwin Fung and Jianping Ye. Edwin Fung will be the chairperson of our audit committee. Edwin Fung satisfies the criteria of an audit committee financial expert as set forth under the applicable rules of the SEC. Each of Edwin Fung and Jianping Ye satisfies the requirements for an "independent director" within the meaning of Section 303A of the NYSE Listed Company Manual and will meet the criteria for independence set forth in Rule 10A-3 of the United States Securities Exchange Act of 1934, as amended, or the Exchange Act. Our audit committee will consist solely of independent directors.

The audit committee oversees our accounting and financial reporting processes and the audits of our financial statements. Our audit committee is responsible for, among other things:

- selecting the independent auditor;

- pre-approving auditing and non-auditing services permitted to be performed by the independent auditor;

161

Table of Contents

- annually reviewing the independent auditor's report describing the auditing firm's internal quality control procedures, any material issues raised by the most recent internal quality control review, or peer review, of the independent auditors and all relationships between the independent auditor and our company;

- setting clear hiring policies for employees and former employees of the independent auditors;

- reviewing with the independent auditor any audit problems or difficulties and management's response;

- reviewing and, if material, approving all related party transactions on an ongoing basis;

- reviewing and discussing the annual audited financial statements with management and the independent auditor;

- reviewing and discussing with management and the independent auditors major issues regarding accounting principles and financial statement presentations;

- reviewing reports prepared by management or the independent auditors relating to significant financial reporting issues and judgments;

- discussing earnings press releases with management, as well as financial information and earnings guidance provided to analysts and rating agencies;

- reviewing with management and the independent auditors the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on our financial statements;

- discussing policies with respect to risk assessment and risk management with management, internal auditors and the independent auditor;

- timely reviewing reports from the independent auditor regarding all critical accounting policies and practices to be used by our company, all alternative treatments of financial information within U.S. GAAP that have been discussed with management and all other material written communications between the independent auditor and management;

- establishing procedures for the receipt, retention and treatment of complaints received from our employees regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by our employees of concerns regarding questionable accounting or auditing matters;

- annually reviewing and reassessing the adequacy of our audit committee charter;

- such other matters that are specifically delegated to our audit committee by our board of directors from time to time;

- meeting separately, periodically, with management, internal auditors and the independent auditor; and

- reporting regularly to the full board of directors.

***Compensation Committee***

Our compensation committee will initially consist of Derek Boyang Shen, Jing Gao and Edwin Fung. Derek Boyang Shen will be the chairperson of our compensation committee. Edwin Fung satisfies the requirements for an "independent director" within the meaning of Section 303A of the NYSE Listed Company Manual.

Our compensation committee is responsible for, among other things:

- reviewing, evaluating and, if necessary, revising our overall compensation policies;

162

Table of Contents

- reviewing and evaluating the performance of our directors and senior officers and determining the compensation of our senior officers;

- reviewing and approving our senior officers' employment agreements with us;

- setting performance targets for our senior officers with respect to our incentive-compensation plan and equity-based compensation plans;

- administering our equity-based compensation plans in accordance with the terms thereof; and such other matters that are specifically delegated to the compensation committee by our board of directors from time to time.

### *Nominating and Corporate Governance Committee*

Our nominating and corporate governance committee will initially consist of Jing Gao, Derek Boyang Shen and Jianping Ye. Jing Gao will be the chairperson of our nominating and corporate governance committee. Jianping Ye satisfies the requirements for an "independent director" within the meaning of Section 303A of the NYSE Listed Company Manual. The nominating and corporate governance committee will assist the board of directors in selecting individuals qualified to become our directors and in determining the composition of the board and its committees. The nominating and corporate governance committee will be responsible for, among other things:

- selecting and recommending to the board nominees for election by the shareholders or appointment by the board;

- reviewing annually with the board the current composition of the board with regards to characteristics such as independence, knowledge, skills, experience and diversity;

- making recommendations on the frequency and structure of board meetings and monitoring the functioning of the committees of the board; and

- advising the board periodically with regards to significant developments in the law and practice of corporate governance as well as our compliance with applicable laws and regulations, and making recommendations to the board on all matters of corporate governance and on any remedial action to be taken.

### Compensation of Directors and Executive Officers

In 2018, we paid aggregate cash compensation of approximately RMB1.0 million (US$0.1 million) to our directors and executive officers as a group. We did not pay any other cash compensation or benefits in kind to our directors and executive officers. We have not set aside or accrued any amount to provide pension, retirement or other similar benefits to our directors and executive officers. Our PRC subsidiaries and consolidated VIEs are required by law to make contributions equal to certain percentages of each employee's salary for his or her pension insurance, medical insurance, unemployment insurance and other statutory benefits and a housing provident fund. Our board of directors may determine compensation to be paid to the directors and the executive officers. The compensation committee will assist the directors in reviewing and approving the compensation structure for the directors and the executive officers.

For information regarding share awards granted to our directors and executive officers, see "—Equity Incentive Plans."

### Employment Agreements and Indemnification Agreements

We have entered into employment agreements with each of our executive officers. Under these agreements, each of our executive officers is employed for a specified time period. We may terminate

163

Table of Contents

employment for cause, at any time, without advance notice, for certain acts of the executive officer, such as conviction or plea of guilty to a felony or any crime involving moral turpitude, willful misconduct or gross negligence to our detriment, or serious breach of duty of loyalty to us. We may also terminate an executive officer's employment without cause upon three-month advance written notice. In such case of termination by us, we will provide severance payments to the executive officer as expressly required by applicable law of the jurisdiction where the executive officer is based. The executive officer may resign at any time with a three-month advance written notice.

Each executive officer has agreed to hold, both during and within two years after the termination or expiry of his or her employment agreement, in strict confidence and not to use, except as required in the performance of his or her duties in connection with the employment or pursuant to applicable law, any of our confidential information or trade secrets, any confidential information or trade secrets of our business partners, or the confidential or proprietary information of any third party received by us and for which we have confidential obligations. The executive officers have also agreed to disclose in confidence to us all inventions, designs and trade secrets which they conceive, develop or reduce to practice during the executive officer's employment with us and to assign all right, title and interest in them to us, and assist us in obtaining and enforcing patents, copyrights and other legal rights for these inventions, designs and trade secrets.

In addition, each executive officer has agreed to be bound by non-competition and non-solicitation restrictions during the term of his or her employment and typically for one year following the last date of employment. Specifically, each executive officer has agreed not to (i) approach financial institutions, dealers or other persons or entities introduced to the executive officer in his or her capacity as a representative of us for the purpose of doing business with such persons or entities that will harm our business relationships with these persons or entities; (ii) assume employment with or provide services to any of our competitors, or engage, whether as principal, partner, licensor or otherwise, any of our competitors, without our express consent; or (iii) seek directly or indirectly, to solicit the services of any of our employees who is employed by us on or after the date of the executive officer's termination, or in the year preceding such termination, without our express consent.

We intend to enter into indemnification agreements with each of our directors and executive officers. Under these agreements, we may agree to indemnify our directors and executive officers against certain liabilities and expenses incurred by such persons in connection with claims made by reason of their being a director or officer of our company.

**Equity Incentive Plans**

***2017 Stock Incentive Plan***

In February 2018, our board of directors adopted our 2017 stock incentive plan. The purpose of the 2017 stock incentive plan is to attract and retain the services of employees, directors and consultants by providing additional incentive to promote the business of our company. The 2017 stock incentive plan initially provides for an aggregate amount of no more than 75,000,000 ordinary shares to be issued pursuant to options granted under the plan. In January 2019, we amended and restated the 2017 stock incentive plan under which an aggregate amount of no more than 180,849,469 ordinary shares may be issued pursuant to options granted under the plan. In October 2019, we further amended and restated the 2017 stock incentive plan and increased the maximum number of ordinary shares that may be issued pursuant to options granted under the plan to 274,226,921.

*Type of Awards*

The 2017 stock incentive plan permits awards of options.

164

Table of Contents

*Administration*

The 2017 stock incentive plan is administered by our board of directors, a sub-committee of the board or such person or delegates approved and appointed by the board. The administrator determines the provisions and terms and conditions of each equity award. The chief executive officer of the company has been authorized by the board to exercise the powers and rights of the administrator of the plan, subject to certain exceptions.

*Term*

Unless terminated earlier, the 2017 stock incentive plan will continue in effect for a term of ten years from the date of its adoption.

*Option Agreement*

Share options under the 2017 stock incentive plan shall be granted pursuant to an option agreement providing for the number of ordinary shares subject to the award, and the terms and conditions of the award, which must be consistent with the plan.

*Vesting Schedule*

The vesting schedule of each share option granted under the 2017 stock incentive plan will be set forth in the option agreement for such equity award. Generally, the share options shall vest in a four-year period, of which the first 25% of the share options shall vest on the expiry date of a twelve-month period following the date of grant, and the remaining 75% of the share options shall vest in equal monthly installments over the following three years commencing from the vesting date of the first installment. The vesting schedule is subject to the performance KPI as established by the administrator.

*Option Exercise*

The administrator determines the exercise price for each award, which is stated in the option agreement. Generally, the share options granted under the plan shall be exercisable at the time and under the conditions as determined by the administrator under the terms of the plan, which is stated in the option agreements. However, the share options may not be exercised before the consummation of an initial public offering or a corporate transaction of the company. A "corporate transaction" under the 2017 stock incentive plan is defined as any of the following transactions, provided, however, that the administrator shall determine under parts (iv) and (v) whether multiple transactions are related, and its determination shall be final, binding and conclusive: (i) a merger or consolidation in which the company is not the surviving entity, except for a transaction the principal purpose of which is to change the jurisdiction in which the company is incorporated; (ii) the sale, transfer or other disposition of all or substantially all of the assets of the company; (iii) the complete liquidation or dissolution of the company; (iv) any reverse merger or series of related transactions culminating in a reverse merger (including, but not limited to, a tender offer followed by a reverse merger) in which the company is the surviving entity but (A) the ordinary shares of the company outstanding immediately prior to such merger are converted or exchanged by virtue of the merger into other property, whether in the form of securities, cash or otherwise, or (B) in which securities possessing more than 50% of the total combined voting power of the company's outstanding securities are transferred to a person or persons different from those who held such securities immediately prior to such merger or the initial transaction culminating in such merger, but excluding any such transaction or series of related transactions that the administrator determines shall not be a corporate transaction; or (v) acquisition in a single or series of related transactions by any person or related group of persons (other than the company or by a company-sponsored employee benefit plan) of beneficial ownership (within the meaning of Rule 13d-3 of the Exchange Act) of securities possessing more than 50% of the total

165

Table of Contents

combined voting power of the company's outstanding securities but excluding any such transaction or series of related transactions that the Administrator determines shall not be a corporate transaction.

*Deprivation of Granted Options*

Under certain circumstances, the company is entitled to in its sole discretion forfeit up to 80% of the unvested share options granted under the 2017 shock incentive plan of a grantee.

*Termination of Service*

Generally, any share option that is not vested on the date of the termination of service of a grantee shall be immediately terminated, cancelled and forfeited on such date, subject to the administrator's other determination. If the termination of a grantee's service is not for cause, subject to certain restrictions, all the vested and exercisable share options shall be exercised within 90 days after the date of termination of service, and all the vested but not exercised share options shall be immediately terminated, cancelled and forfeited on the 91 day after the date of termination of service, subject to the administrator's other determination. If the termination of a grantee's service is for cause, any vested but not exercised share options shall be immediately terminated, canceled and forfeited on the date of termination of service, subject to the administrator's other determination. In addition, the company is entitled to certain repurchase rights to the shares held by a grantee in the event of termination of service.

*Termination upon Corporate Transaction*

Unless the share options are assumed in connection with a corporation transaction as so determined by the board, all outstanding share options under the 2017 stock incentive plan shall terminate upon the consummation of a corporation transaction.

*Acceleration upon Corporate Transaction or Change in Control*

In the event of a corporate transaction, the administrator shall determine whether the neither assumed nor replaced share options shall automatically become fully vested and exercisable and be released from any repurchase or forfeiture rights prior to the specified effective date of a corporate transaction, subject to certain restrictions and exceptions. In the event of a change in control (other than change in control which is also a corporate transaction), the administrator shall determine whether each outstanding share option under the plan shall automatically become fully vested and exercisable and be released from any repurchase or forfeiture rights immediately prior to the specified effective date of a change in control, subject to certain restrictions and exceptions, depending on the administrator's determination with respect to whether provision shall be made for an appropriate assumption of the share option theretofore granted under the plan and for substitution of appropriate new share options. A "change in control" under the 2017 stock incentive plan is defined as a change in ownership or control of the company effected through the following transactions: the direct or indirect acquisition by any person or related group of persons (other than an acquisition from or by the company or by a company-sponsored employee benefit plan or by a person that directly or indirectly controls, is controlled by, or is under common control with, the company) of beneficial ownership (within the meaning of Rule 13d-3 of the Exchange Act) of securities possessing more than 50% of the total combined voting power of the company's outstanding securities pursuant to a tender or exchange offer made directly to the company's shareholders which a majority of the directors of the company who are not affiliates or associates of the offer or do not recommend such shareholders accept.

*Amendment and Termination of Plan*

The board may at any time amend, suspend or terminate the 2017 stock incentive plan.

166

Table of Contents

*Granted Options*

As the date of the prospectus, we have granted share options to purchase in aggregate of 205,774,214 ordinary shares under the 2017 stock incentive plan, 1,922,700 of which were subsequently repurchased by us on January 16, 2019 pursuant to an option repurchase agreement entered into between and among us and certain grantees of the share options. Such share options repurchased by us were subsequently cancelled. Certain other share options previously granted were also subsequently cancelled. As a result, as of the date of the prospectus, there are 176,602,914 ordinary shares issuable upon the exercise of outstanding share options under the 2017 stock incentive plan and 97,624,007 ordinary shares reserved for future issuance under the 2017 stock incentive plan.

The table below summarizes, as of the date of this prospectus, the options we have granted to our directors and executive officers.

| Name | Ordinary Shares Underlying Option Awarded | Option Exercise Price (US$/share) | Grant Date | Option Expiration Date |
|---|---|---|---|---|
| Derek Boyang Shen | 22,860,782 | 0.05 | December 1, 2017 and September 30, 2019 | February 12, 2028 |
| Jing Gao | 17,741,716 | 0.05 | September 30, 2019 | February 12, 2028 |
| Yan Cui | 17,741,716 | 0.05 | September 30, 2019 | February 12, 2028 |
| Michael Guodong Gu | * | 0.05 | June 17, 2019 | February 12, 2028 |
| Jason Zheng Zhang | * | 0.05 | July 2, 2019 | February 12, 2028 |
| Bing Yu | * | 0.05 | September 30, 2019 | February 12, 2028 |
| Lillian Jing Liu | * | 0.05 | September 30, 2019 | February 12, 2028 |

\*     Less than 1% of our outstanding shares.

***2019 Equity Incentive Plan***

In October 2019, our board of directors adopted the 2019 equity incentive plan, which will become effective upon completion of this offering. The 2019 equity incentive plan allows us to grant share options, restricted shares, restricted share units and other share-based awards to our employees, directors and consultants. The maximum number of Class A ordinary shares may be subject to equity awards pursuant to the 2019 equity incentive plan is 230,000,000 initially and shall on each January 1 automatically increase to 2% of the total number of Class A and Class B ordinary shares issued and outstanding on the last day of the immediately preceding fiscal year if the maximum number of Class A ordinary shares may be subject to equity awards pursuant to the 2019 equity incentive plan falls below such limit.

*Administration*

The 2019 equity incentive plan is administered by (i) the compensation committee, (ii) such other committee of the board to which the board delegates the power to administer the 2019 equity incentive plan or (iii) the board in the event of the absence of any such committee.

*Change in Control*

In the event of a change in control, the administrators may provide for acceleration of equity awards, purchase of equity awards from holders, provide for assumption, conversion or replacement of equity awards or combination of the foregoing.

*Term*

Unless terminated earlier, the 2019 equity incentive plan will continue in effect for a term of ten years.

167

Table of Contents

*Award Agreement*

All equity awards granted under the 2019 equity incentive plan are evidenced by an award agreement providing for the number of Class A ordinary shares subject to the award, and the terms and conditions of the award, which must be consistent with the 2019 equity incentive plan.

*Vesting*

The administrator determines the vesting schedule of each equity award granted under the 2019 equity incentive plan.

*Amendment and Termination*

The board of directors may at any time amend or terminate the 2019 equity incentive plan, subject to certain exceptions.

**Share Restriction Agreement**

On October 28, 2019, the two entities respectively controlled by our co-founders Mr. Jing Gao and Mr. Yan Cui entered into a share restriction agreement with our company and our shareholders, pursuant to which a total number of 281,290,000 ordinary shares beneficially owned by such co-founders shall be restricted shares, among which 246,000,000 of such restricted shares are beneficially owned by Mr. Jing Gao and 35,290,000 of such restricted shares are beneficially owned by Mr. Yan Cui. Such share restriction arrangements were originally entered into in November 2015 with substantially the same terms.

Pursuant to the share restriction agreement, 25% of such restricted shares shall be vested on November 24, 2016 and remaining 75% of such restricted shares shall be vested in equal and continuous monthly installments over the period of 36 months commencing from November 24, 2016. At the end of the vesting period, all such shares will be vested and will no longer constitute restricted shares.

At any time prior to the end of the vesting period, in the event that a co-founder unilaterally terminates his employment relationship with us or his employment relationship is terminated by us for cause as specified in the share restriction agreement, our company shall have an irrevocable option to repurchase all or part of the unvested restricted shares as of such time from the entity controlled by the leaving co-founder at a purchase price of US$1.

At any time prior to the end of the vesting period, in the event that a co-founder and us mutually terminate his employment relationship with us or under certain other circumstances as specified in the share restriction agreement, our company shall have an irrevocable option to repurchase all of the unvested restricted shares as of such time from the entity controlled by the co-founders at a purchase price of its fair market value for each unvested restricted share. In addition, in such event, all vested restricted shares shall be free of any repurchase right of the company unless agreed otherwise by our company and the leaving founder, however, the leaving founder and the holding entity controlled by him shall appoint us or any person designated by us as its attorney-in-fact in respect of all voting rights and powers of his vested restricted shares.

In the event that one of our co-founders terminates his employment relationship with us and the other co-founder remains a full-time employee of us, subject to certain limitations, the remaining founder shall have an irrevocable option to purchase all or any portion of the vested restricted shares from the entity controlled by the leaving co-founder.

Entities respectively controlled by our co-founders shall not assign, encumber or dispose of any interest in the unvested restricted shares. Our company's repurchase option is assignable to our shareholders under certain circumstances.

The share restriction agreement will terminate immediately upon the completion of this offering.

168

5/3/2021
https://sec.report/Document/0001047469-20-000244/a2240464zf-1a.htm

Table of Contents

**PRINCIPAL SHAREHOLDERS**

The following table sets forth information as of the date of this prospectus with respect to the beneficial ownership of our ordinary shares by:

•   each of our directors and executive officers; and

•   each person known to us to own beneficially 5.0% or more of our ordinary shares.

Beneficial ownership is determined in accordance with the rules of the SEC and includes voting or investment power with respect to, or the power to receive the economic benefit of ownership of, the securities. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, we have included shares that the person has the right to acquire within 60 days, including through the exercise of any option or other right or the conversion of any other security. These shares, however, are not included in the computation of the percentage ownership of any other person.

The total number of ordinary shares outstanding as of the date of this prospectus is 1,729,796,852, assuming conversion of all convertible redeemable preferred shares into ordinary shares.

The total number of ordinary shares outstanding after completion of this offering will be 1,835,796,852, comprising 1,589,796,852 Class A ordinary share and 246,000,000 Class B ordinary shares, which is based upon (i) the conversion and re-designation of all of the issued and outstanding 1,448,506,852 preferred shares into 1,448,506,852 ordinary shares on a one-for-one-basis immediately prior to the completion of this offering; (ii) the creation of an additional 47,500,000,000 ordinary shares, to rank pari passu in all respects with the existing ordinary shares, such that following such increase, the total number of authorized shares of our company is 50,000,000,000; (iii) the reorganization and re-classification of 246,000,000 ordinary shares held by YIHAN HOLDINGS LIMITED into 246,000,000 Class B ordinary shares on a one-for-one-basis immediately prior to the completion of this offering; (iv) the reorganization and re-classification of all of the remaining ordinary shares (including the ordinary shares resulting from the conversion of the preferred shares) into 49,754,000,000 Class A ordinary shares on a one-for-one-basis immediately prior to the completion of this offering; and (v) 106,000,000 Class A ordinary shares issued in connection with this offering (assuming the underwriters do not exercise their option to purchase additional ADSs), but excludes (i) 176,602,914 Class A ordinary shares issuable upon the exercise of outstanding share options under our 2017 stock incentive plan; (ii) 97,624,007 Class A ordinary shares reserved for future issuance under our 2017 stock incentive plan; and (iii) 230,000,000 Class A ordinary shares reserved for future issuance under our 2019 equity incentive plan, which will become effective upon the completion of this offering. The underwriters may choose to exercise the over-allotment option in full, in part or not at all.

Three of our existing shareholders, Antfin (Hong Kong) Holding Limited, Internet Fund IV Pte. Ltd. (an affiliate of Tiger Global Management, LLC), and Joy Capital and/or their affiliates, have indicated interest in purchasing up to US$30 million, US$25 million and US$20 million, respectively, of the ADSs being offered in this offering at the initial public offering price and on the same terms as the other ADSs being offered. Such indications of interest are not binding agreements or commitments to purchase, and we and the underwriters are under no obligations to sell ADSs to such investors.

169

https://sec.report/Document/0001047469-20-000244/a2240464zf-1a.htm

Table of Contents

Accordingly, the figures in the table below do not reflect the possible purchase of ADSs in this offering by these shareholders.

| | Ordinary Shares Beneficially Owned Prior to This Offering | | Ordinary Shares Beneficially Owned After This Offering | | | |
| | Number | Percent | Class A ordinary shares | Class B ordinary shares | Percentage of total ordinary shares on an as-converted basis | Percentage of aggregate voting power* |
|---|---|---|---|---|---|---|
| **Directors and Executive Officers:†** | | | | | | |
| Derek Boyang Shen[1] | 109,385,928 | 6.3% | 109,385,928 | — | 5.9 | 1.7 |
| Jing Gao[2] | 246,000,000 | 14.2% | — | 246,000,000 | 13.4 | 75.6 |
| Yan Cui[3] | 35,290,000 | 2.0% | 35,290,000 | — | 1.9 | 0.5 |
| Wenbiao Li[4] | 180,545,958 | 10.4% | 180,545,958 | — | 9.8 | 2.8 |
| Erhai Liu[5] | 271,901,054 | 15.7% | 271,901,054 | — | 14.8 | 4.2 |
| Xian Chen | — | — | — | — | — | — |
| Gang Ji | — | — | — | — | — | — |
| William Wang | — | — | — | — | — | — |
| Edwin Fung | — | — | — | — | — | — |
| Jianping Ye | — | — | — | — | — | — |
| Michael Guodong Gu | — | — | — | — | — | — |
| Jason Zheng Zhang | — | — | — | — | — | — |
| Bing Yu | — | — | — | — | — | — |
| Lillian Jing Liu | — | — | — | — | — | — |
| All directors and executive officers as a group | 843,122,940 | 48.7% | 597,122,940 | 246,000,000 | 45.9 | 84.7 |
| **Principal Shareholders** | | | | | | |
| Internet Fund IV Pte. Ltd.[6] | 345,860,755 | 20.0% | 345,860,755 | — | 18.8 | 5.3 |
| Joy Capital Entities[5] | 271,901,054 | 15.7% | 271,901,054 | — | 14.8 | 4.2 |
| YIHAN HOLDINGS LIMITED[2] | 246,000,000 | 14.2% | — | 246,000,000 | 13.4 | 75.6 |
| KIT Cube Limited[4] | 180,545,958 | 10.4% | 180,545,958 | — | 9.8 | 2.8 |
| CMC Entities[7] | 162,157,419 | 9.4% | 162,157,419 | — | 8.8 | 2.5 |
| Antfin (Hong Kong) Holding Limited[8] | 135,778,438 | 7.8% | 135,778,438 | — | 7.4 | 2.1 |
| Primavera Entities[9] | 118,737,086 | 6.9% | 118,737,086 | — | 6.5 | 1.8 |
| Napa Time Holdings Inc.[1] | 106,506,453 | 6.2% | 106,506,453 | — | 5.8 | 1.6 |

\*    For each person and group included in this column, percentage of voting power is calculated by dividing the voting power beneficially owned by such person or group by the voting power of all of our Class A and Class B ordinary shares as a single class. In respect of all matters subject to a shareholders' vote, each Class A ordinary share is entitled to one vote, and each Class B ordinary share is entitled to twenty votes, voting together as one class. Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof. Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances.

†    The business address for our directors and executive officers is Room 212, Chao Yang Shou Fu, 8 Chao Yang Men Nei Street, Dongcheng District, Beijing, People's Republic of China.

(1)    Represents (i) 106,506,453 Class A ordinary shares upon conversion of 106,506,453 Series A-1 convertible preferred shares that are held by Napa Time Holdings Inc., a limited liability company established in the British Virgin Islands and (ii) 2,879,475 share options granted under our 2017 stock incentive plan that have vested or are expected to vest within 60 days from the date of this prospectus. Napa Time Holdings Inc. is ultimately controlled by Mr. Derek Boyang Shen. The registered address of Napa Time Holdings Inc. is P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, British Virgin Islands.

170

Table of Contents

(2)     Represents 246,000,000 Class B ordinary shares upon conversion of 246,000,000 ordinary shares that are held by YIHAN HOLDINGS LIMITED, a limited liability company established in the British Virgin Islands. YIHAN HOLDINGS LIMITED is ultimately controlled by Mr. Jing Gao. The registered address of YIHAN HOLDINGS LIMITED is OMC Chambers, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands.

In October 2019, YIHAN HOLDINGS LIMITED and SHENGDUO HOLDINGS LIMITED entered into a share restriction agreement with the company and its shareholders, pursuant to which 246,000,000 of ordinary shares held by YIHAN HOLDINGS LIMITED became restricted shares. YIHAN HOLDINGS LIMITED currently holds voting power associated with such restricted shares, and the restricted shares are included in the total number of ordinary shares held by YIHAN HOLDINGS LIMITED. For further information, see "Management—Equity Incentive Plans—Share Restriction Agreement."

(3)     Represents 35,290,000 Class A ordinary shares upon conversion of 35,290,000 ordinary shares that are held by SHENGDUO HOLDINGS LIMITED, a limited liability company established in the British Virgin Islands. SHENGDUO HOLDINGS LIMITED is ultimately controlled by Mr. Yan Cui. The registered address of SHENGDUO HOLDINGS LIMITED is OMC Chambers, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands.

In October 2019, YIHAN HOLDINGS LIMITED and SHENGDUO HOLDINGS LIMITED entered into a share restriction agreement with the company and its shareholders, pursuant to which 35,290,000 of ordinary shares held by SHENGDUO HOLDINGS LIMITED became restricted shares. SHENGDUO HOLDINGS LIMITED currently holds voting power associated with such restricted shares, and the restricted shares are included in the total number of ordinary shares held by SHENGDUO HOLDINGS LIMITED. For further information, see "Management—Equity Incentive Plans—Share Restriction Agreement."

(4)     Represents 111,502,621 Class A ordinary shares upon conversion of 111,502,621 Series A-2 redeemable convertible preferred shares and 69,043,337 Class A ordinary shares upon conversion of 69,043,337 Series A-3 redeemable convertible preferred shares that are collectively held by KIT Cube Limited, a limited liability company established in the British Virgin Islands. KIT Cube Limited is wholly owned by Kaiwu Walden Capital, L.P., which in turn is ultimately collectively controlled by Mr. Wenbiao Li and Mr. Shuhua Zhou. The registered address of KIT Cube Limited is Trinity Chambers, P.O. Box 4301, Road Town, Tortola, British Virgin Islands.

(5)     Represent (i) 161,658,273 Class A ordinary shares upon conversion of 161,658,273 Series A-3 redeemable convertible preferred shares that are collectively held by Joy Capital I, L.P., a limited partnership established in the Cayman Islands; (ii) 45,955,779 Class A ordinary shares upon conversion of 45,955,779 Series B-1 redeemable convertible preferred shares and 22,351,220 Class A ordinary shares upon conversion of 22,351,220 Series B-2 redeemable convertible preferred shares that are collectively held by Joy Capital II, L.P., a limited partnership established in the Cayman Islands; (iii) 27,155,688 Class A ordinary shares upon conversion of 27,155,688 Series C-1 redeemable convertible preferred shares held by SUCCESS GOLDEN GROUP LIMITED, a company limited by shares established in the British Virgin Islands and (iv) 14,780,094 Class A ordinary shares upon conversion of 14,780,094 Series C-2 redeemable convertible preferred shares held by Joy Capital Opportunity, L.P., a limited partnership established in Cayman Islands. The general partner of Joy Capital I, L.P. is Joy Capital I GP L.P., of which the general partner in turn is Joy Capital GP, Ltd. The general partner of Joy Capital II, L.P. is Joy Capital II GP L.P., of which the general partner in turn is Joy Capital GP, Ltd. SUCCESS GOLDEN GROUP LIMITED is wholly owned by Joy Capital Opportunity, L.P., of which the general partner is Joy Capital Opportunity GP L.P., of which the general partner in turn is Joy Capital GP, Ltd. Joy Capital GP, Ltd. is wholly owned by Mr. Erhai Liu. The registered address of Joy Capital I, L.P. is Sertus Chambers, P.O. Box 2547, Cassia Court, Camana Bay, Grand Cayman, Cayman Islands. The registered address of Joy Capital II, L.P. is Harneys Services (Cayman) Limited, 4th Floor, Harbour Place, 103 South Church Street, P.X. Box 10240, Grand Cayman KY1-1002, Cayman Islands. The registered address of SUCCESS GOLDEN GROUP LIMITED is Craigmuir Chambers, Road Town, Tortola, VG 1110, British Virgin Islands. The registered address of Joy Capital Opportunity, L.P.is Harneys Services (Cayman) Limited, 4th Floor, Harbour Place, 103 South Church Street, P.O. Box 10240, Grand Cayman KY1-1002, Cayman Islands.

(6)     Represents 32,247,379 Class A ordinary shares upon conversion of 32,247,379 Series A-2 redeemable convertible preferred shares, 87,315,980 Class A ordinary shares upon conversion of 87,315,980 Series B-2 redeemable convertible preferred shares and 226,297,396 Class A ordinary shares upon conversion of 226,297,396 Series C-2 redeemable convertible preferred shares that are collectively held by Internet Fund IV Pte. Ltd., a private company limited by shares established in Singapore. Internet Fund IV Pte. Ltd. is ultimately controlled by Tiger Global Management, LLC, which in turn is ultimately collectively controlled by Mr. Chase Coleman and Mr. Scott Shleifer. The registered address of Internet Fund IV Pte. Ltd. is 8 Temasek Boulevard, #32-02, Suntec Tower 3, Singapore 038988.

(7)     Represents (i) 68,933,668 Class A ordinary shares upon conversion of 68,933,668 Series B-1 redeemable convertible preferred shares, 15,666,743 Class A ordinary shares upon conversion of 15,666,743 Series B-2 redeemable convertible preferred shares and 5,728,199 Class A ordinary shares upon conversion of 5,728,199 Series C-2 redeemable convertible preferred shares that are collectively held by CMC Downtown Holdings Limited, an exempted company with limited liability established in the Cayman Islands and (ii) 71,828,809 Class A ordinary shares upon conversion of

171

Table of Contents

71,828,809 Series D redeemable convertible preferred shares that are held by CMC Downtown II Holdings Limited, an exempted company with limited liability established in the Cayman Islands. CMC Downtown Holdings Limited is a subsidiary of CMC Capital Partners II, L.P. The general partner of CMC Capital Partners II, L.P. is CMC Capital Partners GP II, L.P., of which its general partner is CMC Capital Partners GP II, Ltd., which is in turn ultimately controlled by Mr. Ruigang Li. CMC Downtown II Holdings Limited is ultimately controlled by Mr. Ruigang Li. The registered address of CMC Downtown Holdings Limited is Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. The registered address of CMC Downtown II Holdings Limited is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.

(8)     Represents 135,778,438 Class A ordinary shares upon conversion of 135,778,438 Series C-2 redeemable convertible preferred shares that are held by Antfin (Hong Kong) Holding Limited, a limited liability company established in Hong Kong. Antfin (Hong Kong) Holding Limited is an indirect wholly owned subsidiary of Ant Small and Micro Financial Services Group Co., Ltd. The registered address of Antfin (Hong Kong) Holding Limited is 26/F, Tower One, Times Square, 1 Matheson Street, Causeway Bay, Hong Kong.

(9)     Represents (i) 36,207,583 Class A ordinary shares upon conversion of 36,207,583 Series C-2 redeemable convertible preferred shares that are held by Ducati Investment Limited, a limited liability company established in the British Virgin Islands and (ii) 12,243,547 Class A ordinary shares upon conversion of 12,243,547 Series A-1 convertible preferred shares, 4,595,578 Class A ordinary shares upon conversion of 4,595,578 Series B-1 redeemable convertible preferred shares, 1,044,450 Class A ordinary shares upon conversion of 1,044,450 Series B-2 redeemable convertible preferred shares and 64,645,928 Class A ordinary shares upon conversion of 64,645,928 Series D redeemable convertible preferred shares that are collectively held by Juneberry Investment Holdings Limited, a limited liability company established in the British Virgin Islands. Both Ducati Investment Limited and Juneberry Investment Holdings Limited are wholly-owned subsidiaries of Primavera Capital Fund III L.P., the general partner of which is Primavera Capital GP III Ltd. The registered address of Ducati Investment Limited is Wickhams Cay II, Road Town, Tortola VG1110, British Virgin Islands. The registered address of Juneberry Investment Holdings Limited is Wickhams Cay II, Road Town, Tortola VG1110, British Virgin Islands.

As of the date of this prospectus, none of our outstanding ordinary shares or convertible redeemable preferred shares is held by record holders in the United States. We are not aware of any of our shareholders being affiliated with a registered broker-dealer or being in the business of underwriting securities.

We are not aware of any arrangement that may, at a subsequent date, result in a change of control of our company.

**Historical Changes in Our Shareholding**

See "Description of Share Capital—History of Securities Issuances" for historical changes in our shareholding.

172

Table of Contents

## RELATED PARTY TRANSACTIONS

**Contractual Arrangements with Consolidated VIEs and their shareholders**

Due to PRC legal restrictions on foreign ownership and investment in, among other areas, VATS, which include the operation of internet content providers, or ICPs, we, similar to all other entities with foreign-incorporated holding company structures operating in our industry in China, currently conduct these activities mainly through Yishui, one of our consolidated VIEs. In order to maintain flexibility of financing in China, we established another consolidated VIE, Zi Wutong, during the course of the reorganization in connection with the establishment of Phoenix Tree Holdings Limited. We effectively control each consolidated VIEs through a series of contractual arrangements with such VIEs, its shareholders and Xiaofangjian. For a description of these contractual arrangements, see "Our History and Corporate Structure—Contractual Arrangements with Consolidated VIEs and Their Shareholders"

**Private Placements**

See "Description of Share Capital—History of Securities Issuances."

**Shareholders Agreement**

See "Description of Share Capital—Shareholders Agreement" and "Description of Share Capital—Registration Rights."

**Employment Agreements and Indemnification Agreements**

See "Management—Employment Agreements and Indemnification Agreements."

**Equity Incentive Plans**

See "Management—Equity Incentive Plans."

**Transactions with Shaohu Luo**

In 2018, we had loans of RMB10.3 million from Shaohu Luo, a shareholder of series A-3 redeemable convertible preferred shares of our company, to facilitate his participation in our series A-3 financing offshore. The loan was unsecured, interest-free with a term of five years.

**Share Repurchase from Certain Shareholders**

In January 2019, we repurchased a total of 6,210,000 ordinary shares from the entities controlled by our co-founders for a total consideration of US$6.9 million and a total of 27,155,688 series A-3 preferred shares from Joy Capital Entities for a total consideration of US$30.0 million.

173

Table of Contents

**DESCRIPTION OF SHARE CAPITAL**

We are a Cayman Islands exempted company with limited liability and our affairs are governed by our memorandum and articles of association as amended from time to time, and the Companies Law, Cap. 22 (Law 3 of 1961, as consolidated and revised), as amended, of the Cayman Islands, which is referred to as the Companies Law below, and the common law of the Cayman Islands.

As of the date of this prospectus, our authorized share capital is US$50,000 divided into (i) 1,051,493,148 ordinary shares of par value US$0.00002 each, (ii) 118,750,000 Series A-1 preferred shares of par value US$0.00002 each, (iii) 143,750,000 Series A-2 preferred shares of par value US$0.00002 each, (iv) 256,065,251 Series A-3 preferred shares of par value US$0.00002 each, (v) 16,967,466 Series A-2-I preferred shares of par value US$0.00002 each, (vi) 183,823,115 B-1 preferred shares of par value US$0.00002 each, (vii) 141,000,686 Series B-2 preferred shares of par value US$0.00002 each, (viii) 27,155,688 Series C-1 preferred shares of par value US$0.00002 each, (ix) 424,519,909 Series C-2 preferred shares of par value US$0.00002 each and (x) 136,474,737 Series D preferred shares of par value US$0.00002 each.

As of the date of this prospectus, 281,290,000 ordinary shares and 1,448,506,852 preferred shares are issued and outstanding.

Upon the closing of this offering, we will have 1,589,796,852 Class A ordinary shares and 246,000,000 Class B ordinary shares issued and outstanding (or 1,605,696,852 Class A ordinary shares and 246,000,000 Class B ordinary shares if the underwriters exercise the over-allotment option in full), excluding (i) 176,602,914 Class A ordinary shares issuable upon the exercise of outstanding options and 97,624,007 Class A ordinary shares reserved for future issuance under our 2017 stock incentive plan as of the closing of this offering; and (ii) 230,000,000 Class A ordinary shares reserved for future issuance under our 2019 equity incentive plan, which will become effective upon the completion of this offering. All of our ordinary shares issued and outstanding prior to the completion of the offering are and will be fully paid, and all of our shares to be issued in the offering will be issued as fully paid. Our authorized share capital post-offering will be US$1,000,000 divided into 50,000,000,000 ordinary shares with a par value of US$0.0002 each, comprising of 49,754,000,000 Class A ordinary shares with a par value of US$0.00002 each and 246,000,000 Class B ordinary shares with a par value of US$0.00002 each.

Our eleventh amended and restated memorandum and articles of association will become effective upon completion of this offering and will replace our current memorandum and articles of association in its entirety. The following are summaries of material provisions of our post-offering amended and restated memorandum and articles of association and the Companies Law insofar as they relate to the material terms of our Class A and Class B ordinary shares.

**Ordinary Shares**

*Objects of Our Company.*

Under our post-offering amended and restated memorandum and articles of association, the objects of our company are unrestricted and we have the full power and authority to carry out any object not prohibited by the law of the Cayman Islands.

*Class A and Class B Ordinary Shares.*

Holders of Class A ordinary shares and Class B ordinary shares have the same rights except for voting and conversion rights. All of our outstanding ordinary shares are fully paid and non-assessable. Certificates representing the ordinary shares are issued in registered form. Our shareholders who are non-residents of the Cayman Islands may freely hold and vote their ordinary shares.

174

Table of Contents

*Dividends*

The holders of our ordinary shares are entitled to such dividends as may be declared by our board of directors subject to the Companies Law, our articles of association and the common law of the Cayman Islands. In addition, our shareholders may by an ordinary resolution declare a dividend, but no dividend may exceed the amount recommended by our directors. Under Cayman Islands law, our company may declare and pay a dividend only out of funds legally available therefor, namely out of either profit or our share premium account, provided that in no circumstances may we pay a dividend if this would result in our company being unable to pay its debts as they fall due in the ordinary course of business. Holders of Class A ordinary shares and Class B ordinary shares will be entitled to the same amount of dividends, if declared.

*Voting Rights*

Holders of Class A ordinary shares and Class B ordinary shares shall, at all times, vote together as one class on all matters submitted to a vote by the members at any general meeting of the Company. Each Class A ordinary share shall be entitled to one vote on all matters subject to the vote at general meetings of our company, and each Class B ordinary share shall be entitled to twenty votes on all matters subject to the vote at general meetings of our company. Voting at any meeting of shareholders is by show of hands unless a poll is demanded. A poll may be demanded by the chairman of such meeting or any one shareholder present in person or by proxy.

An ordinary resolution to be passed by the shareholders requires the affirmative vote of a simple majority of votes attached to the ordinary shares cast by those shareholders entitled to vote who are present in person or by proxy at a general meeting, while a special resolution requires the affirmative vote of no less than two thirds of votes cast attached to the ordinary shares cast by those shareholders entitled to vote who are present in person or by proxy at a general meeting. Both ordinary resolutions and special resolutions may also be passed by a unanimous written resolution signed by all the shareholders of our company, as permitted by the Companies Law and our post-offering amended and restated memorandum and articles of association. A special resolution will be required for important matters such as a change of name or making changes to our post-offering amended and restated memorandum and articles of association. Holders of the ordinary shares may, among other things, divide or combine their shares by ordinary resolution.

*Conversion.*

Each Class B ordinary share is convertible into one Class A ordinary share at any time at the option of the holder thereof. Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon any sale, assignment, disposition or transfer of Class B ordinary shares by a holder to any person or entity which is not an affiliate of such holder, or upon a change of ultimate beneficial ownership of any Class B ordinary shares to any person who is not an affiliate of the holder of such Class B Ordinary shares, such Class B ordinary shares shall be automatically and immediately converted into the equivalent number of Class A ordinary shares.

*Transfer of Ordinary Shares*

Subject to the restrictions set out below, any of our shareholders may transfer all or any of his or her ordinary shares by an instrument of transfer in the usual or common form or any other form approved by our board of directors.

175

Table of Contents

Our board of directors may, in its absolute discretion, decline to register any transfer of any ordinary share which is not fully paid up or on which we have a lien. Our board of directors may also decline to register any transfer of any ordinary share unless:

- the instrument of transfer is lodged with us, accompanied by the certificate for the ordinary shares to which it relates and such other evidence as our board of directors may reasonably require to show the right of the transferor to make the transfer;

- the instrument of transfer is in respect of only one class of shares;

- the instrument of transfer is properly stamped, if required;

- in the case of a transfer to joint holders, the number of joint holders to whom the ordinary share is to be transferred does not exceed four; and

- a fee of such maximum sum as the NYSE may determine to be payable or such lesser sum as our directors may from time to time require is paid to us in respect thereof.

If our directors refuse to register a transfer they shall, within three months after the date on which the instrument of transfer was lodged, send to each of the transferor and the transferee notice of such refusal.

The registration of transfers may, after compliance with any notice required of the NYSE, be suspended and the register closed at such times and for such periods as our board of directors may from time to time determine, provided, however, that the registration of transfers shall not be suspended nor the register closed for more than 30 calendar days in any year as our board may determine.

### Liquidation

On a winding up of our company, if the assets available for distribution among our shareholders shall be more than sufficient to repay the whole of the share capital at the commencement of the winding up, the surplus will be distributed among our shareholders in proportion to the par value of the shares held by them at the commencement of the winding up, subject to a deduction from those shares in respect of which there are monies due, of all monies payable to our company for unpaid calls or otherwise. If our assets available for distribution are insufficient to repay all of the paid-up capital, the assets will be distributed so that the losses are borne by our shareholders in proportion to the par value of the shares held by them. We are a "limited liability" company registered under the Companies Law, and under the Companies Law, the liability of our members is limited to the amount, if any, unpaid on the shares respectively held by them. Our memorandum of association contains a declaration that the liability of our members is so limited

### Calls on Ordinary Shares and Forfeiture of Ordinary Shares

Our board of directors may from time to time make calls upon shareholders for any amounts unpaid on their ordinary shares. The ordinary shares that have been called upon and remain unpaid are subject to forfeiture.

### Redemption, Repurchase and Surrender of Ordinary Shares

Subject to the provisions of the Companies Law and other applicable law, we may issue shares on terms that are subject to redemption, at our option or at the option of the holders, on such terms and in such manner, including out of capital, as may be determined by the board of directors or by ordinary resolution by our shareholders. Our company may also repurchase any of our shares provided that the manner and terms of such purchase have been approved by our board of directors or by ordinary resolution of our shareholders, or are otherwise authorized by our post-offering memorandum and

176

Table of Contents

articles of association. Under the Companies Law, the redemption or repurchase of any share may be paid out of our company's profits or out of the proceeds of a fresh issue of shares made for the purpose of such redemption or repurchase, or out of capital (including share premium account and capital redemption reserve) if the company can, immediately following such payment, pay its debts as they fall due in the ordinary course of business. In addition, under the Companies Law no such share may be redeemed or repurchased (a) unless it is fully paid up, (b) if such redemption or repurchase would result in there being no shares outstanding, or (c) if the company has commenced liquidation. In addition, our company may accept the surrender of any fully paid share for no consideration.

### Variations of Rights of Shares

If at any time, our share capital is divided into different classes of shares, the rights attached to any class of shares may, subject to the provisions of the Companies Law, be varied with the consent in writing of the holders of two-thirds of the issued shares of that class or with the sanction of an special resolution passed at a general meeting of the holders of the shares of that class. The rights conferred upon the holders of the shares or any class of shares shall not, unless otherwise expressly provided by the terms of issue of such shares, be deemed to be varied by the creation, re-designation, or issue of shares ranking *pari passu* with such shares.

### General Meetings of Shareholders

As a Cayman Islands exempted company, we are not obliged by the Companies Law to call shareholders' annual general meetings. Our post-offering memorandum and articles of association provide that we may (but are not obliged to) in each year hold a general meeting as our annual general meeting in which case we shall specify the meeting as such in the notices calling it, and the annual general meeting shall be held at such time and place as may be determined by our directors.

Shareholders' meetings may be convened by a majority of our board of directors. Advance notice of at least ten calendar days is required for the convening of our annual general shareholders' meeting and any other general meeting of our shareholders. A quorum required for a meeting of shareholders consists one or more holders holding shares which carry in aggregate not less than a majority of all votes attaching to all of the issued and outstanding ordinary shares present in person or by proxy and entitled to vote at general meetings.

The Companies Law provides shareholders with only limited rights to requisition a general meeting, and does not provide shareholders with any right to put any proposal before a general meeting. However, these rights may be provided in a company's articles of association. Our post-offering memorandum and articles of association provides that upon the requisition of any one or more of our shareholders who together hold shares which carry in aggregate not less than one-third of all votes attaching to the issued and outstanding shares of our company entitled to vote at general meetings, our board will convene an extraordinary general meeting and put the resolutions so requisitioned to a vote at such meeting. However, our post-offering memorandum and articles of association do not provide our shareholders with any right to put any proposals before annual general meetings or extraordinary general meetings not called by such shareholders.

### Inspection of Books and Records

Holders of our ordinary shares will have no general right under Cayman Islands law to inspect or obtain copies of our list of shareholders or our corporate records. See "Where You Can Find More Information."

177

Table of Contents

*Changes in Capital*

We may from time to time by ordinary resolution:

- increase our share capital by such sum as the resolution shall prescribe and with such rights, priorities and privileges annexed thereto, as we in general meeting may determine;

- consolidate and divide all or any of our share capital into shares of a larger amount than our existing shares;

- by subdivision of our existing shares or any of them divide the whole or any part of our share capital into shares of smaller amount than is fixed by our post-offering amended and restated memorandum of association ; or

- cancel any shares that at the date of the passing of the resolution have not been taken or agreed to be taken by any person.

We may by special resolution, subject to the confirmation by the Grand Court of the Cayman Islands on an application by our company, reduce our share capital or any capital redemption reserve fund in any manner permitted by law.

**Exempted Company**

We are an exempted company with limited liability incorporated under the Companies Law. The Companies Law in the Cayman Islands distinguishes between ordinary resident companies and exempted companies. Any company that is registered in the Cayman Islands but conducts business mainly outside of the Cayman Islands may apply to be registered as an exempted company. The requirements for an exempted company are essentially the same as for an ordinary company except that an exempted company:

- does not have to file an annual return of its shareholders with the Registrar of Companies;

- is not required to open its company's register of members to inspection;

- does not have to hold an annual general meeting;

- may issue shares with no par value;

- may obtain an undertaking against the imposition of any future taxation (such undertakings are usually given for 20 years in the first instance);

- may register by way of continuation in another jurisdiction and be deregistered in the Cayman Islands;

- may register as a limited duration company; and

- may register as a segregated portfolio company.

"Limited liability" means that the liability of each shareholder is limited to the amount unpaid by the shareholder on the shares of the company(except in exceptional circumstances, such as involving fraud, the establishment of an agency relationship or an illegal or improper purpose or other circumstances in which a court may be prepared to pierce or lift the corporate veil). Upon the closing of this offering, we will be subject to reporting and other informational requirements of the Exchange Act, as applicable to foreign private issuers. We currently intend to comply with the NYSE rules in lieu of following home country practice after the closing of this offering. The NYSE rules require that every company listed on the NYSE hold an annual general meeting of shareholders. In addition, our post-offering amended and restated articles of association provides that a general meetings of shareholders may be convened by a majority of our directors.

178

Table of Contents

**Differences in Corporate Law**

The Companies Law is derived, to a large extent, from the older Companies Acts of England but does not follow recent United Kingdom statutory enactments, and accordingly there are significant differences between the Companies Law and the current Companies Act of England. In addition, the Companies Law differs from laws applicable to United States corporations and their shareholders. Set forth below is a summary of the significant differences between the provisions of the Companies Law applicable to us and the laws applicable to companies incorporated in the State of Delaware.

*Mergers and Similar Arrangements*

The Companies Law permits mergers and consolidations between Cayman Islands companies and between Cayman Islands companies and non-Cayman Islands companies. For these purposes, (i) "merger" means the merging of two or more constituent companies and the vesting of their undertaking, property and liabilities in one of such companies as the surviving company, and (ii) a "consolidation" means the combination of two or more constituent companies into a consolidated company and the vesting of the undertaking, property and liabilities of such companies to the consolidated company. In order to effect such a merger or consolidation, the directors of each constituent company must approve a written plan of merger or consolidation, which must then be authorized by (a) a special resolution of the shareholders of each constituent company, and (b) such other authorization, if any, as may be specified in such constituent company's articles of association. The written plan of merger or consolidation must be filed with the Registrar of Companies of the Cayman Islands together with a declaration as to the solvency of the consolidated or surviving company, a list of the assets and liabilities of each constituent company and an undertaking that a copy of the certificate of merger or consolidation will be given to the members and creditors of each constituent company and that notification of the merger or consolidation will be published in the Cayman Islands Gazette. Court approval is not required for a merger or consolidation which is effected in compliance with these statutory procedures.

A merger between a Cayman parent company and its Cayman subsidiary or subsidiaries does not require authorization by a resolution of shareholders of that Cayman subsidiary if a copy of the plan of merger is given to every member of that Cayman subsidiary to be merged unless that member agrees otherwise. For this purpose a company is a "parent" of a subsidiary if it holds issued shares that together represent at least ninety percent (90%) of the votes at a general meeting of the subsidiary.

The consent of each holder of a fixed or floating security interest over a constituent company is required unless this requirement is waived by a court in the Cayman Islands.

Save in certain circumstances, a dissentient shareholder of a Cayman constituent company is entitled to payment of the fair value of his shares upon dissenting to a merger or consolidation. The exercise of appraisal rights will preclude the exercise of any other rights save for the right to seek relief on the grounds that the merger or consolidation is void or unlawful.

In addition, there are statutory provisions that facilitate the reconstruction and amalgamation of companies, provided that the arrangement is approved by a majority in number of each class of shareholders and creditors with whom the arrangement is to be made, and who must, in addition, represent three-fourths in value of each such class of shareholders or creditors, as the case may be, that are present and voting either in person or by proxy at a meeting, or meetings, convened for that purpose. The convening of the meetings and subsequently the arrangement must be sanctioned by the Grand Court of the Cayman Islands. While a dissenting shareholder has the right to express to the court the view that the transaction ought not to be approved, the court can be expected to approve the arrangement if it determines that:

- the statutory provisions as to the required majority vote have been met;

179

Table of Contents

- the shareholders have been fairly represented at the meeting in question and the statutory majority are acting bona fide without coercion of the minority to promote interests adverse to those of the class;

- the arrangement is such that may be reasonably approved by an intelligent and honest man of that class acting in respect of his interest; and

- the arrangement is not one that would more properly be sanctioned under some other provision of the Companies Law.

The Companies Law also contains a statutory power of compulsory acquisition which may facilitate the "squeeze out" of dissentient minority shareholder upon a tender offer. When a tender offer is made and accepted by holders of 90% of the shares within four months, the offeror may, within a two-month period commencing on the expiration of such four month period, require the holders of the remaining shares to transfer such shares on the terms of the offer. An objection can be made to the Grand Court of the Cayman Islands but this is unlikely to succeed in the case of an offer which has been so approved unless there is evidence of fraud, bad faith or collusion.

If an arrangement and reconstruction by way of scheme of arrangement is thus approved and sanctioned, or if a tender offer is made and accepted in accordance with the foregoing statutory precedures, the dissenting shareholder would have no rights comparable to appraisal rights, which would otherwise ordinarily be available to dissenting shareholders of Delaware corporations, providing rights to receive payment in cash for the judicially determined value of the shares.

### Shareholders' Suits

In principle, we will normally be the proper plaintiff and as a general rule a derivative action may not be brought by a minority shareholder. However, based on English authorities, which would in all likelihood be of persuasive authority in the Cayman Islands, there are exceptions to the foregoing principle, including when:

- a company acts or proposes to act illegally or ultra vires;

- the act complained of, although not ultra vires, could only be effected if duly authorized by more than a simple majority vote that has not been obtained; and

- those who control the company are perpetrating a "fraud on the minority."

### Indemnification of Directors and Executive Officers and Limitation of Liability

Cayman Islands law does not limit the extent to which a company's articles of association may provide for indemnification of officers and directors, except to the extent any such provision may be held by the Cayman Islands courts to be contrary to public policy, such as to provide indemnification against civil fraud or the consequences of committing a crime. Our post-offering memorandum and articles of association provides that that we shall indemnify our officers and directors against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by such directors or officer, other than by reason of such person's dishonesty, willful default or fraud, in or about the conduct of our company's business or affairs (including as a result of any mistake of judgment) or in the execution or discharge of his duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by such director or officer in defending (whether successfully or otherwise) any civil proceedings concerning our company or its affairs in any court whether in the Cayman Islands or elsewhere. This standard of conduct is generally the same as permitted under the Delaware General Corporation Law for a Delaware corporation. In addition, we intend to enter into indemnification agreements with our directors and senior executive officers that will provide such persons with additional indemnification beyond that provided in our amended and restated memorandum and articles of association.

180

Table of Contents

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to our directors, officers or persons controlling us under the foregoing provisions, we have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

### *Anti-Takeover Provisions in the Post-Offering Memorandum and Articles of Association*

Some provisions of our post-offering amended and restated memorandum and articles of association may discourage, delay or prevent a change in control of our company or management that shareholders may consider favorable, including provisions that:

- authorize our board of directors to issue preferred shares in one or more series and to designate the price, rights, preferences, privileges and restrictions of such preferred shares without any further vote or action by our shareholders; and

- limit the ability of shareholders to requisition and convene general meetings of shareholders

However, under Cayman Islands law, our directors may only exercise the rights and powers granted to them under our post-offering amended and restated memorandum and articles of association, as amended and restated from time to time, for what they believe in good faith to be in the best interests of our company.

### *Directors' Fiduciary Duties*

Under Delaware corporate law, a director of a Delaware corporation has a fiduciary duty to the corporation and its shareholders. This duty has two components: the duty of care and the duty of loyalty. The duty of care requires that a director act in good faith, with the care that an ordinarily prudent person would exercise under similar circumstances. Under this duty, a director must inform himself of, and disclose to shareholders, all material information reasonably available regarding a significant transaction. The duty of loyalty requires that a director act in a manner he or she reasonably believes to be in the best interests of the corporation. He or she must not use his or her corporate position for personal gain or advantage. This duty prohibits self-dealing by a director and mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the shareholders generally. In general, actions of a director are presumed to have been made on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation. However, this presumption may be rebutted by evidence of a breach of one of the fiduciary duties. Should such evidence be presented concerning a transaction by a director, a director must prove the procedural fairness of the transaction, and that the transaction was of fair value to the corporation.

As a matter of Cayman Islands law, a director of a Cayman Islands company is in the position of a fiduciary with respect to the company and therefore it is considered that he or she owes the following duties to the company—a duty to act *bona fide* in the best interests of the company, a duty not to make a profit based on his or her position as director (unless the company permits him to do so), a duty not to put himself in a position where the interests of the company conflict with his or her personal interest or his or her duty to a third party and a duty to exercise powers for the purpose for which such powers were intended. A director of a Cayman Islands company owes to the company a duty to act with skill and care. It was previously considered that a director need not exhibit in the performance of his or her duties a greater degree of skill than may reasonably be expected from a person of his or her knowledge and experience. However, English and Commonwealth courts have moved towards an objective standard with regard to the required skill and care and these authorities are likely to be followed in the Cayman Islands.

181

Table of Contents

*Shareholder Action by Written Consent*

Under the Delaware General Corporation Law, a corporation may eliminate the right of shareholders to act by written consent by amendment to its certificate of incorporation. Cayman Islands law and our post-offering amended and restated articles of association provide that shareholders may approve corporate matters by way of a unanimous written resolution signed by or on behalf of each shareholder who would have been entitled to vote on such matter at a general meeting without a meeting being held.

*Shareholder Proposals*

Under the Delaware General Corporation Law, a shareholder has the right to put any proposal before the annual meeting of shareholders, provided it complies with the notice provisions in the governing documents. A special meeting may be called by the board of directors or any other person authorized to do so in the governing documents, but shareholders may be precluded from calling special meetings.

The Companies Law provides shareholders with only limited rights to requisition a general meeting, and does not provide shareholders with any right to put any proposal before a general meeting. However, these rights may be provided in a company's articles of association. Our post-offering memorandum and articles of association allow any one or more of our shareholders who together hold shares which carry in aggregate not less than one-third of the total number of votes attaching to all issued and outstanding shares of our company entitled to vote at general meetings to requisition an extraordinary general meeting of our shareholders, in which case our board is obliged to convene an extraordinary general meeting and to put the resolutions so requisitioned to a vote at such meeting. Other than this right to requisition a shareholders' meeting, our post-offering memorandum and articles of association do not provide our shareholders with any other right to put proposals before annual general meetings or extraordinary general meetings. As an exempted Cayman Islands company, we are not obliged by law to call shareholders' annual general meetings.

*Cumulative Voting*

Under the Delaware General Corporation Law, cumulative voting for elections of directors is not permitted unless the corporation's certificate of incorporation specifically provides for it. Cumulative voting potentially facilitates the representation of minority shareholders on a board of directors since it permits the minority shareholder to cast all the votes to which the shareholder is entitled on a single director, which increases the shareholder's voting power with respect to electing such director. As permitted under Cayman Islands law, our post-offering amended and restated articles of association do not provide for cumulative voting. As a result, our shareholders are not afforded any less protections or rights on this issue than shareholders of a Delaware corporation.

*Removal of Directors*

Under the Delaware General Corporation Law, a director of a corporation with a classified board may be removed only for cause with the approval of a majority of the outstanding shares entitled to vote, unless the certificate of incorporation provides otherwise. Under our amended and restated articles of association, directors may be removed by ordinary resolution or subject to the post-offering amended and restated articles of association, by the affirmative vote of a simple majority of the directors present and voting at a board meeting.

*Transactions with Interested Shareholders*

The Delaware General Corporation Law contains a business combination statute applicable to Delaware corporations whereby, unless the corporation has specifically elected not to be governed by

182

Table of Contents

such statute by amendment to its certificate of incorporation, it is prohibited from engaging in certain business combinations with an "interested shareholder" for three years following the date that such person becomes an interested shareholder. An interested shareholder generally is a person or a group who or which owns or owned 15% or more of the target's outstanding voting stock within the past three years. This has the effect of limiting the ability of a potential acquirer to make a two-tiered bid for the target in which all shareholders would not be treated equally. The statute does not apply if, among other things, prior to the date on which such shareholder becomes an interested shareholder, the board of directors approves either the business combination or the transaction which resulted in the person becoming an interested shareholder. This encourages any potential acquirer of a Delaware corporation to negotiate the terms of any acquisition transaction with the target's board of directors.

Cayman Islands law has no comparable statute. As a result, we cannot avail ourselves of the types of protections afforded by the Delaware business combination statute. However, although Cayman Islands law does not regulate transactions between a company and its significant shareholders, it does provide that such transactions must be entered into *bona fide* in the best interests of the company and for a proper corporate purpose and not with the effect of constituting a fraud on the minority shareholders.

### Dissolution; Winding Up

Under the Delaware General Corporation Law, unless the board of directors approves the proposal to dissolve, dissolution must be approved by shareholders holding 100% of the total voting power of the corporation. Only if the dissolution is initiated by the board of directors may it be approved by a simple majority of the corporation's outstanding shares. Delaware law allows a Delaware corporation to include in its certificate of incorporation a supermajority voting requirement in connection with dissolutions initiated by the board. Under Cayman Islands law, a company may be wound up by either an order of the courts of the Cayman Islands or by a special resolution of its members or, if the company is unable to pay its debts as they fall due, by an ordinary resolution of its members. The court has authority to order winding up in a number of specified circumstances including where it is, in the opinion of the court, just and equitable to do so.

Under Cayman Islands law, a company may be wound up by either an order of the courts of the Cayman Islands or by a special resolution of its members or, if the company is unable to pay its debts as they fall due, by an ordinary resolution of its members. The court has authority to order winding up in a number of specified circumstances including where it is, in the opinion of the court, just and equitable to do so. Under the Companies Law and our post-offering memorandum and articles of association, our company may be dissolved, liquidated or wound up by a special resolution of our shareholders.

### Variation of Rights of Shares

Under the Delaware General Corporation Law, a corporation may vary the rights of a class of shares with the approval of a majority of the outstanding shares of such class, unless the certificate of incorporation provides otherwise. Under Cayman Islands law and our post-offering amended and restated articles of association, if our share capital is divided into more than one class of shares, we may vary the rights attached to any class only with the written consent of the holders of two-thirds of the issued shares of that class or the sanction of a special resolution passed at a general meeting of the holders of the shares of that class.

### Amendment of Governing Documents

Under the Delaware General Corporation Law, a corporation's governing documents may be amended with the approval of a majority of the outstanding shares entitled to vote, unless the

183

Table of Contents

certificate of incorporation provides otherwise. As permitted by Cayman Islands law, our post-offering amended and restated memorandum and articles of association may only be amended by special resolution or the unanimous written resolution of all shareholders.

### *Rights of Non-Resident or Foreign Shareholders*

There are no limitations imposed by our post-offering amended and restated memorandum and articles of association on the rights of non-resident or foreign shareholders to hold or exercise voting rights on our shares. In addition, there are no provisions in our post-offering amended and restated memorandum and articles of association governing the ownership threshold above which shareholder ownership must be disclosed.

### *Directors' Power to Issue Shares*

Subject to applicable law, our board of directors is empowered to issue or allot shares or grant options and warrants with or without preferred, deferred, qualified or other special rights or restrictions.

### History of Securities Issuances

The following is a summary of our securities issuances in the past three years. None of transactions set forth below involved any underwriters' underwriting discounts or commissions, or any public offering. We believe that each of the following transactions was exempt from registration under the Securities Act in reliance on Regulation S or Rule 701 under the Securities Act or pursuant to Section 4(2) of the Securities Act regarding transactions not involving a public offering.

### *Ordinary Shares*

On February 28, 2017, we issued a total of 62,500,000 ordinary shares to YIHAN HOLDINGS LIMITED and SHENGDUO HOLDINGS LIMITED as equity-based awards to our co-founders.

A total of 6,210,000 of our ordinary shares owned by entities respectively controlled by our co-founders were repurchased by us on January 16, 2019 for an aggregate consideration of US$6.9 million.

### *Preferred Shares*

On March 7, 2017, we issued a total of 275,076,555 series A-3 redeemable convertible preferred shares to Joy Capital I, L.P., KIT Cube Limited, Ucommune International Limited and Shaohu Luo for an aggregate consideration of US$14.6 million. A total of 27,155,688 shares of such series A-3 redeemable convertible preferred shares were repurchased by us from Joy Capital I, L.P. on January 16, 2019 for an aggregate consideration of US$30.0 million. A total of 2,714,795 shares of such series A-3 redeemable convertible preferred shares issued to Ucommune International Limited were cancelled on August 23, 2019 and we concurrently issued the same number of series A-3 redeemable convertible preferred shares to Ucommune Group Holdings (Hong Kong) Limited. On March 7, 2017, we also issued a total of 16,967,466 series A-2-I redeemable convertible preferred shares to Shaohu Luo for an aggregate consideration of US$0.7 million.

Pursuant to the share purchase agreement between certain series A-3 and series A-2-I investors and us, dated March 6, 2017, as supplemented by the joinder agreement between Manhua Shi and us, dated November 21, 2017, we agreed to issue 8,144,384 series A-3 redeemable convertible preferred shares to Manhua Shi for an aggregated consideration of US$431,344. In August 2019, we received US$431,344 in cash for the subscription of such Series A-3 redeemable convertible preferred shares. Pursuant to certain share transfer agreement, in which Manhua Shi agreed to transfer her right in such shares to Hupo Harmony Capital Management Ltd, we issued 8,144,384 series A-3 redeemable convertible preferred shares to Hupo Harmony Capital Management Ltd on August 23, 2019.

184

Table of Contents

On February 12, 2018, we issued a total of 183,823,115 series B redeemable convertible preferred shares to CMC Downtown Holdings Limited, Banyan Partners Fund III, L.P., Banyan Partners Fund III-A, L.P., Joy Capital II, L.P., Vision Plus Capital Fund II, L.P., BAI GmbH, G&M Capital Holding Limited and R Capital Growth Fund LP for an aggregate consideration of US$60.0 million. All of such series B redeemable convertible preferred shares were re-designated to series B-1 redeemable convertible preferred shares on May 25, 2018.

On May 25, 2018, we issued a total of 99,222,705 series B-2 redeemable convertible preferred shares to Internet Fund IV Pte. Ltd. and Joy Capital II, L.P. for an aggregate consideration of US$50.0 million. On the same date, we issued a total of 41,777,981 series B-2 redeemable convertible preferred shares to CMC Downtown Holdings Limited, Banyan Partners Fund III, L.P., Banyan Partners Fund III-A, L.P., Joy Capital II, L.P., R Capital Growth Fund LP, Vision Plus Capital Fund II, L.P., BAI GmbH and G&M Capital Holding Limited, all of which were converted from convertible loans. See "—Convertible Loan"

On September 30, 2018, we issued a total of 226,297,396 series C redeemable convertible preferred shares to Internet Fund IV Pte. Ltd. for an aggregated consideration of US$250.0 million. All of such series C redeemable convertible preferred shares were re-designated to series C-2 redeemable convertible preferred shares on January 16, 2019.

On January 16, 2019, we issued a total of 27,155,688 series C-1 redeemable convertible preferred shares to SUCCESS GOLDEN GROUP LIMITED for an aggregated consideration of US$30.0 million. On the same date, we issued a total of 198,222,513 series C-2 redeemable convertible preferred shares to Antfin (Hong Kong) Holding Limited, Ducati Investment Limited, Joy Capital Opportunity, L.P., CMC Downtown Holdings Limited, Banyan Partners Fund III, L.P. and Banyan Partners Fund III-A, L.P. for an aggregated consideration of US$219.0 million.

On October 18, 2019, we issued a total of 71,828,809 series D redeemable convertible preferred shares to CMC Downtown II Holdings Limited for an aggregated consideration of US$100.0 million. On October 28, 2019, we issued a total of 64,645,928 series D redeemable convertible preferred shares to Juneberry Investment Holdings Limited for a total consideration of US$90.0 million.

### Convertible Loan

On February 12, 2018, we entered into convertible note agreements with CMC Downtown Holdings Limited, Banyan Partners Fund III, L.P., Banyan Partners Fund III-A, L.P., Joy Capital II, L.P., Vision Plus Capital Fund II, L.P.,BAI GmbH, G&M Capital Holding Limited, and R Capital Growth Fund LP (collectively, the "2018 Convertible Loan Holders") to obtain a loan of US$20.0 million with a term of 18 months (the "2018 Convertible Loan"). 2018 Convertible Loan Holders are entitled to an option to convert all or part of the outstanding principal of the 2018 Convertible Loan to our preferred shares upon next round of financing. The interest rate of 2018 convertible loan is 8% per annum provided that no interest shall be accrued on the outstanding principal amount, if the entire or any portion of the principal amount is converted to our preferred shares. The conversion price shall be 80% or 70% (if the financing occurs after 12 months from the closing) of the per share price of the next financing. On May 25, 2018, we entered into convertible note conversion agreements with the 2018 Convertible Loan Holders respectively, pursuant to which the 2018 Convertible Loan was converted to 41,777,981 Series B-2 Preferred Shares at the price of US$0.4787 per share.

### Option Grants

We have granted share options to purchase our ordinary shares to certain of our directors, executive officers and employees. See "Management—Equity Incentive Plans."

185

Table of Contents

**Shareholders Agreement**

Pursuant to our eighth amended and restated shareholders agreement dated October 28, 2019, we granted certain preferential rights, including, among others, information right, right of first refusal, prohibition on transfer of shares, right of co-sale and drag-along right and contains provisions governing the board of directors and other corporate governance matters. These preferential rights, as well as corporate governance provisions, will terminate upon the completion of the offering, expect that certain special rights with respect to confidentiality will not terminate.

**Registration Rights**

Pursuant to our eighth amended and restated shareholders agreement dated October 28, 2019, we have granted certain registration rights to certain of our shareholders. These registration rights will terminate upon the fifth anniversary of this offering. Set forth below is a description of these registration rights.

*Demand Registration Rights*

At any time after the earlier of (i) the date that is 5 years after the closing of the sale and purchase of our series C-1 redeemable convertible preferred shares and series C-2 redeemable convertible preferred shares or (ii) one year following the effective date of our IPO, upon a written request from the holders of at least 20% of the registrable securities then outstanding, we shall, within ten business days after the receipt thereof, give a written notice of such request to all holders and shall, use our best efforts to effect as soon as practicable, the registration under the Securities Act of all registrable securities which the holders request to be registered within 20 days after receipt of our notice, subject to certain limitations. We, however, are not obligated to effect a demand registration if we have already effected a demand registrations, an F-3 demand registration, or a piggyback registration in which holders had an opportunity to participate, within the six-month period preceding the date of the holders' such request, subject to certain exceptions. In addition, we shall not be obligated to effect more than 3 demand registrations.

*Piggyback Registration Rights*

If we propose to file a registration statement under the Securities Act in connection with a public offering of securities of our company, subject to certain exceptions, then we shall notify all holders of registrable securities in writing at least 30 days prior to filing any registration statement, and must offer each such holder the opportunity to include their shares in the registration statement. Registration pursuant to piggyback registration rights is not deemed to be a demand registration, and there is no limit on the number of times the holders may exercise their piggyback registration rights.

*Form F-3 Demand Registration Rights*

When eligible for use of form F-3, any holder of the registrable securities then outstanding have the right to demand that we effect a registration on Form F-3/S-3. We, however, are not obligated to effect a registration on Form F-3/S-3 if, among other things, we have already effected a registration statement within the six-month period preceding the date of the registration request, subject to certain limitations. In addition, we have the right to defer Form F-3 demand registrations under certain circumstances.

*Expenses of Registration*

We will pay all expenses incurred by us relating to any demand, piggyback or Form F-3 demand registration, except that the participating holders shall bear the expense of any underwriting discounts and selling commissions relating to the offering of their securities. We will not be required to pay for any expenses of any registration proceeding begun pursuant to demand registration rights, unless subject to certain exception, if the registration request is subsequently withdrawn at the request of a majority of the holders of the registrable securities then outstanding.

*Termination of Registration Rights*

The registration rights discussed above shall terminate upon the fifth anniversary of this offering.

186

Case 1:20-cv-03259-PAC Document 60-2 Filed 05/03/21 Page 79 of 112

Table of Contents

## DESCRIPTION OF AMERICAN DEPOSITARY SHARES

Citibank, N.A. has agreed to act as the depositary for the American Depositary Shares. Citibank's depositary offices are located at 388 Greenwich Street, New York, New York 10013. American Depositary Shares are frequently referred to as "ADSs" and represent ownership interests in securities that are on deposit with the depositary. ADSs may be represented by certificates that are commonly known as "American Depositary Receipts" or "ADRs." The depositary typically appoints a custodian to safekeep the securities on deposit. In this case, the custodian is Citibank, N.A.—Hong Kong, located at 9/F, Citi Tower, One Bay East, 83 Hon Hai Road, Kwun Tong, Kowloon, Hong Kong.

We have appointed Citibank as depositary pursuant to a deposit agreement. A copy of the deposit agreement is on file with the SEC under cover of a Registration Statement on Form F-6. You may obtain a copy of the deposit agreement from the SEC's Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549 and from the SEC's website (www.sec.report). **Please refer to Registration Number 333-235850 when retrieving such copy.**

We are providing you with a summary description of the material terms of the ADSs and of your material rights as an owner of ADSs. Please remember that summaries by their nature lack the precision of the information summarized and that the rights and obligations of an owner of ADSs will be determined by reference to the terms of the deposit agreement and not by this summary. We urge you to review the deposit agreement in its entirety. The portions of this summary description that are italicized describe matters that may be relevant to the ownership of ADSs but that may not be contained in the deposit agreement.

Each ADS represents the right to receive, and to exercise the beneficial ownership interests in, 10 Class A ordinary shares that are on deposit with the depositary and/or the custodian. An ADS also represents the right to receive, and to exercise the beneficial interests in, any other property received by the depositary or the custodian on behalf of the owner of the ADS but that has not been distributed to the owners of ADSs because of legal restrictions or practical considerations. We and the depositary may agree to change the ADS-to-Class A ordinary shares ratio by amending the deposit agreement. This amendment may give rise to, or change, the depositary fees payable by ADS owners. The custodian, the depositary and their respective nominees will hold all deposited property for the benefit of the holders and beneficial owners of ADSs. The deposited property does not constitute the proprietary assets of the depositary, the custodian or their nominees. Beneficial ownership in the deposited property will under the terms of the deposit agreement be vested in the beneficial owners of the ADSs. The depositary, the custodian and their respective nominees will be the record holders of the deposited property represented by the ADSs for the benefit of the holders and beneficial owners of the corresponding ADSs. A beneficial owner of ADSs may or may not be the holder of ADSs. Beneficial owners of ADSs will be able to receive, and to exercise beneficial ownership interests in, the deposited property only through the registered holders of the ADSs, the registered holders of the ADSs (on behalf of the applicable ADS owners) only through the depositary, and the depositary (on behalf of the owners of the corresponding ADSs) directly, or indirectly, through the custodian or their respective nominees, in each case upon the terms of the deposit agreement.

If you become an owner of ADSs, you will become a party to the deposit agreement and therefore will be bound to its terms and to the terms of any ADR that represents your ADSs. The deposit agreement and the ADR specify our rights and obligations as well as your rights and obligations as owner of ADSs and those of the depositary. As an ADS holder you appoint the depositary to act on your behalf in certain circumstances. The deposit agreement and the ADRs are governed by New York law. However, our obligations to the holders of Class A ordinary shares will continue to be governed by the laws of the Cayman Islands, which may be different from the laws in the United States.

In addition, applicable laws and regulations may require you to satisfy reporting requirements and obtain regulatory approvals in certain circumstances. You are solely responsible for complying with such

187

Table of Contents

reporting requirements and obtaining such approvals. Neither the depositary, the custodian, us or any of their or our respective agents or affiliates shall be required to take any actions whatsoever on your behalf to satisfy such reporting requirements or obtain such regulatory approvals under applicable laws and regulations.

*As an owner of ADSs, we will not treat you as one of our shareholders and you will not have direct shareholder rights. The depositary will hold on your behalf the shareholder rights attached to the Class A ordinary shares underlying your ADSs. As an owner of ADSs you will be able to exercise the shareholders rights for the Class A ordinary shares represented by your ADSs through the depositary only to the extent contemplated in the deposit agreement. To exercise any shareholder rights not contemplated in the deposit agreement you will, as an ADS owner, need to arrange for the cancellation of your ADSs and become a direct shareholder.*

The manner in which you own the ADSs (e.g., in a brokerage account vs. as registered holder, or as holder of certificated vs. uncertificated ADSs) may affect your rights and obligations, and the manner in which, and extent to which, the depositary's services are made available to you. As an owner of ADSs, you may hold your ADSs either by means of an ADR registered in your name, through a brokerage or safekeeping account, or through an account established by the depositary in your name reflecting the registration of uncertificated ADSs directly on the books of the depositary (commonly referred to as the "direct registration system" or "DRS"). The direct registration system reflects the uncertificated (book-entry) registration of ownership of ADSs by the depositary. Under the direct registration system, ownership of ADSs is evidenced by periodic statements issued by the depositary to the holders of the ADSs. The direct registration system includes automated transfers between the depositary and The Depository Trust Company ("DTC"), the central book-entry clearing and settlement system for equity securities in the United States. If you decide to hold your ADSs through your brokerage or safekeeping account, you must rely on the procedures of your broker or bank to assert your rights as ADS owner. Banks and brokers typically hold securities such as the ADSs through clearing and settlement systems such as DTC. The procedures of such clearing and settlement systems may limit your ability to exercise your rights as an owner of ADSs. Please consult with your broker or bank if you have any questions concerning these limitations and procedures. All ADSs held through DTC will be registered in the name of a nominee of DTC. This summary description assumes you have opted to own the ADSs directly by means of an ADS registered in your name and, as such, we will refer to you as the "holder." When we refer to "you," we assume the reader owns ADSs and will own ADSs at the relevant time.

The registration of the Class A ordinary shares in the name of the depositary or the custodian shall, to the maximum extent permitted by applicable law, vest in the depositary or the custodian the record ownership in the applicable Class A ordinary shares with the beneficial ownership rights and interests in such Class A ordinary shares being at all times vested with the beneficial owners of the ADSs representing the Class A ordinary shares. The depositary or the custodian shall at all times be entitled to exercise the beneficial ownership rights in all deposited property, in each case only on behalf of the holders and beneficial owners of the ADSs representing the deposited property.

**Dividends and Distributions**

As a holder of ADSs, you generally have the right to receive the distributions we make on the securities deposited with the custodian. Your receipt of these distributions may be limited, however, by practical considerations and legal limitations. Holders of ADSs will receive such distributions under the terms of the deposit agreement in proportion to the number of ADSs held as of the specified record date, after deduction of the applicable fees, taxes and expenses.

188

Table of Contents

**Distributions of Cash**

Whenever we make a cash distribution for the securities on deposit with the custodian, we will deposit the funds with the custodian. Upon receipt of confirmation of the deposit of the requisite funds, the depositary will arrange for the funds received in a currency other than U.S. dollars to be converted into U.S. dollars and for the distribution of the U.S. dollars to the holders, subject to the laws and regulations of the Cayman Islands.

The conversion into U.S. dollars will take place only if practicable and if the U.S. dollars are transferable to the United States. The depositary will apply the same method for distributing the proceeds of the sale of any property (such as undistributed rights) held by the custodian in respect of securities on deposit.

The distribution of cash will be made net of the fees, expenses, taxes and governmental charges payable by holders under the terms of the deposit agreement. The depositary will hold any cash amounts it is unable to distribute in a non-interest bearing account for the benefit of the applicable holders and beneficial owners of ADSs until the distribution can be effected or the funds that the depositary holds must be escheated as unclaimed property in accordance with the laws of the relevant states of the United States.

**Distributions of Shares**

Whenever we make a free distribution of Class A ordinary shares for the securities on deposit with the custodian, we will deposit the applicable number of Class A ordinary shares with the custodian. Upon receipt of confirmation of such deposit, the depositary will *either* distribute to holders new ADSs representing the Class A ordinary shares deposited *or* modify the ADS-to-Class A ordinary shares ratio, in which case each ADS you hold will represent rights and interests in the additional Class A ordinary shares so deposited. Only whole new ADSs will be distributed. Fractional entitlements will be sold and the proceeds of such sale will be distributed as in the case of a cash distribution.

The distribution of new ADSs or the modification of the ADS-to-Class A ordinary shares ratio upon a distribution of Class A ordinary shares will be made net of the fees, expenses, taxes and governmental charges payable by holders under the terms of the deposit agreement. In order to pay such taxes or governmental charges, the depositary may sell all or a portion of the new Class A ordinary shares so distributed.

No such distribution of new ADSs will be made if it would violate a law (*e.g.*, the U.S. securities laws) or if it is not operationally practicable. If the depositary does not distribute new ADSs as described above, it may sell the Class A ordinary shares received upon the terms described in the deposit agreement and will distribute the proceeds of the sale as in the case of a distribution of cash.

**Distributions of Rights**

Whenever we intend to distribute rights to subscribe for additional Class A ordinary shares, we will give prior notice to the depositary and we will assist the depositary in determining whether it is lawful and reasonably practicable to distribute rights to subscribe for additional ADSs to holders.

The depositary will establish procedures to distribute rights to subscribe for additional ADSs to holders and to enable such holders to exercise such rights if it is lawful and reasonably practicable to make the rights available to holders of ADSs, and if we provide all of the documentation contemplated in the deposit agreement (such as opinions to address the lawfulness of the transaction). You may have to pay fees, expenses, taxes and other governmental charges to subscribe for the new ADSs upon the exercise of your rights. The depositary is not obligated to establish procedures to facilitate the distribution and exercise by holders of rights to subscribe for new Class A ordinary shares other than in the form of ADSs.

189

Table of Contents

The depositary will *not* distribute the rights to you if:

- We do not timely request that the rights be distributed to you or we request that the rights not be distributed to you; or

- We fail to deliver satisfactory documents to the depositary; or

- It is not reasonably practicable to distribute the rights.

The depositary will sell the rights that are not exercised or not distributed if such sale is lawful and reasonably practicable. The proceeds of such sale will be distributed to holders as in the case of a cash distribution. If the depositary is unable to sell the rights, it will allow the rights to lapse.

**Elective Distributions**

Whenever we intend to distribute a dividend payable at the election of shareholders either in cash or in additional shares, we will give prior notice thereof to the depositary and will indicate whether we wish the elective distribution to be made available to you. In such case, we will assist the depositary in determining whether such distribution is lawful and reasonably practicable.

The depositary will make the election available to you only if it is reasonably practicable and if we have provided all of the documentation contemplated in the deposit agreement. In such case, the depositary will establish procedures to enable you to elect to receive either cash or additional ADSs, in each case as described in the deposit agreement.

If the election is not made available to you, you will receive either cash or additional ADSs, depending on what a shareholder in the Cayman Islands would receive upon failing to make an election, as more fully described in the deposit agreement.

**Other Distributions**

Whenever we intend to distribute property other than cash, Class A ordinary shares or rights to subscribe for additional Class A ordinary shares, we will notify the depositary in advance and will indicate whether we wish such distribution to be made to you. If so, we will assist the depositary in determining whether such distribution to holders is lawful and reasonably practicable.

If it is reasonably practicable to distribute such property to you and if we provide to the depositary all of the documentation contemplated in the deposit agreement, the depositary will distribute the property to the holders in a manner it deems practicable.

The distribution will be made net of fees, expenses, taxes and governmental charges payable by holders under the terms of the deposit agreement. In order to pay such taxes and governmental charges, the depositary may sell all or a portion of the property received.

The depositary will *not* distribute the property to you and will sell the property if:

- We do not request that the property be distributed to you or if we request that the property not be distributed to you; or

- We do not deliver satisfactory documents to the depositary; or

- The depositary determines that all or a portion of the distribution to you is not reasonably practicable.

The proceeds of such a sale will be distributed to holders as in the case of a cash distribution.

190

Table of Contents

**Redemption**

Whenever we decide to redeem any of the securities on deposit with the custodian, we will notify the depositary in advance. If it is practicable and if we provide all of the documentation contemplated in the deposit agreement, the depositary will provide notice of the redemption to the holders.

The custodian will be instructed to surrender the shares being redeemed against payment of the applicable redemption price. The depositary will convert into U.S. dollars upon the terms of the deposit agreement the redemption funds received in a currency other than U.S. dollars and will establish procedures to enable holders to receive the net proceeds from the redemption upon surrender of their ADSs to the depositary. You may have to pay fees, expenses, taxes and other governmental charges upon the redemption of your ADSs. If less than all ADSs are being redeemed, the ADSs to be retired will be selected by lot or on a *pro rata* basis, as the depositary may determine.

**Changes Affecting Class A ordinary shares**

The Class A ordinary shares held on deposit for your ADSs may change from time to time. For example, there may be a change in nominal or par value, split-up, cancellation, consolidation or any other reclassification of such Class A ordinary shares or a recapitalization, reorganization, merger, consolidation or sale of assets of the Company.

If any such change were to occur, your ADSs would, to the extent permitted by law and the deposit agreement, represent the right to receive the property received or exchanged in respect of the Class A ordinary shares held on deposit. The depositary may in such circumstances deliver new ADSs to you, amend the deposit agreement, the ADRs and the applicable Registration Statement(s) on Form F-6, call for the exchange of your existing ADSs for new ADSs and take any other actions that are appropriate to reflect as to the ADSs the change affecting the Shares. If the depositary may not lawfully distribute such property to you, the depositary may sell such property and distribute the net proceeds to you as in the case of a cash distribution.

**Issuance of ADSs upon Deposit of Class A ordinary shares**

Upon completion of the offering, the Class A ordinary shares being offered pursuant to the prospectus will be deposited by us with the custodian. Upon receipt of confirmation of such deposit, the depositary will issue ADSs to the underwriters named in the prospectus.

After the closing of the offer, the depositary may create ADSs on your behalf if you or your broker deposit Class A ordinary shares with the custodian. The depositary will deliver these ADSs to the person you indicate only after you pay any applicable issuance fees and any charges and taxes payable for the transfer of the Class A ordinary shares to the custodian. Your ability to deposit Class A ordinary shares and receive ADSs may be limited by U.S. and Cayman Islands legal considerations applicable at the time of deposit.

The issuance of ADSs may be delayed until the depositary or the custodian receives confirmation that all required approvals have been given and that the Class A ordinary shares have been duly transferred to the custodian. The depositary will only issue ADSs in whole numbers.

When you make a deposit of Class A ordinary shares, you will be responsible for transferring good and valid title to the depositary. As such, you will be deemed to represent and warrant that:

- The Class A ordinary shares are duly authorized, validly issued, fully paid, non-assessable and legally obtained.

- All preemptive (and similar) rights, if any, with respect to such Class A ordinary shares have been validly waived or exercised.

191

Case 1:20-cv-03259-PAC Document 60-2 Filed 05/03/21 Page 84 of 112

Table of Contents

- You are duly authorized to deposit the Class A ordinary shares.

- The Class A ordinary shares presented for deposit are free and clear of any lien, encumbrance, security interest, charge, mortgage or adverse claim, and are not, and the ADSs issuable upon such deposit will not be, "restricted securities" (as defined in the deposit agreement).

- The Class A ordinary shares presented for deposit have not been stripped of any rights or entitlements.

If any of the representations or warranties are incorrect in any way, we and the depositary may, at your cost and expense, take any and all actions necessary to correct the consequences of the misrepresentations.

**Transfer, Combination and Split Up of ADRs**

As an ADR holder, you will be entitled to transfer, combine or split up your ADRs and the ADSs evidenced thereby. For transfers of ADRs, you will have to surrender the ADRs to be transferred to the depositary and also must:

- ensure that the surrendered ADR is properly endorsed or otherwise in proper form for transfer;

- provide such proof of identity and genuineness of signatures as the depositary deems appropriate;

- provide any transfer stamps required by the State of New York or the United States; and

- pay all applicable fees, charges, expenses, taxes and other government charges payable by ADR holders pursuant to the terms of the deposit agreement, upon the transfer of ADRs.

To have your ADRs either combined or split up, you must surrender the ADRs in question to the depositary with your request to have them combined or split up, and you must pay all applicable fees, charges and expenses payable by ADR holders, pursuant to the terms of the deposit agreement, upon a combination or split up of ADRs.

**Withdrawal of Class A ordinary shares Upon Cancellation of ADSs**

As a holder, you will be entitled to present your ADSs to the depositary for cancellation and then receive the corresponding number of underlying Class A ordinary shares at the custodian's offices. Your ability to withdraw the Class A ordinary shares held in respect of the ADSs may be limited by U.S. and Cayman Islands law considerations applicable at the time of withdrawal. In order to withdraw the Class A ordinary shares represented by your ADSs, you will be required to pay to the depositary the fees for cancellation of ADSs and any charges and taxes payable upon the transfer of the Class A ordinary shares. You assume the risk for delivery of all funds and securities upon withdrawal. Once canceled, the ADSs will not have any rights under the deposit agreement.

If you hold ADSs registered in your name, the depositary may ask you to provide proof of identity and genuineness of any signature and such other documents as the depositary may deem appropriate before it will cancel your ADSs. The withdrawal of the Class A ordinary shares represented by your ADSs may be delayed until the depositary receives satisfactory evidence of compliance with all applicable laws and regulations. Please keep in mind that the depositary will only accept ADSs for cancellation that represent a whole number of securities on deposit.

192

Table of Contents

You will have the right to withdraw the securities represented by your ADSs at any time except for:

- Temporary delays that may arise because (i) the transfer books for the Class A ordinary shares or ADSs are closed, or (ii) Class A ordinary shares are immobilized on account of a shareholders' meeting or a payment of dividends.

- Obligations to pay fees, taxes and similar charges.

- Restrictions imposed because of laws or regulations applicable to ADSs or the withdrawal of securities on deposit.

The deposit agreement may not be modified to impair your right to withdraw the securities represented by your ADSs except to comply with mandatory provisions of law.

**Voting Rights**

As a holder, you generally have the right under the deposit agreement to instruct the depositary to exercise the voting rights for the Class A ordinary shares represented by your ADSs. The voting rights of holders of Class A ordinary shares are described in "Description of Share Capital."

At our request, the depositary will distribute to you any notice of shareholders' meeting received from us together with information explaining how to instruct the depositary to exercise the voting rights of the securities represented by ADSs. In lieu of distributing such materials, the depositary may distribute to holders of ADSs instructions on how to retrieve such materials upon request.

If the depositary timely receives voting instructions from a holder of ADSs, it will endeavor to vote the securities (in person or by proxy) represented by the holder's ADSs as follows:

- *In the event of voting by show of hands*, the depositary will vote (or cause the custodian to vote) all Class A ordinary shares held on deposit at that time in accordance with the voting instructions received from a majority of holders of ADSs who provide timely voting instructions.

- *In the event of voting by poll*, the depositary will vote (or cause the Custodian to vote) the Class A ordinary shares held on deposit in accordance with the voting instructions received from the holders of ADSs.

Securities for which no voting instructions have been received will not be voted (except as otherwise contemplated in the deposit agreement). Please note that the ability of the depositary to carry out voting instructions may be limited by practical and legal limitations and the terms of the securities on deposit. We cannot assure you that you will receive voting materials in time to enable you to return voting instructions to the depositary in a timely manner.

193

---

Table of Contents

**Fees and Charges**

As an ADS holder, you will be required to pay the following fees under the terms of the deposit agreement:

| Service | Fees |
|---|---|
| • Issuance of ADSs (e.g., an issuance of ADS upon a deposit of Class A ordinary shares, upon a change in the ADS(s)-to-Class A ordinary shares ratio, or for any other reason), excluding ADS issuances as a result of distributions of Class A ordinary shares) | Up to U.S. 5¢ per ADS issued |
| • Cancellation of ADSs (e.g., a cancellation of ADSs for delivery of deposited property, upon a change in the ADS(s)-to-Class A ordinary shares ratio, or for any other reason) | Up to U.S. 5¢ per ADS cancelled |
| • Distribution of cash dividends or other cash distributions (e.g., upon a sale of rights and other entitlements) | Up to U.S. 5¢ per ADS held |
| • Distribution of ADSs pursuant to (i) stock dividends or other free stock distributions, or (ii) exercise of rights to purchase additional ADSs | Up to U.S. 5¢ per ADS held |
| • Distribution of securities other than ADSs or rights to purchase additional ADSs (e.g., upon a spin-off) | Up to U.S. 5¢ per ADS held |
| • ADS Services | Up to U.S. 5¢ per ADS held on the applicable record date(s) established by the depositary |
| • Registration of ADS transfers (e.g., upon a registration of the transfer of registered ownership of ADSs, upon a transfer of ADSs into DTC and *vice versa*, or for any other reason) | Up to U.S. 5¢ per ADS (or fraction thereof) transferred |
| • Conversion of ADSs of one series for ADSs of another series (e.g., upon conversion of Partial Entitlement ADSs for Full Entitlement ADSs, or upon conversion of Restricted ADSs (each as defined in the Deposit Agreement) into freely transferable ADSs, and *vice versa*). | Up to U.S. 5¢ per ADS (or fraction thereof) converted |

As an ADS holder you will also be responsible to pay certain charges such as:

- taxes (including applicable interest and penalties) and other governmental charges;

- the registration fees as may from time to time be in effect for the registration of Class A ordinary shares on the share register and applicable to transfers of Class A ordinary shares to or from the name of the custodian, the depositary or any nominees upon the making of deposits and withdrawals, respectively;

- certain cable, telex and facsimile transmission and delivery expenses;

194

Table of Contents

- the fees, expenses, spreads, taxes and other charges of the depositary and/or service providers (which may be a division, branch or affiliate of the depositary) in the conversion of foreign currency;

- the reasonable and customary out-of-pocket expenses incurred by the depositary in connection with compliance with exchange control regulations and other regulatory requirements applicable to Class A ordinary shares, ADSs and ADRs; and

- the fees, charges, costs and expenses incurred by the depositary, the custodian, or any nominee in connection with the ADR program.

ADS fees and charges for (i) the issuance of ADSs, and (ii) the cancellation of ADSs are charged to the person for whom the ADSs are issued (in the case of ADS issuances) and to the person for whom ADSs are cancelled (in the case of ADS cancellations). In the case of ADSs issued by the depositary into DTC, the ADS issuance and cancellation fees and charges may be deducted from distributions made through DTC, and may be charged to the DTC participant(s) receiving the ADSs being issued or the DTC participant(s) holding the ADSs being cancelled, as the case may be, on behalf of the beneficial owner(s) and will be charged by the DTC participant(s) to the account of the applicable beneficial owner(s) in accordance with the procedures and practices of the DTC participants as in effect at the time. ADS fees and charges in respect of distributions and the ADS service fee are charged to the holders as of the applicable ADS record date. In the case of distributions of cash, the amount of the applicable ADS fees and charges is deducted from the funds being distributed. In the case of (i) distributions other than cash and (ii) the ADS service fee, holders as of the ADS record date will be invoiced for the amount of the ADS fees and charges and such ADS fees and charges may be deducted from distributions made to holders of ADSs. For ADSs held through DTC, the ADS fees and charges for distributions other than cash and the ADS service fee may be deducted from distributions made through DTC, and may be charged to the DTC participants in accordance with the procedures and practices prescribed by DTC and the DTC participants in turn charge the amount of such ADS fees and charges to the beneficial owners for whom they hold ADSs. In the case of (i) registration of ADS transfers, the ADS transfer fee will be payable by the ADS Holder whose ADSs are being transferred or by the person to whom the ADSs are transferred, and (ii) conversion of ADSs of one series for ADSs of another series, the ADS conversion fee will be payable by the Holder whose ADSs are converted or by the person to whom the converted ADSs are delivered.

In the event of refusal to pay the depositary fees, the depositary may, under the terms of the deposit agreement, refuse the requested service until payment is received or may set off the amount of the depositary fees from any distribution to be made to the ADS holder. Certain depositary fees and charges (such as the ADS services fee) may become payable shortly after the closing of the ADS offering. Note that the fees and charges you may be required to pay may vary over time and may be changed by us and by the depositary. You will receive prior notice of such changes. The depositary may reimburse us for certain expenses incurred by us in respect of the ADR program, by making available a portion of the ADS fees charged in respect of the ADR program or otherwise, upon such terms and conditions as we and the depositary agree from time to time.

**Amendments and Termination**

We may agree with the depositary to modify the deposit agreement at any time without your consent. We undertake to give holders 30 days' prior notice of any modifications that would materially prejudice any of their substantial rights under the deposit agreement. We will not consider to be materially prejudicial to your substantial rights any modifications or supplements that are reasonably necessary for the ADSs to be registered under the Securities Act or to be eligible for book-entry settlement, in each case without imposing or increasing the fees and charges you are required to pay.

195

Table of Contents

In addition, we may not be able to provide you with prior notice of any modifications or supplements that are required to accommodate compliance with applicable provisions of law.

You will be bound by the modifications to the deposit agreement if you continue to hold your ADSs after the modifications to the deposit agreement become effective. The deposit agreement cannot be amended to prevent you from withdrawing the Class A ordinary shares represented by your ADSs (except as permitted by law).

We have the right to direct the depositary to terminate the deposit agreement. Similarly, the depositary may in certain circumstances on its own initiative terminate the deposit agreement. In either case, the depositary must give notice to the holders at least 30 days before termination. Until termination, your rights under the deposit agreement will be unaffected.

After termination, the depositary will continue to collect distributions received (but will not distribute any such property until you request the cancellation of your ADSs) and may sell the securities held on deposit. After the sale, the depositary will hold the proceeds from such sale and any other funds then held for the holders of ADSs in a non-interest bearing account. At that point, the depositary will have no further obligations to holders other than to account for the funds then held for the holders of ADSs still outstanding (after deduction of applicable fees, taxes and expenses).

In connection with any termination of the deposit agreement, the depositary may make available to owners of ADSs a means to withdraw the Class A ordinary shares represented by ADSs and to direct the depositary of such Class A ordinary shares into an unsponsored American depositary share program established by the depositary. The ability to receive unsponsored American depositary shares upon termination of the deposit agreement would be subject to satisfaction of certain U.S. regulatory requirements applicable to the creation of unsponsored American depositary shares and the payment of applicable depositary fees.

**Books of Depositary**

The depositary will maintain ADS holder records at its depositary office. You may inspect such records at such office during regular business hours but solely for the purpose of communicating with other holders in the interest of business matters relating to the ADSs and the deposit agreement.

The depositary will maintain in New York facilities to record and process the issuance, cancellation, combination, split-up and transfer of ADSs. These facilities may be closed from time to time, to the extent not prohibited by law.

**Limitations on Obligations and Liabilities**

The deposit agreement limits our obligations and the depositary's obligations to you. Please note the following:

- We and the depositary are obligated only to take the actions specifically stated in the deposit agreement without negligence or bad faith.

- The depositary disclaims any liability for any failure to carry out voting instructions, for any manner in which a vote is cast or for the effect of any vote, provided it acts in good faith and in accordance with the terms of the deposit agreement.

- The depositary disclaims any liability for any failure to determine the lawfulness or practicality of any action, for the content of any document forwarded to you on our behalf or for the accuracy of any translation of such a document, for the investment risks associated with investing in Class A ordinary shares, for the validity or worth of the Class A ordinary shares, for any tax consequences that result from the ownership of ADSs, for the credit-worthiness of any third

196

Table of Contents

party, for allowing any rights to lapse under the terms of the deposit agreement, for the timeliness of any of our notices or for our failure to give notice.

- We and the depositary will not be obligated to perform any act that is inconsistent with the terms of the deposit agreement.

- We and the depositary disclaim any liability if we or the depositary are prevented or forbidden from or subject to any civil or criminal penalty or restraint on account of, or delayed in, doing or performing any act or thing required by the terms of the deposit agreement, by reason of any provision, present or future of any law or regulation, or by reason of present or future provision of any provision of our post-offering memorandum and articles of association, or any provision of or governing the securities on deposit, or by reason of any act of God or war or other circumstances beyond our control.

- We and the depositary disclaim any liability by reason of any exercise of, or failure to exercise, any discretion provided for in the deposit agreement or in our post-offering memorandum and articles of association or in any provisions of or governing the securities on deposit.

- We and the depositary further disclaim any liability for any action or inaction in reliance on the advice or information received from legal counsel, accountants, any person presenting Shares for deposit, any holder of ADSs or authorized representatives thereof, or any other person believed by either of us in good faith to be competent to give such advice or information.

- We and the depositary also disclaim liability for the inability by a holder to benefit from any distribution, offering, right or other benefit that is made available to holders of Class A ordinary shares but is not, under the terms of the deposit agreement, made available to you.

- We and the depositary may rely without any liability upon any written notice, request or other document believed to be genuine and to have been signed or presented by the proper parties.

- We and the depositary also disclaim liability for any consequential or punitive damages for any breach of the terms of the deposit agreement.

- No disclaimer of any Securities Act liability is intended by any provision of the deposit agreement.

- Nothing in the deposit agreement gives rise to a partnership or joint venture, or establishes a fiduciary relationship, among us, the depositary and you as ADS holder.

- Nothing in the deposit agreement precludes Citibank (or its affiliates) from engaging in transactions in which parties adverse to us or the ADS owners have interests, and nothing in the deposit agreement obligates Citibank to disclose those transactions, or any information obtained in the course of those transactions, to us or to the ADS owners, or to account for any payment received as part of those transactions.

**Taxes**

You will be responsible for the taxes and other governmental charges payable on the ADSs and the securities represented by the ADSs. We, the depositary and the custodian may deduct from any distribution the taxes and governmental charges payable by holders and may sell any and all property on deposit to pay the taxes and governmental charges payable by holders. You will be liable for any deficiency if the sale proceeds do not cover the taxes that are due.

The depositary may refuse to issue ADSs, to deliver, transfer, split and combine ADRs or to release securities on deposit until all taxes and charges are paid by the applicable holder. The depositary and the custodian may take reasonable administrative actions to obtain tax refunds and reduced tax withholding for any distributions on your behalf. However, you may be required to provide

197

Table of Contents

to the depositary and to the custodian proof of taxpayer status and residence and such other information as the depositary and the custodian may require to fulfill legal obligations. You are required to indemnify us, the depositary and the custodian for any claims with respect to taxes based on any tax benefit obtained for you.

**Foreign Currency Conversion**

The depositary will arrange for the conversion of all foreign currency received into U.S. dollars if such conversion is practical, and it will distribute the U.S. dollars in accordance with the terms of the deposit agreement. You may have to pay fees and expenses incurred in converting foreign currency, such as fees and expenses incurred in complying with currency exchange controls and other governmental requirements.

If the conversion of foreign currency is not practical or lawful, or if any required approvals are denied or not obtainable at a reasonable cost or within a reasonable period, the depositary may take the following actions in its discretion:

- Convert the foreign currency to the extent practical and lawful and distribute the U.S. dollars to the holders for whom the conversion and distribution is lawful and practical.

- Distribute the foreign currency to holders for whom the distribution is lawful and practical.

- Hold the foreign currency (without liability for interest) for the applicable holders.

**Governing Law/Waiver of Jury Trial**

The deposit agreement, the ADRs and the ADSs will be interpreted in accordance with the laws of the State of New York. The rights of holders of Class A ordinary shares (including Class A ordinary shares represented by ADSs) are governed by the laws of the Cayman Islands.

As an owner of ADSs, you irrevocably agree that any legal action arising out of the Deposit Agreement, the ADSs or the ADRs, involving the Company or the Depositary, may only be instituted in a state or federal court in the city of New York.

**AS A PARTY TO THE DEPOSIT AGREEMENT, YOU IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, YOUR RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF THE DEPOSIT AGREEMENT OR THE ADRs AGAINST US AND/OR THE DEPOSITARY.**

*The deposit agreement provides that, to the extent permitted by law, ADS holders waive the right to a jury trial of any claim they may have against us or the depositary arising out of or relating to our Class A ordinary shares, the ADSs or the deposit agreement, including any claim under U.S. federal securities laws. If we or the depositary opposed a jury trial demand based on the waiver, the court would determine whether the waiver was enforceable in the facts and circumstances of that case in accordance with applicable case law. However, you will not be deemed, by agreeing to the terms of the deposit agreement, to have waived our or the depositary's compliance with U.S. federal securities laws and the rules and regulations promulgated thereunder.*

198

Table of Contents

**SHARES ELIGIBLE FOR FUTURE SALE**

Upon closing of this offering, we will have ADSs outstanding representing approximately 5.8% of our ordinary shares (or ADS outstanding representing approximately 6.6% of our ordinary shares if the underwriters exercise in full the over-allotment option). In addition, options to purchase an aggregate of approximately 176,602,914 Class A ordinary shares will be outstanding as of the closing of this offering. Of these options, 76,228,339 will have vested at or prior to the closing of this offering and 100,374,575 approximately will vest over the next 3 years.

All of the ADSs sold in this offering and the Class A ordinary shares they represent will be freely transferable by persons other than our "affiliates" without restriction or further registration under the Securities Act. Rule 144 of the Securities Act defines an "affiliate" of a company as a person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, our company. All outstanding ordinary shares prior to this offering are "restricted securities" as that term is defined in Rule 144 because they were issued in a transaction or series of transactions not involving a public offering. Restricted securities, in the form of ADSs or otherwise, may be sold only if they are the subject of an effective registration statement under the Securities Act or if they are sold pursuant to an exemption from the registration requirement of the Securities Act such as those provided for in Rules 144 or 701 promulgated under the Securities Act, which rules are summarized below. Restricted ordinary shares may also be sold outside of the United States to non-U.S. persons in accordance with Rule 904 of Regulation S under the Act. This prospectus may not be used in connection with any resale of our ADSs acquired in this offering by our affiliates.

Pursuant to Rule 144, ordinary shares will be eligible for sale at various times after the date of this prospectus, subject to the lock-up agreements.

Sales of substantial amounts of our ADSs in the public market could adversely affect prevailing market prices of our ADSs. Prior to this offering, there has been no public market for our Class A ordinary shares or ADSs, and while our application has been made to list our ADSs on the NYSE, we cannot assure you that a regular trading market will develop in the ADSs. We do not expect that a trading market will develop for our ordinary shares not represented by ADSs.

**Lock-up Agreements**

We, our directors, executive officers and our existing shareholders holding more than 98% of our total equity interest have agreed, subject to some exceptions, not to sell, transfer or dispose of, directly or indirectly, any of our ordinary shares, in the form of ADSs or otherwise, or any securities convertible into or exchangeable or exercisable for our ordinary shares, in the form of ADSs or otherwise, for a period of 180 days after the date this prospectus becomes effective. After the expiration of the 180-day period, the ordinary shares or ADSs held by our directors, executive officers or existing shareholders may be sold subject to the restrictions under Rule 144 under the Securities Act or by means of registered public offerings. In addition, we have agreed to instruct Citibank, N.A., as depositary, not to accept any deposit of any ordinary shares or issue any ADSs for 180 days after the date of this prospectus (other than in connection with this offering), unless we instruct the depositary otherwise with the prior written consent of the representatives of the underwriters.

**Rule 144**

In general, under Rule 144 as currently in effect, a person who has beneficially owned our restricted securities for at least six months is entitled to sell the restricted securities without registration under the Securities Act, subject to certain restrictions. Persons who are our affiliates (including

199

Table of Contents

persons beneficially owning 10% or more of our outstanding shares) may sell within any three-month period a number of restricted securities that does not exceed the greater of the following:

- 1% of the number of our ordinary shares then outstanding, in the form of ADSs or otherwise, which will equal approximately 18,357,969 ordinary shares immediately after this offering; and

- the average weekly trading volume of our ADSs on the NYSE during the four calendar weeks preceding the date on which notice of the sale is filed with the SEC.

Such sales are also subject to manner-of-sale provisions, notice requirements and the availability of current public information about us. The manner-of-sale provisions require the securities to be sold either in "brokers' transactions" as such term is defined under the Securities Act, through transactions directly with a market maker as such term is defined under the Exchange Act or through a riskless principal transaction as described in Rule 144. In addition, the manner-of-sale provisions require the person selling the securities not to solicit or arrange for the solicitation of orders to buy the securities in anticipation of or in connection with such transaction or make any payment in connection with the offer or sale of the securities to any person other than the broker or dealer who executes the order to sell the securities. If the amount of securities to be sold in reliance upon Rule 144 during any period of three months exceeds 5,000 shares or other units or has an aggregate sale price in excess of US$50,000, three copies of a notice on Form 144 should be filed with the SEC. If such securities are admitted to trading on any national securities exchange, one copy of such notice also must be transmitted to the principal exchange on which such securities are admitted. The Form 144 should be signed by the person for whose account the securities are to be sold and should be transmitted for filing concurrently with either the placing with a broker of an order to execute a sale of securities or the execution directly with a market maker of such a sale.

Persons who are not our affiliates and have beneficially owned our restricted securities for more than six months but not more than one year may sell the restricted securities without registration under the Securities Act subject to the availability of current public information about us. Persons who are not our affiliates and have beneficially owned our restricted securities for more than one year may freely sell the restricted securities without registration under the Securities Act.

**Rule 701**

Beginning 90 days after the date of this prospectus, persons other than affiliates who purchased ordinary shares under a written compensatory plan or contract may be entitled to sell such shares in the United States in reliance on Rule 701 under the Securities Act, or Rule 701. Rule 701 permits affiliates to sell their Rule 701 shares under Rule 144 without complying with the holding period requirements of Rule 144. Rule 701 further provides that non-affiliates may sell these shares in reliance on Rule 144 subject only to its manner-of-sale requirements. However, the Rule 701 shares would remain subject to lock-up arrangements and would only become eligible for sale when the lock-up period expires.

**Registration Rights**

Upon completion of this offering, certain holders of our Class A ordinary shares or their transferees will be entitled to request that we register their shares under the Securities Act, following the expiration of the lock-up agreements described above. See "Description of Share Capital—Registration Rights."

200

Table of Contents

## TAXATION

The following is a general summary of certain Cayman Islands, People's Republic of China and United States federal income tax consequences relevant to an investment in our ADSs and Class A ordinary shares. To the extent that the discussion below relates to matters of Cayman Islands tax law, it is the opinion of Maples and Calder (Hong Kong) LLP, our Cayman Islands counsel. To the extent that the discussion below relates to matters of PRC tax law, it is the opinion of Haiwen & Partners, our PRC counsel. To the extent that the discussion below relates to matters of United States federal income tax law, it is the opinion of Simpson Thacher & Bartlett LLP, our United States counsel. The discussion is not intended to be, nor should it be construed as, legal or tax advice to any particular prospective purchaser. The discussion is based on laws and relevant interpretations thereof in effect as of the date of this prospectus, all of which are subject to change or different interpretations, possibly with retroactive effect. The discussion does not address U.S. state or local tax laws, or tax laws of jurisdictions other than the Cayman Islands, the People's Republic of China and the United States. You should consult your tax advisors with respect to the consequences of acquisition, ownership and disposition of our ADSs and Class A ordinary shares.

**Cayman Islands Taxation**

The Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciations and there is no taxation in the nature of inheritance tax or estate duty or withholding tax applicable to us or to any holder of our ADSs and Class A ordinary shares. Stamp duties may be applicable on instruments executed in, or after execution brought within the jurisdiction of, the Cayman Islands. No stamp duty is payable in the Cayman Islands on transfers of shares of Cayman Islands companies except those which hold interests in land in the Cayman Islands. The Cayman Islands is not a party to any double tax treaties that are applicable to any payments made to or by our company. There are no exchange control regulations or currency restrictions in the Cayman Islands.

Pursuant to Section 6 of the Tax Concessions Law (2018 Revision) of the Cayman Islands, we have obtained an undertaking from the Financial Secretary of the Cayman Islands:

(1)      that no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciation shall apply to us or our operations; and

(2)      that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable:

         (a)      on or in respect of the shares, debentures or other obligations of the Company; or

         (b)      by way of withholding in whole or in part of any relevant payment as defined in section 6(3) of the Tax Concessions Law (2018 Revision).

The undertaking for us is for a period of twenty years from September 23, 2019.

**People's Republic of China Taxation**

In March 2007, the National People's Congress of China enacted the Enterprise Income Tax Law, which became effective on January 1, 2008 and amended on February 24, 2017 and December 29, 2018, respectively. The modified Enterprise Income Tax Law provides that enterprises organized under the laws of jurisdictions outside China with their "de facto management bodies" located within China may be considered PRC resident enterprises and therefore subject to PRC enterprise income tax at the rate of 25% on their worldwide income. The implementing rules of the Enterprise Income Tax Law further define the term "de facto management body" as the management body that exercises substantial and overall management and control over the business, personnel, accounts and properties of an enterprise.

201

Table of Contents

In addition, SAT Circular 82 issued by the SAT in April 2009 specifies that certain offshore incorporated enterprises controlled by PRC enterprises or PRC enterprise groups will be classified as PRC resident enterprises if the following are located or resident in the PRC: (a) senior management personnel and departments that are responsible for daily production, operation and management; (b) financial and personnel decision-making bodies; (c) key properties, accounting books, company seal, minutes of board meetings and shareholders' meetings; and (d) half or more of the senior management or directors having voting rights. While we do not currently consider our company or any of our overseas subsidiaries to be a PRC resident enterprise, there is a risk that the PRC tax authorities may deem our company or any of our overseas subsidiaries as a PRC resident enterprise since a substantial majority of the members of our management team as well as the management team of some of our overseas subsidiaries are located in China, in which case we or the overseas subsidiaries, as the case may be, would be subject to the PRC enterprise income tax at the rate of 25% on worldwide income. If the PRC tax authorities determine that our Cayman Islands holding company is a "resident enterprise" for PRC enterprise income tax purposes, a number of unfavorable PRC tax consequences could follow. One example is a 10% withholding tax would be imposed on dividends we pay to our non-PRC enterprise shareholders and with respect to gains derived by our non-PRC enterprise shareholders from transferring our ADSs or Class A ordinary shares. Furthermore, dividends payable to individual investors who are non-PRC residents and any gain realized on the transfer of ADSs or Class A ordinary shares by such investors may be subject to PRC tax at a current rate of 20%, subject to any reduction or exemption set forth in applicable tax treaties or under applicable tax arrangements between jurisdictions. It is unclear whether, if we are considered a PRC resident enterprise, holders of our ADSs or Class A ordinary shares would be able to claim the benefit of income tax treaties or agreements entered into between China and other countries or areas.

Provided that our Cayman Islands holding company is not deemed to be a PRC resident enterprise, holders of the ADSs and Class A ordinary shares who are not PRC residents will not be subject to PRC income tax on dividends distributed by us or gains realized from the sale or other disposition of our Class A ordinary shares or the ADSs. However, under Bulletin 7 and SAT Circular 37, where a non-resident enterprise conducts an "indirect transfer" by transferring taxable assets, including, in particular, equity interests in a PRC resident enterprise, indirectly by disposing of the equity interests of an overseas holding company, the non-resident enterprise, being the transferor, or the transferee or the PRC entity which directly owned such taxable assets may report to the relevant tax authority such indirect transfer. Using a "substance over form" principle, the PRC tax authority may disregard the existence of the overseas holding company if it lacks a reasonable commercial purpose and was established for the purpose of reducing, avoiding or deferring PRC tax. As a result, gains derived from such indirect transfer may be subject to PRC enterprise income tax, and the transferee or other person who is obligated to pay for the transfer is obligated to withhold the applicable taxes, currently at a rate of 10% for the transfer of equity interests in a PRC resident enterprise. We and our non-PRC resident investors may be at risk of being required to file a return and being taxed under Bulletin 7 and SAT Circular 37, and we may be required to expend valuable resources to comply with Bulletin 7 and SAT Circular 37 or to request the relevant transferors from whom we purchase taxable assets to comply with these circulars, or to establish that we should not be taxed under these circulars. See "Risk Factors—Risks Relating to Doing Business in China—We and our shareholders face uncertainties with respect to indirect transfers of equity interests in PRC resident enterprises or other assets attributed to a Chinese establishment of a non-Chinese company, or immovable properties located in China owned by non-Chinese companies."

**Certain United States Federal Income Tax Considerations**

The following discussion describes certain United States federal income tax consequences of the purchase, ownership and disposition of our ADSs and Class A ordinary shares as of the date hereof.

202

Table of Contents

This discussion deals only with ADSs and Class A ordinary shares that are held as capital assets by a United States Holder (as defined below).

As used herein, the term "United States Holder" means a beneficial owner of our ADSs or Class A ordinary shares that is, for United States federal income tax purposes, any of the following:

- an individual citizen or resident of the United States;

- a corporation (or other entity treated as a corporation for United States federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to United States federal income taxation regardless of its source; or

- a trust if it (1) is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

This discussion is based upon provisions of the Internal Revenue Code of 1986, as amended, or the "Code", and regulations, rulings and judicial decisions thereunder as of the date hereof. Those authorities may be changed, perhaps retroactively, so as to result in United States federal income tax consequences different from those summarized below. In addition, this discussion is based, in part, upon representations made by the depositary to us and assumes that the deposit agreement, and all other related agreements, will be performed in accordance with their terms.

This discussion does not represent a detailed description of the United States federal income tax consequences applicable to you if you are subject to special treatment under the United States federal income tax laws, including if you are:

- a dealer in securities or currencies;

- a financial institution;

- a regulated investment company;

- a real estate investment trust;

- an insurance company;

- a tax-exempt organization;

- a person holding our ADSs or Class A ordinary shares as part of a hedging, integrated or conversion transaction, a constructive sale or a straddle;

- a trader in securities that has elected the mark-to-market method of accounting for your securities;

- a person liable for alternative minimum tax;

- a person who owns or is deemed to own 10% or more of our stock by vote or value;

- a partnership or other pass-through entity for United States federal income tax purposes;

- a person required to accelerate the recognition of any item of gross income with respect to our ADSs or Class A ordinary shares as a result of such income being recognized on an applicable financial statement; or

- a person whose "functional currency" is not the United States dollar.

203

---

5/3/2021     https://sec.report/Document/0001047469-20-000244/a2240464zf-1a.htm

Table of Contents

If an entity or other arrangement treated as a partnership for United States federal income tax purposes holds our ADSs or Class A ordinary shares, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding our ADSs or Class A ordinary shares, you should consult your tax advisors.

**This discussion does not contain a detailed description of all the United States federal income tax consequences to you in light of your particular circumstances and does not address the Medicare tax on net investment income or the effects of any state, local or non-United States tax laws. If you are considering the purchase of our ADSs or Class A ordinary shares, you should consult your tax advisors concerning the particular United States federal income tax consequences to you of the purchase, ownership and disposition of our ADSs or Class A ordinary shares, as well as the consequences to you arising under other United States federal tax laws and the laws of any other taxing jurisdiction.**

*ADSs*

If you hold ADSs, for United States federal income tax purposes, you generally will be treated as the owner of the underlying Class A ordinary shares that are represented by such ADSs. Accordingly, deposits or withdrawals of Class A ordinary shares for ADSs will not be subject to United States federal income tax.

*Taxation of Dividends*

Subject to the discussion under "—Passive Foreign Investment Company" below, the gross amount of distributions on the ADSs or Class A ordinary shares (including any amounts withheld to reflect PRC withholding taxes, as discussed above under "—People's Republic of China Taxation") will be taxable as dividends to the extent paid out of our current or accumulated earnings and profits, as determined under United States federal income tax principles. To the extent that the amount of any distribution exceeds our current and accumulated earnings and profits for a taxable year, the distribution will first be treated as a tax-free return of capital, causing a reduction in the tax basis of the ADSs or Class A ordinary shares, and to the extent the amount of the distribution exceeds your tax basis, the excess will be taxed as capital gain recognized on a sale or exchange. We do not, however, expect to determine earnings and profits in accordance with United States federal income tax principles. Therefore, you should expect that a distribution will generally be treated as a dividend.

Any dividends that you receive (including any withheld taxes) will be includable in your gross income as ordinary income on the day actually or constructively received by you, in the case of Class A ordinary shares, or by the depositary, in the case of ADSs. Such dividends will not be eligible for the dividends received deduction allowed to corporations under the Code.

With respect to non-corporate United States investors, certain dividends received from a qualified foreign corporation may be subject to reduced rates of taxation. A foreign corporation is treated as a qualified foreign corporation with respect to dividends received from that corporation on shares (or ADSs backed by such shares) that are readily tradable on an established securities market in the United States. United States Treasury Department guidance indicates that our ADSs (which we have applied to list on the NYSE) will be readily tradable on an established securities market in the United States once they are so listed. Thus, we believe that dividends we pay on our ADSs will meet the conditions required for these reduced tax rates. Since we do not expect that our Class A ordinary shares will be listed on an established securities market in the United States, we do not believe that dividends that we pay on our Class A ordinary shares that are not represented by ADSs currently meet the conditions required for these reduced tax rates. There also can be no assurance that our ADSs will continue to be readily tradable on an established securities market in later years. A qualified foreign corporation also includes a foreign corporation that is eligible for the benefits of certain income tax

204

Table of Contents

treaties with the United States. In the event that we are deemed to be a PRC resident enterprise under the Enterprise Income Tax Law, we may be eligible for the benefits of the income tax treaty between the United States and PRC, or the Treaty, and if we are eligible for such benefits, dividends we pay on our Class A ordinary shares, regardless of whether such shares are represented by ADSs, would be eligible for reduced rates of taxation. See "Taxation—People's Republic of China Taxation." Non-corporate holders that do not meet a minimum holding period requirement during which they are not protected from the risk of loss or that elect to treat the dividend income as "investment income" pursuant to Section 163(d)(4) of the Code will not be eligible for the reduced rates of taxation regardless of our status as a qualified foreign corporation. In addition, the rate reduction will not apply to dividends if the recipient of a dividend is obligated to make related payments with respect to positions in substantially similar or related property. This disallowance applies even if the minimum holding period has been met. You should consult your tax advisors regarding the application of these rules given your particular circumstances.

Non-corporate United States Holders will not be eligible for reduced rates of taxation on any dividends received from us if we are a passive foreign investment company in the taxable year in which such dividends are paid or in the preceding taxable year (see "—Passive Foreign Investment Company" below).

Subject to certain conditions and limitations (including a minimum holding period requirement), any PRC withholding taxes on dividends may be treated as foreign taxes eligible for credit against your United States federal income tax liability. For purposes of calculating the foreign tax credit, dividends paid on the ADSs or Class A ordinary shares will be treated as income from sources outside the United States and will generally constitute passive category income. The rules governing the foreign tax credit are complex. You are urged to consult your tax advisors regarding the availability of the foreign tax credit under your particular circumstances.

Distributions of ADSs, Class A ordinary shares or rights to subscribe for ADSs or Class A ordinary shares that are received as part of a pro rata distribution to all of our shareholders generally will not be subject to United States federal income tax.

***Passive Foreign Investment Company***

Based on the past and projected composition of our income and assets, and the valuation of our assets, including goodwill (which we have determined based on the expected price of our ADSs in this offering), we do not believe we were a passive foreign investment company, or a PFIC, for our most recent taxable year, and we do not expect to become a PFIC in the current taxable year or in the foreseeable future, although there can be no assurance in this regard.

In general, we will be a PFIC for any taxable year in which:

- at least 75% of our gross income is passive income, or

- at least 50% of the value (determined based on a quarterly average) of our assets is attributable to assets that produce or are held for the production of passive income.

For this purpose, passive income generally includes dividends, interest, royalties and rents (other than royalties and rents derived in the active conduct of a trade or business and not derived from a related person). We believe that the rents we derive from our leasing operations should qualify as derived in the active conduct of a trade or business, and thus, should not constitute passive income. There can be no assurance, however, that the Internal Revenue Service will not successfully assert a contrary position. Cash is treated as an asset that produces or is held for the production of passive income. If we own at least 25% (by value) of the stock of another corporation, for purposes of determining whether we are a PFIC, we will be treated as owning our proportionate share of the other corporation's assets and receiving our proportionate share of the other corporation's income. However,

205

Table of Contents

there is uncertainty as to the treatment of our corporate structure and ownership of our consolidated VIEs for United States federal income tax purposes. For United States federal income tax purposes, we consider ourselves to own the equity of our consolidated VIEs. If it is determined, contrary to our view, that we do not own the equity of our consolidated VIEs for United States federal income tax purposes (for instance, because the relevant PRC authorities do not respect these arrangements), we may be treated as a PFIC.

The determination of whether we are a PFIC is made annually. Accordingly, we may become a PFIC in the current or any future taxable year due to changes in our asset or income composition. The composition of our assets and income may be affected by how, and how quickly, we use our liquid assets and the cash raised in this offering. Because we have valued our goodwill based on the expected market value of our ADSs, a decrease in the price of our ADSs may also result in our becoming a PFIC. If we are a PFIC for any taxable year during which you hold our ADSs or Class A ordinary shares, you will be subject to special tax rules discussed below.

If we are a PFIC for any taxable year during which you hold our ADSs or Class A ordinary shares and you do not make a timely mark-to-market election, as described below, you will be subject to special tax rules with respect to any "excess distribution" received and any gain realized from a sale or other disposition, including a pledge and a deemed sale discussed in the following paragraph, of ADSs or Class A ordinary shares. Distributions received in a taxable year will be treated as excess distributions to the extent that they are greater than 125% of the average annual distributions received during the shorter of the three preceding taxable years or your holding period for the ADSs or Class A ordinary shares. Under these special tax rules:

- the excess distribution or gain will be allocated ratably over your holding period for the ADSs or Class A ordinary shares,

- the amount allocated to the current taxable year, and any taxable year prior to the first taxable year in which we were a PFIC, will be treated as ordinary income, and

- the amount allocated to each other year will be subject to tax at the highest tax rate in effect for individuals or corporations, as applicable, for that year and the interest charge generally applicable to underpayments of tax will be imposed on the resulting tax attributable to each such year.

Although the determination of whether we are a PFIC is made annually, if we are a PFIC for any taxable year in which you hold our ADSs or Class A ordinary shares, you will generally be subject to the special tax rules described above for that year and for each subsequent year in which you hold the ADSs or Class A ordinary shares (even if we do not qualify as a PFIC in such subsequent years). However, if we cease to be a PFIC, you can avoid the continuing impact of the PFIC rules by making a special election to recognize gain as if your ADSs or Class A ordinary shares had been sold on the last day of the last taxable year during which we were a PFIC. You are urged to consult your tax advisor about this election.

In lieu of being subject to the special tax rules discussed above, you may make a mark-to-market election with respect to your ADSs or Class A ordinary shares provided such ADSs or Class A ordinary shares are treated as "marketable stock." The ADSs or Class A ordinary shares generally will be treated as marketable stock if the ADSs or Class A ordinary shares are regularly traded on a "qualified exchange or other market"(within the meaning of the applicable Treasury regulations). Under current law, the mark-to-market election may be available to holders of ADSs once the ADSs are listed on the NYSE which constitutes a qualified exchange, although there can be no assurance that the ADSs will be "regularly traded" for purposes of the mark-to-market election. It is intended that only the ADSs and not the Class A ordinary shares will be listed on the NYSE. Consequently, if you are a holder of

206

Table of Contents

Class A ordinary shares that are not represented by ADSs, you generally will not be eligible to make a mark-to-market election.

If you make an effective mark-to-market election, for each taxable year that we are a PFIC you will include as ordinary income the excess of the fair market value of your ADSs at the end of the year over your adjusted tax basis in the ADSs. You will be entitled to deduct as an ordinary loss in each such year the excess of your adjusted tax basis in the ADSs over their fair market value at the end of the year, but only to the extent of the net amount previously included in income as a result of the mark-to-market election. Your adjusted tax basis in the ADSs will be increased by the amount of any income inclusion and decreased by the amount of any deductions under the mark-to-market rules. In addition, upon the sale or other disposition of your ADSs in a year that we are a PFIC, any loss will be treated as ordinary loss, but only to the extent of the net amount of previously included income as a result of the mark-to-market election, and any gain will be treated as ordinary income. If you make a mark-to-market election, any distributions that we make would generally be subject to the tax rules discussed above under "—Taxation of Dividends," except that the lower rate applicable to dividends received from a qualified foreign corporation (discussed above) would not apply if we are a PFIC in the taxable year in which the dividend is paid or in the preceding taxable year.

If you make a mark-to-market election, it will be effective for the taxable year for which the election is made and all subsequent taxable years unless the ADSs are no longer regularly traded on a qualified exchange or other market, or the Internal Revenue Service consents to the revocation of the election. You are urged to consult your tax advisor about the availability of the mark-to-market election, and whether making the election would be advisable in your particular circumstances.

Alternatively, U.S. taxpayers can sometimes avoid the special tax rules described above by electing to treat a PFIC as a "qualified electing fund" under Section 1295 of the Code. However, this option is not available to you because we do not intend to prepare or provide you with the tax information necessary to permit you to make this election.

If we are a PFIC for any taxable year during which you hold our ADSs or Class A ordinary shares and any of our non-United States subsidiaries is also a PFIC, you will be treated as owning a proportionate amount (by value) of the shares of the lower-tier PFIC for purposes of the application of the PFIC rules. You will not be able to make the mark-to-market election described above in respect of any lower-tier PFIC. You are urged to consult your tax advisors about the application of the PFIC rules to any of our subsidiaries.

You will generally be required to file Internal Revenue Service Form 8621 if you hold our ADSs or Class A ordinary shares in any year in which we are a PFIC. You are urged to consult your tax advisors concerning the United States federal income tax consequences of holding ADSs or Class A ordinary shares if we are a PFIC in any taxable year.

*Taxation of Capital Gains*

For United States federal income tax purposes, you will recognize taxable gain or loss on any sale or exchange of the ADSs or Class A ordinary shares in an amount equal to the difference between the amount realized for the ADSs or Class A ordinary shares and your tax basis in the ADSs or Class A ordinary shares. Subject to the discussion under "—Passive Foreign Investment Company" above, such gain or loss will generally be capital gain or loss and will generally be long-term capital gain or loss if you have held the ADSs or Class A ordinary shares for more than one year. Long-term capital gains of non-corporate United States Holders (including individuals) are eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations. Any gain or loss recognized by you will generally be treated as United States source gain or loss. However, if PRC tax is imposed on any gain (for instance, because we are treated as a PRC resident enterprise for PRC tax purposes or the PRC treats the sale or exchange as an indirect transfer of PRC taxable assets), and if you are eligible for the

207

Table of Contents

benefits of the Treaty, you may elect to treat such gain as PRC source gain under the Treaty. If you are not eligible for the benefits of the Treaty or if you fail to make the election to treat any gain as PRC source, then you generally would not be able to use the foreign tax credit arising from any PRC tax imposed on the disposition of ADSs or Class A ordinary shares unless such credit can be applied (subject to applicable limitations) against tax due on other income derived from foreign sources.

*Information Reporting and Backup Withholding*

In general, information reporting will apply to dividends in respect of our ADSs or Class A ordinary shares and the proceeds from the sale, exchange or other disposition of our ADSs or Class A ordinary shares that are paid to you within the United States (and in certain cases, outside the United States), unless you are an exempt recipient. A backup withholding tax may apply to such payments if you fail to provide a taxpayer identification number or certification of exempt status or fail to report in full dividend and interest income.

Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your United States federal income tax liability provided the required information is timely furnished to the Internal Revenue Service.

208

Table of Contents

**UNDERWRITING**

Under the terms and subject to the conditions in an underwriting agreement dated the date of this prospectus, the underwriters named below, for which Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC and J.P. Morgan Securities LLC are acting as representatives, have severally agreed to purchase, and we have agreed to sell to them, severally, the number of ADSs indicated below:

| Name | Number of ADSs |
|---|---|
| Citigroup Global Markets Inc. | |
| Credit Suisse Securities (USA) LLC | |
| J.P. Morgan Securities LLC | |
| Tiger Brokers (NZ) Limited | |
| **Total:** | |

The underwriters and the representatives are collectively referred to as the "underwriters" and the "representatives", respectively. The underwriters are offering the ADSs subject to their acceptance of the ADSs from us and subject to prior sale. The underwriting agreement provides that the obligations of the several underwriters to pay for and accept delivery of the ADSs offered by this prospectus are subject to the approval of certain legal matters by their counsel and to certain other conditions. The underwriters are obligated to take and pay for all of the ADSs offered by this prospectus if any such ADSs are taken. However, the underwriters are not required to take or pay for the ADSs covered by the underwriters' over-allotment option described below. The underwriting agreement also provides that if an underwriter defaults, the purchase commitments of non-defaulting underwriters may be increased or the offering may be terminated.

The underwriters initially propose to offer part of the ADSs directly to the public at the offering price listed on the cover page of this prospectus and part to certain dealers at a price that represents a concession not in excess of $        per ADS under the initial public offering price. After the initial offering of the ADSs, the offering price and other selling terms may from time to time be varied by the representatives.

We have granted to the underwriters an option, exercisable for 30 days from the date of this prospectus, to purchase on a pro rata basis up to 1,590,000 additional ADSs at the initial public offering price listed on the cover page of this prospectus, less underwriting discounts and commissions. The underwriters may exercise this option solely for the purpose of covering over-allotments, if any, made in connection with the offering of the ADSs offered by this prospectus. To the extent the option is exercised, each underwriter will become obligated, subject to certain conditions, to purchase about the same percentage of the additional ADSs as the number listed next to the underwriter's name in the preceding table bears to the total number of ADSs listed in the preceding table.

The following table shows the per ADS and total public offering price, underwriting discounts and commissions, and proceeds before expenses to us. These amounts are shown assuming both no exercise and full exercise of the underwriters' over-allotment option.

| | | Total | |
|---|---|---|---|
| | Per ADS | No Exercise | Full Exercise |
| Public offering price | $ | $ | $ |
| Underwriting discounts and commissions to be paid by us: | $ | $ | $ |
| Proceeds, before expenses, to us | $ | $ | $ |

The estimated offering expenses payable by us, exclusive of the underwriting discounts and commissions, are approximately $3.7 million.

209

Table of Contents

Three of our existing shareholders, Antfin (Hong Kong) Holding Limited, Internet Fund IV Pte. Ltd. (an affiliate of Tiger Global Management, LLC), and Joy Capital and/or their affiliates, have indicated interest in purchasing up to US$30 million, US$25 million and US$20 million, respectively, of the ADSs being offered in this offering at the initial public offering price and on the same terms as the other ADSs being offered. In addition, a strategic investor has indicated interest in purchasing up to US$25 million of the ADSs being offered in this offering at the initial public offering price and on the same terms as the other ADSs being offered. Such indications of interest are not binding agreements or commitments to purchase, and we and the underwriters are under no obligations to sell ADSs to such investors. The underwriters could determine to sell more, fewer or no ADSs to such investors.

The underwriters have informed us that they do not intend sales to discretionary accounts to exceed 5% of the total number of ADSs offered by them.

Some of the underwriters are expected to make offers and sales both inside and outside the United States through their respective selling agents. Any offers or sales in the United States will be conducted by broker-dealers registered with the SEC. Tiger Brokers (NZ) Limited, or TBNZ is not a broker-dealer registered with the SEC. To the extent that its conduct may involve the offer or sale of ADSs to investors in the United States, those offers or sales will be made through US Tiger Securities, Inc., TBNZ's SEC-registered broker-dealer affiliate in the United States.

The address of Citigroup Global Markets Inc. is 388 Greenwich Street, New York, NY 10013, United States of America. The address of Credit Suisse Securities (USA) LLC is Eleven Madison Avenue, New York, New Yok 10010, U.S.A. The address of J.P. Morgan Securities LLC is 383 Madison Avenue, New York, NY 10179, United States. The address of Tiger Brokers (NZ) Limited is Level 16, 191 Queen Street, Auckland Central, New Zealand, 1010.

We intend to apply for the listing of our ADSs on the NYSE under the trading symbol "DNK".

We, our directors, executive officers and our existing shareholders holding more than 98% of our total equity interest have agreed that, without the prior written consent of the representatives on behalf of the underwriters, we and they will not, during the period ending 180 days after the date of this prospectus (the "restricted period"):

- offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend or otherwise transfer or dispose of, directly or indirectly, any ordinary shares, ADSs or any securities convertible into or exercisable or exchangeable for ordinary shares or ADSs, or enter into a transaction that would have the same effect;

- file any registration statement with the Securities and Exchange Commission relating to the offering of any ordinary shares, ADSs or any securities convertible into or exercisable or exchangeable for ordinary shares or ADSs;

- enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of ordinary shares or ADSs; or

- publicly disclose the intention to make any such offer, sale, pledge or disposition, or to enter into any such transaction, swap, hedge or other arrangement,

whether any such transaction described above is to be settled by delivery of ordinary shares, ADSs or such other securities, in cash or otherwise. In addition, we and each such person agrees that, without the prior written consent of the representatives on behalf of the underwriters, we or such other person will not, during the restricted period, make any demand for, or exercise any right with respect to, the registration of any ordinary shares, ADSs or any security convertible into or exercisable or exchangeable for ordinary shares or ADSs.

210

Table of Contents

In addition, we have agreed to instruct Citibank, N.A., as depositary, not to accept any deposit of any ordinary shares or issue any ADSs for 180 days after the date of this prospectus (other than in connection with this offering), unless we instruct the depositary otherwise with the prior written consent of the representatives of the underwriters.

The restrictions described in the preceding paragraph are subject to certain exceptions.

The representatives, in their sole discretion, may release the ordinary shares, ADSs and other securities subject to the lock-up agreements described above in whole or in part at any time.

In order to facilitate the offering of the ADSs, the underwriters may engage in stabilizing transactions, over-allotment transactions, syndicate covering transactions and penalty bids in accordance with Regulation M under the Exchange Act.

- Stabilizing transactions permit bids to purchase the underlying security so long as the stabilizing bids do not exceed a specified maximum.

- Specifically, the underwriters may sell more ADSs than they are obligated to purchase under the underwriting agreement, creating a syndicate short position. The short position may be either a covered short position or a naked short position. In a covered short position, the number of ADSs over-allotted by the underwriters is not greater than the number of ADSs available for purchase by the underwriters under the over-allotment option. In a naked short position, the number of ADSs involved is greater than the number of ADSs in the over-allotment option. The underwriters can close out a covered short position by exercising the over-allotment option and/or purchasing ADSs in the open market.

- Syndicate covering transactions involve purchases of the ADSs in the open market after the distribution has been completed in order to cover syndicate short positions. In determining the source of ADSs to close out a covered short position, the underwriters will consider, among other things, the open market price of ADSs as compared to the price available under the over-allotment option. The underwriters may also sell ADSs in excess of the over-allotment option, creating a naked short position. The underwriters must close out any naked short position by purchasing ADSs in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the ADSs in the open market after pricing that could adversely affect investors who purchase in this offering.

- As an additional means of facilitating this offering, the underwriters may bid for, and purchase, ADSs in the open market to stabilize the price of the ADSs. Finally, the underwriters may reclaim selling concessions allowed to an underwriter or a dealer for distributing the ADSs in this offering, if the syndicate repurchases previously distributed ADSs to cover syndicate short positions or to stabilize the price of the ADSs.

These activities may raise or maintain the market price of the ADSs above independent market levels or prevent or retard a decline in the market price of the ADSs. The underwriters are not required to engage in these activities and may end any of these activities at any time.

We and the underwriters have agreed to indemnify each other against certain liabilities, including liabilities under the Securities Act.

A prospectus in electronic format may be made available on websites maintained by one or more underwriters, or selling group members, if any, participating in this offering and one or more of the underwriters participating in this offering may distribute prospectuses electronically. The representatives may agree to allocate a number of ADSs to underwriters for sale to their online brokerage account holders. Internet distributions will be allocated by the representatives to underwriters that may make internet distributions on the same basis as other allocations.

211

Table of Contents

The underwriters and their respective affiliates are full service financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, investment research, principal investment, hedging, financing and brokerage activities. Certain of the underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various financial advisory and investment banking services for us, for which they received or will receive customary fees and expenses.

In addition, in the ordinary course of their various business activities, the underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and instruments. Such investment and securities activities may involve securities and/or instruments of ours or our affiliates. The underwriters and their respective affiliates may also make investment recommendations and/or publish or express independent research views in respect of such securities or instruments and may at any time hold, or recommend to clients that they acquire, long and/or short positions in such securities and instruments.

**Pricing of the Offering**

Prior to this offering, there has been no public market for our ordinary shares or ADSs. The initial public offering price was determined by negotiations between us and the representatives. Among the factors considered in determining the initial public offering price were our future prospects and those of our industry in general, our sales, earnings and certain other financial and operating information in recent periods, and the price-earnings ratios, price-sales ratios, market prices of securities, and certain financial and operating information of companies engaged in activities similar to ours.

We cannot assure you that the initial public offering price will correspond to the price at which our ordinary shares or ADSs will trade in the public market subsequent to this offering or that an active trading market for our ordinary shares or ADSs will develop and continue after this offering.

**Selling Restrictions**

No action may be taken in any jurisdiction other than the United States that would permit a public offering of the ADSs or the possession, circulation or distribution of this prospectus in any jurisdiction where action for that purpose is required. Accordingly, the ADSs may not be offered or sold, directly or indirectly, and neither the prospectus nor any other offering material or advertisements in connection with the ADSs may be distributed or published in or from any country or jurisdiction except under circumstances that will result in compliance with any applicable laws, rules and regulations of any such country or jurisdiction.

*Australia*

No placement document, prospectus, product disclosure statement or other disclosure document has been lodged with the Australian Securities and Investments Commission ("ASIC"), in relation to the offering.

This document:

(a)      does not constitute a prospectus, product disclosure statement or other disclosure document under the Corporations Act 2001 (Cth) (the "**Corporations Act**");

(b)      has not been, and will not be, lodged with the Australian Securities & Investments Commission, as a disclosure document for the purposes of Corporations Act and does not purport to include the information required of a prospectus, product disclosure document or other disclosure document for the purposes of the Corporations Act; and

212

Table of Contents

(c) may only be provided in Australia to select investors, or the Exempt Investor, who are "sophisticated investors" (within the meaning of section 708(8) of the Corporations Act), "professional investors" (within the meaning of section 708(11) of the Corporations Act) or otherwise pursuant to one or more exemptions contained in section 708 of the Corporations Act so that it is lawful to offer the ADSs without disclosure to investors under Chapter 6D of the Corporations Act.

The ADSs may not be directly or indirectly offered for subscription or purchased or sold, and no invitations to subscribe for or buy the ADSs may be issued, and no draft or definitive offering memorandum, advertisement or other offering material relating to any ADSs may be distributed in Australia, except where disclosure to investors is not required under Chapter 6D of the Corporations Act or is otherwise in compliance with all applicable Australian laws and regulations. By submitting an application for the ADSs, you represent and warrant to us that you are an Exempt Investor.

As any offer of ADSs under this document will be made without disclosure in Australia under Chapter 6D.2 of the Corporations Act, the offer of those securities for resale in Australia within 12 months may, under section 707 of the Corporations Act, require disclosure to investors under Chapter 6D.2 if none of the exemptions in section 708 applies to that resale. By applying for the ADSs you undertake to us that you will not, for a period of 12 months from the date of issue of the ADSs, offer, transfer, assign or otherwise alienate those ADSs to investors in Australia except in circumstances where disclosure to investors is not required under Chapter 6D.2 of the Corporations Act or where a compliant disclosure document is prepared and lodged with ASIC.

Any person acquiring securities must observe such Australian on-sale restrictions. This document contains general information only and does not take into account the investment objectives, financial situation or particular needs of any particular person. It does not contain any securities recommendations or financial product advice. Before making an investment decision, investors need to consider whether the information in this document is appropriate to their needs, objectives and circumstances, and, if necessary, seek expert advice on those matters.

*Canada*

The ADSs may be sold in Canada only to purchasers in the provinces of Ontario, Quebec, Alberta and British Columbia purchasing, or deemed to be purchasing on a private placement basis exempt from the requirement that we prepare and file a prospectus with the securities regulatory authorities in each province where trades of these securities are made, as principal that are accredited investors, as defined in National Instrument 45-106 *Prospectus Exemptions* or subsection 73.3(1) of the *Securities Act* (Ontario), and are permitted clients, as defined in National Instrument 31-103 *Registration Requirements, Exemptions and Ongoing Registrant Obligations.* Any resale of the ADSs must be made in accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable securities laws which may vary depending on the relevant jurisdiction, and which may require resales to be made under available statutory exemptions or under a discretionary exemption granted by the applicable Canadian securities regulatory authority. Purchasers are advised to seek legal advice prior to any resale of the ADSs.

By purchasing the ADSs in Canada and accepting delivery of a purchase confirmation, a purchaser is representing to the underwriters and the dealers from whom the purchase confirmation is received that:

(a) the purchaser is entitled under applicable provincial securities laws to purchase the ADSs without the benefit of a prospectus qualified under those securities laws as it is an "accredited investor" as defined under National Instrument 45-106—Prospectus Exemptions,

(b) the purchaser is a "permitted client" as defined in National Instrument 31-103—Registration Requirements, Exemptions and Ongoing Registrant Obligations,

213

Table of Contents

(c)     where required by law, the purchaser is purchasing as principal and not as agent, and

(d)     the purchaser has reviewed the resale restriction above.

Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this prospectus (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory. The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory for particulars of these rights or consult with a legal advisor.

Pursuant to section 3A.3 of National Instrument 33-105 *Underwriting Conflicts* ("NI 33-105"), the Canadian purchasers are hereby notified that the underwriters are not required to comply with the disclosure requirements of NI 33-105 regarding underwriter conflicts of interest in connection with this offering.

*Cayman Islands*

This prospectus does not constitute an invitation or offer to the public in the Cayman Islands of the ADSs, whether by way of sale or subscription. The underwriters have not offered or sold, and will not offer or sell, directly or indirectly, any ADSs in the Cayman Islands.

*Dubai International Finance Center ("DIFC")*

This document relates to an Exempt Offer in accordance with the Markets Rules 2012 of the Dubai Financial Services Authority. This document is intended for distribution only to Persons, as defined in the Markets Rules 2012 of the Dubai Financial Services Authority, of a type specified in those rules. It must not be delivered to, or relied on by, any other Person. The Dubai Financial Services Authority has no responsibility for reviewing or verifying any documents in connection with Exempt Offers. The Dubai Financial Services Authority has not approved this document nor taken steps to verify the information set forth herein and has no responsibility for this document. The ADSs to which this document relates may be illiquid and/or subject to restrictions on their resale. Prospective purchasers of the ADSs offered should conduct their own due diligence on the ADSs. If you do not understand the contents of this document, you should consult an authorized financial adviser.

In relation to its use in the DIFC, this document is strictly private and confidential and is being distributed to a limited number of investors and must not be provided to any person other than the original recipient, and may not be reproduced or used for any other purpose. The interests in the ADSs may not be offered or sold directly or indirectly to the public in the DIFC.

*European Economic Area*

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "**Relevant Member State**"), with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State, no offer of ADSs may be made to the public in that Relevant Member State other than at any time:

(a)     to any legal entity which is a qualified investor as defined in the Prospectus Directive;

(b)     to fewer than 150 natural or legal persons (other than qualified investors as defined in the Prospectus Directive), subject to obtaining the prior consent of the underwriters/global co-ordinators; or

(c)     in any other circumstances falling within Article 3(2) of the Prospectus Directive,

provided that no such offer of ADSs shall require the Company or any underwriters/global co-ordinators to publish a prospectus pursuant to Article 3 of the Prospectus Directive.

214

Table of Contents

In the case of any ADSs being offered to a financial intermediary as that term is used in Article 3(2) of the Prospectus Directive, each such financial intermediary will be deemed to have represented, acknowledged and agreed that the ADSs acquired by it in the offer have not been acquired on a non-discretionary basis on behalf of, nor have they been acquired with a view to their offer or resale to, persons in circumstances which may give rise to an offer of any ADSs to the public other than their offer or resale in a Relevant Member State to qualified investors as so defined or in circumstances in which the prior consent of the representatives has been obtained to each such proposed offer or resale.

For the purposes of this provision, the expression an "**offer of ADSs to the public**" in relation to any ADSs in any Relevant Member State means the communication in any form and by means of sufficient information on the terms of the offer and the ADSs to be offered so as to enable an investor to decide to purchase ADSs, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State, the expression "Prospectus Directive" means Directive 2003/71/EC (as amended, including by Directive 2010/73/EU), and includes any relevant implementing measure in the Relevant Member State.

### Hong Kong

The ADSs have not been offered or sold and will not be offered or sold in Hong Kong by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies (Winding Up and Miscellaneous Provisions) Ordinance (Cap.32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap.571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies (Winding Up and Miscellaneous Provisions) Ordinance (Cap.32, Laws of Hong Kong). No advertisement, invitation or document relating to the ADSs has been or may be issued or has been or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to ADSs which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap.571, Laws of Hong Kong) and any rules made thereunder.

### Israel

This document does not constitute a prospectus under the Israeli Securities Law, 5728-1968, and has not been filed with or approved by the Israel Securities Authority. In Israel, this prospectus may be distributed only to, and is directed only at, investors listed in the first addendum, or the Addendum, to the Israeli Securities Law, consisting primarily of joint investment in trust funds; provident funds; insurance companies; banks, portfolio managers, investment advisors, members of the Tel Aviv Stock Exchange Ltd., underwriters, each purchasing for their own account; venture capital funds; entities with equity in excess of NIS 50 million and "qualified individuals," each as defined in the Addendum (as it may be amended from time to time), collectively referred to as qualified investors. Qualified investors shall be required to submit written confirmation that they fall within the scope of the Addendum.

### Japan

The ADSs have not been and will not be registered pursuant to Article 4, Paragraph 1 of the Financial Instruments and Exchange Law of Japan. Accordingly, none of the ADSs nor any interests therein may be offered or sold, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan), or to others for re-offering or resale, directly or indirectly, in Japan or to or for the benefit of a resident of Japan, except pursuant to any exemption

Table of Contents

from the registration requirements of, and otherwise in compliance with, the Financial Instruments and Exchange Law and any other applicable laws, regulations and ministerial guidelines of Japan in effect at the relevant time.

### *Kingdom of Saudi Arabia*

This document may not be distributed in the Kingdom of Saudi Arabia except to such persons as are permitted under the Offers of Securities Regulations issued by the board of the Capital Market Authority ("**CMA**") pursuant to resolution number 2-11-2004 dated 4 October 2004 as amended by resolution number 1-28-2008, as amended (the "**CMA Regulations**"). The CMA does not make any representation as to the accuracy or completeness of this document and expressly disclaims any liability whatsoever for any loss arising from, or incurred in reliance upon, any part of this prospectus. Prospective purchasers of the securities offered hereby should conduct their own due diligence on the accuracy of the information relating to the securities. If you do not understand the contents of this prospectus, you should consult an authorized financial adviser. By accepting this prospectus and other information relating to the offering of the securities in the Kingdom of Saudi Arabia, each recipient represents that he is a "sophisticated investor", as set out in the prospectus.

### *Korea*

The ADSs may not be offered, sold and delivered directly or indirectly, or offered or sold to any person for reoffering or resale, directly or indirectly, in Korea or to any resident of Korea except pursuant to the applicable laws and regulations of Korea, including the Korea Securities and Exchange Act and the Foreign Exchange Transaction Law and the decrees and regulations thereunder. The ADSs have not been and will not be registered under the Financial Investment Services and Capital Markets Act of Korea and the decrees and regulations thereunder, and the ADSs have been and will be offered in Korea as a private placement under the FSCMA. Furthermore, the purchaser of the ADSs shall comply with all applicable regulatory requirements (including but not limited to government approval requirements under the Foreign Exchange Transaction Law and its subordinate decrees and regulations) in connection with the purchase of the ADSs. By the purchase of the ADSs, the relevant holder thereof will be deemed to represent and warrant that if it is in Korea or is a resident of Korea, it purchased the ADSs pursuant to the applicable laws and regulations of Korea.

### *Kuwait*

Unless all necessary approvals from the Kuwait Ministry of Commerce and Industry required by Law No. 31/1990 "Regulating the Negotiation of Securities and Establishment of Investment Funds," its Executive Regulations and the various Ministerial Orders issued pursuant thereto or in connection therewith, have been given in relation to the marketing and sale of the ADSs, these may not be marketed, offered for sale, nor sold in the State of Kuwait. Neither this prospectus (including any related document), nor any of the information contained therein is intended to lead to the conclusion of any contract of whatsoever nature within Kuwait.

### *Malaysia*

No prospectus or other offering material or document in connection with the offer and sale of the securities has been or will be registered with the Securities Commission of Malaysia, or Commission, for the Commission's approval pursuant to the Capital Markets and Services Act 2007. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the securities may not be circulated or distributed, nor may the ADSs be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Malaysia other than to persons falling within the categories specified under Schedule 6 or Section 229(l)(b), Schedule 7 or Section 230(l)(b) and Schedule 8 or Section 257(3) of the Capital Market and Services Act, 2007 of Malaysia: (i) a closed end fund approved by the

216

Table of Contents

Commission; (ii) a holder of a Capital Markets Services License; (iii) a person who acquires the ADSs as principal, if the offer is on terms that the ADSs may only be acquired at a consideration of not less than RM250,000 (or its equivalent in foreign currencies) for each transaction; (iv) an individual whose total net personal assets or total net joint assets with his or her spouse exceeds RM3 million (or its equivalent in foreign currencies), excluding the value of the primary residence of the individual; (v) an individual who has a gross annual income exceeding RM300,000 (or its equivalent in foreign currencies) per annum in the preceding twelve months; (vi) an individual who, jointly with his or her spouse, has a gross annual income of RM400,000 (or its equivalent in foreign currencies), per annum in the preceding twelve months; (vii) a corporation with total net assets exceeding RM10 million (or its equivalent in foreign currencies) based on the last audited accounts; (viii) a partnership with total net assets exceeding RM10 million (or its equivalent in foreign currencies); (ix) a bank licensee or insurance licensee as defined in the Labuan Financial Services and Securities Act 2010; (x) an Islamic bank licensee or takaful licensee as defined in the Labuan Financial Services and Securities Act 2010; and (xi) any other person as may be specified by the Commission; provided that, in the each of the preceding categories (i) to (xi), the distribution of the ADSs is made by a holder of a Capital Markets Services License who carries on the business of dealing in securities. The distribution in Malaysia of this prospectus is subject to Malaysian laws. This prospectus does not constitute and may not be used for the purpose of public offering or an issue, offer for subscription or purchase, invitation to subscribe for or purchase any securities requiring the registration of a prospectus with the Commission under the Capital Markets and Services Act 2007. The Securities Commission of Malaysia shall not be liable for any non-disclosure on the part of the Company and assumes no responsibility for the correctness of any statements made or opinions or reports expressed in this prospectus.

### Mexico

None of the ADSs or the ordinary shares have been or will be registered with the National Securities Registry (Registro Nacional de Valores) maintained by the Mexican National Banking and Securities Commission (Comision Nacional Bancaria y de Valores) ("**CNBV**") of Mexico and, as a result, may not be offered or sold publicly in Mexico. The ADSs and the ordinary shares may only be sold to Mexican institutional and qualified investors, pursuant to the private placement exemption set forth in the Mexican Securities Market Law (Ley del Mercado de Valores). As required under the Mexican Securities Market Law, the company will give notice to the CNBV of the offering of the securities under the terms set forth herein. Such notice will be submitted to the CNBV to comply with the Mexican Securities Market Law, and for informational purposes only. The delivery to, and receipt by, the CNBV of such notice does not certify the solvency of the company, the investment quality of the securities, or that the information contained in this prospectus or in any prospectus supplement. The company has prepared this prospectus and is solely responsible for its content, and the CNBV has not reviewed or authorized such content.

### People's Republic of China

This prospectus has not been and will not be circulated or distributed in the PRC, and the ADSs may not be offered or sold, and will not be offered or sold to any person for re-offering or resale, directly or indirectly, to any resident of the PRC or for the benefit of, legal or natural persons of the PRC except pursuant to any applicable laws and regulations of the PRC. Neither this prospectus nor any advertisement or other offering material may be distributed or published in the PRC, except under circumstances that will result in compliance with applicable laws and regulations. Further, no legal or natural persons of the PRC may directly or indirectly purchase any of the ADSs or any beneficial interest therein without obtaining all prior PRC's governmental approvals that are required, whether statutorily or otherwise. Persons who come into possession of this prospectus are required by the issuer and its representatives to observe these restrictions. For the purpose of this paragraph, PRC does not include Taiwan and the special administrative regions of Hong Kong and Macau.

217

Table of Contents

*Singapore*

This prospectus or any other offering material relating to our ADSs has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of our ADSs may not be circulated or distributed, nor may our ADSs be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore, as modified or amended from time to time including by any subsidiary legislation as may be applicable at the relevant time (together, the "**SFA**"), (ii) to a relevant person or any person pursuant to Section 275(1A), and in accordance with the conditions specified in Section 275 of the SFA, and in accordance with the conditions specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA, in each case subject to compliance with conditions set forth in the SFA.

Where our ADSs are subscribed or purchased under Section 275 by a relevant person which is: (a) a corporation (which is not an accredited investor as defined in Section 4A of the SFA) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals , each of whom is an accredited investor; or (b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor; securities or securities-based derivatives contracts (each term as defined in Section 2(1) of the SFA) of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the ADSs pursuant to an offer made under Section 275 of the SFA, except: (1) to an institutional investor (for corporations under Section 274 of the SFA) or to a relevant person defined in Section 275(2) of the SFA, or to any person arising from an offer referred to in Section 275(1A) or Section 276(4)(i)(B) of the SFA; (2) where no consideration is or will be given for the transfer; (3) where the transfer is by operation of law; or (4) as specified in Section 276(7) of the SFA.

Notification under Section 309B(1)(c) of the SFA: We have determined that the ADSs shall be (A) prescribed capital markets products (as defined in the Securities and Futures (Capital Markets Products) Regulations 2018) and (B) Excluded Investment Products (as defined in MAS Notice SFA 04-N12: Notice on the Sale of Investment Products and MAS Notice FAA-N16: Notice on Recommendations on Investment Products).

*State of Qatar*

The ADSs described in this prospectus have not been, and will not be, offered, sold or delivered, at any time, directly or indirectly in the State of Qatar in a manner that would constitute a public offering. This prospectus has not been, and will not be, registered with or approved by the Qatar Financial Markets Authority or Qatar Central Bank and may not be publicly distributed. This prospectus is intended for the original recipient only and must not be provided to any other person. It is not for general circulation in the State of Qatar and may not be reproduced or used for any other purpose.

*Switzerland*

This document is not intended to constitute an offer or solicitation to purchase or invest in the ADSs described herein. The ADSs may not be publicly offered, sold or advertised, directly or indirectly, in, into or from Switzerland and will not be listed on the SIX Swiss Exchange, or SIX, or on any other stock exchange or regulated trading facility in Switzerland. This document, any other offering or marketing material relating to the securities does not constitute a prospectus within the meaning of, and has been prepared without regard to the disclosure standards for issuance prospectuses under

218

Table of Contents

art. 652a or art. 1156 of the Swiss Code of Obligations or the disclosure standards for listing prospectuses under art. 27 ff. of the SIX Listing Rules or the listing rules of any other stock exchange or regulated trading facility in Switzerland.

Neither this document nor any other offering or marketing material relating to the offering, nor the Company or the ADSs have been or will be filed with or approved by any Swiss regulatory authority or be publicly distributed or otherwise made publicly available in Switzerland. In particular, this prospectus will not be filed with, and the offer of the ADSs will not be supervised by, the Swiss Financial Market Supervisory Authority, and the offer of the ADSs has not been and will not be authorized under the Swiss Federal Act on Collective Investment Schemes (the "**CISA**"). The investor protection afforded to acquirers of interests in collective investment schemes under the CISA does not extend to acquirers of the ADSs.

### Taiwan

The ADSs have not been and will not be registered or filed with, or approved by, the Financial Supervisory Commission of Taiwan pursuant to relevant securities laws and regulations and may not be offered or sold in Taiwan through a public offering or in circumstances which constitute an offer within the meaning of the Securities and Exchange Act of Taiwan or relevant laws and regulations that requires a registration, filing or approval of the Financial Supervisory Commission of Taiwan. No person or entity in Taiwan has been authorized to offer, sell, give advice regarding or otherwise intermediate the offering and sale of the ADSs in Taiwan.

### United Arab Emirates

The ADSs have not been, and are not being, publicly offered, sold, promoted or advertised in the United Arab Emirates other than in compliance with the laws of the United Arab Emirates governing the issue, offering and sale of securities. Further, this prospectus does not constitute a public offer of securities in the United Arab Emirates and is not intended to be a public offer. This prospectus has not been approved by or filed with the Central Bank of the United Arab Emirates, the Securities and Commodities Authority or the Dubai Financial Services Authority. Prospective investors in the Dubai International Financial Centre should have regard to the specific notice to prospective investors in the Dubai International Financial Centre set out above.

### United Kingdom

In addition, in the United Kingdom, this document is being distributed only to, and is directed only at, and any offer subsequently made may only be directed at persons who are "qualified investors" (as defined in the Prospectus Directive) (i) who have professional experience in matters relating to investments falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended (the "Order") and/or (ii) who are high net worth companies (or persons to whom it may otherwise be lawfully communicated) falling within Article 49(2)(a) to (d) of the Order (all such persons together being referred to as "relevant persons") or otherwise in circumstances which have not resulted and will not result in an offer to the public of the ADSs in the United Kingdom within the meaning of the Financial Services and Markets Act 2000.

Any person in the United Kingdom that is not a relevant person should not act or rely on the information included in this document or use it as basis for taking any action. In the United Kingdom, any investment or investment activity that this document relates to may be made or taken exclusively by relevant persons.

219

Table of Contents

**EXPENSES RELATED TO THIS OFFERING**

Set forth below is an itemization of the total expenses, excluding underwriting discounts and commissions, which are expected to be incurred in connection with the offer and sale of the ADSs by us. With the exception of the SEC registration fee, NYSE listing fee and the Financial Industry Regulatory Authority filing fee, all amounts are estimates.

| | | |
|---|---|---:|
| SEC registration fee | US$ | 26,107 |
| NYSE listing fee | | 150,000 |
| Financial Industry Regulatory Authority filing fee | | 30,670 |
| Printing and engraving expenses | | 387,000 |
| Legal fees and expenses | | 1,800,000 |
| Accounting fees and expenses | | 900,000 |
| Miscellaneous | | 356,222 |
| **Total** | **US$** | **3,650,000** |

220