UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| KATHERINE WANDEL, Individually and on Behalf of All Others Similarly Situated, | x<br>:<br>: | Civil Action No. 1:20-cv-03259-PAC |
| | : | CLASS ACTION |
| Plaintiff, | :<br>: | |
| vs. | :<br>: | |
| JING GAO, DEREK BOYANG SHEN, YAN CUI, WENBIAO LI, ERHAI LIU, XIAN CHEN, WILLIAM WANG, GANG JI, EDWIN FUNG, JIANPING YE, JASON ZHENG ZHANG, CITIGROUP GLOBAL MARKETS INC., CREDIT SUISSE SECURITIES (USA) LLC, J.P. MORGAN SECURITIES LLC, TIGER BROKERS (NZ) LIMITED, US TIGER SECURITIES, INC., COGENCY GLOBAL INC., RICHARD ARTHUR, and PHOENIX TREE HOLDINGS LIMITED, | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | |
| Defendants. | :<br>: | |
| | x | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO THE UNDERWRITER DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ......................................................................................................1

II.     STATEMENT OF FACTS .......................................................................................3

        A.      Phoenix Uses Upfront Rental Payments to Improve Apartment Units and
                Leverages Real-Time Data to Adjust to Changing Conditions ..............................3

        B.      Phoenix Goes Public as COVID-19 Sweeps Through China, but Never
                Updates the Offering Materials to Reflect Risks and Uncertainties or
                Substantial Softening in Its Business in the Recently-Ended Q4 2019 ...................5

        C.      Reports of a SARS-Like Virus Leads to Widespread Fear and Panic in
                China, Requiring Stringent Health Protocols and Travel Restrictions
                Before Wuhan Is Placed on Lockdown the Day After the IPO Closes ...................6

        D.      The Company's Post-IPO Disclosure of the Impact of the Coronavirus and
                the Reemergence of Renter and Landlord Complaints ............................................8

III.    ARGUMENT ............................................................................................................9

        A.      Legal Standards Applicable to This Motion .............................................................9

        B.      Defendants Cannot Advance an Alternative Narrative with Materials
                Outside of the Complaint, Such As Unalleged SEC Filings and Articles ..............9

        C.      Plaintiffs Allege Actionable Misstatements and Omissions in Violation of
                Sections 11 and 12(a)(2) of the Securities Act of 1933 .......................................10

                1.      Defendants Did Not Disclose Risks and Uncertainties Associated
                        with the Onset of COVID-19 or Phoenix's Controversial Plans to
                        Offset Its Foreseeable Business Losses .....................................................10

                2.      Defendants Failed to Update the Offering Materials with Risks
                        Associated with the Rapidly Expanding COVID-19 Outbreak .................14

                3.      Defendants Failed to Disclose the Degree to Which Phoenix's
                        Business Had Softened Before the IPO ......................................................15

                4.      Defendants Failed to Disclose How Phoenix Had Changed Its
                        Sales and Marketing Practices Prior to the IPO ........................................17

                5.      Defendants Failed to Disclose the Existence and the Nature of
                        Tenant Complaints at the Time of the IPO ................................................19

**Page**

D.    Defendants Have Not Established Their Negative Causation Defense Because They Cannot Show from the Face of the Complaint that the Allegations Themselves Negate Any Connection to the Claimed Loss ................20

E.    Because Plaintiffs Alleged Primary Violations of the Securities Act, the Control Person Claims Must Also Survive..............................................................21

IV.    CONCLUSION...............................................................................................................21

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Alpha Capital Anstalt v. New Generation Biofuels, Inc.*,
2014 WL 6466994 (S.D.N.Y. Nov. 18, 2014)...........................................................................15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................................................9

*Berg v. Velocity Fin., Inc.*,
2021 WL 268250 (C.D. Cal. Jan. 25, 2021) ...........................................................................13

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
957 F. Supp. 2d 277 (S.D.N.Y. 2013).......................................................................................9

*City of Sterling Heights Police & Fire Ret. Sys. v. Kohl's Corp.*,
2015 WL 1478565 (E.D. Wis. Mar. 31, 2015) .......................................................................10

*Cruz v. TD Bank, N.A.*,
742 F.3d 520 (2d Cir. 2013).....................................................................................................21

*DeMaria v. Anderson*,
318 F.3d 170 (2d Cir. 2003).............................................................................................15, 16

*Esser Steel Algoma Inc. v. Nevada Holdings, Inc.*,
2020 WL 2539031 (S.D.N.Y. May 18, 2020) .........................................................................11

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*,
873 F.3d 85 (2d Cir. 2017)................................................................................................20, 21

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000).....................................................................................................15

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
422 F. Supp. 3d 821 (S.D.N.Y. 2019)......................................................................................13

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983)...................................................................................................................9

*HEXO Corp. Sec. Litig.*,
2021 WL 878589 (S.D.N.Y. Mar. 8, 2021) .............................................................................14

*In re Alliance Pharm. Corp. Sec. Litig.*,
279 F. Supp. 2d 171 (S.D.N.Y. 2003)......................................................................................14

**Page**

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
    980 F. Supp. 2d 564 (S.D.N.Y. 2013)
    *aff'd*, 566 F. App'x 93 (2d Cir. 2014)....................................................................................15

*In re CannaVest Corp. Sec. Litig.*,
    307 F. Supp. 3d 222 (S.D.N.Y. 2018)....................................................................................9

*In re Facebook, Inc., IPO Secs. & Deriv. Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013)..................................................................................11

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    411 F. Supp. 2d 377 (S.D.N.Y. 2006)..................................................................................20

*In re Livent, Inc. Noteholders Sec. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001)..................................................................................18

*In re OSG Sec. Litig.*,
    971 F. Supp. 2d 387 (S.D.N.Y. 2013)..................................................................................20

*In re Ply Gem Holdings, Inc.*,
    2016 WL 5339541 (S.D.N.Y. Sept. 23, 2016)......................................................................13

*In re Stemline Therapeutics, Inc. Sec. Litig.*,
    313 F. Supp. 3d 543 (S.D.N.Y. 2018)..................................................................................14

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)..........................................................................................16, 21

*In re WRT Energy Sec. Litig.*,
    2005 WL 2088406 (S.D.N.Y. Aug. 30, 2005)......................................................................21

*Jaroslawiscz v. M&T Bank Corp.*,
    962 F.3d 701 (3d Cir. 2020)................................................................................................12

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011)................................................................................12, 18, 20

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)................................................................................................21

*Medina v. Tremor Video, Inc.*,
    640 Fed. App'x 45 (2d Cir. 2016)........................................................................................14

*Meyer v. Jinkosolar Holdings, Co., Ltd.*,
    761 F.3d 245 (2d Cir. 2014)................................................................................12, 18, 19

**Page**

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
    709 F.3d 109 (2d Cir. 2013)................................................................................9, 15

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
    2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020)............................................11, 12, 21

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007)...............................................................................10

*Rubenstein v. Credit Suisse Grp. AG*,
    457 F. Supp. 3d 289 (S.D.N.Y. 2020)...................................................................12

*SEC v. Manor Nursing Ctrs., Inc.*,
    458 F.2d 1082 (2d Cir. 1972)..............................................................................14

*SEC v. Mudd*,
    885 F. Supp. 2d 654 (S.D.N.Y. 2012)....................................................................9

*Setzer v. Omega Healthcare Invs., Inc.*,
    968 F.3d 204 (2d Cir. 2020)...............................................................................19

*Wagner v. Royal Bank of Scotland Grp. PLC*,
    2013 WL 4779039 (S.D.N.Y. Sept. 5, 2013)...........................................................10

*Yi Xiang v. Inovalon Holdings, Inc.*,
    254 F. Supp. 3d 635 (S.D.N.Y. 2017)...................................................................13

## STATUTES, RULES AND REGULATIONS

17 C.F.R.
    §229.303(a)(3)(ii)............................................................................................12
    §230.424(b)(3) ...............................................................................................14

Lead Plaintiff Gerald L. Kirkpatrick and named plaintiff Katherine Wandel ("Plaintiffs") respectfully submit this memorandum of law in opposition to the Underwriters' Motion to Dismiss Plaintiffs' Amended Complaint (*see* ECF Nos. 56-58).[1]

## I.    INTRODUCTION

As COVID-19 circulated in Wuhan, China in late 2019 and the opening weeks of 2020, most Americans remained oblivious to the limited reporting coming out of China and the effects the virus might have on global commerce, much less China.  For many Americans, it was not until March 2020 that they first understood the virus might affect the U.S. economy or their lives.  Even then, there was no way for them to predict the impact of the spreading virus on companies in China or elsewhere, with limited access to reliable information from the region.

For Chinese citizens, the experience with the emergence of COVID-19 was much different. China was scarred from a 2002 outbreak of severe acute respiratory syndrome, or "SARS," which infected more than 5,000 people in China, killed nearly 800 people, and impacted the Chinese and global economies.  So as reports of a new respiratory virus outbreak in Wuhan spread on Chinese-language WeChat and other social media in China in late 2019, a common thread quickly emerged: reference to the SARS epidemic.  For many, fear became panic as local authorities warned citizens not to gather in groups and China imposed stringent travel restrictions to stop spreading infection. By January 12, 2020, Wuhan's hospital respiratory wards neared capacity and authorities began to shut down local businesses.

---

[1]    All references to "¶__" are to the Amended Class Action Complaint for Violations of the Securities Act of 1933, dated January 15, 2021 (ECF No. 32) ("Complaint").  "Def. Mem." references the Memorandum of Law in Support of the Underwriters' Motion to Dismiss (ECF No. 57), and "Def. Ex." references exhibits to the Declaration of Adam J. Goldstein in support thereof (ECF Nos. 58, 58-1 - 58-25).  "Defendants" are: (i) Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, J.P. Morgan Securities LLC, Tiger Brokers (NZ) Limited, and US Tiger Securities, Inc. ("Underwriters"); and (ii) Cogency Global Inc. and Richard Arthur ("Cogency Defendants").  Cogency Defendants join in the Underwriters' motion (ECF Nos. 59-61), and Plaintiffs respond to their unique arguments in a separate memorandum of law, filed concurrently.  Citations and internal quotation marks are omitted unless noted.

With China under siege, Phoenix Tree Holdings Limited ("Phoenix" or the "Company"), a co-living apartment rental company with operations in Wuhan and other major Chinese cities, pressed forward with its January 17, 2020 U.S. initial public offering ("IPO"). For a company that relied on upfront rental payments and used technology to monitor the rental market, Phoenix and its IPO advisors were uniquely equipped to understand the impact of the virus and the precautions necessary to deal with the looming uncertainty of the situation. Defendants knew the Company was vulnerable to softening demand and fallout from COVID-19 based on developments in the recently-completed fourth quarter of 2019 ("Q4 2019"): occupancy rates had plummeted (due in part to marketing changes), and it was forced to return upfront rental payments (controversial even before the IPO) it relied on to run its business as lease terminations increased.

Despite this knowledge, the registration statement and prospectus issued in connection with the IPO ("Offering Materials") failed to disclose the immediate impact that the virus was having on Phoenix before the IPO and its drastic plans to conserve cash to weather the storm. In fact, the Offering Materials – amended just two days before becoming effective – only referenced *other* outbreaks in China and cautioned that *future* incidents "could require [Phoenix] employees to be quarantined and/or our offices to be disinfected." That generic warning, however, failed to alert investors to risks and uncertainties Phoenix was facing or its controversial plans to alter its operations to handle the situation. Without this information, investors were unable to assess or appreciate the risks and uncertainties Phoenix faced or accurately value the American Depositary Shares ("ADSs") sold in the IPO.

These undisclosed risks and uncertainties came to fruition after the IPO, requiring Phoenix to overhaul its operations in the face of mounting criticism, and eventually resulting in the delisting of its ADSs, which are now worthless. In fact, Phoenix is now in default in this action, leaving the Underwriters and Cogency Defendants to fend for themselves. Shifting the focus from what

they knew or could have readily learned, these Defendants insist that they could not have predicted that this SARS-like virus would become a "once-in-a-century pandemic."  But predictions were unnecessary to inform or even properly warn investors.

Rather, the well-pleaded allegations, taken as true at this stage, confirm that all Defendants had enough information (or access to information) about the situation in China to understand that renting co-living apartments in Wuhan and nearby cities exposed Phoenix to unique problems not shared by other companies.  Not only might the Company's employees stay home or offices require disinfection (as warned), but tenants could get sick, lose jobs, demand concessions, and terminate leases, and landlords could require the Company to remit payments throughout the whole ordeal and evict tenants if it did not.

As it turns out, this all came to pass – which investors could not have envisioned pre-IPO. Nor could they have expected Phoenix to raise rents for some tenants but suspend it for others or withhold payments from landlords, all of which drew criticism, protests by tenants and landlords, and regulatory scrutiny.  Post-IPO news of these issues drove down the trading price of the ADSs, which closed at $6.97 per share on April 24, 2020 when this case was filed, and even lower later. The market reaction to these developments forecloses Defendants' affirmative defense of negative causation because they cannot prove that the Complaint attributes these declines to other factors.

For all of these reasons and those below, the Court should deny this motion to dismiss.

## II.     STATEMENT OF FACTS

### A.      Phoenix Uses Upfront Rental Payments to Improve Apartment Units and Leverages Real-Time Data to Adjust to Changing Conditions

At the time of its IPO, Phoenix was one of the largest co-living platforms in China.  ¶33. Co-living platforms lease apartments from landlords on a long-term basis, improve or renovate the apartments to increase their attractiveness, and then rent private individual rooms under one-year

leases. ¶¶33-35. Residents share common areas such as the living room, kitchen, and bathroom. ¶36. Phoenix typically requires tenants to pay rent upfront, on an annual, semi-annual, or quarterly basis, and encourages (or in some cases, coerces or deceives) them into taking out long-term loans from its partner financial institutions to make advance payments. ¶¶44, 115-16; Def. Ex. 1 at 142. Lenders then remit the loan proceeds in lump sum payments to Phoenix, which it uses to improve apartments, and the residents repay the loan to the partner financial institution. ¶¶44, 137.

As of September 30, 2019, Phoenix operated in 13 cities in China and oversaw 406,746 apartment units, a number which grew to 438,309 by December 31, 2019. ¶36. It had a lengthy presence in many of China's largest population centers, launching in Beijing in 2015, expanding to Shenzhen and Shanghai in 2016, and commencing operations in Hangzhou, Tianjin, and Wuhan in 2017. ¶¶37, 107. Phoenix employed over 5,000 people; some worked in Wuhan, where it leased office and warehouse space. ¶¶3, 36, 66; Def. Ex. 1 at 144. Phoenix primarily generated revenues from rents and service fees. ¶40. As the Offering Materials reported, Phoenix initially experienced meteoric growth, with revenue increasing by more than 300% in 2018 and by nearly 200% for the nine months ended September 30, 2019. ¶41.

Phoenix attributed its success, in part, to its "big data platform," which utilized artificial intelligence and "continuously processe[d] and structurize[d] a massive amount of data to support, train and improve [its decision-making]." ¶45; *see also* Def. Ex. 1 at 3 ("[O]ur IT infrastructure digitizes our business operation and links all of our employees, property owners, residents and third-party service providers."). It also claimed to "possess[] a vast amount of internally-generated data from [its] day-to-day operations," which it leveraged to "monitor[ ] on a real-time basis [its] business performance and the competitive landscape in each neighborhood . . . ." ¶¶46-47.

**B.** **Phoenix Goes Public as COVID-19 Sweeps Through China, but Never Updates the Offering Materials to Reflect Risks and Uncertainties or Substantial Softening in Its Business in the Recently-Ended Q4 2019**

Phoenix's path to becoming a publicly-traded company in the U.S. began on August 28, 2019, when it filed a confidential draft registration statement and prospectus for the IPO with the SEC. ¶¶52-53. Defendants' legal advisors and auditors staffed personnel out of their Hong Kong offices, and the Company's auditor had an additional office in Wuhan. ¶¶11(a)-(b), 53.

On October 28, 2019, Phoenix publicly filed the draft Offering Materials. ¶55. Phoenix amended the Offering Materials on January 8, 2020 by adding a "Recent Developments" section and providing "selected unaudited financial data for October 2019 and certain operating data for October or November 2019." ¶56. That amendment noted Phoenix's fiscal year ended December 31, 2019 had "recently concluded." *Id.* On January 15, 2020, Phoenix filed its final amendment, but the "Recent Developments" section remained the same. ¶59. Despite this, increased lease terminations occurred in the recently completed Q4 2019, which required the Company to return $151 million in upfront rent payments. ¶¶106, 144. This amount represented a 79.3% increase from the average amount the Company had returned in each of the previous three quarters. ¶144.

On January 16, 2020, the SEC declared the Offering Materials effective. ¶63. The next day, January 17, 2020, the Company filed its final prospectus and commenced its IPO. ¶64. The IPO was completed on January 22, 2020, resulting in the sale of 9.6 million ADSs for net proceeds of approximately $128.4 million. ¶¶14, 34, 64. By then, however, COVID-19 was tearing through China, prompting alarming health warnings and quarantine protocols, stringent travel restrictions, and panic in China and other regions. ¶127. Nevertheless, Defendants did not update the Offering Materials to reflect the risks and uncertainties arising from COVID-19, Phoenix's emergency plans to stem revenue loss, ongoing complaints, or softening in the business during Q4 2019.

**C.      Reports of a SARS-Like Virus Leads to Widespread Fear and Panic in China, Requiring Stringent Health Protocols and Travel Restrictions Before Wuhan Is Placed on Lockdown the Day After the IPO Closes**

In late 2019, Chinese officials identified an outbreak of a pneumonia-like illness in Wuhan City, Hubei Province, which they traced to a local seafood market.  ¶67.  From the outset, the outbreak was likened to the 2002/2003 SARS epidemic which reportedly infected more than 5,000 people in China and had widespread effects globally.  ¶¶67, 124.

It is a matter of public record that SARS, much like COVID-19, is a respiratory coronavirus that reportedly originated in wet markets of Guangdong province before spreading to major cities. By the time the SARS crisis had abated, more than 800 people died and the world economy had suffered $40 billion in costs, while the Chinese economy's growth slowed significantly.  *See* ¶67. In the wake of the SARS epidemic, the Chinese government was widely criticized globally for its initial efforts to cover up the outbreak.  ¶124.

Given this history, news spread quickly in China about the new SARS-like outbreak.  ¶¶67 n.2, 126.  In view of the SARS cover-up, however, Chinese citizens did not rely solely on official accounts to understand the risks of a new pandemic.  *Id.*  Beginning in 2019, concerned residents took to social media for information.  ¶67 n.2.  A study of China's largest social media platform, WeChat, which had more than one billion active users, showed that use of COVID-19 symptom-related terminology in posts and searches significantly increased in late 2019.  *Id.*  Similarly, an analysis of searches emanating from Hubei province (where Wuhan is located) on Baidu, China's leading search engine, revealed that the use of similar keywords had also increased by then.  *Id.* These reports show that by December 2019, fear of a serious SARS-like outbreak was widespread and building, particularly in Wuhan and the surrounding regions.  ¶67 n.2; *see also* ¶126.

On December 30, 2019, Wuhan health authorities issued an "emergency notice" to medical institutions and a public briefing concerning the SARS-like outbreak, confirming 27 cases under

investigation and warning citizens not to gather in enclosed areas. ¶68. Two days later, on January 1, 2020, Chinese officials closed the Wuhan seafood market purportedly linked to the outbreak. ¶70. Within days, more than 50 cases of illness were identified in Wuhan, as Chinese authorities commenced a public education campaign on disease prevention and hygiene. *Id.*

On January 7, 2020, the U.S. Embassy in Beijing issued an advisory to travelers to or from Wuhan, warning of the outbreak. ¶81. By January 10, 2020, Chinese authorities had stationed personnel at airports and train stations across the region to evaluate travelers who visited Wuhan. ¶84. Government directives quickly required Wuhan businesses to shut down, including Kingold Jewelry, Inc., which halted its jewelry production operations on January 12, 2020. ¶85. By then, Wuhan's hospital respiratory wards were approaching maximum capacity. ¶86. The first reported confirmed case outside of China, 1,300 miles away in Thailand on January 13, 2020, removed any doubt that China was facing a budding pandemic. ¶87.

Memories of China's SARS outbreak also influenced Taiwan's and Hong Kong's response to the growing virus-related concerns. By December 31, 2019, Taiwan had already implemented monitoring protocols for travelers from Wuhan. ¶69. By January 3, 2020, Hong Kong authorities reported 44 cases and implemented heightened surveillance procedures. ¶¶72-74. Within days, Hong Kong and Taiwan amplified their travel guidance and quarantine practices while raising the threat level. ¶¶75-79. By January 9, 2020, Taiwan's inspection of flights to and from Wuhan were well underway. ¶83. Around this time, governmental authorities across Asia began implementing similar precautionary measures such as temperature checks and required reporting of symptomatic persons, to detect and curb the spread of the virus. ¶82.

Between the January 16, 2020 effective date of the Offering Materials and the January 22, 2020 close of the IPO, China and others intensified efforts to contain the virus, imposing drastic travel restrictions. ¶¶88-92. On January 17, 2020, Phoenix executives rang the opening bell on

the NYSE, which confirms that they complied with travel restrictions before the close of the IPO and the Offering Materials' effective date.  ¶27.  On January 22, 2020, news emerged that China would place Wuhan and its 11 million residents on lockdown the next day.  ¶93.  By January 30, 2020, China had expanded its travel ban to include 16 cities with 45 million residents.  ¶96.

> **D.    The Company's Post-IPO Disclosure of the Impact of the Coronavirus and the Reemergence of Renter and Landlord Complaints**

In the months that followed the IPO, Phoenix's business cratered as it reported declining occupancy, a reduction in pre-opening apartments, increases in operating expenses, a spike in returned rental payments, and the continuation of renter and landlord complaints.  *See* ¶¶98-102, 106, 111, 116-119.  The profound impact of the coronavirus on Phoenix's operations became clear to the public as early as February 2020, when Phoenix forced landlords to forgo rent payments for 30 days and pledged to return one month's rent to tenants in Wuhan and to offer rent reductions elsewhere.  ¶117.  Nevertheless, tenants continued to complain of Phoenix's deceptive practices, including steering tenants to procure loans without adequate disclosure and requiring large upfront payments without options to pay rent on a more frequent basis.  *Id.*  These practices – which were ongoing before the IPO – rendered Phoenix more vulnerable to losses in the ordinary course of its business as it struggled to deal with the reverberating fallout from the pre-IPO virus outbreak.  *Id.*

On April 29, 2020, Phoenix filed its Annual Report on Form 20-F for the year ended December 31, 2019, revealing the scope of the drastic and costly remediation measures it had taken in response to the pandemic: sourcing fewer apartments; negotiating lease terminations; offering rent waivers; and diverting cash to measures to contain the virus.  ¶107.  The Offering Materials did not mention these plans, even though by January 16, 2020, and certainly by January 22, 2020, Defendants had enough information to know that China – and Wuhan, in particular – was already under siege by the virus, and that Phoenix's business was suffering as a result.  ¶128.

## III.   ARGUMENT

### A.   Legal Standards Applicable to This Motion

"In considering a motion to dismiss[,] the court is to accept as true all facts alleged in the complaint, and must draw all reasonable inferences in favor of the plaintiff." *In re CannaVest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 235 (S.D.N.Y. 2018). The question is whether a claim is plausible and, therefore, "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The court only assess[es] the legal feasibility of the complaint; it does not assay the weight of the evidence which might be offered" later. *SEC v. Mudd*, 885 F. Supp. 2d 654, 660 (S.D.N.Y. 2012) (Crotty, J.).

The pleading standard for Securities Act claims is likewise "minimal": a plaintiff need only allege a material misstatement or omission. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983); *accord N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp.*, PLC, 709 F.3d 109, 120 (2d Cir. 2013). Issuer liability under Section 11 is "virtually absolute, even for innocent misstatements." *Herman*, 459 U.S. at 382. Scienter, reliance, and loss causation are not required. *N.J. Carpenters*, 709 F.3d at 120. "[T]his is an ordinary notice pleading case, subject only to the 'short and plain statement' requirements of [Rule] 8(a)." *Id.*

### B.   Defendants Cannot Advance an Alternative Narrative with Materials Outside of the Complaint, Such As Unalleged SEC Filings and Articles

In their motion, Defendants disregard the well-pled allegations of the Complaint – which must be credited at this stage – and instead introduce facts constructed from self-selected, outside sources. They use these extraneous materials to weave an alternative narrative that the SARS-like virus circulating in China before the IPO was not widely known at the time. Because those sources – articles and other companies' SEC filings – were not incorporated into the Complaint or relied on in drafting it, they cannot be considered now. *See City of Austin Police Ret. Sys. v. Kinross*

*Gold Corp.*, 957 F. Supp. 2d 277, 287 (S.D.N.Y. 2013) (refusing to consider disputed exhibits that were not "integral to, relied upon, attached to, or referenced in the [c]omplaint").

Nor may the Court consider these materials for their *truth* to establish what investors knew about the severity of the coronavirus virus before the IPO, or the cause of the decline in the trading price of the ADSs – the only conceivable reasons why Defendants cite them. *See Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007); *Wagner v. Royal Bank of Scotland Grp. PLC*, 2013 WL 4779039, at *3 (S.D.N.Y. Sept. 5, 2013). Rather, the Court should disregard or strike those exhibits and references in the briefing to them. *See City of Sterling Heights Police & Fire Ret. Sys. v. Kohl's Corp.*, 2015 WL 1478565, at *3-5 (E.D. Wis. Mar. 31, 2015) (striking SEC filings and article and references to such exhibits in brief and denying dismissal due to heavy reliance on those exhibits).

## C.    Plaintiffs Allege Actionable Misstatements and Omissions in Violation of Sections 11 and 12(a)(2) of the Securities Act of 1933

### 1.    Defendants Did Not Disclose Risks and Uncertainties Associated with the Onset of COVID-19 or Phoenix's Controversial Plans to Offset Its Foreseeable Business Losses

At the time of the IPO, the spread of a SARS-like virus was significant news in China and Wuhan, in particular. ¶¶67, 72, 74-75, 79-83, 85, 87, 126. Hospital respiratory wards in Wuhan neared capacity (¶¶86, 126); Wuhan residents were warned not to gather and Chinese authorities instituted a disease prevention campaign (¶¶68-70); Wuhan, Taiwan, and Hong Kong began to control travel and the U.S. Embassy issued travel advisories (¶¶69, 71-84, 87, 126); authorities in China screened for infection at transportation hubs (¶¶84, 87, 126); and Thailand confirmed that the virus had spread beyond China's borders (¶87). Government mandates also required some Wuhan manufacturing and retail businesses to close. ¶¶85, 126. It was thus reasonably foreseeable to Defendants, even before the IPO, that drastic measures might be necessary to mitigate the loss in business resulting from the spreading coronavirus. ¶4. Despite this, the Offering Materials

failed to disclose the looming pandemic and its potentially disastrous impact on the Company.

In the face of these undisputed facts, Defendants argue that they discharged their disclosure obligations through a generic warning in the Offering Materials about viruses and other maladies:

> Our business could also be adversely affected by the effects of Ebola virus disease, H1N1 flu, H7N9 flu, avian flu, Severe Acute Respiratory Syndrome, or SARS, or other epidemics. Our business operations could be disrupted if any of our employees is suspected of having Ebola virus disease, H1N1 flu, H7N9 flu, avian flu, SARS or another contagious disease or condition, since it could require our employees to be quarantined and/or our offices to be disinfected. In addition, our results of operations could be adversely affected to the extent that any of these epidemics harms the Chinese economy in general.

¶125; *see also* Def. Mem. at 16. Their position is without merit for at least three reasons.

*First,* hypothetically warning of the future adverse effect of other potential outbreaks failed to apprise investors of the *present* dangers related to COVID-19. By January 16, 2020, the virus was stoking the fears of Chinese citizens who remembered the government's response to the SARS epidemic. ¶¶124, 126. Since Phoenix understood that trouble was afoot *by the time of the IPO*, warning of possible future outbreaks could not "insulate from liability the failure to disclose that the risk ha[d] transpired." *In re Facebook, Inc., IPO Secs. & Deriv. Litig.*, 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013); *see also Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *12 (S.D.N.Y. Sept. 27, 2020) (holding warnings are insufficient if "framed as mere hypotheticals" which "imply that the risk" is "theoretical," when it "has already materialized").[2]

---

[2] Defendants cannot evade liability by improperly introducing facts outside of the pleadings to show what other issuers disclosed about COVID-19 and *when*. Def. Mem. at 9. Indeed, the securities laws do not countenance an "everyone is doing it" exception to disclosure. *See Esser Steel Algoma Inc. v. Nevada Holdings, Inc.*, 2020 WL 2539031, at *3 (S.D.N.Y. May 18, 2020). And even if the Court could accept these materials for their truth (it cannot), Defendants' examples are not analogous. Def. Mem. at 9. For instance, although Yunhong International was based in Wuhan, it was a "blank check" company with no operations that sought to acquire a business *outside of China*. *See* Def. Ex. 21 at cover page, 2. Phoenix, of course, rented residential apartments in Wuhan. Likewise, disclosures in Huize Holding Limited's registration statement emphasized that a health epidemic in Shenzhen would adversely affect its business because of its extensive operations there. *See* Def. Ex. 22 at 38-39. Phoenix failed to provide a similar disclosure. Lastly, there is no merit to Defendants' contention that they are relieved of their disclosure obligations because guidance from the Division of Corporation Finance regarding disclosures pertaining to COVID-19 was issued after the IPO. Def. Mem. at 10. Importantly, this guidance was "neither approved nor disapproved" by the SEC, did not "alter or amend applicable law," and was not cited in the Complaint. Def. Ex. 5 at 1; *see also* Def. Mem. at 10.

*Second*, this warning was limited to the potential impact on Phoenix's employees and offices and the Chinese economy at large.  Beyond quarantining employees or cleaning offices, Phoenix's business faced undisclosed material risks, such as tenants not paying rent or returning to apartments, landlords evicting tenants or refusing rent concessions, tenant loans drying up, upfront payments to Phoenix ceasing, and Phoenix being unable to source or renovate apartments.  ¶¶131-34.  The Offering Materials did not disclose these risks, nor those associated with actions Phoenix might take in a challenging environment.  After the IPO, however, Phoenix immediately implemented costly and controversial contingency plans that required planning far in advance, given their scope: it returned or froze rent for some tenants while raising rent for others and unilaterally suspended payments to landlords.  ¶¶103, 117-18.

*Third*, by speaking on fundamental aspects of Phoenix's operations and mentioning SARS, Defendants put the then-existing risk of the SARS-like outbreak – which was then threatening the business – "in play" and assumed a duty to speak completely to ensure the Offering Materials did not mislead.  *Meyer v. Jinkosolar Holdings, Co., Ltd.*, 761 F.3d 245, 250 n. 3 (2d Cir. 2014).  Under the rules governing the preparation of the Offering Materials, Defendants also had an affirmative obligation to disclose material risks and known trends and uncertainties that could materially affect the business.[3]  ¶¶146-156; *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718-19 (2d Cir. 2011)

---

[3]    "While Item 303 requires a description of 'any <u>known</u> trends or uncertainties' that are material, plaintiffs need not plead defendants' knowledge[,] as there is no scienter requirement in Section 11." *Jianpu*, 2020 WL 5757628, at *10 (quoting, *inter alia*, 17 C.F.R. §229.303(a)(3)(ii); emphasis by court).  Likewise, an alleged Item 105 violation is evaluated under the materiality standard and requires no allegation of knowledge at all.  *Id.* (considering predecessor to Item 105).  Defendants' reliance on *Rubenstein v. Credit Suisse Grp. AG*, 457 F. Supp. 3d 289, 300-01 (S.D.N.Y. 2020), does not establish that knowledge is required to plead an Item 105 violation.  Def. Mem. at 23.  In that case, unlike here, the plaintiffs *conceded* they had an obligation to plead knowledge and failed to plausibly do so.  Further, *Jaroslawiscz v. M&T Bank Corp.*, 962 F.3d 701 (3d Cir. 2020), is particularly unhelpful to Defendants. In that case, the court upheld an Item 105 violation where the risk to a merger was material and "triggered the need for disclosures," reasoning that defendant's "actual knowledge" of operational "shortcomings" which increased that risk "is of no moment[.]" *Id.* at 716.  Here, as in *Jaroslawiscz*, Plaintiffs plead an Item 105 violation because the Complaint "support[s] a reasonable inference that the omission of information related to these risks was material[.]" *Id.*

(requiring disclosure of how uncertainties, even of publicly known real estate trends, might affect revenues); *Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 644 (S.D.N.Y. 2017) (defendants were "not certain" of the future effect of a tax law change but were required to disclose how it might reasonably be expected to impact revenues); *In re Ply Gem Holdings, Inc.*, 2016 WL 5339541, at *5-6 (S.D.N.Y. Sept. 23, 2016) (disclosures were inadequate because they failed to "provide clarity on the extent of the expected effect" of the problem).

Here, Defendants failed to disclose material information about the virus as the situation worsened in China (and Wuhan specifically) and Phoenix's business softened, which presented risks and uncertainties that uniquely exposed the Company to losses which were then reasonably foreseeable to Defendants. Despite understanding how the virus might affect Phoenix, Defendants disclaim awareness of "the extent" to which it *would*. Def. Mem. at 13-14. Nowhere does the Complaint fault them for a lack of clairvoyance. Defendants were not required to precisely predict the virus's ultimate impact, but to forthrightly identify the particular risks and uncertainties posed by the then-circulating SARS-like virus and describe the contingency plans Phoenix had in place if the virus spread. *See Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 842 (S.D.N.Y. 2019) ("generic warnings about 'regional or country-specific business cycles'" were insufficient to warn about quarterly performance).

This case is nothing like *Berg v. Velocity Financial, Inc.*, 2021 WL 268250 (C.D. Cal. Jan. 25, 2021), which involved a U.S. mortgage company. Although that company went public around the time that Phoenix did, the similarities end there; that company had no exposure to China. *Id.* at *10 ("Plaintiff does not allege that Defendants would or could have known the extent of the coronavirus pandemic, or even the presence of the disease in America, at the time of the IPO"). Unlike many U.S. companies that understood the threat of COVID-19 only later, however, Phoenix was well aware of the threat the virus posed to its weakened business in light of its Q4 2019 results,

- 13 -

its plummeting occupancy rates, its reliance on upfront rental payments, and its use of technology to monitor the rental market.[4]  ¶¶4, 43-48, 115-16, 141-42.

### 2.    Defendants Failed to Update the Offering Materials with Risks Associated with the Rapidly Expanding COVID-19 Outbreak

As of January 16, 2020, Phoenix had yet to disclose any information regarding the risks or impacts of COVID-19 to its business, as it was required to do.  Between January 16 and 22, 2020, the situation intensified as the virus spread in China, prompting government action – including a warning to avoid Wuhan.  ¶127; *see also* ¶¶87-93, 159-61.  These developments further confirmed that the virus could, and in fact would, materially impact the business, as 11 million citizens faced a dramatic lockdown in Wuhan – occurring only one day after the IPO closed.  ¶¶93-94, 160-61.

While Section 11 liability is generally judged from a registration statement's effective date, SEC Rule 424(b)(3) requires a prospectus to disclose information that substantively differs from that set forth in earlier versions.  ¶159 (citing 17 C.F.R. §230.424(b)(3)); *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 183-85 (S.D.N.Y. 2003) (Section 12(a)(2) liability may arise based on deficient prospectus after registration statement is effective); *see also SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1095 (2d Cir. 1972) ("Post-effective developments which materially alter the picture presented in the registration statement must be brought to the attention of public investors.").  Yet Defendants failed to update the Offering Materials to apprise investors of dangers related to the virus's proliferation and the broad impact it would have on Phoenix's operations based on developments occurring between January 16 and 22, 2020.  ¶¶157-61.

---

[4]    Defendants' other authorities are inapposite.  In *In re Stemline Therapeutics, Inc. Sec. Litig.*, 313 F. Supp. 3d 543 (S.D.N.Y. 2018), a prospectus's incorporation of a statement (several years earlier) about a drug company's safety protocols was not misleading for failure to disclose a recent adverse drug reaction, because there was a clear warning that "the data in the incorporated documents were historical only." *Id.* at 549.  In *HEXO Corp. Sec. Litig.*, 2021 WL 878589, at *10 (S.D.N.Y. Mar. 8, 2021), a company had no duty to disclose a failure to satisfy a purchase commitment which had yet to occur.  In *Medina v. Tremor Video, Inc.*, 640 Fed. App'x 45, 49 (2d Cir. 2016), a trend toward certain pricing and increased ad buying "appeared unremarkable at the time" and only *later* led to material problems.

In an attempt to excuse their failure to update the Offering Materials, Defendants assert a premature truth-on-the-market defense, claiming that investors could learn of the pandemic and its implications from public reports.  Def. Mem. at 16-17.  Investors, however, had no obligation (or reason) to look outside of the Offering Materials for information that Phoenix and the other Defendants – its advisors – were supposed to provide.  *See Alpha Capital Anstalt v. New Generation Biofuels, Inc.*, 2014 WL 6466994, at \*9 (S.D.N.Y. Nov. 18, 2014) (characterizing as "an oversimplification of the law" the argument that defendants "had no duty to disclose . . . because the reports were accessible through the internet").

Nor can Defendants prove, at this juncture, that *any* information available to investors – much less public reports – would have sufficiently revealed the truth about the situation in China, and its specific implications for Phoenix, to preclude liability.  *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (noting truth-on-the-market defense requires that "corrective information" is conveyed with sufficient "intensity and credibility" to counter misrepresentations).  Accepting Defendants' self-serving contention that investors gleaned the truth from news snippets "would effectively shift the burden" on a fact-intensive affirmative defense that Defendants must plead and prove.  *See N.J. Carpenters*, 709 F.3d at 127 n.12; *cf. id.* at 127 (rejecting "the sweeping proposition that an issuer . . . is never required to disclose publicly available information").[5]

### 3. Defendants Failed to Disclose the Degree to Which Phoenix's Business Had Softened Before the IPO

The Offering Materials were also materially misleading because they failed to disclose the degree to which Phoenix's business had already softened in the recently completed Q4 2019, which rendered the Company especially vulnerable to the impact of COVID-19.  ¶¶4, 141; *DeMaria v.*

---

[5] By contrast, in *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576-77 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014), the "exact information" needed to evaluate the supposed undisclosed liability was "well within the public domain."

*Anderson*, 318 F.3d 170, 180 (2d Cir. 2003) (disclosure of interim financial information necessary to make other statements not misleading). Though the Offering Materials disclosed that Phoenix's occupancy rate had declined from 86.9% on September 30, 2019 to 77.9% on November 30, 2019 (¶¶43, 142), Phoenix misattributed this drop, stating that it was "primarily" due to "seasonality," as well as a change in sales and marketing strategy in Q4 2019. ¶¶43, 142.

In fact, the Offering Materials withheld a critical metric from Q4 2019 (and November 30, 2019) which would have revealed then-existing vulnerabilities in Phoenix's business: upfront payments returned to financial institutions for early lease terminations and defaults by tenants with financing agreements. ¶¶143-44. The actual undisclosed amount of returned payments for the recently completed Q4 2019 was $151 million, and $403.8 million for the entire year. ¶144. The Q4 2019 repayments were 37.4% of the entire amount Phoenix returned in 2019 and represented a 79.3% increase from the average amount the Company had returned in each of the previous three quarters. *Id.* The total 2019 repayments were even more remarkable since they *exceeded* total upfront payments Phoenix had received from financial institutions that year. ¶106.

Disclosure of Phoenix's Q4 2019 (and/or November 30, 2019) returned upfront payments was required to make the Offering Materials not misleading. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 251 (2d Cir. 2016) ("[A] reasonable investor could find Vivendi's [true] statements about high EBITDA growth misleading for omission to disclose Vivendi's liquidity risk."). Had Phoenix disclosed these metrics, investors would have known when they bought into the IPO that Phoenix's business was weakening as 2019 ended, just as the coronavirus was beginning to spread from Wuhan to other areas of China. ¶145; *see also* ¶¶42, 98-100 (alleging softening Q4 2019 business as reflected in the undisclosed decline in pre-opening units).

Defendants' response to these allegations – that repayments were not "known or knowable" – strains credulity. Def. Mem. at 21. Q4 2019 had already ended by the effective date of the IPO,

- 16 -

but Phoenix disclosed select financial results only through November 30, 2019. ¶¶141-43. While Defendants – the *underwriters* – query whether *Phoenix's* results were "sufficiently finalized and accurate" (Def. Mem. at 21), they cannot deny Phoenix knew (or could have known) it had returned $50 million per month to financial institutions during Q4 2019. ¶144; *see also* ¶¶45-48 (extolling real-time "big data platform" and information systems that recorded and tracked information).

Also without merit is the notion that the increase in Q4 2019 returned payments did not require disclosure because the percentage of residents who terminated leases or defaulted remained constant in Q4 2019. Def. Mem. at 22. *First*, Defendants were required to disclose the $151 million in payments that Phoenix *already* had returned to financial institutions. ¶144. *Second*, the increase in returned payments in Q4 2019 was not, as Defendants suggest, proportional to the 10% increase in rental units from 391,911 units on September 30, 2019 to 431,228 units on December 31, 2019.[6] *Id.*; ¶98. For this same reason, while investors may have been aware that returned payments, like number of rental units, "historically trended upwards," they were not informed that returned payments had spiked in the fourth quarter. Def. Mem. at 23.

### 4.    Defendants Failed to Disclose How Phoenix Had Changed Its Sales and Marketing Practices Prior to the IPO

The Offering Materials also misled investors about the condition of Phoenix's business by attributing the 9% decline in occupancy from September 30 to November 30, 2019 to seasonality and "the fact that [the Company] adjusted [its] sales and marketing strategies in the fourth quarter of 2019[.]" ¶43. In doing so, Phoenix also failed to disclose the relative significance of its sales

---

[6]    Phoenix's rental units increased 87% from 209,413 as of December 31, 2018, to 391,911 as of September 30, 2019, while returned payments barely increased from RMB1,757.1 million to RMB1,759.4 million in that period. ¶¶42, 106, 143; Def. Ex. 1 at 23. Assuming that returned payments remained constant (which is unreasonable, given changing circumstances), one could expect, at most, RMB2,345 million in returned payments for 2019 (RMB1,759.4 divided by three quarters, times four quarters). ¶143. Even in that scenario, returned payments – which were known to Phoenix, but not disclosed to investors – were 20% greater than anyone could expect, reflecting an undisclosed softening of the business. Of course, investors could make no such assumptions. And the 10% increase in units would be largely, if not completely, offset by the rapidly dropping percentage of tenants with financing arrangements.

and marketing changes and how they impacted occupancy.  ¶¶139, 142.  Investors were left unable to identify the principal reason for the occupancy drop or gauge the degree to which the change in sales and marketing might continue to harm Phoenix going forward.  ¶¶139-40, 145.  As a result, investors were taken by surprise when they later learned that Phoenix's occupancy rate had fallen to 76.7% on December 31, 2019, and then to 75.6% on March 31, 2020.  ¶113.

Defendants counter that they had no duty to disclose changes to the Company's sales and marketing practices and suggest, without support, that such changes would not have been material. Def. Mem. at 18-19.  But Defendants' oblique reference to sales and marketing changes – without detailing them – rendered their statements misleadingly incomplete.  *See* ¶¶139-40, 142; *Meyer*, 761 F.3d at 250 ("once a company speaks on an issue or topic, there is a duty to tell the whole truth").[7]  Indeed, Defendants had a duty to disclose not only these changes, but also "the manner in which [they] . . . might reasonably be expected to materially impact" Phoenix's future results. *See Litwin*, 634 F.3d at 718-19; *see also* ¶140.

Switching gears, Defendants argue that they, in fact, disclosed changes to these practices. Def. Mem. at. 19.  But their position once again conflicts with Plaintiffs' allegations.  The Offering Materials stated that sales and marketing expenses mainly consist of "advertising expenses, payroll costs for sales teams, incentives for apartment renting (including sales commissions generation fees paid to third parties), and other related expenses," but did not disclose the nature of *changes* to those *practices*.  ¶140.  Without disclosure of what those changes entailed and their potential effect on Phoenix, investors could not appreciate their import.  Whether the changes were advisable is irrelevant, and Phoenix's business judgment is not implicated here.  *Cf.* Def. Mem. at 18-19.

---

[7]      Invoking *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 441 (S.D.N.Y. 2001), Defendants claim they are not liable for failing to disclose information investors knew was omitted.  Def. Mem. at 19.  But, as alleged, investors were entirely unaware of what changes were made to the Company's marketing and sales practices.

**5.    Defendants Failed to Disclose the Existence and the Nature of Tenant Complaints at the Time of the IPO**

The Offering Materials favorably portrayed Phoenix's business, emphasizing its focus on residents and customer service while cautioning, in the most general way, that complaints made by residents and market rumors *could* adversely affect the Company's business and operations. ¶136.  By addressing these issues, Defendants put them "in play" and assumed a duty to disclose additional facts necessary to render their statements complete and not misleading.  *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020) (citing *Meyer*, 761 F.3d at 250).

The Offering Materials failed to disclose the tenant complaints concerning renter financing at the inception of leases, which was a critical aspect of Phoenix's business model.  *See* ¶¶115-20, 123, 136-38.  Tenants complained that Phoenix pressured or deceived them into taking out long-term loans so that the Company would receive upfront, lump sum payments to fund its operations. ¶¶115-16, 137-38.  These practices complicated lease terminations and refunds since tenants would be entitled to a refund of advance "rent" paid to the Company while often still being obligated to pay back the loan to Phoenix's partner financial institution.  ¶138.  Phoenix was subject to these complaints before the IPO (¶¶117, 123, 137), and these questionable practices – undisclosed in the Offering Materials – rendered Phoenix especially vulnerable to increased lease terminations in Q4 2019, softening demand for apartments, and the continuing fallout from coronavirus.[8]

In an attempt to excuse their failure to disclose these facts, Defendants argue that because all companies have "some customer complaints," these complaints were necessarily immaterial. Def. Mem. at 20.  But this argument disregards the nature and structure of Phoenix's business.

---

[8]    Defendants suggest that investors knew of customer dissatisfaction from a reported 70% of customers who would recommend Phoenix's services.  *See* Def. Mem. at 20.  But the survey underlying this number was completed prior to Q4 2019, did not seek to determine if tenants had complaints, and does not speak to a type of complaint that could threaten Phoenix's business.  In any event, Plaintiffs are not, as Defendants suggest, contending Phoenix had no customer complaints.  *See id*. at 19-20.

Phoenix generates revenue primarily from rents and service fees, funding operations with upfront payments in connection with rent financing to residents. ¶3. As a result, any reputational damage that could (and ultimately did) result from complaints was particularly threatening. These pre-IPO complaints, if disclosed, thus would have altered the total mix of information available to investors, because the complaints implicated a critical revenue source for Phoenix and presented risks and uncertainties for it. ¶¶44, 115-16, 137. Were Phoenix forced to alter its rental practices, its entire business model would be upended. ¶¶44, 115; *see Litwin*, 634 F.3d at 720 ("[O]ne factor affecting . . . materiality is whether the misstatement or omission relates to a segment that plays a 'significant role' in the registrant's business.").

### D. Defendants Have Not Established Their Negative Causation Defense Because They Cannot Show from the Face of the Complaint that the Allegations Themselves Negate Any Connection to the Claimed Loss

Because "loss causation is an affirmative defense to be proven by defendants, not a prima facie element to be proven by plaintiffs," the burden to prove negative loss causation is "heavy." *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 153 (2d Cir. 2017). They must prove that the Complaint *affirmatively pleads* facts negating any inference that exposure of the concealed facts or risks caused *any* decline in the security's value. *See In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 402 (S.D.N.Y. 2013) (defendants unable to refute that damages were causally connected to facts); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 411 F. Supp. 2d 377, 384 (S.D.N.Y. 2006) (defendants failed to show that "the decline was not due, *at least in part,* to the alleged misrepresentations").

Here, Defendants argue that loss causation is lacking because the trading price of the ADSs increased in the days following Phoenix's March 25, 2020 press release. Def. Mem. at 24-25. But the Complaint does not allege that. Instead, it chronicles adverse news in March 25 and June 10, 2020 press releases, the April 29, 2020 Form 20-F, and other disclosures. ¶¶97, 105, 111, 118-19,

- 20 -

122.  It also alleges that the trading price declined as undisclosed (or misrepresented) risks related to COVID-19 materialized after the IPO.  ¶122.

Because Defendants "cite[d] nothing in the pleadings establishing some reason other than the alleged misstatements . . . for the drop in the [ADSs'] value," *In re WRT Energy Sec. Litig.*, 2005 WL 2088406, at *2 (S.D.N.Y. Aug. 30, 2005), they failed to "prov[e] that the risk that caused the loss[es] was [not] within the zone of risk concealed by the misrepresentations and omissions." *Nomura*, 873 F.3d at 154; *see also Jianpu,* 2020 WL 5757628 at *16 (materialization of risk); *cf. Vivendi*, 838 F.3d at 262 (finding loss causation based on materialization of risk where "no specific corrective disclosure ever exposed the precise extent of Vivendi's alleged fraud").

### E. Because Plaintiffs Alleged Primary Violations of the Securities Act, the Control Person Claims Must Also Survive

Defendants' only basis for contesting control person liability is their position that Plaintiffs have failed to plead primary violations of the Securities Act.  Def. Mem. at 25.  Because, as shown above, Plaintiffs have adequately pled such violations, the control person claims must also survive.

## IV. CONCLUSION

For all of the foregoing reasons, the Court should deny the motion to dismiss.  If the Court dismisses any claim, however, Plaintiffs respectfully request a reasonable opportunity to amend.[9]

DATED:  July 1, 2021                                    ROBBINS GELLER RUDMAN
                                                                         & DOWD LLP
                                                                   SAMUEL H. RUDMAN
                                                                   JOSEPH RUSSELLO
                                                                   AVITAL O. MALINA


                                                                   */s/ Joseph Russello*
                                                                   JOSEPH RUSSELLO

---

[9]       As the Second Circuit has held, "it is the usual practice upon granting a motion to dismiss to allow leave to replead."  *See Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (reaffirming "liberal standard" of Rule 15 and recognizing that, "[w]ithout the **benefit of a ruling**, many a plaintiff will not . . . be in a position to weigh the practicality and possible means of curing specific deficiencies").

- 22 -

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
jrussello@rgrdlaw.com
amalina@rgrdlaw.com

JOHNSON FISTEL, LLP
RALPH M. STONE
1700 Broadway, 41st Floor
New York, NY  10019
Telephone:  212/292-5690
212/292-5680 (fax)
ralphs@johnsonfistel.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
Murray House
40 Powder Springs Street
Marietta, GA 30064
Telephone:  470/632-6000
770/200-3101
michaelf@johnsonfistel.com

*Lead Counsel for Plaintiffs*

- 23 -

## CERTIFICATE OF SERVICE

I, Joseph Russello, certify that on July 1, 2021, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel registered to receive such notice.

_/s/ Joseph Russello_
JOSEPH RUSSELLO