# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| _____ | X |  |
| KATHERINE WANDEL, Individually and on Behalf of All Others Similarly Situated, | : | Civil Action No. 1:20-cv-03259-PAC |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| vs. | : |  |
|  | : |  |
| JING GAO, DEREK BOYANG SHEN, YAN CUI, WENBIAO LI, ERHAI LIU, XIAN CHEN, WILLIAM WANG, GANG JI, EDWIN FUNG, JIANPING YE, JASON ZHENG ZHANG, CITIGROUP GLOBAL MARKETS INC., CREDIT SUISSE SECURITIES (USA) LLC, J.P. MORGAN SECURITIES LLC, TIGER BROKERS (NZ) LIMITED, US TIGER SECURITIES, INC., COGENCY GLOBAL INC., RICHARD ARTHUR and PHOENIX TREE HOLDINGS LIMITED, | : | |
|  | : |  |
| Defendants. | : |  |
| _____ | X |  |

## REPLY IN SUPPORT OF THE UNDERWRITERS'
## MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT............................................................................................................................2

    I.       PLAINTIFFS FAIL TO STATE A CLAIM BASED UPON INSUFFICIENT COVID-19 RISK DISCLOSURES...........................................................................2

          A.      Phoenix Tree Had No Duty to Specifically Reference COVID-19 in the Offering Materials.............................................................................................2

          B.      Plaintiffs Fail to Establish that Phoenix Tree Had a Duty to Update ..........5

          C.      Judicial Notice of News Articles Is Proper...................................................6

    II.      PLAINTIFFS FAIL TO STATE A CLAIM BASED ON SALES AND MARKETING CHANGES....................................................................................7

    III.    PLAINTIFFS FAIL TO STATE A CLAIM BASED ON SOFTENING OF PHOENIX TREE'S BUSINESS IN Q4 ..................................................................8

    IV.    PLAINTIFFS FAIL TO STATE A CLAIM BASED ON ALLEGED OMISSIONS OF CUSTOMER COMPLAINTS ....................................................9

    V.     PLAINTIFFS FAIL TO REBUT THE UNDERWRITERS' NEGATIVE CAUSATION DEFENSE.......................................................................................10

CONCLUSION.......................................................................................................................10

# TABLE OF AUTHORITIES

**Cases**                                                                       **Page(s)**

*In re Alliance Pharm. Corp. Sec. Litig.*,
279 F. Supp. 2d 171 (S.D.N.Y. 2003)...................................................................................5

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013)...............................................................................2, 3

*Barilli v. Sky Solar Holdings, Ltd.*,
389 F. Supp. 3d 232 (S.D.N.Y. 2019)..................................................................................6

*In re Carnival Corp. Sec. Litig.*,
2021 WL 2583113 (S.D. Fla. 2021) .....................................................................................3

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
957 F. Supp. 2d 277 (S.D.N.Y. 2013)...................................................................................7

*City of Sterling Heights Police & Fire Ret. Sys. v. Kohl's Corp.*,
2015 WL 1478565 (E.D. Wis. Mar. 31, 2015) .....................................................................7

*Condit v. Dunne*,
317 F. Supp. 2d 344 (S.D.N.Y. 2004)...................................................................................7

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)................................................................................................10

*Garber v. Legg Mason, Inc.*,
347 F. App'x 665 (2d Cir. 2009) ..........................................................................................6

*In re HEXO Corp. Sec. Litig.*,
2021 WL 878589 (S.D.N.Y. Mar. 8, 2021) ......................................................................4, 5

*I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*,
936 F.2d 759 (2d Cir.1991)...................................................................................................8

*Medina v. Tremor Video, Inc.*,
640 F. App'x 45 (2d Cir. 2016) .......................................................................................1, 6

*Meyer v. Jinkosolar Holdings Co.*
761 F.3d 245 (2d Cir. 2014)..................................................................................................8

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
538 F. Supp. 2d 662 (S.D.N.Y. 2008)...................................................................................2

*In re Proshares Tr. II Sec. Litig.*,
  2020 WL 71007 (S.D.N.Y. Jan. 3, 2020), *aff'd* 839 F. App'x 649 (2d Cir.
  2021) ....................................................................................................................5, 6

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007)....................................................................................7

*Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204 (2d Cir. 2020) ............................................9

*Stadnick v. Vivint Solar, Inc.*,
  861 F.3d 31 (2d Cir. 2017).....................................................................................9

*Staehr v. Hartford Fin. Servs. Group, Inc.*,
  547 F.3d 406 (2d Cir. 2008)....................................................................................7

*In re Stemline Therapeutics, Inc. Sec. Litig.*,
  313 F. Supp. 3d 543 (S.D.N.Y. 2018)....................................................................10

*In re TVIX Sec. Litig.*,
  25 F. Supp. 3d 444 (S.D.N.Y. 2014), *aff'd sub nom. Elite Aviation LLC v.
  Credit Suisse AG.,* 588 F. App'x 37 (2d Cir. 2014)..................................................6

*Wagner v. Royal Bank of Scotland Grp. PLC*,
  2013 WL 4779039 (S.D.N.Y. Sept. 5, 2013)...........................................................7

**Statutes and Regulations**

15 U.S.C. § 77a...........................................................................................................4

15 U.S.C. § 77k.......................................................................................................5, 9

15 U.S.C. § 77l............................................................................................................5

17 C.F.R. §230.424(b)(3).........................................................................................5, 6

The Underwriters respectfully submit this reply brief in support of their Motion to Dismiss Plaintiffs' Amended Complaint (the "Motion" or "Mot.").[1]

**PRELIMINARY STATEMENT**

Plaintiffs' Opposition attempts to rewrite the history of the early stages of the COVID-19 pandemic with the luxury of hindsight and the liberal use of hyperbole while urging the Court to ignore judicially noticeable facts indistinguishable from those upon which Plaintiffs themselves rely in their own Complaint.[2]  Plaintiffs cannot explain how their Complaint plausibly alleges that Phoenix Tree's executives knew or could have known as of January 16, 2020—when only *one* "likely" coronavirus-related death had been reported worldwide—that a smattering of possible infections from the then-unknown virus would metastasize into an unprecedented global pandemic.  Plaintiffs also fail to allege any facts to support an inference that Phoenix Tree's executives could have predicted the steps Phoenix Tree would be forced to take during the weeks and months to come in response to COVID-19—a task not even the WHO, the CDC, or the Chinese Government got right at the time. *See Medina v. Tremor Video, Inc.*, 640 F. App'x 45, 49 (2d Cir. 2016) ("[W]e cannot attribute to defendants, based on hindsight alone, knowledge that events that may well have appeared unremarkable at the time, were omens of future material problems.").

The Opposition similarly fails to support cogently Plaintiffs' other claims based on alleged omissions of details about otherwise disclosed changes to sales and marketing practices, unremarkable pre-IPO customer complaints, and selected financial metrics from the fiscal quarter that ended two weeks before the IPO.  The Court should dismiss the Complaint with prejudice.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion. Numbered exhibits are attached to the Declaration of Adam J. Goldstein in Support of the Motion [ECF No. 58], and lettered exhibits are attached to the Supplemental Declaration of Adam J. Goldstein filed concurrently herewith.

[2] As explained in the Underwriters' Motion, it falls to the Underwriters to provide the substantive bases for dismissal because Phoenix Tree has not appeared to defend this action.

1

## ARGUMENT

**I.    Plaintiffs Fail to State a Claim Based Upon Insufficient COVID-19 Risk Disclosures**

**A.    Phoenix Tree Had No Duty to Specifically Reference COVID-19 in the Offering Materials**

Plaintiffs do not dispute that their claim based on Phoenix Tree's alleged failure to disclose specific risks from COVID-19 is actionable *only if those risks were known or knowable* as of January 16, 2020, when the Offering Materials were declared effective. *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013).  Critically, the test here is not whether there was a general awareness of COVID-19, but whether Plaintiffs plausibly allege that Phoenix Tree was aware that COVID-19 posed specific, material risks to its business at that time. *See Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008). Plaintiffs argue the Complaint meets this standard by referencing contemporaneous media reports and a post-hoc analysis of Chinese social media activity. (Opp. 10.)  However, when the Offering Materials became effective:

- There were only 62 reported COVID-19 cases in Wuhan, a city of roughly 11 million people, (AC ¶¶ 89, 93), and just a single confirmed case in each of Japan and Thailand, which in both cases could be traced to travelers from Wuhan (AC ¶ 87);

- Wuhan municipal authorities had announced only a *single* death attributed to COVID-19, (Mot. 6 (citing Ex. 12)), and the official death count rose to a total of *two people* by the time Plaintiffs purchased the ADS the following day (*see* Mot. 8 (citing Ex. 17)); and

- Wuhan was just one of 13 Chinese cities in which Phoenix Tree did business, accounting for approximately 12% of Phoenix Tree's managed apartment units. (AC ¶ 3; Ex. 1 at 128.)

(*See also* Mot. 5-6, 14 (describing situation as of January 16, 2020).)

Plaintiffs argue in a conclusory fashion that "Chinese citizens," presumably including Phoenix Tree, somehow knew "trouble was afoot *by the time of the IPO*" because of China's earlier experience with SARS. (Opp. 1, 11.)  But the risk of a coronavirus outbreak similar to SARS *was disclosed* in the Offering Materials. (Mot. 6-7.)  Accordingly, if Plaintiffs are correct that Phoenix

Tree should have known that "trouble was afoot" based on historical parallels to SARS, they cannot simultaneously claim that the coronavirus risk disclosure was inadequate because it referred to a possible SARS-like epidemic and not the purportedly "afoot" novel coronavirus outbreak. *See Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. at 579 ("[D]isclosure that is broad enough to cover a specific risk . . . is not misleading just because it fails to discuss the specific risk.").

Indeed, Plaintiffs fail to identify any facts that would have suggested to Phoenix Tree at the time of the IPO that COVID-19 would cause anywhere near the comparatively modest (in hindsight) damage inflicted by the 2002 SARS outbreak. (AC ¶ 67.)  At most, Plaintiffs point to travel advisories and more extensive screening of travelers to and from Wuhan, and temporary closures of a clothing store and a jewelry factory in Wuhan. (Opp. 10.)  What is required (but missing) are plausible allegations as to how these events signaled anything other than a public strategy to contain the disease based on historical experience with SARS.  And nothing about these early counter-measures suggests Phoenix Tree was *uniquely* positioned to know how severe COVID-19 would become, much less the unprecedented response that ultimately would be required. *See In re Carnival Corp. Sec. Litig.*, 2021 WL 2583113, at *11 (S.D. Fla. May 28, 2021) (plaintiffs failed to allege how defendant had any more insight as to the impact of COVID-19 than the average person, whether in the U.S. or abroad, despite defendant's alleged presence in Wuhan).

To suggest otherwise, Plaintiffs rely heavily on a "novel" research study published in *October* 2020 that sought to analyze *in hindsight* whether monitoring Chinese social media posts or search engine keyword data for symptom-related terminology might have allowed earlier detection of COVID-19.[3]  But Phoenix Tree's failure in the weeks leading up to the IPO to

---

[3] Notably, the researchers that conducted the study characterized their analysis of WeChat indices for observable increases in the use of keywords such as "Feidian", "SARS", "shortness of breath", "dyspnea", and "diarrhea" as "a novel approach" to early warning and detection of diseases.  The study's authors also acknowledged its "main limitation" is its "retrospective nature." (Ex. A (WeChat Study) at 7.)

3

*prospectively* adopt the admittedly "novel approach" of monitoring WeChat keyword indices for increased use of specific SARS-related terms (that one could only know to look for *with the benefit of hindsight*) cannot be the keystone of an omission claim under the Securities Act.  Nor can the hindsight-driven analysis of everything on WeChat demonstrate what any individual—who may or may not have been on WeChat—perceived at the time.  To this end, Plaintiffs' decision to feature an obscure and novel study so prominently in the Complaint and Opposition would make a rather strange choice if, as they allege, the markers of an emerging outbreak were so visible as of January 16, 2020.[4]

Moreover, Plaintiffs' argument that the Offering Materials failed to capture specific risks to Phoenix Tree's business posed by COVID-19, such as tenant rent payment delinquencies and the growing unavailability of tenant loan arrangements that Phoenix Tree relied on as a source of working and growth capital, is demonstratively false. (Opp. 12.)  The specific impacts identified by Plaintiffs were not caused solely by the disease itself but by the larger economic fallout in China wrought by the pandemic.  That interplay between an epidemic and the Chinese economy—as well as the risks from a Chinese economic contraction—***was*** disclosed.  (Ex. 1 at 36, 44.)

Plaintiffs' contention that the Offering Materials failed to disclose risks associated with the actions Phoenix Tree took to try to stem the bleeding as the pandemic unfolded similarly fails. (Opp. 12.)  That claim makes no sense unless Phoenix Tree actually had a "contingency plan" on January 16, 2020 or knew at the time that the damage to the Chinese economy from COVID-19 would necessitate such drastic measures. *See In re HEXO Corp. Sec. Litig.*, 2021 WL 878589, at

---

[4] Similarly, Plaintiffs' reference to local hospital respiratory wards reaching capacity by the time of the IPO is not based on contemporaneous public reporting but instead on a finding contained in a study published well after the IPO—in June 2020—by a team of researchers from Harvard who, based on their review of satellite imagery from parking lots of Wuhan hospitals, observed higher levels of hospital visitors beginning in August 2019, months before the first documented case of novel coronavirus.  (AC ¶¶ 86, 126.)

*9 (S.D.N.Y. Mar. 8, 2021) (plaintiffs failed to allege "any particular facts indicating that the [company] knew at the time of the IPO that [it] would later exercise their business judgment"). Plaintiffs allege nothing of the sort, and their claim that Phoenix Tree's post-IPO reaction to COVID-19 must have been planned "far in advance" is *ipse dixit* and contrary to common sense.[5]

### B.    Plaintiffs Fail to Establish that Phoenix Tree Had a Duty to Update

Plaintiffs essentially concede Section 11 liability must be adjudged based on the facts as they existed when the Registration Statement became effective on January 16, 2020. (Opp. 14.) However, Plaintiffs argue that SEC Rule 424(b)(3) required Phoenix Tree to update the *Prospectus* with the newest coronavirus-related headlines through January 22, 2020—the closing date of the IPO—and suggest Plaintiffs can pursue a Section 12(a)(2) claim against the Underwriters based on Phoenix Tree's alleged failure to do so. (*Id.*)  This argument fails for at least three reasons.

*First*, Plaintiffs' claims fail because the relevant date for assessing the disclosures in a prospectus is the "time of purchase," *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 186 (S.D.N.Y. 2003), and both Plaintiffs allege that they purchased their ADS on January 17, 2020. (AC ¶ 13.)

*Second*, Plaintiffs fail to plausibly establish that any of the developments that occurred before January 22, 2020 put Phoenix Tree in any better position to meaningfully appreciate the risks to its business posed by the further spread of COVID-19 other than what the Offering Materials already warned investors about, including the impact of any potential epidemic and economic downturn. *See In re Proshares Tr. II Sec. Litig.*, 2020 WL 71007, at *8 (S.D.N.Y. Jan. 3, 2020), *aff'd*, 839 F. App'x 649 (2d Cir. 2021) (no duty to update where registration statement

---

[5] Plaintiffs characterize Phoenix Tree's actions in response to the pandemic as uneven and ill-conceived—*e.g.*, "rais[ing] rent for some residents in the midst of an outbreak then afflicting Wuhan" (AC ¶ 132) and "unilaterally suspend[ing] payments to landlords" (Opp. at 12)—which suggests *a lack of* advance planning.

already disclosed what plaintiffs alleged was omitted); *In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 452-53 (S.D.N.Y. 2014) (no duty to update risk disclosures to make more specific when the "fundamental" nature of the risk was already disclosed).  Instead, Plaintiffs' allegations merely describe publicly reported information, which Phoenix Tree had no special obligation to disclose or, if disclosed by Phoenix Tree, would not have changed the mix of information available to investors. *See Tremor Video,* 640 F. App'x at 49 ("The proposed second amended complaint does not state facts from which we can infer that defendants knew of the existence or impact of any uncertainty or trend that the rest of the world did not know, and that therefore should have been disclosed."); *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 254 (S.D.N.Y. 2019) ("no duty to disclose information that is within the public domain through publication in the news media").[6]

*Finally*, although Plaintiffs purport to draw a "duty to update" from SEC Rule 424(b)(3), they cite no legal authority, and the Rule itself does not impose such a duty.  Rather, SEC Rule 424(b)(3) merely requires an issuer to file an amended prospectus by a specific date when the issuer makes substantive changes from a previously-approved version. 17 C.F.R. §230.424(b)(3).

### C.    Judicial Notice of News Articles Is Proper

The Underwriters ask this Court to take judicial notice of certain news reports not for the truth of their contents, but because they reflect the scope of information about COVID-19 in the public domain around the time of the IPO.  Courts in this Circuit routinely take judicial notice of newspaper articles and SEC filings for this very purpose. *See, e.g.*, *Garber v. Legg Mason, Inc.*,

---

[6] Contrary to Plaintiffs' argument, the Underwriters have not asserted a "truth on the market" defense. (Opp. 15.) Such a defense would excuse Phoenix Tree's non-disclosure of information it was required to disclose.  Instead, the Underwriters argue that Phoenix Tree had no duty to "apprise investors of dangers related to the virus's proliferation" in the absence of any well-pleaded facts alleging that Phoenix Tree had more extensive knowledge of those dangers than could be gleaned from widely circulated news media. (*Id*. 14.)

347 F. App'x 665, 669 (2d Cir. 2009) (court may take judicial notice of newspaper articles); *Staehr v. Hartford Fin. Servs. Grp, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (same); *Condit v. Dunne*, 317 F. Supp. 2d 344, 356-57 (S.D.N.Y. 2004) (same).  The cases cited by Plaintiffs do not hold otherwise.  For example, in *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, the court declined to take judicial notice of cost increases gold miners experienced during 2011, holding that the occurrence of such industry-specific cost increases "was not a well-publicized fact of which an average investor would be aware" as opposed to the "widely-known and typically market-wide events" of which courts routinely take judicial notice.[7] 957 F. Supp. 2d 277, 288 (S.D.N.Y. 2013).  Plaintiffs have no basis to oppose judicial notice by arguing that the content of front-page news concerning the supposedly then-burgeoning COVID-19 pandemic was not widely known— particularly while simultaneously basing their allegations that Phoenix Tree knew or should have known about COVID-19 risks on the same types of sources (if not more obscure ones).

## II.    Plaintiffs Fail to State a Claim Based on Sales and Marketing Changes

Phoenix Tree disclosed in the Offering Materials that it made changes to its sales and marketing strategy, as well as its belief that those changes were in part responsible for a decline in occupancy during the first two months of Q4 2019. (Mot. 18.)  Plaintiffs claim those disclosures were "misleadingly incomplete," but do not identify anything false or misleading about them.  Instead, Plaintiffs' gripe is that Phoenix Tree should have disclosed more detail about what specific changes were made.  But Plaintiffs do not identify a single case requiring an issuer to detail changes (unspecified by Plaintiffs) to its sales and marketing practices in its SEC filings.  And *Meyer v.*

---

[7] In two cases cited by Plaintiffs, the court acknowledged outside documents may be considered if they are "integral to the Plaintiffs' allegations even if not explicitly incorporated by reference." *Wagner v. Royal Bank of Scotland Grp. PLC*, 2013 WL 4779039, at *2 (S.D.N.Y. Sept. 5, 2013); *see also Roth v. Jennings*, 489 F.3d 499, 508 (2d Cir. 2007). Here, Plaintiffs themselves rely on uncited media reports to substantiate their allegations.  The unpublished, out-of-circuit opinion Plaintiffs cite from is irrelevant because it merely held that a court should not take judicial notice of a single news article to establish the cause of a stock market decline. *See City of Sterling Heights Police & Fire Ret. Sys. v. Kohl's Corp.*, 2015 WL 1478565, at *3-5 (E.D. Wis. Mar. 31, 2015).

*Jinkosolar Holdings Co.,* upon which Plaintiffs rely (Opp. 18), did not hold that a company has a duty to disclose every detail on a topic whenever it "speaks on" a topic. 761 F.3d 245, 250-52 (2d Cir. 2014). That case merely reaffirmed the uncontroversial proposition that a company must disclose enough information on any topic so that the statements actually made concerning such topic are not misleading. Phoenix Tree disclosed that there had been changes to its sales and marketing practices that were negatively impacting occupancy rates. Nothing more was required. *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991) (disclosures must "steer a middle course [and not] submerg[e] a material fact in a flood of collateral data.").

**III.    Plaintiffs Fail to State a Claim Based on Softening of Phoenix Tree's Business in Q4**

The Opposition also lays bare Plaintiffs' failed attempt to state a claim based on Phoenix Tree's alleged failure to disclose softening in its business during Q4 2019, the fiscal quarter that closed just before the IPO. Plaintiffs concede that Phoenix Tree fully disclosed data from Q4 2019 evidencing softening in its business—specifically, that its occupancy rate had dropped from 89% to 87% during Q3 2019, and then down to 77.9% during the first two months of Q4 2019. (Opp. 16, Ex. 1 at 4.) Although Plaintiffs claim that disclosure of reduced demand for Phoenix Tree's services was itself misleading because the cause of the drop was "misattributed," (Opp. 16), Plaintiffs do not specify what the purportedly "true cause" was and thus do not state a claim.

Plaintiffs next argue that it was not enough to disclose the drop in occupancy; Phoenix Tree also had to disclose the amount of total upfront rent payments returned to financial institutions through at least November 30, 2019 (as opposed to through September 30, 2019, which was disclosed), amounts that were reported in accordance with Phoenix Tree's regular reporting schedule. (*Id.* 15.) But Plaintiffs' own arguments establish that this would have been cumulative of the reduced occupancy rate because the claimed significance of the returned upfront payments figure, according to Plaintiffs, was how it reflected that "Phoenix's business had already softened

8

in the recently completed Q4 2019." (*Id.*); *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017) (dismissing Section 11 claims and finding that "a reasonable investor would not consider the omission of the third-quarter results to be material").  Moreover, the omission of the unofficial figure for Q4 2019 was not misleading.  Plaintiffs themselves point to Phoenix Tree's disclosures that the total amount of returned payments during the first nine months of 2019 exceeded the total amount of returned payments for *all of 2018*. (Opp. 17 n.6.)  Plaintiffs cannot seriously claim that reasonable investors would not have expected the 2019 totals to exceed the 2018 totals by an even greater amount once Q4 2019 returned payments were reported.

**IV.     Plaintiffs Fail to State a Claim Based on Alleged Omissions of Customer Complaints**

Plaintiffs cannot point to any statement by Phoenix Tree that it had no customer complaints.[8]  Indeed, Phoenix Tree disclosed a 70% customer satisfaction rate, as well as risks associated with potential customer complaints. (Mot. 20.)  To argue the Complaint nevertheless states a claim based on a failure to disclose pre-IPO customer complaints, Plaintiffs rely on a post-IPO *increase* in complaints that occurred in response to the steps Phoenix Tree took to deal with the effects of the pandemic. (Opp. 19.)  To the extent the Complaint even attempts to allege the existence of customer complaints contemporaneous with the IPO, the allegations are entirely conclusory. (*See*, *e.g.*, AC ¶ 117 ("…before the IPO, Phoenix Tree was the subject of complaints about these practices…."); *see also* Mot. 20.)

Plaintiffs' pivot to arguing that the *nature*—as opposed to the volume—of the complaints was material similarly falls short. (Opp. 19-20.)  Plaintiffs argue essentially that Phoenix Tree was

---

[8] Plaintiffs' contention that Phoenix Tree's risk disclosures concerning *potential* customer complaints required Phoenix Tree to disclose any and all facts related to existing customer complaints is baseless.  Plaintiffs selectively quote from *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204 (2d Cir. 2020) to support their "in play" theory (*see* Opp. 19), but in that case, the Second Circuit explained that the duty to speak completely on a topic does not require disclosure of "all the facts that pertain to a subject . . . but instead [describes] a duty not to omit material facts whose omission, in the light of what was stated, would be misleading." *Id.* at 214 n.15.

9

required to disclose even a small volume of pre-IPO tenant complaints because they concerned a "critical revenue source," *i.e.*, Phoenix Tree's (fully disclosed) practice of requiring tenants to prepay up to a full year of rent at lease inception by steering them towards particular financing arrangements. (*Id*. 19.)  The risks from refund-related complications were disclosed in the Offering Documents. (Ex. 1 at 27, 31-32.)[9]

## V.       Plaintiffs Fail to Rebut the Underwriters' Negative Causation Defense.

The Underwriters are also entitled to dismissal on grounds of negative causation.  Plaintiffs allege that Phoenix Tree's March 25, 2020 press release contained full financial results from Q4 2019 and disclosed to investors that its financial results for the quarter in progress (Q1 2020) would be negatively impacted, including by COVID-19. (AC ¶¶ 6, 97-104.)  And yet, the price of Phoenix Tree's ADS *rose* immediately after the purported "truth" was revealed. (Mot. 25.)  There is thus no need to "negat[e] any inference that exposure of the [allegedly] concealed facts or risks caused *any* decline in the security's value" (Opp. 20) because there was no decline in the wake of that so-called "exposure."  Nor is it necessary to wait for summary judgment because this Court can take judicial notice of Phoenix Tree's stock prices whether they are pleaded in the Complaint or not.[10]

### <u>CONCLUSION</u>

For the foregoing reasons and for those set forth in the Motion, the Underwriters respectfully request that this Court dismiss the Complaint with prejudice.[11]

---

[9] The Offering Materials disclosed that: (i) the percentage of tenants with rent financing had already decreased from 91.3% at the end of 2017 to 67.9% as of September 30, 2019, even as the number of apartments managed by Phoenix Tree increased almost eight-fold during that time (Ex. 1 at 1, 27); and (ii) Phoenix Tree planned to reduce the amounts received through rent financing to less than 30% of total rental income by the end of 2021 (*Id.* at 27.).

[10] *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000); *In re Stemline Therapeutics, Inc. Sec. Litig.*, 313 F. Supp. 3d 543, 547 n.3 (S.D.N.Y. 2018) (Crotty, J.).

[11] Plaintiffs suggest that the Court should grant leave to amend if it dismisses the Complaint.  The Underwriters respectfully submit that no amendment could possibly solve the Complaint's fundamental flaw of requiring Phoenix Tree to make disclosures in mid-January 2020 with a level of foresight about the pandemic that even the world's leading epidemiologists lacked at that time.

10

New York, New York
August 2, 2021

SHEARMAN & STERLING LLP

By:    */s/  Daniel Lewis*
       Adam S. Hakki
       Daniel Lewis
       Adam J. Goldstein
       SHEARMAN & STERLING LLP
       599 Lexington Avenue
       New York, New York 10022-6069
       Telephone:  (212) 848-4000
       Facsimile:  (212) 848-7179
       Email:  adam.hakki@shearman.com
              daniel.lewis@shearman.com
              adam.goldstein@shearman.com

       *Attorneys for Underwriters*